UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 22-4952-GW-ASx | Date | February 10, 2023 |
|---|---|---|---|
| Title | *Jane Doe v. Calvin Broadus, et al.* | | |

| Present: The Honorable | GEORGE H. WU, UNITED STATES DISTRICT JUDGE | |
|---|---|---|
| Javier Gonzalez | None Present | N/A |
| Deputy Clerk | Court Reporter / Recorder | Tape No. |

| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
|---|---|
| None Present | None Present |

**PROCEEDINGS:** IN CHAMBERS - TENTATIVE RULING ON PLAINTIFF'S MOTION FOR ADJOURNMENT AND LEAVE TO FILE A SUPPLEMENTAL BRIEFING/AFFIRMATION OF LAW IN LIGHT OF, AND TO HAVE THE COURT TAKE JUDICIAL NOTICE OF, RECENT CHANGES IN THE LAW [25]; DEFENDANT CALVIN BROADUS'S MOTION TO DISMISS PLAINTIFF'S COMPLAINT [13]; DEFENDANT DONALD CAMPBELL'S MOTION TO DISMISS PLAINTIFF'S COMPLAINT [15]

Attached hereto is the Court's Tentative Ruling on above-entitled Motions [13][15][25] set for hearing on February 13, 2023 at 8:30 a.m.

: 

Initials of Preparer   JG

*<u>Doe v. Broadus, et al.</u>*, Case No. 2:22-cv-4952-GW-(ASx)
Tentative Ruling on: (1) Defendant Calvin Broadus a/k/a "Snoop Dogg"'s Motion to Dismiss, (2) Defendant Donald Campbell's Motion to Dismiss, and (3) Plaintiff Jane Doe's Motion for Adjournment and Leave to File a Supplemental Briefing/Affirmation of Law in Light of, and to Have the Court Take Judicial Notice of, Recent Changes in the Law

## I. <u>Introduction</u>

Defendants Calvin Broadus a/k/a "Snoop Dogg" ("Broadus") and Donald Campbell a/k/a "Bishop Don Magic Juan" ("Campbell" and, together with Broadus, "Defendants") separately move to dismiss the Complaint for Monetary and Punitive Damages ("Complaint") filed by plaintiff Jane Doe ("Plaintiff") on July 20, 2022. The Complaint contains eleven causes of action: 1) violation of the Trafficking Victims Protection Act, 18 U.S.C. § 1591 ("TVPA"); 2) conspiracy in violation of 18 U.S. Code § 1594; 3) sexual battery; 4) sexual assault; 5) violation of the Tom Bane Civil Rights Act; 6) defamation; 7) false light; 8) intentional infliction of emotional distress; 9) negligent infliction of emotional distress; 10) unlawful retaliation in violation of California Labor Code § 1102.5; and 11) harassment, aiding, and abetting in violation of California Government Code §§ 12940 et seq. The first four claims are pled against both Defendants, with claims five through eleven pled only against Broadus.

Though the motions address all of Plaintiff's claims, at this time the Court focuses *only* on the factual allegations relevant to Plaintiff's claims under the TVPA, and will analyze *only* those claims herein because a dismissal of those claims would lead the Court to decline supplemental jurisdiction over Plaintiff's remaining state claims pursuant to 28 U.S.C. § 1367(c)(3). If the Court concludes that a final dismissal is *not* warranted, or that leave to amend is appropriate,[1] the Court will then separately examine Plaintiff's remaining claims, keeping that analysis distinct at least in part because the landscape relevant to statute of limitations-based arguments as to some of those claims has altered since the time the instant motion was fully briefed due to a recent change in

---

[1] Given that this is Plaintiff's *second* lawsuit raising these allegations, *see Doe v. Broadus*, No. 2:22-cv-00900-GW-AS, and that she already filed two versions of her complaint in her earlier action, we are certainly nearing the end of the road for giving Plaintiff opportunities to amend, if we are not already there.

California law.[2]

## II. The Complaint's Allegations

The allegations in the Complaint relevant to Plaintiff's TVPA claims reveal the following[3]:

Broadus is a rapper and is the owner, agent, officer, and proxy for many businesses, corporations, and entities which include the ownership and production of music, videos, media, shows, and concerts. *See* Complaint ¶¶ 16, 18. He has created, produced, broadcast, and profited from a web video series uploaded to Youtube.com called *GGN: Snoop Dogg's Double G News Network* ("GGN"). *See id.* ¶ 19. "Weather girls" – typically models – play well-known roles on GGN, usually scantily-dressed or in bikinis, dancing as they describe the weather. *See id.* ¶ 72. Defendants profited from GGN, receiving revenue from millions of worldwide viewers. *See id.* ¶¶ 75, 78, 87, 141, 145. In particular, the Complaint alleges that weather girls generate revenue and viewership for Broadus, while simultaneously providing a potential source of income, exposure, and career advancement for women like Plaintiff. *See id.*

Plaintiff asserts that Campbell "was and has been [Broadus's] 'Spiritual Advisor,' employee, agent, representative, and servant," *id.* ¶ 10, with the Complaint also including other boilerplate, conclusory agency allegations as well, *see id.* ¶¶ 12, 22, 24. The Complaint also conclusorily asserts that Campbell, as Broadus's agent, "engaged in and conspired in a common scheme and enterprise of recruiting, enticing, providing, transporting, soliciting, and forcing Plaintiff and individuals similarly situated to Plaintiff, with the intent that Plaintiff engage in sexual activities" with Defendants "in exchange for access to employment with Defendants." *See id.* ¶ 24; *see also id.* ¶¶ 47, 62, 78, 85, 160-161. Similarly, Plaintiff asserts that Defendants "were aware of,

---

[2] Plaintiff has, in fact, filed her own motion set for this same day, a "Motion for Adjournment and Leave to File a Supplemental Briefing/Affirmation of Law in Light of, and to Have the Court Take Judicial Notice of, Recent Changes in the Law." Given the tenor of that motion, the Court believes that the parties may want an opportunity to provide further briefing relevant to Plaintiff's sexual battery and sexual assault claims, and will inquire with the parties accordingly if it determines – following consideration of Defendants' motions as to Plaintiff's TVPA claims – that Plaintiff's state law claims will remain in this case (at least for now).

[3] As discussed below, where allegations are factual, the Court must accept them as true for purposes of Defendants' motion. Where conclusory, however, that is not required. This "Alleged Factual Background" section at times makes clear where the Court believes certain allegations are conclusory.

2

encouraged, and allowed each other to engage in, use, and profit from compelling women to engage in sexual acts in exchange for employment opportunities." *Id.* ¶ 74; *see also id.* ¶¶ 78, 85.

Plaintiff has worked as a professional dancer, model, actress, host, and spokesmodel. *See id.* ¶ 15. Some of these jobs came about as a result of previous work as a dancer for Defendants. *See id.* ¶¶ 16-17, 20.

Around May 29, 2013, during the period Plaintiff performed for Defendants, Plaintiff and a friend attended one of Broadus's shows at a nightclub in Anaheim. *See id.* ¶ 61. Plaintiff and her friend entered the VIP room where they ran into Campbell. *See id.*

Campbell invited Plaintiff and her friend back to join him and Broadus at Broadus's recording studio. *See id.* ¶ 62. Plaintiff and her friend agreed, and Campbell transported Plaintiff and her friend to the studio. *See id.* After midnight, Plaintiff's friend left, leaving Plaintiff alone with Defendants. *See id.* ¶ 63. Campbell told Plaintiff "I can take you home or I can take you back to my place with me." *Id.* Plaintiff asked Campbell to drop her off at her home. *See id.*

Shortly thereafter, Plaintiff left the studio with Campbell and fell asleep in the car. *See id.* ¶ 64. When she woke up, she was still in the car with Campbell, and after a short time they arrived at Campbell's home despite Plaintiff's request to be dropped off at her own home. *See id.* Too exhausted to argue or get home by herself, Plaintiff fell asleep at Campbell's home. *See id.*

At about 4 a.m. that morning, Plaintiff awoke to Campbell "turning her body over to face him. [Campbell] then removed his penis from his pants, put it in Plaintiff's face, then repeatedly shoved his penis into Plaintiff's mouth." *See id.* ¶ 65 (omitting bold and underline). After being unable to obtain an erection after some time, Campbell turned away from Plaintiff and left her alone. *See id.* Plaintiff conclusorily asserts that Campbell "leveraged his relationship, employment, and agency of [Broadus] to place himself in a position of power and authority over Plaintiff, which enabled him to force Plaintiff to engage in sexual acts," *id.* ¶ 66, and "thought he was entitled to sexually abuse" Plaintiff because he "viewed her as one of his prostitutes and property," *id.* ¶ 67. She also states that Campbell "believed he could, and he did, sexually assault and batter

Plaintiff because he provided her with other work with [Broadus], work which both Defendants profited from." *Id.* ¶ 68.

At some unspecified point in time after this encounter, Campbell told Plaintiff to put a dress on, but Plaintiff was not feeling well and replied "Can't I sleep? I don't feel well." *Id.* ¶ 71. Campbell "aggressively" responded "Put the dress on," "let's go to Snoop's videotaping. I want to see if he will make you the weather girl," and "Snoop wants you there." *Id.* (omitting bold and italics). Plaintiff asserts that Campbell "implied that Plaintiff did not have a choice, and urged Plaintiff: 'Snoop wants you there. Let's go. This is a career move.'" *Id.* (omitting bold and italics); *see also id.* ¶ 76.[4] The Complaint alleges that Campbell told Plaintiff what to wear so that Broadus would be more attracted to Plaintiff and inclined to hire her as a weather girl, and was "essentially grooming" Plaintiff and preparing her to have sexual relations with Broadus in exchange for such work. *See id.* ¶ 79. Plaintiff conclusorily alleges that, "[a]s other similarly situated women have described, it was common for [Campbell] to place himself in a position of power and authority over women in order to force them to engage in sexual acts with himself and [Broadus]," and that Campbell had "additionally instructed women to wear specific outfits for him which he found to be more attractive or thought that [Broadus] would find more attractive." *Id.* ¶ 73.

Plaintiff alleges that she "complied in hopes of advancing her career," *id.* ¶ 71, and that Campbell's "offer of employment as a Weather Girl blatantly implies that money would be involved and that she could expect future employment with Defendants if she complied" with Defendants' demands, *id.* ¶ 76. She also asserts that Broadus "told [Campbell] to bring Plaintiff back to the studio," *id.* ¶ 71, and that Campbell "had the ability to bring actresses and models onto" GGN, *id.* ¶ 72.

Although Plaintiff had a stomachache, she complied with Campbell's demands, put on the dress he had ordered her to wear, all in the hopes of obtaining a weather girl position or other job with Defendants. *See id.* ¶ 81. Campbell then transported Plaintiff to Broadus. *See id.* They arrived at the recording studio where Broadus filmed GGN

---

[4] The Complaint also reflects these same – or remarkably similar – statements earlier, in paragraph 22. *See* Complaint ¶ 22. There is no timeframe given for the paragraph 22 references, however, so the Court presumes these allegations relate to the same comments Campbell allegedly made *after* his own alleged attempt at forcing Plaintiff to perform oral sex, before taking Plaintiff to Broadus's studio.

4

and, while waiting for production to begin, "Plaintiff made eye contact with [Broadus], who leered at her and undressed her with his eyes." *Id.* ¶ 82.

Shortly thereafter, still having stomach pains, Plaintiff went to the bathroom. *See id.* ¶ 83. While she sat on a toilet, Broadus opened the door to the bathroom, shut the door behind him, walked up to Plaintiff with his crotch in her face, removed his penis, grabbed Plaintiff's shoulder and ordered her to "Put it in your mouth." *Id.* (omitting bold, underline and italics). Plaintiff, panicked and terrified and in fear of her safety, future and retaliation, reluctantly complied. *See id.*

After a few minutes, Broadus "withdrew his penis from Plaintiff's mouth, visibly dissatisfied with Plaintiff's reluctant performance," and then proceeded to masturbate, ejaculating on Plaintiff's upper chest and lower neck. *Id.* ¶ 84 (omitting bold and underline). He told her "I'll be back, I'll get you something to clean up with," but he never returned, leaving Plaintiff humiliated and terrified. *Id.* Shortly thereafter, she cleaned herself off and exited the bathroom, locking eyes with Broadus "who, once again, leered at Plaintiff." *Id.* ¶ 92. Fearing for her life and job security, Plaintiff walked away, went into the production room, laid down on a couch and cried. *See id.*

Shortly after she was told that she had to leave the production room, Campbell spotted her and waved her over, insisting "Come here! Take a picture with Snoop!" *Id.* ¶ 94. "[M]ortified, embarrassed, and fearing for her safety," Plaintiff walked over and stood next to Broadus while Campbell took a picture of them, with Broadus then telling Campbell "Make sure you bring this one back," before Plaintiff left. *Id.*

Plaintiff alleges that Broadus "was aware that Plaintiff was at his studio to obtain a GGN Weather Girl job. [He] instructed [Campbell] to bring Plaintiff there – indeed Campbell said so, that 'Snoop wants you there.'" *Id.* ¶ 85. She also alleges that Broadus "instructed [Campbell] to bring Plaintiff to his studio for *quid pro quo* sexual acts in exchange for hiring her as a Weather Girl or performer for his other shows." *Id.*

Because she "rebuffed" Broadus by "reluctantly acceding" to his sexual advances "and refusing to be pimped out and exploited by Defendants," Defendants retaliated against her by refusing to hire her. *Id.* ¶¶ 86, 95-96.

## III. Discussion

### A. Applicable Procedural Standards

Under Rule 12(b)(6), a court must (1) construe the complaint in the light most favorable to the plaintiff, and (2) accept all well-pleaded factual allegations as true, as well as all reasonable inferences to be drawn from them. *See Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir.), *amended on denial of reh'g*, 275 F.3d 1187 (9th Cir. 2001); *Pareto v. F.D.I.C.*, 139 F.3d 696, 699 (9th Cir. 1998). The court need not accept as true "legal conclusions merely because they are cast in the form of factual allegations." *Warren v. Fox Family Worldwide, Inc.*, 328 F.3d 1136, 1139 (9th Cir. 2003).

Dismissal pursuant to Rule 12(b)(6) is proper only where there is either a "lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory." *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990); *Johnson v. Riverside Healthcare Sys., LP*, 534 F.3d 1116, 1121-22 (9th Cir. 2008); *see also Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 561-63 (2007) (dismissal for failure to state a claim does not require the appearance, beyond a doubt, that the plaintiff can prove "no set of facts" in support of its claim that would entitle it to relief). However, a plaintiff must also "plead 'enough facts to state a claim to relief that is plausible on its face.'" *Johnson*, 534 F.3d at 1122 (quoting *Twombly*, 550 U.S. at 570); *see also William O. Gilley Enters., Inc. v. Atlantic Richfield Co.*, 588 F.3d 659, 667 (9th Cir. 2009) (confirming that *Twombly* pleading requirements "apply in all civil cases"). A complaint does not "suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 556). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*[5]

---

[5] In her Opposition brief, Plaintiff seeks to rely upon now-outmoded rules for analyzing the sufficiency of pleadings. *See* Docket No. 18, at 2:16-18 & n.2. In doing so, she relies in part on the Ninth Circuit's 2022 decision in *Ernst & Haas Mgmt. Inc. v. Hiscox, Inc.*, 23 F.4th 1195, 1199 (9th Cir. 2022). That decision seemingly seeks to revive standards pre-dating the *Twombly/Iqbal* revolution in pleading standards, harkening back to *Conley v. Gibson*, 355 U.S. 41 (1957) – *i.e.*, the case *Twombly* explicitly-overruled and abandoned in this regard, *see* 550 U.S. 544, 562-63 (2007). It would be one thing if *Ernst & Haas* were an outlier in this regard, but that decision cites *City of Almaty v. Khrapunov*, 956 F.3d 1129, 1131 (9th Cir. 2020), as support in this regard, a case which in turn cites *Painters & Allied Trades District Council 82 Health Care Fund v. Takeda Pharmaceuticals Company Ltd.*, 943 F.3d 1243, 1248 (9th Cir. 2019), a case which in turn cites *Bain v. California Teachers Association*, 891 F.3d 1206, 1211 (9th Cir. 2018). Each of

### B. TVPA Claims

Under the TVPA,

(a) Whoever knowingly—

(1) in or affecting interstate or foreign commerce, or within the special maritime and territorial jurisdiction of the United States, recruits, entices, harbors, transports, provides, obtains, advertises, maintains, patronizes, or solicits by any means a person; or

(2) benefits, financially or by receiving anything of value, from participation in a venture which has engaged in an act described in violation of paragraph (1),

Knowing, or, except where the act constituting the violation of paragraph (1) is advertising, in reckless disregard of the fact, that means of force, threats of force, fraud, coercion described in subsection (e)(2), or any combination of such means will be used to cause the person to engage in a commercial sex act, or that the person has not attained the age of 18 years and will be caused to engage in a commercial sex act, shall be punished as provided in subsection (b).

18 U.S.C. § 1591.[6] Section 1595 of Title 18 gives any "individual who is a victim" of a violation of – among other provisions – Section 1591 the right to bring a civil action against "the perpetrator" or "whoever knowingly benefits, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in an act in violation of" Section 1591. 18 U.S.C. § 1595(a); *see also Does 1-6 v. Reddit, Inc.*, 51 F.4th 1137, 1141 (9th Cir. 2022), *petition for cert. filed*, \_

---

those earlier decisions similarly – at least with respect to the "no set of facts" standard; *Ernst & Haas* by itself attempts to revive the "viewed with disfavor" standard by citing a 1991 Ninth Circuit decision, *see Ernst & Haas*, 23 F.4th at 1199 (quoting *McDougal v. Cty. of Imperial*, 942 F.2d 668, 676 n.7 (9th Cir. 1991)) – take the reader down a pleading path that one would have thought any first year civil procedure student would have recognized as overgrown with analytical weeds stemming from lack of use over the course of the last 15 years or so. The earliest of these four decisions, *Bain*, is where the Ninth Circuit first appears to have stepped off into the procedural jungle from the clearly-lit course paved with the thousands of pages from over 15 years of jurisprudence based upon *Twombly* and *Iqbal*. *See Bain*, 891 F.3d at 1211 (quoting *Edwards v. Marin Park, Inc.*, 356 F.3d 1058, 1061 (9th Cir. 2004), which in turn quoted *Conley*, 355 U.S. at 45-46). It would do the Ninth Circuit some good for it to get everyone – perhaps most-importantly, itself – back on the correct path as quickly as possible. For now, this Court follows controlling Supreme Court precedent on the question, not subsequent (and conflicting) Ninth Circuit decisions.

[6] Section 1591 has been amended in the years since the incidents in question. *See, e.g., Noble v. Weinstein*, 335 F.Supp.3d 504, 514-15 & n.1 (S.D.N.Y. 2018); *Huett v. Weinstein Co. LLC*, No. 2:18-cv-06012-SVW-MRW, 2018 WL 6314159, *1 (C.D. Cal. Nov. 5, 2018). In the briefing before the Court, no party has raised subsequent amendments as an issue or suggested in any way that any such amendment has any impact on this Court's determination regarding the viability of Plaintiff's TVPA claims.

U.S.L.W. _ (U.S. Jan. 25, 2023) (No. 22-695).

Under this statutory setting, all parties' brief look to the same elements for purposes of what Plaintiff must allege to sufficiently-plead her TVPA claims: that Defendants 1) knowingly and 2) in interstate or foreign commerce, (3) recruited, enticed, harbored, transported, provided, obtained, or maintained by any means a person; (4) "knowing, or in reckless disregard of the fact, that means of force, threats of force, fraud . . . or any combination of such means will be used;" (5) "to cause the person to engage in a commercial sex act." *Noble v. Weinstein*, 335 F.Supp.3d 504, 515 (S.D.N.Y. 2018) (quoting 18 U.S.C. § 1591). Here, Broadus[7] takes aim at the third and fifth elements, arguing that Plaintiff has not pled that he "enticed" her or that any "commercial sex act" was involved.

 1. Which "Sex Act"?

As an initial aside, there is nothing in the Complaint, other than conclusory allegations which the Court need not credit in conducting a Rule 12(b)(6) analysis, *see* Complaint ¶¶ 66-68, 73,[8] that Campbell ever did anything or said anything to Plaintiff prior to *his own* alleged attempted sexual act/abuse of Plaintiff that would qualify that sexual conduct as a "commercial sex act" under the TVPA.[9] *See id.* ¶¶ 61-65. As a result, the Court limits its consideration of Plaintiff's current allegations to the sexual conduct Broadus himself allegedly committed at his studio, and the statements/conduct *leading up to* that interaction.[10]

---

[7] With respect to the TVPA claims, Campbell simply joins each of Broadus's arguments, without advancing any of his own that differ in any respect. *See* Docket No. 15, at 6:21-25; *see also* Docket No. 21, at 1:1-2:11.

[8] *See also* Docket No. 19, at 14:21-15:3 ("Campbell lured Plaintiff to his home, forced his penis into her mouth, and then took her to the studio so that [Broadus] could receive oral sex from her too, on the promise of opportunities to be on [Broadus's] show.").

[9] Of course, this is by no means any comment on Plaintiff's ability to state *other* claims against Campbell based upon Campbell's alleged sexual act.

[10] Broadus's statement "Make sure you bring this one back" occurred *after* his alleged sexual act with Plaintiff, *see* Complaint ¶ 94, meaning that it too is seemingly irrelevant to Plaintiff's TVPA claims because it could not have "caused" Plaintiff to have engaged in a commercial sex act. Although Plaintiff *also* alleges in *paragraph 71* of her Complaint – in the midst of her allegations concerning what Campbell told her in order to get her to go to Broadus's studio the morning after Campbell allegedly forced Plaintiff to engage in oral sex – that Broadus "told [Campbell] to bring Plaintiff back to the studio," the Court presumes, at least without clarification in the Complaint from Plaintiff on this point, that this is a reference

### 2. "Enticed"

With respect to enticement, Broadus notes that Plaintiff has not alleged that *he* ever said or did anything in terms of any offer or promise regarding her career or employment *prior to* the sex act in which he was involved. Here, the only statements that could seemingly have a chance of qualifying came from Campbell, not directly from Broadus.[11] As to Campbell's statements, Broadus asserts that they are "a far cry" from the types of allegations that have been found sufficient in other TVPA litigation.

Plaintiff responds that "[t]here can be no reasonable doubt that 'enticement' includes 'using promises of career advancement.'" Docket No. 18, at 7:1-2. The Court does not question the truth of that assertion,[12] but what was the "promise" here? Plaintiff asserts that it was made "explicit" by Campbell telling her to "look nice" for Broadus and that this would be a "career move." *See id.* at 7:13-15. Putting aside for the moment the question of what Plaintiff understands "explicit" to mean,[13] she next jumps to taking on Broadus's argument that he did not say anything like this to Plaintiff *directly* by asserting that the TVPA permits liability under a "beneficiary theory" (and by later emphasizing that a sex-trafficking defendant need not have actual knowledge of the trafficking) but in doing so she fails to shore up her predicate. What analogous case does she have indicating that advising someone to "look nice" and suggesting it would be a "career

---

to the *same* comment Broadus allegedly made in Plaintiff's presence at the studio after he allegedly forced Plaintiff to engage in oral sex, as recounted in paragraph 94. It is therefore similarly disregarded.

[11] To the extent Plaintiff seeks to extend TVPA liability to Broadus's music performances or lyrics that "glamoriz[e] and promot[e] a 'pimp' culture that inherently entices and forces vulnerable women to exchange sexual acts for money or promises thereof," Docket No. 18, at 4:16-19 – later terming this an "arrangement," *id.* at 5:1-3 – the Court will not join her on that path. At a minimum, an application of the statute for that type of conduct would seemingly raise significant First Amendment concerns. Unsurprisingly, she has not directed the Court to any decision that appears to support her approach in this regard.

[12] Courts have understood "enticed" consistent with the dictionary definition – the phrase not having been defined in the TVPA itself – such that it means "to attract artfully or adroitly or by arousing hope or desire," and "[to] attract or tempt by offering pleasure or advantage." *E.g.*, *Noble*, 335 F.Supp.3d at 517; *Huett*, 2018 WL 6314159, at *2.

[13] Further raising questions in this regard, Plaintiff also later argues in her Opposition briefs that Campbell "explicitly stated Plaintiff's job position/career advancement depended on him transporting her to [Broadus's] studio to perform sexual acts." Docket No. 18, at 9:1-4; Docket No. 19, at 18:12-15. She cites no paragraph in the Complaint that supports such an ultimatum. The Court has read the Complaint and came across no such statement by Campbell, "explicit" or otherwise.

move" amounts to a "promise"?  If her Opposition is any indication, it appears she has none, but instead would look only to the asserted principle that, as multiple courts have concluded, the TVPA "requires broad interpretation" as a remedial provision, *see* Docket No. 18, at 3:8-12, and a concern – built upon foundations established by the "#MeToo" movement – that by finding what Plaintiff says happened here insufficient the Court would be setting a "dangerous precedent," *see id.* at 3:13-4:11, 6:6-12.  Perhaps Plaintiff has done herself no favors here by shooting for the stars, when a cloud would do – does she really need to allege a "promise" to sufficiently show she was "enticed"?  To this point, she has not clearly argued that a lower bar applies.

To get past that potential problem with her allegations, Plaintiff points also to paragraph 85 of her Complaint, where she alleges that Broadus "instructed [Campbell] to bring Plaintiff" to Broadus's studio, and "instructed [Campbell] to bring Plaintiff to his studio for *quid pro quo* sexual acts in exchange for hiring her as a Weather Girl or performer for his other shows."[14]  Complaint ¶ 85; *see also* Docket No. 18, at 5:8-11 (alleging that Broadus "instructed his agent, spiritual advisor, and idol (Campbell, also a self-proclaimed 'pimp'), to bring Plaintiff to his studio on the pretext of career-enhancing job [*sic*], so [Broadus] could force her to perform oral sex"); 9:10-13 ("[Broadus] used and instructed his agent to bring Plaintiff to his studio on the pretext that she would have an opportunity to be on his show – in exchange for sex acts.").  This, she argues, "is more than enough to satisfy 'enticement' under the TVPA."  Docket No. 18, at 8:5-7.  But where a principal, such as Broadus allegedly was, allegedly instructs his agent, such as Campbell allegedly was, to do what is reflected in paragraph 85, and the agent simply tells Plaintiff to "look nice" and that it would be a "career move," the question still

---

[14] In his Reply brief, Broadus assert that this allegation is "conclusory," a "bare recitation of the elements of liability [that is] uncoupled from any facts about a particular interaction, place, or time," and is therefore insufficient under *Twombly* and *Iqbal*.  *See* Docket No. 20, at 6:17-22.  Certainly, the Court would agree that Plaintiff's recitation of this alleged conversation between Campbell and Broadus does not contain any directly-quoted language, in contrast with Plaintiff's allegations concerning certain of the statements Campbell and Broadus each made to Plaintiff.  But Plaintiff does not indicate that she was present for this conversation between Campbell and Broadus.  This does not make her allegation conclusory.  While it might pale in comparison to the other conversations in terms of specifics and might arguably fall short were the applicable pleading standard the particularity/specificity requirement of Federal Rule of Civil Procedure 9(b), that standard does not apply here (or at least Defendants have not argued that it does).  It may or may not ultimately be supported by evidence, but it is a sufficiently-factual argument for purposes of *Twombly*/*Iqbal*, and the Court consequently must credit it as true.

10

remains where is the "enticement" if Plaintiff's position is that a "promise" qualifies as such? In other words, if the agent falls short of the principal's instruction in this regard, it matters, doesn't it? Plaintiff's discussion of cases in her Opposition brief does not appear to highlight any case that makes the leap she would seemingly need here, and Broadus's discussion of those cases in his Reply seemingly only cements the factual distinctions.[15]

The parties discuss a handful of cases bearing upon this issue, most related to incidents involving Harvey Weinstein: *Noble*; *Huett v. Weinstein Co. LLC*, No. 2:18-cv-06012-SVW-MRW, 2018 WL 6314159 (C.D. Cal. Nov. 5, 2018); *Canosa v. Ziff*, 18 Civ. 4115 (PAE), 2019 WL 498865 (S.D.N.Y. Jan. 28, 2019); *Geiss v. Weinstein Co. Holdings LLC*, 383 F.Supp.3d 156 (S.D.N.Y. 2019); *Ardolf v. Weber*, 332 F.R.D. 467 (S.D.N.Y. 2019); *David v. Weinstein Co. LLC*, 431 F.Supp.3d 290 (S.D.N.Y. 2019); *Eckhart v. Fox News Network, LLC*, 20-CV-5593 (RA), 2021 WL 4124616 (S.D.N.Y. Sept. 9, 2021). The Court has reviewed all of them.

Upon the Court's review of these cases, here is what is notable about them, for present purposes: each unquestionably involved *promises*, each involved promises *made by a person with an obvious direct ability to act upon those promises*, and each involved promises *made by the person who engaged in the alleged sex act*. See *Noble*, 335 F.Supp.3d at 512, 517-18 (reflecting, among other things, Weinstein's statements that "he had a particular acting role in mind for" the plaintiff, that it "will be good for [her]," an invitation to plaintiff to come to come to his room "to discuss the film role he had in mind for her," that he would "take care of everything," and that "everything will be taken care of for [her]");[16] *Huett*, 2018 WL 6314159, at *2-3 (reflecting, among other things,

---

[15] Perhaps because Broadus framed the inquiry as dependent on Plaintiff's ability to sufficiently-allege that she was "enticed," Plaintiff makes no attempt in her Opposition – apart from occasionally typing the word "transport" (or one of its variations), *see, e.g.*, Docket No. 18, at 1:4, 6:10-11, 9:4, 10:12, without any connected argument – to rely upon Section 1591(a)(1)'s use of the terms "recruits," "transports," "provides," or "obtains." Defendants assert in their Reply that "[t]he Opposition acknowledges that to state a TVPA claim, Plaintiff must allege that . . . Broadus 'enticed' her through 'empty promises' of a future role or position." Docket No. 20, at 1:9-11. Given the description of the third element of a TVPA claim recited *supra*, the Court questions whether such a concession would accurately reflect the law, regardless of whether or not Plaintiff "acknowledge[d]" it.

[16] In *Noble*, similar statements at least of encouragement were made by a Weinstein Company producer, *see Noble*, 335 F.Supp.3d at 512, but no analysis of the sufficiency, under the TVPA, of those statements by themselves was attempted.

11

Weinstein's promise of participation and role in entertainment project); *Canosa*, 2019 WL 498865, at *2, 23 (reflecting, among other things, promises to make plaintiff part of production team/production deals); *Geiss*, 383 F.Supp.3d at 163-65, 168 (reflecting, among other statements/behavior, promises by Weinstein that actress "would get the part," that actress would be "perfect" for two upcoming productions, and that he would "greenlight" individual's script);[17] *Ardolf*, 332 F.R.D. at 472, 475-77 (reflecting, among other things, comments by fashion photographer "clearly insinuating" that he would "use his power and influence in the fashion industry to help their modeling careers," suggesting that "he could book Plaintiffs for his upcoming photoshoots" and that his help could allow them to "go very far" in the industry); *David*, 431 F.Supp.3d at 295, 301, 303-05 (reflecting, among other things, Weinstein's statements that he had a movie role he would cast the plaintiff in and that he also wanted her to do some "voiceover work" for him); *Eckhart*, 2021 WL 4124616, at *1, 3, 7-9 (reflecting, among other things, network news anchor's "empty promises of career advancement" and offer to bring plaintiff on show as frequent on-air guest). None of these characteristics are present here. So, are statements that: 1) fall short of promises, 2) are made by an individual who does not him/herself unquestionably have the authority to make such promises come true, and 3) are made by an individual who is not the person who – subsequent to those statements – allegedly forces a sexual act upon the plaintiff, sufficient for purposes of an "enticed" requirement (or the third recognized element of a TVPA claim, *see* Footnote 15, *supra*)? What case does Plaintiff have that demonstrates this/these question(s) should be answered in her favor?

As a further attempted means of getting around the potential problem presented by the fact that Broadus himself did not say anything directly to her that might suffice as a pre-sex act enticement, Plaintiff relies on an agency theory (again, presuming that anything Campbell himself said to her would qualify as enticement), seemingly linked, at

---

[17] As in *Noble*, *see* Footnote 16, *supra*, statements were also made by at least one third party in *Geiss*, *see* 383 F.Supp.3d at 164 (reflecting statement by Weinstein's assistant to actress to go to Weinstein's hotel room for a "very important" meeting), but again no independent analysis of the sufficiency, under the TVPA, of such a statement by itself was conducted. *Cf. Corradino v. Liquidnet Holdings Inc.*, No. 19 Civ. 10434 (LGS), 2021 WL 2853362, *1, 3 (reflecting company's Head of Europe, the Middle East, and Africa and the Global Head of Sales telling Plaintiff she "should" date company's CEO to advance her career and that she should "take one for the team," but noting that statements were not linked back to CEO).

least somewhat, to the earlier-mentioned beneficiary theory of TVPA liability.[18]  In doing so, she cites three district court cases – *H.G. v. Inter-Continental Hotels Corp.*, 489 F.Supp.3d 697, 704 (E.D. Mich. 2020), *A.B. v. Hilton Worldwide Holdings, Inc.*, 484 F.Supp.3d 921, 935 (D. Or. 2020), and *B.M. v. Wyndham Hotels & Resorts, Inc.*, No. 20 Civ. 656 (BLF), 2020 WL 4368214, *4 (N.D. Cal. July 30, 2020).  The Court has reviewed each of these cases as well.  To the extent agency is concerned, they each involved questions of whether a corporate parent hotel franchisor was in an agency relationship with their local hotel franchisee in connection with acts of sex trafficking occurring at the franchisee's hotel.  Even assuming that Campbell's statements could suffice as having "enticed" Plaintiff, these cases shed virtually no light on whether he could be deemed Broadus's agent in that regard.

Based on the arguments presented to the Court thus far, in the end what Plaintiff is going to require here is a viable agency theory capable of tying Campbell's statements – assuming they are sufficient to qualify as "enticement" – to Broadus.  It is not clear yet that what she has alleged thus far gets her there.  Resolving that issue is not made any easier by the lack of any sustained "agency" discussion/analysis in the parties' briefs, at least by way of reference to any governing rules of agency, until Broadus directed a single paragraph to the topic in his Reply brief.  *See* Docket No. 20, at 7:4-20.  Plaintiff, for her part, merely uses the term "agent" several times, as if the word's mere incantation should do the trick.

It is conceivable that the allegation in paragraph 85 of the Complaint gets Plaintiff where she needs to go in this regard.  But she would need to explain – with citation to controlling standards – why that is so.  Plaintiff also alleges that Campbell "had the ability to bring actresses and models onto" GGN, an assertion which, if true, would presumably bear upon the agency question.  Complaint ¶ 72.  But the Court is inclined to view this allegation as insufficiently factual, *i.e.* conclusory.

It is also possible that *without* a successful agency theory, Plaintiff might be able

---

[18] Plaintiff emphasizes that Section 1595(a) authorizes claims not just against *perpetrators* of sex trafficking, but also against those who *benefit from participation in* a venture that they "knew or should have known" engaged in sex trafficking.  But, thus far, for the reasons stated above, Plaintiff has not alleged anything that qualifies as "sex trafficking" covered by the TVPA (at least as the recognized elements define that concept).  Plaintiff cannot jump to discussion of a beneficiary theory when the sex trafficking "structure" giving rise to the possibility of such a discussion is missing.

13

to state a claim against at least Campbell. But to convince the Court that she can, the Court might still need her to explain how the nature of Campbell's statements suffice to show that he "enticed" her (or that the third TVPA element is otherwise satisfied).

### 3. Commercial Sex Act

As noted, the other aspect of a TVPA claim Defendants challenge is the "commercial sex act" element. The statute itself defines the term to mean "any sex act, on account of which anything of value is given to or received by any person." 18 U.S.C. § 1591(e)(3). With regard to any "commercial sex act," Broadus notes that courts have *included* promises of "future jobs or specific career advancement as 'things of value.'" Docket No. 13, at 12:7-8. If this is taken to suggest that "thing of value" does not just include, but is *limited* to statements that come in the form of a *promise* (or a "*quid pro quo*"), as the progression of Broadus's argument then suggests, *see id.* at 12:22-24 ("Here, however, there is no factual allegation that Mr. Broadus made *any* offer or promise of a future job or career advancement, much less that he offered to Plaintiff a discrete, specific benefit."), the Court would have to disagree, for reasons addressed below. Before getting to those reasons, the Court notes that here, again, Broadus observes that Plaintiff has not alleged that *he* made any offer, much less a promise, or that he knew of anything Campbell might have said to her. Even with regard to what Campbell said, Broadus argues there was no promise, because he merely told her that he wanted to see "if" Broadus would make Plaintiff a weather girl.

As to this element in particular, Plaintiff again directs the Court to paragraph 85 of her Complaint. That paragraph does in fact allege that the purpose of Broadus's alleged instruction to Campbell was to have Campbell bring Plaintiff to Broadus's studio "for *quid pro quo* sexual acts in exchange for hiring her as a Weather Girl or performer for his other shows." Complaint ¶ 85. If that is considered a factual allegation – and the Court cannot discern why it would *not* be, *see* Footnote 14, *supra* – it would be an allegation the truth of which the Court would have to accept for present purposes.[19]

The case law does not support Broadus's premise that "anything of value" requires a *promise*. *See David*, 431 F.Supp.3d at 303-04 (concluding that "aspiring

---

[19] The straightforward intent and plan that it reveals also would make merely academic any debate amongst the parties about whether a *negligent failure to prevent* sex trafficking would be sufficient.

actress['s]" receipt of meetings "with one of the most influential producers in her industry, as well as opportunities for potential movie and television roles based on her contact with him" were "things of value"); *Noble*, 335 F.Supp.3d at 519, 521 (analyzing whether statements were material, "that is, important enough to a reasonable plaintiff to be relied upon," and noting that "[f]or an aspiring actress, meeting a world-renowned film producer carries value, in and of itself"). Thus, discussion of the *sufficiency* of any *promise* is misplaced when it comes to an assessment of this discrete element. Clearly, once there is no doubt – at least based on the allegations in paragraph 85 – that Defendants *intended* a commercial sex act, Plaintiff has pled that the situation presented to her "cause[d her] to engage in a commercial sex act" because of her belief about the opportunity presented to her – and that Broadus was not outside of the causal chain – which is all the element requires.

Thus, to the extent Defendants attempt to defeat Plaintiff's TVPA claims at this procedural stage, their arguments regarding the "commercial sex act" element fail to do the job.

### C. TVPA Conspiracy

Defendants' arguments regarding the deficiency of the TVPA conspiracy claim are largely founded on their certainty that the underlying TVPA claim cannot proceed (and, to the extent they are not, they rely on assertions which seemingly ignore the allegations present in paragraph 85 of the Complaint). *See* Docket No. 13, at 13:11-23; *see also* Docket No. 15, at 6:21-25; Docket No. 18, at 12:20-13:13; Docket No. 19, at 22:19-23:15; Docket No. 20, at 8:21-22; Docket No. 21, at 2:7-9. There is therefore no need to independently analyze that claim at this juncture. It too fails unless and until Plaintiff can better explain how she can satisfy the third element of a TVPA claim.

### IV. Conclusion

On the present briefing, the Court is not yet convinced that Plaintiff can survive the pleadings on her TVPA claims. Before giving her an opportunity to amend (because it is at least conceivable that there may not be such an opportunity), the Court would ask for supplemental briefing on the third element of a TVPA claim. As it has been argued thus far, the Court would expect from that supplemental briefing a much more robust discussion of whether an agency theory can get Plaintiff where she needs to be to survive

Defendants' challenges.

Until this TVPA issue is resolved in connection with the allegations in the Complaint, the Court will not further address Plaintiffs' state-law claims.