Michael J. Bowe
(*admitted pro hac vice*)
mbowe@brownrudnick.com
Lauren Tabaksblat visa
(*admitted pro hac vice*)
ltabaksblat@brownrudnick.com
BROWN RUDNICK LLP
7 Times Square
New York, NY 10036
Telephone:    (212) 209-4800
Facsimile:    (212) 209-4801

David M. Stein (#198256)
dstein@brownrudnick.com
BROWN RUDNICK LLP
2211 Michelson Drive, 7th Floor
Irvine, California 92612
Telephone:    (949) 752-7100
Facsimile:    (949) 252-1514

*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
SOUTHERN DIVISION

| | |
|---|---|
| SERENA FLEITES and JANE DOE NOS. 1 through 33, <br><br> Plaintiffs, <br><br> v. <br><br> MINDGEEK S.A.R.L. a foreign entity; MG FREESITES, LTD., a foreign entity; MINDGEEK USA INCORPORATED, a Delaware corporation; MG PREMIUM LTD, a foreign entity; RK HOLDINGS USA INC., a Florida corporation, MG GLOBAL ENTERTAINMENT INC., a Delaware corporation, TRAFFICJUNKY INC., a foreign entity; BERND BERGMAIR, a foreign individual; FERAS ANTOON, a foreign individual; DAVID TASSILLO, a foreign individual; COREY URMAN, a foreign individual; VISA INC., a Delaware corporation; COLBECK CAPITAL DOES 1-10; and BERGMAIR DOES 1-10 <br><br> Defendants. | CASE NO. 2:21-cv-4920-CJC-ADS <br><br> **PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS** <br><br> Date:   February 14, 2022 <br> Time:  1:30 p.m. <br> Courtroom: 9B <br><br> *The parties hereto request that the Court sign the included proposed order without a hearing or further briefing.* |

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................. 1

FACTUAL BACKGROUND ................................................................................ 5

    A. MindGeek's Human Trafficking Venture and Criminal Enterprise .......... 5

        1. The Fake Pornhub Façade ................................................. 5

        2. MindGeek Solicited, Promoted, and Normalized

        Illegal Content on Its Platform ........................................ 10

            (a) MindGeek Purchased Trafficked Content In Bulk ............. 10

            (b) MindGeek's Unpoliced Platform ...................................... 11

            (c) MindGeek Modified, Distributed, and Reuploaded

                Illegal and Nonconsensual Content to Its Platform ............ 13

    B. The Enterprise Directing MindGeek's Rackets And Schemes ................ 18

        1. The Enterprise and Its Members ....................................... 18

        2. Antoon, Tassillo, Urman, and the Bro Club ................................. 18

        3. Bergmair and the Financiers ............................................. 20

        4. The Fraudulent Network of MindGeek Sham Shell Companies ... 22

        5. Visa ................................................................................. 24

    C. The Criminal Scheme to Conceal the Enterprise's Racketeering

    and Shame, Discredit, Intimidate, and Silence Victims ......................... 26

    D. The Victims .................................................................................... 27

LEGAL STANDARD ...................................................................................... 30

ARGUMENT ................................................................................................. 31

    I. The Complaint Pleads Violations of the TVPRA ..................................... 31

        A. The MindGeek Defendants Are Beneficiaries of

        a Trafficking Venture ........................................................ 32

            1. Participation in a Venture ................................................. 32

i

2. The MindGeek Defendants Knowingly Received

A Benefit From Their Participation in a Venture ................ 34

3. Plaintiffs Sufficiently Allege that Defendants

Knew or Should Have Known that the Venture

was Engaged in Trafficking .................................................. 35

4. The Complaint Alleged that MindGeek Committed

Commercial Sex Acts and Participated in a Venture

That Trafficked Plaintiffs ..................................................... 39

B. The MindGeek Defendants Are Directly Liable for

Sex Trafficking .................................................................... 42

1. Advertising ...................................................................... 43

2. Recruiting, Enticing, Harboring, and/or Maintaining .......... 44

C. The Complaint Properly Pleads a Claim Against Visa

for Beneficiary Liablity .......................................................... 46

1. Participation in a Venture..................................................... 46

2. Benefitting from its Pariticpation in that Venture................ 47

3. Visa Knew or Should Have Known that

the Venture was a Sex Trafficking Venture........................ 48

D. The Complaint Adequately Pleads a Violation of Section 1594... 49

E. Plaintiffs do not Seek to Extend the TVPRA's

Reach Extraterritorially ................................................... 49

II.  Fleites and Does 1-13 State Claims for Violations of

Child Sexual Exploitation Laws ................................................ 50

III. The Federal RICO Claims Are Properly Pled ....................................... 52

A. The Complaint Alleges A RICO Enterprise.................................. 53

B. The Complaint Alleges Cognizable RICO Injuries...................... 56

ii

1      C. The Complaint Adequately Pleads Racketeering Activity ............ 60

2      D. The Complaint Alleges A RICO Conspiracy ................................ 61

3    IV. The State and Common Law Claims Are Properly Pled........................ 62

4    V. CDA § 230 Does Not Bar Plaintiffs' Claims ............................................ 64

5      A. The MindGeek Defendants Are Content Creators ........................ 65

6      B. Plaintiffs' Sex Trafficking Claims Are Exempted

7         From CDA 230 Immunity ................................................ 67

8    VI. The Court Has Jurisdiction and Plaintiffs Have Standing..................... 67

9      A. The Determination Of Proper Parties Requires Discovery ........... 68

10     B. The Court Has Personal Jurisdiction Over Each Defendant ......... 69

11        1. The Agency And Alter Ego Relationship

12           Between and Among the MindGeek Defendants

13           Confer General Jurisdiction ................................................. 70

14        2. The Court Has Personal Jurisdiction Over the

15           MindGeek Defendants Pursuant to Rule 4(k)(2) and

16           the RICO Statute .................................................. 74

17        3. The Court May Exercise Pendent Personal Jurisdiction...... 75

18        4. The Individual Defendants' Remaining Arguments

19           Are Unavailing .................................................. 76

20        5. Jurisdictional Discovery is Appropriate.............................. 76

21     C. Plaintiffs Have Article III Standing.............................................. 77

22    VII. Plaintiffs Can Pursue Their Claims Jointly ......................................... 80

23     A. Plaintiffs' Claims Arise From the Same Series of

24        Transactions or Occurences........................................... 81

25     B. Plaintiffs' Claims Share Numerous Common Issues of Law

26        and Fact that are Most Efficiently Addressed in One Litigation .. 83

27

28

iii

1

CONCLUSION ................................................................................................... 85

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

# <u>TABLE OF AUTHORITIES</u>

2

**Page(s)**

3

**Cases**

4

*A.B. v. Wyndham Hotels & Resorts, Inc.*,

5
   2021 WL 1235241 (D. Ore. Mar. 31, 2021) ................................................. 34, 41

6

*Action Embroidery Corp. v. Atl. Embroidery, Inc.*,

7
   368 F.3d 1174 (9th Cir. 2004) ............................................................. 74

8

*ADO Fin., AG v. McDonnell Douglas Corp.*,

9
   931 F. Supp. 711 (C.D. Cal. 1996) ...................................................... 70, 71

10

*Akishev v. Kapustin*,

11
   2016 WL 7165714 (D.N.J. Dec. 8, 2016) ................................................. 58

12

*Almont Ambulatory Surgery Ctr., LLC v. UnitedHealth Grp., Inc.*,
   99 F. Supp. 3d 1110 (C.D. Cal. 2015) ................................................... 81

13

*AMA Multimedia, LLC v. Wanat*,

14
   970 F.3d 1201 (9th Cir. 2020) ............................................................. 71

15

*Amy v. Curtis*,

16
   2020 WL 5365979 (N.D. Cal. Sep. 8, 2020) ........................................... 56

17

*Anderson v. Peregrine Pharms., Inc.*,

18
   2013 WL 12122423 (C.D. Cal. Aug. 23, 2013), *aff'd*, 654 F. App'x

19
   281 (9th Cir. 2016) ......................................................................... 38

20

*Aragon v. Che Ku*,
   277 F. Supp. 3d 1055 (D. Minn. 2017) ................................................... 60

21

*Ardolf v. Weber*,

22
   332 F.R.D. 467 (S.D.N.Y. 2019) .................................................... *passim*

23

*Arevalo v. Bank of Am. Corp.*,

24
   850 F. Supp. 2d 1008 (N.D. Cal. 2011) ................................................. 68

25

*Bell Atl. Corp. v. Twombly*,

26
   550 U.S. 544 (2007) ........................................................................ 30

27

28

*Bennett v. Spear*,
  520 U.S. 154 (1997) ................................................................... 78, 79

*Blackman v. Teespring, Inc.*,
  2019 WL 7832600 (N.D. Cal. July 12, 2019) (Mot. to Sever ) ........................ 82

*Bondit, LLC v. Hallows Movie, Inc.*,
  2020 WL 7777992 (C.D. Cal. Apr. 1, 2020) ...................................... 56

*Boyle v. United States*,
  556 U.S. 938 (2009) ................................................................. 53, 56

*Brighton Collectibles, Inc. v. RK Texas Leather Mfg.*,
  2013 WL 2631333 (S.D. Cal. June 11, 2013) ........................................ 81, 84

*Brophy v. Almanzar*,
  359 F. Supp. 3d 917 (C.D. Cal. 2018) (Carney, J.) .......................... 77

*Bui v. Nguyen*,
  712 F. App'x 606 (9th Cir. 2017) ....................................... 53

*Bunnett & Co. v. Gearhart*,
  2018 WL 1070298 (N.D. Cal. Feb. 27, 2018) ............................... 53, 54

*C&M Cafe v. Kinetic Farm, Inc.*,
  2016 WL 6822071 (N.D. Cal. Nov. 18, 2016) ............................. 56

*Californians for Alternatives to Toxics v. Schneider Dock &*
  *Intermodal Facility, Inc.*,
  374 F. Supp. 3d 897 (N.D. Cal. 2019) ................................... 78

*Canosa v. Ziff*,
  2019 WL 498865 ................................................................ 41

*Cappello Glob., LLC v. TEMSA Ulasim Arclari Sanayi Ve Ticaret A.S.*,
  2020 WL 8994099 (C.D. Cal. Sept. 25, 2020) ................................. 80

*In re Chrysler-Dodge-Jeep Ecodiesel Mktg., Sales Pracs.,*
  *& Prods. Liab. Litig.*,
  295 F. Supp. 3d 927 (N.D. Cal. 2018) ...................................... 41, 55

*Clark v. Stipe Law Firm, L.L.P.*,
  320 F. Supp. 2d 1207 (W.D. Okla. 2004) .................................. 55

vi

*Cooper v. San Bernardino Sheriff Dep't*,
  2017 WL 10511568 (C.D. Cal. Mar. 10, 2017)................................................. 37

*Cork v. CC-Palo Alto, Inc.*,
  534 F. Supp. 3d 1156 (N.D. Cal. 2021) ............................................................ 62

*Cuprite Mine Partners LLC v. Anderson*,
  809 F.3d 548 (9th Cir. 2015).............................................................................. 79

*Diaz v. Gates*,
  420 F.3d 897 (9th Cir. 2005) (en banc) ................................................. 55, 56, 57

*DISH Network L.L.C. v. Vicxon Corp.*,
  923 F. Supp. 2d 1259 (S.D. Cal. 2013)............................................................. 68

*Doe v. MindGeek*,
  2021 WL 4167054 (C.D. Cal. Sept. 3, 2021) ............................................ *passim*

*Doe v. MindGeek*,
  21-cv-0038, Slip. Op. (Dec. 2, 2021) ............................................................... 63

*Doe v. MindGeek*,
  Order on Reconsideration ......................................................................... 34, 35

*Doe v. MindGeek*
  Recon. Order ...................................................................................................... 63

*Doe v. Twitter, Inc.*,
  2021 WL 3675207 (N.D. Cal. Aug. 19, 2021) .......................................... *passim*

*Doe v. Unocal Corp.*,
  248 F.3d 915 (9th Cir. 2001).............................................................................. 69

*People ex rel. DuFauchard v. U.S. Fin. Mgmt., Inc.*,
  169 Cal. App. 4th 1502 (Cal. Ct. App. 2009) .................................................. 61

*In re Facebook, Inc., Consumer Privacy User Profile Litig.*,
  402 F. Supp. 3d 767 (N.D. Cal. 2019) .............................................................. 76

*Fair Housing Council v. Roommates.com*,
  521 F.3d 1157 (9th Cir. 2008) (*en banc*) ......................................................... 63

vii

*Fed. Reserve Bank of San Fran. v. HK Sys.*,
  1997 U.S. Dist. LEXIS 5573 (N.D. Cal. 1997) ................................................ 70

*Firstmark Capital Corp. v. Hempel Financial Corp.*,
  859 F.2d 92, 94 (9th Cir.1988)............................................................ 71

*Fla. Audubon Soc. v. Bentsen*,
  94 F.3d 658 (D.C. Cir. 1996) .............................................................. 78

*Flynt Distrib. Co. v. Harvey*,
  734 F.2d 1389 (9th Cir. 1984) ............................................................ 69

*Fraihat v. U.S. Immigr. & Customs Enf't*,
  2020 WL 2759848 (C.D. Cal. Apr. 15, 2020) ....................................... 80, 81, 82

*Fraley v. Facebook, Inc.*,
  830 F. Supp. 2d 785 (N.D. Cal. 2011) ............................................. 56, 57, 62

*Georgian v. Zodiac Grp., Inc.*,
  2011 WL 13214306 (S.D. Fla. Jan. 6, 2011) ........................................... 56

*Ghotra by Ghotra v. Bandila Shipping, Inc.*,
  113 F.3d 1050 (9th Cir. 1997) ............................................................ 83

*Gonzalez v. Google LLC*,
  2 F.4th 871 (9th Cir. 2021) ............................................................... 64

*Guerrero v. Gates*,
  110 F. Supp. 2d 1287 (C.D. Cal. 2000) ................................................. 55

*H.H. v. G6 Hosp., LLC*,
  2019 WL 6682152 (S.D. Ohio Dec. 6, 2019) ...................................... 31, 33

*Holland Am. Line Inc. v. Wartsila N. Am., Inc.*,
  485 F.3d 450 (9th Cir. 2007)............................................................. 73

*Humphrey v. GlaxoSmithKline PLC*,
  905 F.3d 694 (3d Cir. 2018)......................................................... 49, 58

*Just Film, Inc. v. Buono*,
  847 F.3d 1108 (9th Cir. 2017) ..................................................... 51, 55, 58

*JW Gaming Dev., LLC v. James*,
   2018 WL 4853222 (N.D. Cal. Oct. 5, 2018)...................................................... 60

*JW Gaming Dev., LLC v. James*,
   2020 WL 3640004 (N.D. Cal. July 6, 2020)...................................................... 53

*Kaing v. Pulte Homes, Inc.*,
   2010 WL 625365 (N.D. Cal. Feb. 18, 2010), *aff'd sub nom. Kaing v. Pultegroup, Inc.*, 464 F. App'x 630 (9th Cir. 2011) ........................................... 79

*Kao v. Holiday*,
   58 Cal. App. 5th 199 (Cal. Ct. App. 2020) ......................................... 63

*Ketayi v. Health Enrollment Grp.*,
   516 F. Supp. 3d 1092 (S.D. Cal. 2021) ......................................... 52, 60

*Kevin Barry Fine Art Assocs. v. Ken Gangbar Studio, Inc.*,
   391 F. Supp. 3d 959 (N.D. Cal. 2019) ......................................... 60

*Khosroabadi v. Mazgani Social Servs., Inc.*,
   2017 WL 4712074 (C.D. Cal. July 28, 2017) (Carney, J.) ............................... 51

*LD v. United Behavioral Health*,
   508 F. Supp. 3d 583 (N.D. Cal. 2020) ......................................... 60

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
   572 U.S. 118 (2014) ......................................... 77

*M.A. v. Wyndham Hotels Resorts Inc.*,
   425 F. Supp. 3d 959 (S.D. Ohio 2019) ......................................... 32, 34

*MadKudu Inc. v. U.S. Citizenship & Immigr. Servs.*,
   2020 WL 5628968 (N.D. Cal. Sept. 14, 2020) ...................................... 80, 81, 82

*Massachusetts v. E.P.A.*,
   549 U.S. 497 (2007) ......................................... 76

*Mavrix Photo, Inc. v. Brand Techs., Inc.*,
   647 F.3d 1218 (9th Cir. 2011) ......................................... 68

*MedImpact Healthcare Sys., Inc. v. IQVIA, Inc.*,
   2020 WL 5064253 (S.D. Cal. Aug. 27, 2020) ......................................... 55

*Mendia v. Garcia*,
    768 F.3d 1009 (9th Cir. 2014) .......................................................... 78

*Mendoza v. Zirkle Fruit Co.*,
    301 F.3d 1163 (9th Cir. 2002) .......................................................... 57

*Mesler v. Bragg Mgmt. Co.*,
    39 Cal. 3d 290, 301 (1985) .............................................................. 71

*MH Pillars Ltd. v. Realini*,
    2018 WL 1184847 (N.D. Cal. Mar. 7, 2018)................................ 54, 58

*Mieuli v. DeBartolo*,
    2001 WL 777447 (N.D. Cal. Jan. 16, 2001) ...................................... 70

*Mir v. Freines, Martin, Stein & Richland*,
    2015 WL 4139435 (C.D. Cal. Jan. 12, 2015) .................................... 73

*Nat. Res. Def. Council v. Sw. Marine, Inc.*,
    236 F.3d 985 (9th Cir. 2000)............................................................. 77

*Nat. Res. Def. Council v. U.S. E.P.A.*,
    542 F.3d 1235 (9th Cir. 2008) .......................................................... 76

*National Audubon Society v. Davis*,
    307 F.3d 835 (9th Cir. 2002)............................................................. 77

*Native Vill. of Kivalina v. ExxonMobil Corp.*,
    663 F. Supp. 2d 863 (N.D. Cal. 2009), *aff'd,* 696 F.3d 849 (9th Cir. 2012)................................................................................................. 79

*Natural-Immunogenics Corp. v. Newport Trial Grp.*,
    2020 WL 7263544 (C.D. Cal. Nov. 23, 2020)................................... 53

*In re NCAA Student-Athlete Name & Likeness Licensing Litig.*,
    724 F.3d 1268 (9th Cir. 2013) .......................................................... 56

*Newcal Indus., Inc. v. Ikon Office Solution*,
    513 F.3d 1038 (9th Cir. 2008) .......................................................... 57

*Ning Xianhua v. Oath Holdings, Inc.*,
    2021 WL 1700227 (N.D. Cal. Apr. 29, 2021) ................................... 77

x

*Noble v. Weinstein*,
   335 F. Supp. 3d 504 (S.D.N.Y. 2018)........................................................ 38, 39

*Novoa v. GEO Grp., Inc.*,
   2018 WL 3343494 (C.D. Cal. June 21, 2018) .................................................. 62

*Nuñag-Tanedo v. E. Baton Rouge Par. Sch. Bd.*,
   790 F. Supp. 2d 1134 (C.D. Cal. 2011) ...................................................... 48, 58

*Odom v. Microsoft Corp.*,
   486 F.3d 541 (9th Cir. 2007)......................................................................... 52

*Pebble Beach Co. v. Caddy*,
   453 F.3d 1151 (9th Cir. 2006) ....................................................................... 68

*Perez v. DirecTV Grp. Holdings, LLC*,
   2019 WL 6362471 (C.D. Cal. July 23, 2019).............................................. 59, 60

*Perfect 10, Inc. v. Visa Int'l Serv. Ass'n*,
   494 F.3d 788 (9th Cir. 2007)....................................................................... 24, 46

*Ratha v. Phatthana Seafood Co.*,
   2017 WL 8293174 (C.D. Cal. Dec. 21, 2017) ................................................ 46

*RJR Nabisco, Inc. v. European Community*,
   579 U.S. 325 (2016)....................................................................................... 58

*Robins v. Spokeo, Inc.*,
   867 F. 3d 1108 (9th Cir. 2017) ...................................................................... 76

*Sec. & Exch. Comm'n v. City of Victorville*,
   2013 WL 12133651 (C.D. Cal. Nov. 14, 2013)................................................ 37

*Sedima, S.P.R.L. v. Imrex Co.*,
   473 U.S. 479 (1985)....................................................................................... 51

*Sierra Club v. EPA*,
   699 F.3d 530 (D.C. Cir. 2012) ...................................................................... 76

*Sihler v. Fulfillment Lab, Inc*,
   2020 WL 7226436 (S.D. Cal. Dec. 8, 2020)................................................... 70

xi

*Socheat Chy v. Lam Sin Yam*,
    2017 WL 10676596 (C.D. Cal. Nov. 7, 2017)............................................. 58, 60

*Solano v. Playgirl, Inc.*,
    292 F.3d 1078 (9th Cir. 2002) ............................................................... 56

*Spencer v. Mowat*,
    46 Cal. App. 5th 1024 (Cal. Ct. App. 2020) ....................................... 62

*State Comp. Ins. Fund v. Drobot*,
    2014 WL 12586244 (C.D. Cal. Jan. 28, 2014) ................................... 79

*State Comp. Ins. Fund v. Khan*,
    2013 WL 12132027 (C.D. Cal. July 30, 2013) (Carney, J.)................. 29, 52, 83

*State Compensation Ins. Fund v. Khan*,
    2012 WL 12887395 (C.D. Cal. Dec. 28, 2012) (Carney, J.) ...................... 53, 54

*Stiefel v. Bechtel Corp.*,
    497 F. Supp. 2d 1138 (S.D. Cal. 2007)................................................ 67

*Synopsys, Inc. v. Ubiquiti Networks, Inc.*,
    2017 WL 3485881 (N.D. Cal. Aug. 15, 2017) ................................... 60

*Thomas v. Dun & Bradstreet Credibility Corp.*,
    100 F. Supp. 3d 937 (C.D. Cal. 2015) ................................................ 61

*Ulti-Mate Connectors, Inc. v. Am. Gen. Life Ins. Co.*,
    2015 WL 12734007 (C.D. Cal. Mar. 27, 2015)................................. 59

*United States v. Alcius*,
    952 F. 3d 83 (2d Cir. 2020)................................................................ 35

*United States v. Botefuhr*,
    309 F.3d 1263 (10th Cir. 2002) ......................................................... 74

*United States v. Chacon*,
    533 F.3d 250 (4th Cir. 2008)............................................................. 35

*United States v. Christensen*,
    828 F.3d 763 (9th Cir. 2015)............................................................. 52

CASE NO. 21-CV-04920-CJC-ADS

PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS

*United States v. Cook*,
　782 F.3d 983 (8th Cir. 2015)............................................................. 34

*United States v. Durham*,
　902 F.3d 1180 (10th Cir. 2018) ...................................................... 39

*United States v. Estrada-Tepal*,
　57 F. Supp. 3d 164 (E.D.N.Y. 2014) ............................................. 42

*United States v. Flanders*,
　752 F.3d 1317 (11th Cir. 2014) ...................................................... 38

*United States v. Jungers*,
　702 F.3d 1066 (8th Cir. 2013) ........................................................ 42

*United States v. Juskowich*,
　2021 WL 5166564 (W.D. Pa. Nov. 5, 2021) ................................. 37

*United States v. Marcus*,
　487 F. Supp. 2d 289 (E.D.N.Y. 2007) ........................................... 39

*United States v. Mongol Nation*,
　693 F. App'x 637 (9th Cir. 2017) .............................................. 53, 54

*United States v. Robinson*,
　702 F.3d 22 (2d Cir. 2012)............................................................... 35

*United States v. Rogers*,
　321 F.3d 1226 (9th Cir. 2003) ........................................................ 60

*United States v. Shine*,
　2019 WL 6838623 (W.D.N.Y Dec. 16, 2019)................................ 36

*Visendi v. Bank of Am., N.A.*,
　733 F.3d 863 (9th Cir. 2013)........................................................... 81

*In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prods. Liab.*
　*Litig.*,
　2017 WL 4890594 (N.D. Cal. Oct. 30, 2017) ...................... 41, 55, 73

*Waldrup v. Countrywide Fin. Corp.*,
　2015 WL 93363 (C.D. Cal. Jan. 5, 2015) ....................................... 41

xiii

*Ward v. United Airlines, Inc.*,
    889 F.3d 1068 (9th Cir. 2018) .......................................................................... 61

*Zosma Ventures, Inc. v. Givi*,
    2014 WL 12579805 (C.D. Cal. Oct. 28, 2014)..................................... 67, 68, 71

**Statutes**

18 U.S.C. § 1591(a)(1) .................................................................................... 42

18 U.S.C. § 1591(c) ........................................................................................ 35

18 U.S.C. § 1594(b) ........................................................................................ 47

18 U.S.C. § 1957 ............................................................................................. 60

18 U.S.C. § 1961(4) ........................................................................................ 51

18 U.S.C. § 1961(5) ........................................................................................ 58

18 U.S.C. § 1962(c) ........................................................................................ 51

18 U.S.C. § 1965(b) .................................................................................... 73, 74

18 U.S.C. § 1965(c) ........................................................................................ 83

18 U.S.C. § 2252 .............................................................................. 49, 53, 59

18 U.S.C. § 2255(a) ........................................................................................ 56

18 U.S.C. § 2257 ............................................................................................. 24

Cal. Civ. Code § 3344(a)........................................................................... 56, 57

California Civil Code § 1708.85 ....................................................................... 62

California Civil Code Section 3344 .................................................................. 56

California's Unfair Competition Law ................................................................ 57

CDA 230.................................................................................... 4, 63, 64, 65

Clean Water Act ............................................................................................. 76

Communications Decency Act.......................................................................... 63

Communications Decency Act Section 230.................................................... 63, 64

DMCA ............................................................................................... *passim*

RICO ................................................................................................. *passim*

Trafficking Victims Protection Act Section 1595.................................. *passim*

TVPRA .............................................................................................. *passim*

TVPRA, Section 1596................................................................................. 48

Unfair Competition Law ............................................................................ 62

**Other Authorities**

154 Cong. Rec. H10888-01 (daily ed. Dec. 10, 2008)............................. 34

Fed. R. Civ. P. 4(k)(1)(A) ........................................................................ 68

Fed. R. Civ. P. 12 ...................................................................................... 29

Fed. R. Civ. P. 15(a) ................................................................................. 83

Fed. R. Civ. P. 20(a) ........................................................................... 80, 81

FRCP Rule 4(k)(2) ................................................................................... 68

Nicholas Kristoff, "The Children of Porn Hub," ....................... 24, 25, 26

Rule 4(k)(2) .............................................................................................. 73

Rule 9(b) ................................................................................................... 53

Rule 12(b)(6) ............................................................................................ 57

CASE NO. 21-CV-04920-CJC-ADS

PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS

Serena Fleites and Jane Doe Nos. 1 through 33 (collectively, "plaintiffs") respectively submit this memorandum of points and authorities in opposition to the motions to dismiss filed by MindGeek S.á.r.l., MG Freesites Ltd., MindGeek USA Incorporated, MG Premium Ltd., RK Holdings USA Inc., MG Global Entertainment, Inc., Trafficjunky Inc. (ECF No. 72-2 ("MG Mot.")), Bernd Bergmair (ECF No. 62 ("Bergmair Mot.")), Feras Antoon (ECF No. 68 ("Antoon Mot.")), David Tassilo (ECF No. 67 ("Tassilo Mot.")), Corey Urman (ECF No. 69-1 ("Urman Mot.")), and Visa (ECF No. 55-1 ("Visa Mot."))[1] and the motion to sever filed by the MindGeek Entities and joined by the Individual Defendants (ECF No. 75-2 ("Mot. to Sever")).

## PRELIMINARY STATEMENT

MindGeek, the most dominant online pornography company in the world, is also one of the largest human trafficking ventures in the world. For more than a decade, MindGeek, its owners, executives, and partners, have knowingly and intentionally elected to capitalize and profit from the horrendous exploitation and abuse of tens of thousands of human beings so that they can make more than the enormous sums of money they would have otherwise made.

In the arms race to be the number one result in the Google search engine for pornography, defendants knew it would be a huge advantage to have more content than anyone else. In the science of search engine optimization, content is king and the unrestricted accumulation of content is a driving factor in determining which website leads in Google search results. Thus, the MindGeek Defendants embraced a business

---

[1] References to the "MindGeek Entities" are to defendants MindGeek S.á.r.l., MG Freesites Ltd., MindGeek USA Incorporated, MG Premium Ltd., RK Holdings USA Inc., MG Global Entertainment, Inc., Trafficjunky Inc. References to the "Individual Defendants" are to Bergmair, Antoon, Tassilo, and Urman (collectively with the MindGeek Entities, "MindGeek Defendants.") References to "MindGeek" is to the MindGeek Defendants and the hundreds of sham entities they operate and control. Plaintiffs refer herein to MindGeek Defendants and Visa collectively as "defendants."

model in which they not only allowed users to populate their platform with virtually any type of pornographic content, but also devoted themselves to scientifically analyzing all the content and how such content, including the illegal content, could be used to maximize website traffic and advertising revenue.

This detailed, moment-to-moment analysis of site content provided defendants with a comprehensive understanding of the content on their platforms, the users who consumed it, and how to induce such users to use their platforms with the content of their choice. This included the not insignificant number of consumers of child pornography, rape, and other non-consensual content. They used this comprehensive understanding of the content, including non-consensual content, to maximize site traffic and advertising revenue by (a) soliciting, producing, purchasing, and promoting such illegal and non-consensual content on their platforms; (b) proactively editing video length, titles, and descriptive search tags based on detailed analytics to maximize views and customer advertising conversions; (c) suggesting and directing users to similar non-consensual content defendants' analytics identified as likely to induce further engagement from that user; (d) failing to impose even pretextual restrictions on the type of content that was uploaded; (f) transferring illegal non-consensual content defendants had optimized to its affiliate sites; (g) actively resisting and frustrating efforts from victims and advocates to get such material removed; (f) reuploading illegal non-consensual content in the rare instances in which they were forced to remove such content; and (g) actively misrepresenting the presence and defendants' intentional exploitation of such content to platform users, the public, the media, law enforcement and legislative bodies. In doing so, defendants succeeded in creating a bustling marketplace for child pornography, rape videos, trafficked videos, and every other form of non-consensual content.

These criminal activities were directed by MindGeek's financier, defendant Bergmair, and its executives, defendants Antoon, Urman, and Tassillo, and executed

through a byzantine international structure of hundreds of sham shell companies that were in constant metamorphous, served no legitimate purpose, and were created and dissolved sometimes daily to mask criminal activity, evade liability, and otherwise enrich defendants.  Also knowingly profiting along with them was defendant Visa, who was uniquely situated to stop this exploitation but chose instead to participate in the profiteering, even after its competitors publicly cut ties with MindGeek.

The extensive criminal activities and the detailed allegations of each defendants' role in these activities set forth in the Complaint gives rise to a host of cognizable federal and state claims.  Defendants' motions to dismiss offer no arguments that individually or collectively insulate them from responsibility for the harm their wrongdoing has caused to the 34 plaintiffs and tens of thousands of other victims.

First, defendants argue that they cannot be held liable for sex trafficking because the Complaint fails to allege that any defendant in this case assaulted, raped, coerced, or engaged in a sex act with any plaintiff or defendants' knowledge or reckless disregard that the images of plaintiffs on its platform were illegal or nonconsensual. According to MindGeek, plaintiffs' sexual assailants, traffickers, and ex-boyfriends are solely and exclusively responsible for the harm plaintiffs suffered, and MindGeek is simply a neutral internet platform that had no knowledge of these violations and cannot be held liable.  But this Court has previously rejected these very same arguments in *Doe v.MindGeek*, 2021 WL 4167054 (C.D. Cal. Sept. 3, 2021), and should do so here again.  As this Court previously held on substantially similar (albeit less egregious) allegations, MindGeek's patterns and practices create a reasonable inference of its participation in a trafficking venture and actual knowledge of the harm plaintiffs' sustained.  At a minimum, these issues raise inherent questions of fact which turn on information uniquely in defendants' possession, and cannot be resolved on this Motion.

The MindGeek Defendants' challenges to plaintiffs' claims for violation of federal child exploitation laws fare no better.  The MindGeek Defendants do not

dispute that their tubesites are rife with child pornography, which must be accepted as true on this Motion.  Their claim that the Complaint fails to plead their knowledge that each minor plaintiff was underage is belied by, among other things, their repeated public claim that MindGeek moderators reviewed every video prior to upload, and the numerous indicia in titles, tags, and comments that plaintiffs "could not be more than a teenager."  Moreover, even assuming *arguendo* that the MindGeek Defendants lacked the requisite knowledge at the time the images were uploaded (which they did not), MindGeek has maintained that it never deleted a single photograph or video posted to its tubesites even after being informed they were illegal and nonconsensual and received requests that they be taken down.  MindGeek, therefore, has illegally possessed plaintiffs' child sexual exploitation materials on its servers for years and continues to do so to this day.

Plaintiffs' RICO claims are likewise sufficiently alleged and none of defendants' challenges warrant dismissal.  As set forth herein, the Complaint pleads a RICO enterprise, each defendant's role in that enterprise, cognizable injury, and hundreds of predicate acts.  To the extent, certain allegations involve "group" pleading, that is plainly permissible at this stage in the proceedings as this Court and the Ninth Circuit have repeatedly held.

Finally, the Complaint also pleads numerous state statutory and common law claims, which defendants do not meaningfully challenge on this Motion.

Faced with the Complaint's detailed allegations and this Court's prior holding in *Doe v. MindGeek*, defendants resort to a series of procedural arguments.  None of these challenges insulate them from liability.  As this Court previously held in *Doe v. MindGeek*, defendants' practice of soliciting, curating, modifying, transferring, and reuploading nonconsensual content materially contributed to the illegal materials on its tubesites, and renders it a content creator not entitled to CDA 230 protection.

4

Defendants' efforts to escape liability on personal jurisdiction grounds should similarly be rejected. As an initial matter, the MindGeek Entities concede for the purposes of these motions that the California-based plaintiffs have a basis for personal jurisdiction over them. Moreover, this Court has general jurisdiction over the two California-based MindGeek Entities, MindGeek USA Incorporated and MG Global Entertainment Inc. The Complaint alleges that each of the Individual Defendants and MindGeek Entities – including defendants MindGeek USA and MG Global which are headquartered in this State and do not contest jurisdiction on this Motion – are alter egos of each other and hundreds of international sham shell companies that serve no other purpose than to avoid investigation and liability for their ongoing criminal activities. Under these circumstances, MindGeek USA and MG Global's jurisdictional contacts must be imputed to the remaining defendants under alter ego theories of liability. This is particularly true here, where a sworn declaration submitted by the MindGeek Defendants concedes that the entities operated without regard to the corporate form and as one single company, including that employees of California-based defendant MG Global (purportedly created for television-based services) moderates videos posted and reuploaded to MindGeek tubesites by MindGeek Freesites, among others. At a minimum, plaintiffs are entitled to discovery concerning the relationship between these entities and individuals and their jurisdictional contacts.

Finally, this Court should deny the motion to sever certain plaintiffs' claims which all arise from the same ongoing, pervasive patterns and practices. Under these circumstances, where there is substantial overlap in the factual and legal issues, joinder is in the interests of judicial efficiency and severance is unwarranted.

## FACTUAL BACKGROUND

### A. MindGeek's Human Trafficking Venture and Criminal Enterprise.

1. <u>The Fake Pornhub Façade</u>

Defendants go to great lengths to portray MindGeek like other internet

5

companies, such as YouTube or Craigslist. (MG Mot. 4, 21-22; Tassillo Mot. 2; Antoon Mot. 3.) And, as far as it goes, MindGeek has similarities to other internet companies, much like Satrieles and BadaBing had similarities to legitimate businesses in the Sopranos. MindGeek owns a group of "tubesites" that contain free, purportedly user-populated, digital pornography. Users are drawn to the MindGeek tubesites by the ability to access, upload, and exchange free content. (¶ 83.) MindGeek uses the traffic generated by that free content to (a) advertise additional pornographic sites that offer paid content that are either owned by MindGeek or by third-parties; (b) sell advertising for other products and services it or third-parties offer; and (c) harvest user data for its own purposes and to sell to third parties. (*See* ¶¶ 83-89.)

Central to the economics of these relationships is traffic to MindGeek's tubesites. (¶ 91.) The more traffic, the more attractive the tubesites are to advertisers and paid content partners, the more ad impressions and customer conversions generating revenue, the more data to optimize and increase traffic, impressions, and conversions, and the more content to attract more user traffic. (*Id.*) This is a reinforcing dynamic. (*Id.*) As traffic increases, content, product, and service optimization increases, which, in turn, increases traffic even more. (*Id.*)

None of that is remarkable. Indeed, it is standard internet business. What is remarkable and illegal is MindGeek's incorporation of illegal, non-consensual content as a major component of this business. Although MindGeek tried to portray its flagship tubesite, Pornhub, as well as its other tubesites as "wholesome," legitimate, responsible, and mainstream, this was all window dressing. MindGeek's business plan is to provide supply for any pornography for which there is a demand, without regard to consent or legality because this was the only way to maximize SEO. Content was king and MindGeek's exclusive priority. (¶¶ 123-27.)

To maximize SEO, MindGeek intentionally elected to put no restrictions on the content it would accept, offer, and commercialize. (¶ 172.) Like a soft-drink company

selling different beverage types and flavors to capture all existing consumer tastes, MindGeek sought to service demand for all pornographic tastes, including tastes for child pornography, rape, extreme violence, racism and hate, and other illegal acts like bestiality. (¶¶ 168-175.) Indeed, numerous versions of "underage," "teen," and "incest" were consistently among the most searched terms and popular results in MindGeek's algorithmic video and search term tubesite suggestions. (¶ 128.) Likewise, numerous versions of "drunk," "drugged," "passed out," and other tags indicating incapacitation were also among search terms sought most often by users and suggested by MindGeek. (*Id.*) None of this was random. It was all a product of Mindgeek's constant SEO operation which monitored traffic, use, searches, and interactions to constantly refine the platform's interface with users, particularly the descriptive tags and search terms used and proposed and the suggestions for additional searches and content the site provided to users.

Indeed, the entire image of Pornhub and its affiliates as platforms comprised primarily of user uploaded content was a fraud. (¶ 131.) And it was an important strategic fraud intentionally designed to obscure the MindGeek Defendants' direct control and culpability and insulate them from exposure under United States laws. (*Id.*) In fact, however, vast amounts of the content on these sites, although appearing to be uploaded by individuals independent of MindGeek was produced, acquired, and uploaded by MindGeek, sometimes directly and sometimes through affiliates and partners. (¶ 132.) This content was not merely acquired for MindGeek, but it was produced, purchased, and formatted by MindGeek. Specifically, MindGeek regularly had specific content produced in trafficking regions such as Asia and Eastern Europe, had it uploaded surreptitiously as "user content" through shell companies and partners, tested and refined the content to improve future productions, edited the scenes and length, provided the titles and tags, and uploaded it to appear as if it was posted by individuals. (¶¶ 132, 200-04.)

CASE NO. 21-CV-04920-CJC-ADS

PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS

In addition to MindGeek's own production and uploading of purportedly user-generated content, a substantial amount of the content it placed on its sites was from bulk uploads of pirated copyrighted materials that MindGeek or third-parties it commissions pirated. (¶ 133.) Indeed, whistleblowers reported personnel in MindGeek's Montreal headquarters "ripping" content from DVDs in a regular overnight operation and uploading that content to Pornhub and the other tubesites as independently uploaded content. (*Id.*) This was just one of the many schemes MindGeek used to add content to its sites. (¶¶ 133, 135, 139, 215-16, 342-43.)

Even content that was user-generated was edited by MindGeek formatters before upload. (¶ 134.) These formatters would provide or modify titles, descriptions, and tags, and edit videos in order to maximize SEO, ad impressions, and customer conversions. (*Id.*) MindGeek has repeatedly maintained publicly that every video on its sites went through this process. (*Id.*)

Moreover, MindGeek pushed all content posted on any of its tubesites, regardless of initial sourcing, to its other tubesites, which it again falsely portrayed as posted by third party users. (¶¶ 136, 138, 198-99, 247, 249-53, 259, 405.)

MindGeek's intensive SEO function scrutinized all content, particularly content that its real-time analytics indicated was trending, gaining ad impressions, and generating conversions. (¶ 137.) This process was applied to all content, regardless of category or subject being portrayed, and content that was effective would be modified and often duplicated to optimize its SEO further. (*Id.*) Where analytics indicated any content could be optimized better, it too would be modified to do so. (*Id.*)

Another scheme was the reuploading of all materials that despite MindGeek's best efforts had to be taken down because it had received a directive from authorities or a victim's lawyer to remove child pornography or other illegal content or a DMCA copyright violation notice. (¶¶ 135, 212-15, 218, 405.) Although MindGeek would begrudgingly comply with such legal requirements, it would only disable the videos,

not delete the webpage, title, tags, or comments.  (¶¶ 135, 209-11, 256, 258, 405.)  Nor would it delete the video from its server, even in those cases where the content was identified as child pornography.  (¶ 135.)  MindGeek has publicly confirmed this on multiple occasions.  *Id.*  The reason behind MindGeek's decision to keep every video (even disabled ones) ever uploaded on its servers is simple:  content was king, and disabled content would be reuploaded to the system by MindGeek in a manner that appeared as if it had been uploaded by users and not MindGeek.  (*Id.*)

Thus, regardless of initial production,  Mindgeek, not independent users, uploaded vast amounts of its platform's content; MindGeek was intimately familiar with, analyzing, modifying, and optimizing in real-time all content regardless of who uploaded it or whether it was legal; Mindgeek used all that optimized content to generate revenue in various ways; and MindGeek transferred all that content to its other sites and sometimes third-party partner sites to maximize revenue generated. (¶ 138.)  That is, all the individual content on MindGeek's tubesites was a MindGeek production and product.  (*Id.*)

Although, MindGeek expended substantial resources and effort ensuring that its tubesites had all the indicia of legitimate internet websites, including a polished appearance, comprehensive terms of service, policies, and customer service, this was all part of its elaborate scheme.  (¶¶ 124, 127, 551.) The extensive terms of service were never enforced or intended to be enforced.  (¶ 128.)  To the contrary, those stated terms, policies, and restrictions were anathema to the actual business model MindGeek was pursuing.  (*Id.*)   The terms of service operated as instructions to users to title, tag, and describe their content to include terms signaling illegal or non-consensual content and upload this very type of content.  (¶¶ 129-30, 168, 176, 188-95, 200-04, 207-11.) Likewise, there was no real complaint or customer service functions because actually enforcing the terms of service was contrary to the actual business model MindGeek was implementing.   (¶¶ 130, 187.)

2.  MindGeek Solicited, Promoted, and Normalized Illegal Content on Its Platform.

From inception, MindGeek embraced underage, nonconsensual, and pirated content in its business; solicited, produced, paid for, and placed such content on its pornography platforms; and lied about and concealed these facts.  (¶¶ 168, 176.)

(a)  MindGeek Purchased Trafficked Content In Bulk

Substantial portions of the purported "user" content on MindGeek's tubesites was content produced by human traffickers that MindGeek itself commissioned or from whom it otherwise agreed to purchase.  (¶ 177.)  It did this to increase its content and SEO exponentially more than it could have had it relied entirely on actual user uploaded content.  (*Id.*)  It also allowed it to secure content that its SEO analysis revealed was generating the greatest ad impressions and conversions.  (*Id.*)

First, monies necessary to pay for the production, middlemen, and uploading of the content were transferred from foreign subsidiaries to agents/middlemen without any paper trail as to what the payments were for.  (¶ 178.)  Those agents/middlemen would handle all interactions with producers in Eastern Europe and Asia who offered the best quality for the cheapest prices.  (*Id.*)  The finished content would then be transferred to the agent, who then transferred it for formatting to shell companies or MindGeek partner channels who would do the formatting in exchange for favorable terms or monies disguised as partner channel payouts.  (*Id.*)  Once formatted, the content would be uploaded by these entities and/or a network of agents who were paid to create user identities and upload content.  (¶ 180.)  Sometimes such content would be uploaded by MindGeek directly.  (*Id.*)  Once uploaded the content would be analyzed for SEO effectiveness, and the content and formatting refined to maximize SEO.  (*Id.*)  Then additional orders would be placed using the same process.  (*Id.*)

MindGeek was aware the content was trafficked because it met with the producers and visited some of their production sites.  (¶ 182.)  In one such visit, MindGeek executives witnessed a football-field size warehouse in which women were

10

crammed into studio stalls "like livestock" to perform on camera.  (*Id.*)  Many of the women appeared young and were engaged in scenes depicting underage girls.  (*Id.*)  When asked by the producer where the women came from, the producer explained that his company had agents that scoured Eastern Europe for women who they recruited with promises of lucrative modelling jobs that would allow them to go to college and otherwise have a better life.  (¶ 183.)  When those women agreed, they were transported to dormitory style housing and matched with a "boyfriend" who would groom them for porn.  (*Id.*)  Women who were victimized by this trafficking network reported that when they tried to leave, they were informed that their sessions had been recorded and if they did not continue performing the trafficker would send copies to their families and otherwise release them publicly and destroy their reputation and future.  (¶ 184.)

Defendants repeatedly deflected concerns raised internally by finance people when they realized MindGeek was paying numerous ostensibly independent cam models through a single account.  (¶ 186.)  This was a trafficking red flag, but MindGeek executives informed finance to ignore the red flags and continue payments because "they knew the people behind the account and it was ok."  (*Id.*)

(b)  <u>MindGeek's Unpoliced Platform</u>

MindGeek's intentional use of illegal content was nowhere more apparent than the unrestricted ability to upload such content onto its tubesites.  (¶ 187.)  MindGeek's own Social Media Manager publicly explained that it would be a "disaster" to try to restrict users and uploaders to adults because "then no one would upload anything," it would "cost[] us money to verify," "devastate[] traffic," and "MindGeek loses money." (*Id.*)  This MindGeek spokesperson further warned that even pretextual restrictions would be unacceptable to MindGeek because some percentage of minors would not be able to figure out how to circumvent them: "you would get around them, a lot of

1  people here would too but the large majority won't know how." (*Id.*)  In the SEO arms

2  race that is online pornography any restriction in content is unacceptable.

3        Consistent with this ethos, despite publicly representing that every image was

4  reviewed before being uploaded and despite knowing illegal content would be

5  uploaded without legitimate monitoring, MindGeek intentionally used an upload

6  process that would not filter out illegal content.  (¶ 188.)  Thus, while non-

7  pornographic tubesites with far less content uploaded on a daily basis (and far less

8  users seeking illegal conduct) employed tens of thousands of "moderators" and

9  sophisticated technology to ensure content was legal and complied with the terms of

10  service, MindGeek's uploading process – with a vastly increased risk of illegal content

11  – ensured virtually no illegal content would be blocked from upload.  (¶ 189.)

12        MindGeek's sham moderation function consisted of as few as 6 but never more

13  than about 30 untrained, minimum wage contractors for all of MindGeek's tubesites

14  and millions of videos uploaded daily.  (¶ 190.)  It was, of course, impossible for such

15  a minute number of individuals to actually watch and moderate the vast volume of

16  daily videos uploaded.  (¶¶ 191, 193.)  Indeed, their real function was formatting, and

17  internally they were called "content formatters," not "content moderators."  (¶ 192.)

18  As formatters, their task was not to moderate legality, but format the videos for optimal

19  SEO.  (¶¶ 192, 195.)  To do so, they would add or edit the title, tags, and descriptions

20  and sometimes edit the video.  (¶ 192.)  They also "scrubbed" words in the titles and

21  tags that unequivocally indicated criminality.  (*Id.*)  While the red flags of criminality

22  were removed, the video would nevertheless be uploaded with optimized titles, tags,

23  and descriptions that would still permit MindGeek's search engine to suggest the video

24  to users searching for that illegal content.  (*Id.*)

25        Demonstrating the task was formatting not moderation, MindGeek set unrealistic

26  daily quotas of at a minimum 700-800 videos that bore no relationship to the time it

27

28

CASE NO. 21-CV-04920-CJC-ADS

PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS

would take to actually screen that content.  (¶ 194.)  The quotas were based on how long it should take to format, not screen, the content.  (*Id.*)

(c)    MindGeek Modified, Distributed And Reuploaded Illegal and Nonconsensual Content To Its Platform.

MindGeek did much more than permit illegal content to be uploaded and remain on its site.  (¶ 198.)  For example, MindGeek took all content uploaded without restrictions onto Pornhub and transferred that content to its other tubesites.  (¶¶ 136, 138, 198-99, 247, 249-53, 259, 405.)

In addition, as part of its critical SEO process of supplying product for every taste and demand, MindGeek's primary business function was real-time analytics of all its content and traffic, including without exception its illegal content, so that it could decipher what content, presentations, and other elements generated the most traffic, interaction, and revenue conversion and modify the content and sites accordingly. Thus, for example, based on this relentless real-time analytics, MindGeek would modify the formatting (titles, tags, descriptions) of similar content to improve its performance and SEO generally, and it used a sophisticated and ever improved algorithm to direct users to more content that suited their identified interests.  (¶ 200.) This was done for all categories of content, including those depicting minors, rape victims, and other non-consensual conduct.  (*Id.*)

The focus of this analysis was exclusively identifying which content was trending and producing ad impressions and subscriptions.  (¶ 201.)  Content that was trending was further refined and tested to amplify it even more, and the conclusions drawn from that were applied to similar content.  (*Id.*)  What was not a focus at all was whether the content was in fact consensual or adult.  (*Id.*)  Nowhere in this process or elsewhere, did MindGeek comply with § 2257's requirements that they secure proof of age where they were uploading material or confirm that content being transferred by MindGeek contain the required age certification from the producer.  (*Id.*)

When MindGeek identified a title or tags that too explicitly flagged illegal content and thus risked revealing such ubiquitous content on its sites, it would notify the user to change the title or change it themselves. (¶ 202.) But MindGeek would not disable the illegal video. (*Id.*) For example, a member of the Pornhub model program, whose revenues were shared with MindGeek, had multiple videos of underage and incapacitated women with titles indicating such was the case (*Id.*) One video of an underage and incapacitated woman carried the viewers comments, "I thought she was dead until five minutes in" and "I don't think that girl is old enough to buy lottery tickets. If you catch my drift." (*Id.*) The uploader originally titled the video, "delete your history after watching this" obviously flagging the video as child pornography. (*Id.*) But then he changed the title and when asked why by others, he explained, "Pornhub support told to change all titles." (*Id.*)

This analysis was also part of MindGeek's sophisticated search algorithm by which it would solicit users to view similar content. (¶ 203.) Thus, for example, when a user, searched for "teen sex," MindGeek would present the most popular video results associated with that term, and solicit searches with a host of other more detailed terms used by others for similar content, like "barely legal teen sex," "young teen sex," "middle school teen sex." (*Id.*) Investigators, advocates, and journalists following MindGeek's suggestions easily found within a few clicks videos of obvious child pornography or other forms of non-consensual sex with terms associated with that type of abuse, like "drunk," drugged," and "passed out." (*Id.*)

This was no accident. (¶ 204.) It was a product of MindGeek's deliberate, and detailed understanding of the content on its site and effort to solicit people to watch that content and continue using the site. (*Id.*) As an insider explained, MindGeek had the capabilities to easily search for illegal content, but never did: "[Y]ou can search any word, any video, you can look for the user, anything like any other database . . . so, why are they not searching for this and cleaning? . . . Because they want the content on

14

their sites." (¶ 205.) MindGeek did not search because it did not need to. It was intimately aware of the content of its website like NASA is aware of everything going on in a space capsule. It knew full well that it had thousands of videos with clear indicia of illegal or nonconsensual content, and that this was a "genre" from which it could generate significant revenue. (*See, e.g.,* ¶¶ 217 (15-year-old was beaten and raped); 218 (two videos of child pornography, including a toddler in diapers being abused and a prepubescent girl being anally raped); 427 (detailing videos resulting from searches for illegal content).)

The only time MindGeek would voluntarily remove content was when this detailed analysis revealed the content was harming its SEO. (¶ 206.) For example, MindGeek determined that male homosexual content was interfering with its impressions and conversions because when the search algorithms suggests a gay video, a material percentage of users exited the website. (*Id.*) Accordingly, MindGeek affirmatively worked to reduce such content on its site. (*Id.*) No similar steps were taken when it became aware of illegal, nonconsensual content in its SEO work. (*Id.*)

The intentional exploitation of illegal content was further evidenced by MindGeek's treatment of videos flagged by authorities, victims, and users as illegal. (¶ 207.) Such requests were ignored, stonewalled, and stalled to preserve the use of the content for as long as possible. (*Id.*) This was especially a priority when the content was performing well, and MindGeek's SEO analysts were trying to use that data to refine their algorithms and solicit views of similar content from the same category of "consumers." (*Id.*)

Thus, when victims, including plaintiffs, would notify MindGeek that videos of their abuse had been uploaded, they were typically ignored unless the victims persisted. (¶¶ 208, 263-64 (Fleites), 274 (Doe 1), 280 (Doe 2), 295 (Doe 6), 314 (Doe 11), 327 (Doe 14), 331 (Doe 15), 336 (Doe 16), 341-43 (Doe 17), 346 (Doe 18), 349 (Doe 19), 356 (Doe 22), 362 (Doe 24), 365 (Doe 25), 376 (Doe 28), 382-83 (Doe 29).)

Then they would be stonewalled with denials or demands for information. (¶ 208.) For example, in some instances, victims, including plaintiffs, were told that only the uploader could request a video be taken down; or they needed to provide the URLs for the videos; or that the videos did not exist or could not be found when they did exist and could be found; or that they had been taken down when they had not been. (¶¶ 208, 264, 281, 331, 341.)

Moreover, when victims or authorities succeeded in getting MindGeek to remove an illegal video, it would only disable the video but keep the webpage with its title, description, tags, and comments so that the video though disabled would still continue to increase SEO. (¶ 209.) When a user searching for such content landed on the disabled video's webpage, MindGeek's search and video suggestion algorithms would solicit the user with similar videos to the one disabled. (*Id.*) Indeed, to this day, one can run internet searches for known CSAM/child pornography or other non-consensual content that was ordered taken down and the search will bring you to Pornhub even though that video is not enabled. (¶ 211.) MindGeek's algorithm will then direct you to similar non-disabled content. (*Id.*)

Much worse, according to multiple insiders, MindGeek systematically would reupload all content that it had been forced to disable back to the system and do so in a manner in which it appeared to have been reuploaded by independent users and which circumvented MindGeek's purported systems for identifying previously disabled videos. (¶ 212.) This is the reason why so many victims, including plaintiffs, reported that even when they successfully got videos disabled, the same videos would be reuploaded again and again. (¶¶ 212, 280 (Doe 2), 293-94 (Doe 6), 303 (Doe 8), 326-27 (Doe 14), 343 (Doe 17), 365 (Doe 25), 390 (Doe 31).) One eyewitness to this process, explained that caches of disabled content "would be provided to employees on disks and they would be instructed to reupload those videos from non-MindGeek

computers using specific email addresses that would allow the uploads to bypass MindGeek's purported 'fingerprinting' of removed videos. . ." (¶ 213.)

MindGeek has repeatedly stated publicly that it retains on its servers all videos ever uploaded onto its tubesites. (¶ 214.) This no doubt is necessary for its reuploading practice and SEO generally. (¶¶ 213-14.) MindGeek, therefore, has throughout its existence illegally possessed CSAM/child pornography, and reuploaded that CSAM/child pornography innumerable times. (*Id.*) Indeed, MindGeek, with duplicative servers in the United States and Canada (among other places) is likely the largest non-regulatory repository of CSAM/child pornography in North America. (*Id.*)

Moreover, insiders explained that MindGeek provided a download button for users to facilitate the propagation of content, including illegal content. (¶ 215.) MindGeek knew and counted on users to download content, make new content and compilations, and then reupload it as new content or as a replacement for disabled content. (*Id.*) And it incentivized them to do so by providing various programs whereby they could monetize such content, sharing the revenue with MindGeek.

Despite admitted possession of massive amounts of child pornography, until 2020, and hundreds if not thousands of complaints about such content, MindGeek never voluntarily made a single legally required disclosure to authorities in the United States or Canada about that material under either countries' laws. (¶ 217.) Not only did MindGeek not report CSAM/child pornography it became aware of on its tubesites, it actively discouraged victims and others from reporting it, and lied to do so. (¶ 219.) For example, MindGeek tried to convince a victim of CSAM/child pornography not to report its presence on MindGeek's tubesites and lied about MindGeek's practice of not removing such content unless forced to do so: "You don't need to report the urls to an agency, just flag them it[']s very likely if it[']s not removed it not illegal content. . . . We do have access to our entire upload library, including deleted videos and can confirm this." (*Id.*) Only an entity committed to the exploitation of such illegal

material would systemically fail to report it as legally required and try so hard to ensure others did not report it as well.

## B. The Enterprise Directing MindGeek's Rackets And Schemes

### 1. The Enterprise and Its Members

MindGeek's criminal activities were executed through an associated-in-fact enterprise (the "Enterprise") comprised of hundreds of international sham shell entities, including the MindGeek Entities (¶¶ 100, 140-42, 144, 146, 537). This international network of sham entities, were managed, directed, and controlled by defendants Antoon, Tassillo, Urman, Bergmair and the uber wealthy investors that Bergmair represents, (¶¶ 100, 119-21, 140-42, 144, 146, 537), the MindGeek defendants' "capos" and "soldiers" including those who previously ran tubesites or porn advertising companies that MindGeek used and relied on to solicit and secure trafficked and nonconsensual content (¶¶ 98-99), and a network of corrupt credit card companies (¶¶ 149, 159), including defendant Visa (¶¶ 9, 417-25, 431-32, 503-06, 536-37), which the Enterprise relied on to process fraudulent financial transactions, siphon off illicit profits, and avoid credit card red flags. (¶¶ 3, 72-75, 80, 93, 110.) The Complaint details how each member of the Enterprise furthered its common purpose.

### 2. Antoon, Tassillo, Urman, and The Bro Club

Managing and directing every aspect of these illegal activities was a select group of "made" men, led by MindGeek's CEO, defendant Feras Antoon. (¶¶ 93, 100, 109, 119, 144-45, 153-55, 178.) These "made men," including defendants Corey Urman and David Tassillo, refer to themselves as the "Bro-Club." (¶¶ 93-94.) Bro-Club membership comes with the opportunity to make substantial monies participating in the Enterprise's criminal activities. (¶ 93.)

These "made" members earned their "bones" not through *bona fide* skills, but because they had demonstrated a loyalty to Antoon, eagerness to participate in the Enterprise's criminal activities, an appetite for money, and a willingness to participate

without objection, inquiry, or disclosure of illicit activities to advance in the organization.  (¶ 94.)  Thus, for example, the critical position of Chief Technology Officer of this purportedly leading technology company was initially given to an Antoon relative, Karin Mouaffi, without the resume to rate the job.  (¶ 97.)  Experienced MindGeek programmers consistently complained and were extremely frustrated with his inept leadership.  (*Id.*)  But his loyalty to the Enterprise was beyond question and thus he was in charge of the technology central to so many of its criminal schemes.  (*Id.*)  Other high-ranking positions were also reserved for Antoon's relatives despite that they lacked the credentials for these roles.  (¶¶ 95-96, 122.)

The Bro-Club "capos" also included some who had previously formed successful tubesites or porn advertising companies that were sold to or otherwise partnered with MindGeek.  (¶ 98.)  Although teaming with MindGeek meant these individuals needed to share their revenues, one insider explained, they joined the Enterprise nevertheless because "it provided protection from overseas folks who are bad guys involved in bad stuff . . . If you are running your own site and you know these pimps might do harm to you, you join Tony Soprano's team.  Make less money but no one will shoot you in the street."  (*Id.*)  The "pimps" being referred to were the known traffickers in Eastern Europe and Asia from whom the Enterprise and those who typically joined it bought substantial pornography.  (¶ 99.)

This core group of "bosses" controlled all the elements of MindGeek's business through which the Enterprise executed and masked its schemes.  (¶ 100.)  In particular, they controlled its finances, technology, content acquisition, formatting, moderation, website operation and optimization, and the byzantine network of international affiliates and partners through which the Bro-Club executed many of its schemes.  (*Id.*)  They did so through "capos" looking to enter the Bro-Club.  (*Id.*)  These directors and vice-presidents were directly supporting the Enterprise's illegal activities that ran off the MindGeek platform.  (*Id.*)  One former insider explained, "they referred to

directors and managers as 'parachutes' if this goes wrong. . . . They keep them in the dark, tell them to approve shady things like ads and partnerships and credit card transactions but never in writing.  Then they would be able to say it was someone else's decision if it went wrong." (¶ 103.)  This structure provided the Bro-Club with, in defendant Antoon's words, "plausible deniability"; revealed which employees should be promoted; and chilled insiders with questions or objections.  (*Id.*)

There was extreme secrecy and security attached to the Bro-Club's deliberations, decision, and activities.  (¶ 104.)  Due to fears of recording, phones were excluded from meetings of senior Bro-Club members.  (*Id.*)  The executive offices from which the Bro-Club operated were separated from regular employees and protected by strict security measures.  (*Id.*)  Particularly guarded were the finance offices.  (¶ 105.)  Only certain personnel were allowed to even enter these offices; others were permitted only when certain other designated personnel were present; and doors were locked and shades drawn when unoccupied.  (*Id.*)

Moreover, Antoon, Tassillo, and Urman actively concealed the Enterprise's criminal activities through false testimony to the Canadian House of Commons and in public interviews with media sources wherein they materially misrepresented the types of content on Pornhub's and its affiliates tubesites and their putative moderation and review systems.  (¶¶ 82, 196, 204, 255, 439-40, 451, 453-57, 459-60, 463-64, 470-71, 473, 475, 477-78.)  In addition, as detailed below, Facts § C, *infra*, Urman orchestrated an astroturf campaign to silence victims and advocates threatening to expose MindGeek's criminal activities, including through the use of aliases (¶¶ 435-83.)

### 3. Bergmair and the Financiers

While the Bro-Club had daily operational control over MindGeek's business, they were not the exclusive bosses.  (¶ 109.)  Also in control were the actual owners of MindGeek, a group of uber wealthy individuals represented by defendant Bernd Bergmair, the former CEO of Pornhub competitor RedTube.  (¶¶ 109, 114.)  In 2012-

20

13, Bergmair's investors purchased MindGeek's predecessor, Manwin, restructured Manwin's existing debt, and merged it with Redtube. (¶¶ 116-17.)  Despite full awareness of the fraudulent international corporate structure through which Manwin conducted its business (¶¶ 115, 119), the acquisition was falsely portrayed as a "clean wash" of the company which had been plagued by criminal misconduct and government investigations, and the "new" company, MindGeek, was portrayed publicly as a company specializing in SEO and committed to best practices and technology to ensure the business was free of illegal content and activities.  (¶ 119.)  In truth, nothing had changed with respect to the nature of the business.  (*Id.*)  Bergmair and his owner group conducted extensive due diligence before proceeding with the transaction and were fully aware of the fraudulent international structure through which MindGeek conducted its illicit business and on which it depended.  (¶ 119.)

Despite their centrality to the transaction, and control of the company going forward, the identities of Bergmair's investors, as well as Bergmair's real identity remained unknown.  (¶ 118.)  To the public, Antoon and other members of the Bro-Club were falsely reported to be the owners of the business.  (*Id.*)  It was understood that the existence of other owners was never to be mentioned.  (*Id.*)  Bergmair took extreme steps to conceal not just his identity, but his very existence.  (¶ 115.)  He expended substantial sums scrubbing almost any references of himself from the internet and went by various alias.  (*Id.*)  He took such extraordinary measures because he and his investors were fully aware of the legally dubious nature of the business they owned and ran, and some of these investors were themselves the subject of international legal scrutiny or associated with those who were.  (*Id.*)  The investors were so uneasy being associated with this business, they were rabid about even their financier becoming known.  (*Id.*)

Bergmair exercised daily direct oversight and control over the strategic operations of MindGeek, closely managing financial operations, business plans, and

even the technology that was critical to the internet porn company's business.  (¶ 120.)
Indeed, his technology involvement was so extensive, programmers and developers
complained incessantly about what they considered his uninformed meddling.  (*Id.*)

In exercising control for the owner group, Bergmair was in regular contact with
and directing the Bro-Club on major MindGeek decisions.  (¶ ¶ 56, 72, 121.)  He
received regular briefings on the financial performance of the Enterprise, was briefed
on all activities designed to meet its financial commitments to the owners, and
approved those initiatives material to that requirement.  (*Id.*)

### 4.   The Fraudulent Network of MindGeek Sham Shell Companies

From its inception, MindGeek operated its business through hundreds of sham
shell companies scattered throughout the world that were created and maintained solely
to facilitate and mask criminal conduct and insulate the company, its executives,
owners, and enterprise members from liability.  (¶ 140.)   Of course, there was no *bona
fide* business reason for this putative SEO company to utilize this excessively
complicated international network of sham shell companies.  (*Id.*)

Consequently, despite generating hundreds of millions in revenue annually,
MindGeek pays effectively no taxes anywhere.  (¶ 141.)  Instead, by the time those
revenues are funneled through the hundreds of international shell companies, the
parent company records massive losses, not profits.  (*Id.*)  And because these sham
shell companies are so numerous, and so dispersed across jurisdictions, no one
jurisdiction can easily investigate the evasion or even be incentivized to do so.   (*Id.*)

Consistent with its illicit purpose, this network was in constant metamorphosis.
(¶ 142.)  MindGeek created, dissolved, and then replaced sham shell companies on a
monthly and sometimes daily basis, often with virtually the same names.  (*Id.*)  These
sham shell companies had no *bona fide* business or substantive economic purpose,
directors, officers, employees, or offices.  (*Id.*)  There was, likewise, no *bona fide*
business purpose for the network's sheer complexity and opaqueness or its constantly

1  quantum like dissolution and creation of entities.  (*Id.*)  This shell game existed

2  exclusively to implement and mask the Enterprise's criminal schemes, evade taxes,

3  launder money, and insulate Enterprise members from culpability.  (*Id.*)  Bergmair and

4  the Bro-Club implemented and controlled this elaborate shell game.  (¶¶ 100, 119-22,

5  144.)

6     These sham entities would have a single nominal director from among low-level

7  Enterprise members or MindGeek employees (such as executive assistants).  (¶ 144.)

8  These purported "directors" knew nothing about the shell's purpose, existence, or

9  operations; exercised no control over its bank accounts or "operations"; were paid

10 handsomely for the no-show job and the substantial legal risk associated with it; were

11 pure proxies and agents from the Bro-Club members who appointed and directed them;

12 were frequently questioned by authorities without having any information to provide

13 because they were figureheads controlled by the Bro-Club leaders; and were replaced

14 regularly according to an appointed schedule so as to further impede the ability of

15 authorities to investigate.  (*Id.*)

16    MindGeek operated these various sham entities as agents and alter egos of each

17 other.  (¶ 66.)  Indeed, it funneled monies from its foreign subsidiaries in Luxembourg

18 and Cyprus through its MindGeek USA subsidiary into California to lobby against

19 laws governing the porn industry in violation of California law.  (¶ 438.)  This illegal

20 lobbying and laundering of money to oppose these proposed laws resulted in fines

21 imposed by California Fair Political Practices Committee.  (*Id.*)  The MindGeek

22 Entities concede that this network of shell companies were all operated as one large

23 company (ECF No. 70-2 Dec., ¶ 22), including with respect to the critical moderation

24 function for its tubesites, which MindGeek admits was tasked to employees of U.S.-

25 based defendant MG Global Entertainment, which was putatively formed to provide

26 services for television-based businesses (*id*. at ¶ 21).

27

28

In addition to being used to mask criminal involvement, MindGeek's sham shell companies were used to launder cash out of the organization to criminal partners and Enterprise members. (¶ 146.)  These transactions, typically in the form of loans, investments, or vendor payments, would result in net operating losses to MindGeek. (*Id.*)  Indeed, over the last 3-5 years, MindGeek has accumulated substantial net operating losses despite hundreds of millions of dollars in annual revenue. (*Id.*)  Those "lost" monies were transferred to third parties in which Enterprise members had an interest or financial arrangement. (*Id.*; see also 147-150.)

Moreover, Enterprise members or their associates and partners would use their control over MindGeek to cause it to transact with shell companies they owned, or (more often) companies owned by others from whom the Enterprise members would be paid. (¶ 152.)  In another scheme the Bro-Club would use its control over MindGeek to give favorable advertising placement to so-called affiliate channels or partners using the site as a feeder for their own paysites. (¶ 153.)  In exchange, Enterprise members would receive a cut of that third party's profits as a kickback. (*Id.*)  This defrauded others who had bid and paid more for priority placement on the site by diverting traffic from their sites to the ones paying the Enterprise members. (*Id.*)  In other instances, the Bro-Club would simply place ads for these affiliates ahead of those of unrelated affiliates who had bid more for that placement. (*Id.*)

Thus, the Enterprise used MindGeek and its network of sham shell companies to perpetuate a long-running, elaborate pattern of illegal schemes, mask their illicit activities, launder money, and evade taxes by making it difficult for any one jurisdiction to see suspicious transactions and effectively investigate isolated transactions let alone the overall operation. (¶¶ 73, 140, 142, 145-46, 160-61.)

### 5. Visa

For over a decade, Visa partnered with MindGeek and profited millions of dollars from MindGeek's trafficking venture and other criminal activities. (¶¶ 407-08,

415, 418-19, 421-27, 431, 502.)  Visa was aware of actual instances of trafficking and CSAM/child pornography and red flags from its own due diligence and compliance functions.  (¶¶ 410, 424, 537.)  Indeed, even the most superficial inquiry would have revealed: (i) titles, descriptions, and tags that showed that MindGeek's algorithmic suggested video and search functions did not merely tolerate non-consensual content but encouraged its upload and viewing; (ii) MindGeek failed to take any steps to police illegal content; and (iii) MindGeek systemically ignored age-verification requirements or otherwise failed to comply with 18 U.S.C. § 2257.  (¶¶ 411-13.)

Visa's knowing and intentional participation in MindGeek's human trafficking enterprise and other criminal activities is further evidenced by the fact that Visa continued to do business with MindGeek even after: (i) PayPal publicly terminated its business relationship with MindGeek because it could no longer ignore the overwhelming evidence of MindGeek's trafficking venture (¶ 417); (ii) MindGeek's partner channels, GirlsDoPorn, was convicted for being a human trafficking venture (¶ 418); (iii) Visa was presented with irrefutable evidence from advocates and public interest groups about MindGeek's illegal activities and Visa's participation therein (¶¶ 419-26); and (iv) the December 4, 2020 New York Times bombshell report by Pulitzer Prize winner Nicholas Kristoff, "The Children of Porn Hub," reported how his relatively modest investigative efforts easily revealed that MindGeek was flooded with non-consensual content and seemed designed to be so (¶¶ 427, 432).  Indeed, in the wake of that report, Visa and Mastercard publicly announced investigations of their own, which within days purportedly confirmed the Kristoff reporting, which could only mean they knew about such conduct beforehand and could not have missed it.

Like Urman, Antoon, and Tassillo, Visa made numerous public misrepresentations in an effort to conceal MindGeek's criminal activities and its own participation therein.  (¶¶ 419, 427 (falsely alleging Visa categorically barred

transactions involving child pornography and human trafficking, that Visa only permits transactions on the Visa network for lawful products and services).)

### C. The Criminal Scheme to Conceal the Enterprise's Racketeering and Shame, Discredit, Intimidate, and Silence Victims.

MindGeek worked as hard to conceal and suppress the truth about its business model as it did on SEO. (¶ 433.) When illegal and nonconsensual content was publicly questioned in social media discourse, it initially hid behind the false façade it had built of itself as a mainstream legitimate company. (*Id.*) This played on the general public's misunderstanding that because users were not operating on the dark web, but on Pornhub, the content was consensual and legal. (*Id.*)

Indeed, Social Media Optimization ("SMO") was also an integral part of its Enterprise. (¶ 434.) As part of this SMO, MindGeek used its extensive control and influence over all aspects of the new online porn industry that it dominated to mount powerful public messaging campaigns. (*Id.*) When it felt necessary, MindGeek would activate this extensive network of seemingly independent voices to generate an "astroturf" campaign to promote messaging MindGeek needed. (¶ 435.) They did this through sophisticated SMO that included "ghost blogging," illegal undisclosed placed content, social media influencing and amplification, and extensive marketing, advertising, and media outreach. (*Id.*) Through all these tools, MindGeek worked tirelessly to manufacture a false public image that concealed its illicit practices and to silence those who posed a risk to that façade. (¶¶ 435-38, 451-53, 455-56, 458.)

Most troubling, MindGeek aggressively used its powerful messaging network to insidiously attack, discredit, and intimidate former employees and partners, whistleblowers, activists, and victims of its criminal schemes. (¶ 439.) These efforts were directly led by MindGeek vice-president, defendant, Corey Urman, who closely controls and often personally participates in the public messaging. (¶¶ 439, 255, 440, 451-53, 455-57, 459-60, 463-64, 471, 473, 476-78.) Urman on behalf of MindGeek leads these efforts and works closely with powerful public relations and social media

firms in North America and Europe, including most prominently powerful New York public relations firm 5wPR. (¶ 439.) Urman and 5wPR regularly purport to publicly speak on behalf of MindGeek using false identities misrepresented as MindGeek spokespeople. (¶ 440.) These identities include Ian Andrews, Mike Williams, Chris Jackson, Brett Hall, Dusty Gitalto, and Corey Price. (*Id.*) Urman and others used these false identities because they knew the statements they were making were false and they did not want them attributed to themselves. (*Id.*)

MindGeek and 5wPR directly and through investigative firms and "partners" in Eastern Europe do deep opposition research and investigation of their "enemies" and their immediate and extended families. (¶ 441.) This information is then used to intimidate and blackmail them. (*Id.*) MindGeek "enemies" also repeatedly experience hacking of personal information and doxing. (*Id.*) Insiders uniformly report that it is understood that anyone who crosses MindGeek or is seen as a threat to expose their illegal practices will be subjected to this treatment. (*Id.*) Over the course of the last 16 months, MindGeek, 5wPR, and their operatives have mounted an aggressive "astroturf" campaign against advocates and victims calling attention to its true business practices. (¶¶ 441, 447-83.)

**D. The Victims.**

Plaintiffs are 34 of the tens of thousands of victims of defendants' criminal enterprise. Fourteen plaintiffs are victims of child pornography. (¶¶ 262-322.) At least four of the plaintiffs are victims of violent rapes and assaults that were monetized on MindGeek's tubesites. (¶¶ 339, 345, 351, 396.) Three plaintiffs were visibly drugged or unconscious in the videos. (¶¶ 323, 329-30, 351.) At least sixteen were trafficked by producers or middlemen/agents that partnered with MindGeek or profited from its criminal activities. (¶¶ 270, 301-16, 320-22, 333-38, 351-55, 358-74, 380-87.) None of the plaintiffs consented to their images being uploaded to MindGeek's platform, disseminated, downloaded, or monetized. (¶¶ 405, 262, 273, 276, 286, 288, 292, 295,

297, 299, 301, 306, 308, 310, 312-13, 318, 320, 324, 329, 336, 340, 345, 348, 351, 353, 356, 359, 361, 364, 367, 373, 375-76, 381, 386, 388, 397-98, 401.)

MindGeek, its owners, agents, and partners, including defendant Visa, knew — or should have known — that the images of plaintiffs were illegal and nonconsensual. Among other indicia, plaintiffs' images and videos had titles that clearly identified the content as underage including: "13-Year Old Brunette Shows Off For the Camera" (¶ 262), "Young Stepsister Stripped" (¶ 285), "teenager" and "amateur" in title (¶ 290), "naked teen" (¶ 295), "Prostitute school girl from Colombia agrees to f*** without a condom for $10.00 . . ." (¶ 302), victim wearing middle school uniform (¶ 309), "Thai Student" (¶ 310). Moreover, their images were accompanied by hundreds of tags and comments that identified plaintiffs as, among other things, "naked teen" (¶ 295) and "not [ ] more than a teenager" (¶ 264.) Moreover, plaintiffs' images and videos had titles or comments clearly identifying the content as rape, assault, trafficked, or nonconsensual, including: "Capture and Rape of [Doe 18's Name]" (¶ 345), tags identifying Doe 14 as drugged (¶ 323 ("sleeping pills" and "while sleeping")), Doe 20 being gang raped (¶ 351), violent nonconsensual sex acts (¶ 371), sexual assault (¶ 385), and videos taken with hidden cameras (¶¶ 223(d), 255, 356, 388, 401.)

Not only did MindGeek intentionally elect to not employ any effective monitoring to prevent plaintiffs' images from being uploaded, disseminated, exploited, and monetized without their knowledge and consent (and in violation of state and federal laws) (¶¶ 188-95, 567), they actively transferred these images and videos to other sites they owned or are affiliated with (¶¶ 136, 138, 198-99, 247, 249-53, 259, 405, 265, 269, 308, 311, 326, 337, 343, 346, 349, 354, 377, 388, 390, 403). Moreover, they stonewalled plaintiffs, their parents, advocates, paid consultants, and law enforcement's efforts to have the nonconsensual content removed from its sites (¶¶ 263-64, 274, 295, 314, 327, 331, 336, 341, 343, 346, 349, 356, 362, 365, 376, 382-83) including, among other things: (i) ignoring countless takedown requests (¶¶ 281,

295, 314, 327, 346, 349, 362) and in some cases only responding after plaintiffs impersonated their parents or got legal counsel or law enforcement involved (¶¶ 263, 280, 342, 376); (ii) shifting the burden to plaintiffs to show proof they were underage or the individual depicted in the video before taking any action (¶ 264); and (iii) falsely asserting that the illegal and nonconsensual content could only be removed if plaintiff provided them with links or proof that they owned copyrights associated with the content (¶¶ 281, 331, 341).  In the case of Doe 2, MindGeek went so far as to request that she send the child pornography she was requesting be removed to a third-party site MindGeek owned and controlled, even though neither MindGeek nor Doe 2 was legally allowed to possess that content. (¶ 281.)  In those rare cases where defendants were forced to remove content, they merely disabled the video link but maintained the webpage, title, description, thumbnail, tags, and comments. (¶¶ 135, 209-11, 256, 258, 325-27, 373, 386, 389, 405.)  And MindGeek then proceeded to reupload the removed content under different titles.  (¶¶ 212-15, 405, 280, 293-94, 303, 326-27, 343, 365, 390.)  MindGeek has admitted that it never deleted any of plaintiffs' images even after being informed they were illegal and nonconsensual and received requests they be taken down.  (¶¶ 135, 219, 250-53, 522, 532, 549.)  MindGeek, therefore, has illegally possessed plaintiffs' CSAM and other illegal content on its servers for years and continuing to this day. (¶¶ 135, 250-53, 522, 532, 549.)

For many plaintiffs their illegal or nonconsensual images remained on one of MindGeek's tubesites for extended periods of time and received tens of thousands, and sometimes millions, of views. (*See* ¶¶ 280-81 (15-year-old Doe 2's images were available on Pornhub for over two years); ¶ 290 (16-year-old Doe 4's video was available on Pornhub for at least two years); ¶ 297 (17-year-old Doe 7's video available on Pornhub for at least one year); ¶ 303 (15-year-old Doe 8's video available on Pornhub for 7 months); ¶ 323 (Doe 14 was unconscious on Pornhub for more than 1,100 days); ¶ 341 (Doe 17's video was continuously available on MindGeek's

tubesites for six years) ¶ 264 (plaintiff Fleites video received over 2.7 million views), ¶ 280 (video of Doe 2 with hundreds of thousands of views), ¶ 283 (video of Doe 3 had 234,000 views), ¶ 313 (video of Doe 11 had 1.5 million views), ¶ 361 (video of Doe 24 with 114,000 views), 388 (video of Doe 31 with nearly 500,000 views).

The impact to plaintiffs has been devastating and ongoing.  Plaintiffs have suffered adverse career impacts (¶¶ 284, 287, 291, 315, 318, 338, 347, 357, 363, 378, 392) and incurred significant costs to have their images removed from the internet, in virtually every case without success.  (¶¶ 342, 377, 382, 390, 393.)  Most significantly, Plaintiffs have and continue to sustain extreme emotional distress.  (¶¶ 266-67, 269, 275, 284, 287, 291, 294, 296, 300, 305, 311, 316, 318, 321, 328, 332, 338, 344, 347, 350, 352, 355, 357, 359, 363, 366, 369, 373, 379, 384, 387, 394, 399, 404.)  Numerous Plaintiffs have attempted suicide, others suffer from eating disorders, depression, post-traumatic stress disorder, anxiety, or substance abuse.  (¶¶ 267-69, 275, 284, 287, 291, 294, 296, 316, 321, 328, 332, 338, 344, 347, 352, 355, 357, 359, 373, 379, 387, 394.) Many are estranged from their families; almost every Plaintiff continues to receive therapy to this day.  (¶¶ 266, 269, 275, 287, 291, 296, 300, 305, 311, 321, 344, 347, 350, 369, 373, 394, 399, 404.)

## LEGAL STANDARD

A motion to dismiss pursuant to Fed. R. Civ. P. 12 should be denied "where a plaintiff has alleged 'enough facts to state a claim to relief that is plausible on its face.'"  *State Comp. Ins. Fund v. Khan*, 2013 WL 12132027, at *2 (C.D. Cal. July 30, 2013) (Carney, J.) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  At this stage of the case, the Court "must accept all material allegations in the complaint as true and construe them in the light most favorable to the non-moving party."  *Id*. The issue "is not whether the plaintiff will ultimately prevail, but whether the plaintiff is entitled to offer evidence to support the claims."  *Doe v. MindGeek*, 2021 WL 4167054, at *3.  A plaintiff's factual allegations are sufficient to survive a motion to

PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS

dismiss "even if it strikes a savvy judge the actual proof of those facts is improbable and that recovery is very remote and unlikely." *Twombly*, 550 U.S. at 556 (internal quotation omitted).

## ARGUMENT

## I.  THE COMPLAINT PLEADS VIOLATIONS OF THE TVPRA.

Section 1595 of the Trafficking Victims Protection Act ("TVPRA") "provides trafficking victims with a private right of action to pursue claims against perpetrators of trafficking ('direct liability'), or those who knowingly benefit financially from trafficking ('beneficiary liability')." *Doe v. MindGeek*, 2021 WL 4167054, at *8. This Court has already held, based on nearly identical (albeit less egregious) allegations, that the MindGeek Defendants' criminal scheme and rackets give rise to a claim for beneficiary liability. *See id.* The same conclusion is mandated here. Moreover, the Complaint's detailed allegations that the MindGeek Defendants recruited, harbored, enticed, and advertised plaintiffs and tens of thousands of other victims state a claim for direct liability.

Despite this Court's prior ruling and the Complaint's well-pled allegations, the MindGeek Defendants contend that they should not be held responsible for the devastating and ongoing harm caused by the dissemination and commercialization of plaintiffs' nonconsensual content on their tubesites because the Complaint fails to allege a casual *quid pro quo* between the sex act and an exchange of value or that any MindGeek Entity or Individual Defendant assaulted, raped, coerced, or engaged in a sex act with any plaintiff in this case. (MG Mot. at 26-27.) According to MindGeek, plaintiffs' sexual assailants, traffickers, and ex-boyfriends are solely and exclusively responsible for the harm plaintiffs suffered, and MindGeek is simply a neutral, innocent internet platform that cannot be held responsible. As set forth below, this Court has previously rejected these very same arguments, and should do so here again.

CASE NO. 21-CV-04920-CJC-ADS
PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS

Alternatively, MindGeek argues that even if the Court were to accept as true the Complaint's detailed allegations of MindGeek's criminal activities, dismissal is still warranted because these general allegations are insufficient to establish liability as to each individual plaintiff.  This argument fares no better.  Leaving aside the Complaint's detailed allegations as to each plaintiff, in this pre-discovery phase, where the Complaint pleads a general widespread practice of sex trafficking by the MindGeek Defendants, it is reasonable to infer that those practices were applied to each plaintiff. *See Doe v. MindGeek*, 2021 WL 4167054, at *9 n.6 ("[p]laintiff alleges general, widespread practices detailing how [d]efendants materially contribute to the creation of child pornography and that the videos depicting her constitute child pornography. Viewing these allegations in the light most favorable to the non-moving party, as the Court must at the motion to dismiss stage, [p]laintiff plausibly alleges that those widespread practices applied to videos depicting her.").

### A.   The MindGeek Defendants Are Beneficiaries Of A Trafficking Venture.

To state a claim for violation of Section 1595(a) of the TVPRA, a plaintiff must allege that defendant "'1) . . . knowingly participated in a venture; 2) . . . received a benefit from its participation; and 3) . . . *knew or should have known* that [p]laintiffs were victims of sex trafficking.'" *Doe v. MindGeek*, 2021 WL 4167054, at *4 (quoting *Doe v. Twitter, Inc.*, 2021 WL 3675207, at *25 (N.D. Cal. Aug. 19, 2021)) (emphasis in original).  The Complaint plainly pleads these elements.

### 1.   Participation In A Venture

As this Court previously recognized, participation in a venture is inferred where the complaint pleads "a continuous business relationship between the trafficker and [defendants] such that it would appear that the trafficker and [defendants] have established a pattern of conduct or could be said to have a tacit agreement."  *See Doe v. MindGeek*, 2021 WL 4167054, at *5; *see also H.H. v. G6 Hosp., LLC*, 2019 WL

6682152, at *4 (S.D. Ohio Dec. 6, 2019).  Courts have found a tacit agreement to participate in a sex venture where, as here, the complaint generally pleads that defendants were aware of the prevalence of sex trafficking and failed to take adequate steps to prevent its occurrence.  *See, e.g., Twitter*, 2021 WL 3675207 at *25 ("general allegations" that Twitter makes it hard for users to report sexual abuse material, permits large amounts of human trafficking, rarely removes hashtags associated with such materials, and has a search suggestion feature that makes it easier for users to find the illicit content were sufficient to defeat motion to dismiss);  *M.A. v. Wyndham Hotels Resorts Inc.,* 425 F. Supp. 3d 959, 968 (S.D. Ohio 2019) (allegations that defendants rented rooms to individuals they knew or should have known were sex traffickers were adequate at the pleading stage).

Consistent with these rulings, this Court previously held that plaintiffs' allegations that MindGeek solicits and promotes child pornography and other illegal content, including allegations that the MindGeek Defendants "enable child sex trafficking on their platforms and failed to remove the child pornography depicting plaintiff"; "permit[] large amounts of human trafficking and commercial sexual exploitation material on its platform, despite having the ability to monitor it"; "enter into agreements with traffickers to share proceeds of advertisement revenue earned from child pornography [and other nonconsensual] videos posted to their websites"; and "actively employ tactics to make it difficult for law enforcement to locate traffickers" give rise to an inference that the MindGeek Defendants engaged in a sex trafficking venture.  *See Doe v. MindGeek,* 2021 WL 4167054, at *5; *cf.* Facts § A.2.

Moreover, like the plaintiff in *Doe v. MindGeek*, plaintiffs here have sufficiently alleged that the MindGeek Defendants were aware that the videos of plaintiffs contained child pornography, rape, assault, trafficked, or otherwise nonconsensual content.  Among other things, the Complaint alleges that defendants' moderators reviewed and approved each video prior to upload (¶¶ 134, 196, 482, 489(b)); the

videos contained titles, tags, comments or other indicia that the content was illegal and nonconsensual (Facts § D); certain plaintiffs were trafficked by serial traffickers that victimized others and posted large volumes of nonconsensual content to MindGeek's tubesites, including in the cases of Does 1, 2, 8-11, 13, 16, 20, 23-27, 29, 31-33, and plaintiffs' images were on defendants' tubesites for extended periods of time, providing ample time for defendants to identify and remove the nonconsensual content. *Compare Doe v. MindGeek*, 2021 WL 4167054, at *13 *with* Facts § D.[2]

Finally, the Complaint also alleges that the MindGeek Defendants failed to place any restriction on the uploading of content because they knew this would reduce traffic and profits (Facts, §§ A.1, A.2(b)); actively transferred content from one site to its affiliate sites (Facts, § A.2(c)); stonewalled plaintiffs' efforts to have identified nonconsensual content removed (*Id.*; Facts § D); maintained the webpage, title, tags, and comments for content it was forced to remove so that it could continue to generate SEO and conversions from the nonconsensual and disabled content (*id.* §§ A.2(c)); and maintained on its severs copies of all content that ever appeared on its tubesites, even those images and videos that were identified as CSAM or otherwise illegal (*id.*).

Taken together, plaintiffs' general and specific allegations plainly plead the existence of a tacit agreement to participate in a sex trafficking venture.

## 2.  The MindGeek Defendants Knowingly Received A Benefit From Their Participation In A Venture.

Moreover, the Complaint adequately alleges that the MindGeek Defendants received benefits from their participation in a sex trafficking venture by, among other things, monetizing CSAM and other nonconsensual content through advertising revenue, fee-based subscription services, selling user data, and driving additional

---

[2] *See* ¶¶ 358, 360 (Does 10, 11, 23, and 24, victims of convicted sex trafficking felon Kamonsak); ¶ 370 (Doe 27, victim of sex trafficking ring led by Derek Hay of LA Direct Models); ¶ 400 (Does 31, 32 and 33 victims of the same perpetrator).

traffic and customer conversions to MindGeek's tubesites.  *See Doe v. MindGeek*, 2021 WL 4167054, at *6; *cf.* Facts § A.1; *id.*§ D.[3]  Plaintiffs also allege that the MindGeek Defendants received additional benefits in the form of actual pornographic videos and images, which the MindGeek Defendants maintained and continue to maintain on a server in the United States (*see, e.g.,* ¶¶ 46, 67, 135, 219, 250-51, 522, 533, 549).  These images alone constitute something "of value."  *See, e.g.*, *United States v. Cook*, 782 F.3d 983, 989-90 (8th Cir. 2015) ("[S]exual acts, photographs, and videos—which are items that many people spend significant time, money, and effort pursuing and acquiring—could constitute 'things of value.'").

### 3.  Plaintiffs Sufficiently Allege That Defendants Knew Or Should Have Known That The Venture Was Engaged in Trafficking.

Finally, this Court has twice held based on substantially identical allegations that the MindGeek Defendants "'knew or should have known that [p]laintiff[s] were the victim[s] of sex trafficking at the hands of user[s] who posted the content.'" *Doe v. MindGeek*, 2021 WL 4167054, at *4 (quoting *Twitter*, 2021 WL 3675207, at *25); *see also* Tabaksblat Decl. Ex. A (*Doe v. MindGeek*, Order on Reconsideration (the "*MindGeek* Recon. Order")), at 21.[4]  In so holding, the Court reasoned that the MindGeek Defendants' public claims that they "review and approve each and every

---

[3] Importantly, there is no requirement that there be a direct payment from the direct trafficker to the beneficiary.  *See G6 Hospitality, LLC*, 2019 WL 6682152, at *2 (rejecting defendants' argument that there must be a "causal relationship between the rental of a hotel room and the perpetrator's sex trafficking scheme" because "[t]he statutory language requires that [the defendant] knowingly benefit financially, not that the perpetrator compensate [the defendant] on account of the sex trafficking."); *Wyndham Hotels & Resorts, Inc.*, 425 F. Supp. 3d at 965.

[4] As set forth *infra* Argument, § V, plaintiffs need only allege constructive knowledge of the sex trafficking venture, a lower standard akin to willful blindness and aimed to reach "those who turned a willfully blind eye toward a person in commercial sexual activity who is being physically abused or is underage." *See* 154 Cong. Rec. H10888-01 (daily ed. Dec. 10, 2008) (statement of Reps. Berman & Conyers), 2008 WL 5169865.

35

video posted to their platforms . . . specifically evaluating whether the content contains illicit content, such as child pornography, [ ] intentionally allow some evidence to be posted anyway" (*id.*; *see* Facts, § A.2(b)), and refuse to implement verification tools because of the financial harm it would cause (*id.*), constitutes actual knowledge of a sex trafficking venture. *MindGeek* Recon. Order at 21.

Moreover, in the case of the minor plaintiffs, defendants' knowledge is presumed where, as here, defendants had a reasonable opportunity to observe the minor. *See* 18 U.S.C. § 1591(c).[5] As set forth above, MindGeek observed each plaintiff during its putative "moderation" process. *See supra*. Moreover, the Complaint also alleges that many of the minor victims reported the CSAM to Pornhub and other MindGeek tubesites, yet the MindGeek Defendants nevertheless failed to timely remove their videos. (Facts, §D) Further, many of the minor plaintiffs' videos were streaming on Pornhub or other MindGeek sites for months or years at a time, offering the MindGeek Defendants and their moderators prolonged opportunities to view the content. (*Id.*) This passage of time has been held to constitute as "a reasonable opportunity to observe." *United States v. Alcius*, 952 F.3d 83, 87 (2d Cir. 2020) (rejecting a defendant's argument that reasonable opportunity requires evidence of a more extensive personal relationship between the defendant and victim); *United States v. Robinson*, 702 F.3d 22, 31 (2d Cir. 2012) (section 1591(c) imposes strict liability with regard to defendant's awareness of age).

In any event, the Court's prior holding and the presumption of knowledge is supplemented by clear indicia of defendants' knowledge or reckless disregard of signs that plaintiffs were minors in the posted images or that the commercial sex act depicted was induced through fraud, force, and/or coercion or some combination

---

[5] 18 U.S.C. § 1591(c)'s presumption does not apply to advertising claims.

CASE NO. 21-CV-04920-CJC-ADS

PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS

thereof.[6]   (*See* ¶¶ 262, 285, 302, 290, 345, 295, 323, 264.)  In addition to titles, tags, comments, and content which put defendants on notice that plaintiffs' were underage, victims of rape, assault, coercion, sex trafficking, or hidden cameras, the MindGeek Defendants recklessly disregarded trafficking violations by, among other things: (i) adopting policies that facilitated the dissemination of nonconsensual sexual content including 'providing a download button for users, in part, to facilitate the propagation of . . . illegal non-consensual content," (¶ 215; *see also* ¶¶ 216, 240); (ii) failing to deter such dissemination, including "[doing] nothing to remove or even investigate this patently abusive content or highly suspect content," ¶ 225; (iii) ignoring and stonewalling efforts to have illegal content removed (Facts, § D), and in those rare instances when it was forced to do so, it maintained the webpage, title, tags and comments so that it could continue to drive traffic and generate ad revenue from the disabled images (¶¶ 135, 209-11, 256, 258, 325-27, 373, 386, 389, 405)), and in some cases affirmatively reuploading the removed content under different users and titles (Facts, §§ A.2(c), D).

MindGeek argues that it was sometimes difficult to ascertain whether a victim was underage or the content was nonconsensual.  (MG Mot. 31-32.)  Leaving aside the dozens of examples where the age of the victim or the use of fraud, coercion, or force was plainly evident from the title, tags, comments, or content, the fact of the matter is MindGeek refused to implement the most basic protections against child pornography or nonconsensual content on their systems, failed to use age verification

---

[6] Fraud means "a knowing misrepresentation . . . of a material fact made to induce another to act to his or her detriment." *Ardolf v. Weber*, 332 F.R.D. 467, 476 (S.D.N.Y. 2019).  Force does not require overt physical force, instead it can be affected through force *or*" "'power' or 'pressure,' which do not necessarily have physical components." *United States v. Chacon*, 533 F.3d 250, 257 (4th Cir. 2008).  "Coercion" "is not limited to overt uses of violence, like torture, but encompasses more subtle forms of manipulation and exploitation of a victim's vulnerabilities." *United States v. Shine*, 2019 WL 6838623, at *5 (W.D.N.Y Dec. 16, 2019).

CASE NO. 21-CV-04920-CJC-ADS

PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS

technology and, in fact, specifically designed its review system to permit illegal material to pass through.  MindGeek's own Social Media Manager publicly explained that actually creating a system to prevent the uploading of illegal content would be a "disaster" because "then no one would upload anything," it would "cost[] us money to verify," "devastate[] traffic," and "MindGeek loses money."  (¶ 187.) Thus, the MindGeek Defendants prioritized money over monitoring, knowing that such illegal content, including CSAM would appear on their sites.  Notably, the MindGeek Defendants do not claim, nor can they, that there is *no* verification system that would have identified illegal and non-consensual content.  Instead, they simply argue that under their purposely flawed review process they can't be charged with knowledge of its existence.  This is not the law. *See, e.g., Cooper v. San Bernardino Sheriff Dep't*, 2017 WL 10511568, at *3 (C.D. Cal. Mar. 10, 2017) (finding that the court could draw reasonable inferences from the circumstances alleged to find actual knowledge); *Sec. & Exch. Comm'n v. City of Victorville,* 2013 WL 12133651, at *11 (C.D. Cal. Nov. 14, 2013), *on reconsideration*, 2014 WL 12607683 (C.D. Cal. Jan. 7, 2014) ("[T]his pleading requirement also permits a court to make reasonable inferences of actual knowledge from the facts as pleaded."); *Anderson v. Peregrine Pharms., Inc.*, 2013 WL 12122423, at *7 (C.D. Cal. Aug. 23, 2013), *aff'd*, 654 F. App'x 281 (9th Cir. 2016).

Finally, the MindGeek Defendants argue that plaintiffs cannot establish knowledge of means of fraud, force or coercion because in many instances the physical sex act was "presumably consensual."  (*See* MG Mot. at 27.)  However, as set forth in the Complaint even those plaintiffs who had knowledge that they were being videotaped or consented to the sex act or the recording would not have done so, had they known the videos would be publicly uploaded, monetized, reuploaded, transferred to multiple sites and made available for download.  Thus, the

commercialization of the sex act was obtained by fraud in violation of the statute.[7]  It is of no moment that the MindGeek Defendants did not, themselves, use force, fraud, or coercion against the victims.  *See United States v. Juskowich*, 2021 WL 5166564, at *3 (W.D. Pa. Nov. 5, 2021).  Rather, the monetization of the sex act constitutes a violation of section 1595 of the TVPA. *See, e.g., United States v. Flanders*, 752 F.3d 1317, 1330 n.2 (11th Cir. 2014) (finding a violation of 1591(a)(1) where the victims were recruited "under the false pretense of auditioning for a lucrative modeling contract" based on various fraudulent statements by purported "modeling agent[s]" and the victims agreed to perform "love scenes" under the assumption that they were there for modeling work not creating pornography).

Applying these standards, the Complaint adequately alleges actual knowledge, or at a minimum, constructive knowledge of the venture's sex trafficking violations.

### 4.  The Complaint Alleges That MindGeek Committed Commercial Sex Acts And Participated In a Venture That Trafficked Plaintiffs.

Despite this Court's ruling in *Doe v. MindGeek*, the MindGeek Defendants again argue that dismissal is warranted because the Complaint fails to allege commercial sex acts (MG Mot. at 26-28), plaintiffs do not allege that they were trafficked (MG Mot. at 28-29), and plaintiffs have not alleged that defendants participated in a venture that trafficked them (MG Mot. at 29-30).  According to the MindGeek Defendants, because the Complaint does not allege that any MindGeek entity or Individual Defendant actually assaulted, raped, forced themselves upon, or otherwise had a sexual encounter with any plaintiff, and because pornography for "private use" is not commercial, they should be absolved from all liability under the TVPRA. (MG Mot. at 26-27.)  These arguments are wrong as a matter of law, ignore detailed allegations in the Complaint,

---

[7] As with the rest of the TVPRA, other than coercion, which is specifically defined in the statute, the words "fraud" and "force" are given their plain meaning and read expansively within the context of the statute.  *See Ardolf*, 332 F.R.D. at 474.

and are irreconcilable with Congress's mandate that the TVPRA be "broad," "expansive," and punish a wide-range of conduct. *Noble v. Weinstein*, 335 F. Supp. 3d 504, 515 (S.D.N.Y. 2018).  Consistent with these principles, this Court previously rejected each of these arguments, and should do so here again.

The TVPRA defines a "commercial sex act" as "any sex act, on account of which *anything of value* is given to or received by *any person*."  The statute is a remedial statute that requires broad interpretation. *See Doe v. MindGeek*, 2021 WL 4167054, at *7 (quoting 18 U.S.C. § 1591(e)(3)) ("the TVPRA . . . defines a commercial sex act broadly . . ."); *Noble*, 335 F. Supp. 3d at 515-16 (collecting cases). As this Court previously held, the posting of sexually explicit material on a website qualifies as a commercial sex act.  *Doe v. MindGeek*, 2021 WL 4167054, at *7 (commercial sex act sufficiently alleged where plaintiff alleged ex-boyfriend posted child pornography on MindGeek's tubesites and that MindGeek received a financial benefit); *see also Twitter*, 2021 WL 3675207, at *27; *United States v. Marcus*, 487 F. Supp. 2d 289, 307 (E.D.N.Y. 2007) (vacated, 538 F.3d 97 (2d Cir. 2008), rev'd, 560 U.S. 258, 130 S. Ct. 2159, 176 L. Ed. 2d 1012 (2010), and aff'd in part, vacated in part, remanded, 628 F.3d 36 (2d Cir. 2010)).[8]

Contrary to the MindGeek Defendants' claims, plaintiffs are not required to allege that defendants participated in the actual physical sex act; rather, plaintiffs must simply plead that the MindGeek Defendants received "anything of value" from "any person" on account of the underlying sex act.  Plaintiffs have done so here.  Like in

---

[8] Indeed, the posting of all pornography on a website—including legal, consensual pornography—qualifies as a commercial sex act, as the court in *Marcus* reasoned. 487 F. Supp. 2d at 307. The MindGeek Entities' reliance on *United States v. Durham*, 902 F.3d 1180, 1195 (10th Cir. 2018), to support their argument that "[t]he production of pornography—legal or not—for *private* use is not a commercial sex act" (MG Mot. at 27 (emphasis added)), is misplaced. Plaintiffs' allegations do not rest on the private use of their videos and photographs, but rather the commercialization of such content—*i.e.* the widespread dissemination of their videos to the public.

*Doe v. MindGeek*, plaintiffs allege that the MindGeek Defendants posted, monetized, continuously uploaded, and transferred images and videos of plaintiffs from which defendants received a financial benefit in the form of premium subscriptions, advertisement revenue, and/or credit card transaction fees.  (Facts, §§ A.2(c), D.)  Each upload, repost, transfer, advertisement, or monetization of plaintiffs' images constitutes a new commercial sex act.  *Twitter*, 2021 WL 3675207, at *27.

The MindGeek Defendants claim that because in some cases money was not exchanged between plaintiffs and plaintiffs' perpetrators in connection with the underlying sex act, plaintiffs fail to allege that the sex acts were commercial.  (MG Mot. at 26.)  In so arguing, the MindGeek Defendants ignore their own conduct entirely and instead claim that the sexual interaction between plaintiff and her perpetrator needs to be commercial for the TVPRA to be triggered.  This is not the law, and courts, including this one, have already rejected this position. *Doe v. MindGeek*, 2021 WL 4167054, at *7.  To the contrary, as set forth above, the after-the-fact monetization of the sex act renders it a commercial sex act under the TVPRA.  *Id.*; *see also Canosa v. Ziff*, 2019 WL 498865, at *24 (finding a beneficiary's participation in a venture can be shown from after-the-fact conduct, like covering up a sexual assault).

Finally, the MindGeek Defendants' claim that the Complaint fails to allege that they knowingly participated in a sex venture involving each plaintiff (Mot. at 30), has likewise been squarely rejected by courts interpreting Section 1595, which require only constructive knowledge of a sex trafficking venture.  *See, e.g., Twitter,* 2021 WL 3675207, at *25 (finding nearly identical allegations sufficient to meet the knowledge element of a 1595 claim).[9]  In any event, the Complaint contains detailed allegations

_____

[9] The MindGeek Defendants also claim that they should not be held liable because the TVPRA "'does not impose an affirmative duty to police and prevent sex trafficking.'" (Mot. at 30 (quoting *A.B. v. Wyndham Hotels & Resorts, Inc.*, 2021 WL 1235241 (D. Ore. Mar. 31, 2021)).  Although the Court in *A.B.* and the cases cited therein hold that

41

supporting a finding that MindGeek had the requisite knowledge that each plaintiff was

the victim of a sex trafficking venture because among other things, MindGeek

reviewed and approved each video and failed to implement any methods to moderate

or control the content being uploaded.  (¶¶ 134, 172-73, 187-88, 196, 482.)[10]

**B.    The MindGeek Defendants Are
Directly Liable For Sex Trafficking.**

To state a claim for direct liability under section 1595 of the TVPRA, a plaintiff

must allege that the defendants (1) "recruit[ed], entic[ed], harbor[ed] . . . advertis[ed],

[or], maintain[ed] . . . by any means a person"; (2) knowing or in reckless disregard of

---

there is no duty to *investigate* potential sex trafficking, as set forth herein plaintiffs
seek to hold defendants' liable for their actual and constructive knowledge of a sex
trafficking venture and their affirmative participation therein.

[10] The Individual Defendants argue that the TVPRA claims against them should be
dismissed because they are merely lumped in with the entity defendants.  (MG Mot. at
7-8).  As an initial matter, the Complaint alleges that each of the Individual Defendants
exercised control over the operation of the MindGeek Entities.  (Facts §§ B.2-B.4.)
More importantly, the Complaint details the ways in which defendants created a
complex corporate structure and enterprise designed to conceal which entities and
which individuals exercised control over which aspects of the enterprise/venture's
rackets and schemes. (*See, e.g.,* ¶¶ 59-61, 100, 103, 104, 107, 115, 118, 144-46, 150-
58.)  The MindGeek Defendants cannot benefit from the structure they created to avoid
the consequence of their illegal conduct.  In any event, where, as here, the allegations
are based on illegal conduct and the defendants are uniquely in possession of the
relevant information group pleading is permitted at this stage of the proceedings.  *See
Waldrup v. Countrywide Fin. Corp.*, 2015 WL 93363, at *8 (C.D. Cal. Jan. 5, 2015)
("[a]bsent discovery . . . plaintiff [could not] point to the specific fraudulent
misrepresentations or omissions allegedly made by the four parent company
defendants as part of the alleged scheme"); *In re Chrysler-Dodge-Jeep Ecodiesel
Mktg., Sales Pracs., & Prods. Liab. Litig.*, 295 F. Supp. 3d 927, 976-77 (N.D. Cal.
2018) (sustaining RICO claims based on group pleading where plaintiffs were unable
to parse out individual defendants because of how "[d]efendants have chosen to
operate"); *In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prods. Liab. Litig.*,
2017 WL 4890594, at *11 (N.D. Cal. Oct. 30, 2017) (same).  At a minimum, plaintiffs
are entitled to discovery concerning each individual defendants' role in the venture and
enterprise.  *See Waldrup*, 2015 WL 93363, at *8.

the fact that;  (3) the person was a minor and would be caused to engage in a commercial sex act, or that the person was caused to engage in the sex act by means of force, threats of force, or fraud. 18 U.S.C. § 1595.  As set forth, *supra*, this Court has already held that the MindGeek Defendants had actual knowledge of the venture's sex trafficking violations.  The Complaint, likewise, alleges that defendants trafficked plaintiffs and tens of thousands of other victims.

Courts and the legislature mandate that the definition of trafficking under the first prong of the statute is expansive and broad. *See, e.g., United States v. Estrada-Tepal*, 57 F. Supp. 3d 164, 168-69 (E.D.N.Y. 2014) (citing numerous cases and legislative history).  Indeed, the TVPRA was specifically enacted to "criminalize[] a broad spectrum of conduct." *United States v. Jungers*, 702 F.3d 1066, 1069-70 (8th Cir. 2013) (internal citations and quotations omitted).  "[E]xpansiveness was a legislative goal in enacting the statute." *Estrada-Tepal*, 57 F. Supp. 3d at 169. Accordingly, courts have ascribed the delineated violations their plain meaning as informed by the context of the statute. *Id.*

### 1. Advertising.

A website "advertises" a person in violation of 18 U.S.C. § 1591(a)(1) by posting a video of that person.  *Twitter*, 2021 WL 3675207, at *20.  Here, the Complaint alleges that MindGeek advertised plaintiffs by posting, reuploading, monetizing, and transferring content of them to its other platforms. Moreover, MindGeek further advertised plaintiffs when it promoted plaintiffs' images in curated video recommendations which directed users to additional videos of the same persons or similar styles of videos depicting similarly illegal behavior.  Even when MindGeek was forced to remove videos that contained illegal content, MindGeek continued to advertise plaintiffs by, among other things, maintaining the webpage, title, tags and comments. *See e.g.*, ¶ 326 (videos of Doe 14 and thumbnail images of her remained available through searches on neutral platforms even after the videos of her were

purportedly disabled); ¶ 251 (searches of her name turned up videos of Nicole Addimando, a victim of physical abuse and rape); ¶¶ 336, 341, 345 (videos of Doe Nos. 16 through 18 with titles including their names); ¶ 375 (videos of Doe 28 with comments disclosing her name and other information which resulted in persons contacting her employer after running searches on Google).[11]  Moreover, the inclusion of identifying information of persons depicted in the video to generate additional viewership qualifies as advertising of a person.[12]

### 2. Recruiting, Enticing, Harboring, and/or Maintaining

The Complaint also alleges that the MindGeek Defendants directly trafficked plaintiffs by, among other things, partnering with known traffickers, using agents to traffic minors and other victims, enticing victims to shoot videos under the guise of a modeling program while, once there, forcing them to engage in sex acts and refusing to permit them to leave, and supplying the funds for the operation of warehouses where victims were housed and forced to make pornography.  (Facts, § A.2(a).)   The MindGeek Defendants similarly produced CSAM and nonconsensual sexual content through MindGeek owned, funded, and operated production companies, worked with known traffickers as their agents through its ModelHub program, and knowingly partnered with sex traffickers because it was cheaper than producing consensual pornography.  (*Id.*)  They also recruited, commissioned, paid for, bought and

---

[11] While the posting of a video alone qualifies as advertisement, at least one Plaintiff, Doe 16, identified an advertisement of her on Pornhub for Pornhub's services. ¶ 337.

[12] Because the MindGeek Defendants are solely in possession of information to identify whether MindGeek used any of the other plaintiffs in advertisements for MindGeek's services, plaintiffs should be entitled to discovery. Plaintiffs' allegations of a widespread pattern and practice of advertising from nonconsensual content counsels in favor of drawing a reasonable inference at this stage, that plaintiffs were advertised.  *See Doe v. MindGeek*, 2021 WL 4167054, at *9 n.6.

44

aggressively solicited content through known traffickers, human slavery, and pirated materials, shared advertising revenue with numerous known sex traffickers. (*Id.*)

In addition to funding and partnering with agents to create CSAM and other non-consensual content, the MindGeek Defendants monetized, reuploaded, and broadly disseminated illegal material, including material they had been forced to disable because of its illegal nature. (*Id.* § C.)  Moreover, they fraudulently did so in a manner that suggested independent third parties were uploading the content. (¶¶ 212-13.)  MindGeek, illegally possesses CSAM/child pornography that, until recently, it continued to reupload and transfer to additional tubesites owned by the MindGeek Enterprise. (Facts, § C)  To this day, it continues to maintain this illegal content on its servers throughout the United States and Canada. (*Id.*)

Indeed, with respect to the individual plaintiffs, many of them were trafficked under the same circumstances as the other MindGeek trafficked victims, including being enticed to participate in modeling, acting, or other auditions, at which time they were then forcibly or otherwise coerced into engaging in sex acts. (*See, e.g.*, ¶¶ 334 (Doe 16), 370 (Doe 27), 385 (Doe 30).)  Some were assaulted in warehouses. (*See, e.g.*, ¶¶ 217 (Doe 1).)  Others were the victims of Asian traffickers, MindGeek insiders confirmed MindGeek partnered with.

Taken together and construed in the light most favorable to plaintiffs, these allegations create a reasonable inference that the MindGeek Defendants recruited, enticed and maintained plaintiffs in violation of the federal sex trafficking laws.[13]

---

[13] *See Ardolf*, 332 F.R.D. at 474 (the term "recruit" "means that the perpetrator somehow secured the services of the victim" and "entice" "means that the perpetrator attracts the victim by offering something that arouses hope or desire."); Miriam-Webster, Maintain ("to support or provide for").

### C. The Complaint Properly Pleads A Claim Against Visa For Beneficiary Liability

#### 1. Participation in a Venture

The Complaint similarly alleges a claim for beneficiary liability against Visa arising from the ongoing benefits it received from its participation in the MindGeek Defendants' sex trafficking venture. As set forth in the Complaint, Visa was in a continuous business relationship with the MindGeek Defendants (Facts, § B.5.); processed credit card payments that "carried with them obvious red flags" such as transactions "involving accounts from known trafficking regions and where payments from large numbers of purportedly independent cam models were being deposited into single accounts of obvious traffickers" (¶¶ 424, 501); and willfully turned a blind-eye to known or obvious instances of sex trafficking for its own financial gain (*see, e.g.*, ¶¶ 418-27). These allegations are more than sufficient to establish a "tacit agreement" to participate in a sex trafficking venture. *See supra.*

Despite these allegations, Visa argues that the claims against it should be dismissed because allowing the case to proceed would "halt commerce" and that "[t]ermination of payment processing would not have brought an end to the Plaintiffs' alleged injuries." (Visa Mot. at 17.) Both these arguments are easily disposed of. First, holding Visa responsible for its actual knowledge, or at a minimum constructive knowledge, that it was funding, assisting, and profiting from a trafficking venture, would not interfere with legitimate commerce; rather it would prevent companies like Visa from knowingly continuing to benefit from such illegal activities.

Second, Visa's position is undermined by the fact that when MasterCard changed its payment policies (followed by a reluctant Visa), MindGeek was left with no choice but to remove ten million unverified videos. (¶ 406.) Thus, continued violations of the sex trafficking laws could have been prevented had Visa terminated its relationship with MindGeek earlier or, at a minimum, not knowingly continued to process payments without insisting, as MasterCard has now, that the business ensure

46

1  only legal content was being monetized.  And plainly this would not have terminated

2  the business for legal pornography.  Nevertheless, even with the knowledge it has

3  today, Visa, unlike MasterCard, has returned to  processing payments for MindGeek

4  without insisting on sufficient controls to ensure legal content.

### 2.  Benefitting from Its Participation in that Venture

6       The Complaint similarly pleads Visa's financial benefit from its participation in

7  the MindGeek Defendants' sex trafficking ventures including, among other benefits,

8  (i) collecting millions of dollars in profits from GirlsDoPorn and similar MindGeek

9  partner channels and electing to continue to do so without any investigation or

10  diligence (¶ 418);  (ii) Visa and its merchant banks servicing MindGeek permitted and

11  profited from tens of thousands of transactions annually from MindGeek's trafficking

12  venture (¶ 420); and (3) Visa collected millions of dollars in profits from credit card

13  transaction fees for premium subscription (¶ 502).

14       Nevertheless, Visa claims that dismissal is warranted because the complaint fails

15  to "tie the transaction fees that Visa received to illegal sex trafficking content, as

16  opposed to the legal content hosted on MindGeek websites." (Visa Mot. at 21.)  This

17  argument fails for several reasons.  First, the Complaint alleges the ubiquitous

18  prevalence of illegal and non-consensual content on MindGeek's platforms, such that

19  Visa's routine processing of payments necessarily implicated such content.

20      Second, the court in *B.M. v. Wyndham Hotels & Resorts, Inc*., rejected the

21  stringent standard Visa advocates for here, holding that plaintiff need only allege that

22  the benefit received by the defendants "derive directly from, and be knowingly

23  received in exchange for, participating in a sex-trafficking venture."  2020 WL

24  4368214, at *4 (N.D. Cal. July 30, 2020).  It need not derive directly from the illegal

25  activities itself.  *See id.* ("The 'knowingly benefit' element of section 1595 'merely

26  requires that [d]efendant knowingly receive a financial benefit' and the rental of a

27

28

CASE NO. 21-CV-04920-CJC-ADS

room . . . constitutes a financial benefit from a relationship with the trafficker.")[14] Here, Visa received the benefit of all of MindGeek's commerce by willingly processing payments for those portions of its commerce that were trafficked and non-consensual.  And, unlike MasterCard, it continues to do so.  The Complaint alleges specific facts showing this was a knowing and intentional decision, one which it cannot now use technical legal arguments to hide behind.

### 3. Visa Knew or Should Have Known that the Venture Was a Sex Trafficking Venture.

Finally, the complaint sufficiently alleges that Visa knew or should have known about the sex trafficking venture.  The Complaint alleges that long before this suit, Visa's competitor PayPal publicly terminated its relationship with MindGeek "because it could no longer ignore the overwhelming evidence of MindGeek's trafficking venture" (¶ 417).  It also alleges that "[t]he presence of trafficking in the webcam industry was notorious and well known to Visa," and its member banks (¶¶ 410, 423) as well as the monetization of other trafficked content on the platform from their own due diligence and compliance functions, anti-trafficking advocacy groups' presentations and warning (¶¶ 421-26, 506), and numerous other public disclosures, such as the December 2020 New York Times article.  (¶¶ 418-20, 427).

Indeed, in the wake of that reporting Visa and MasterCard both purported to launch investigations into the allegations, and announced days later they had confirmed the allegations and would take action.  The speed at which such "investigations" were concluded is definitive proof that the evidence of this illegal conduct was obvious to anyone, like Visa, remotely familiar with this business.

---

[14] The cases Visa putatively relies on to support this standard do not deal with beneficiary liability based on a violation of section 1591.  *See Ratha v. Phatthana Seafood Co.*, 2017 WL 8293174, at *4 (C.D. Cal. Dec. 21, 2017) (interpreting Section 1589 of the TVPRA with different language); *Perfect 10, Inc. v. Visa Int'l Serv. Ass'n*, 494 F.3d 788, 798 (9th Cir. 2007) (interpreting copyright infringement statute).

### D.    The Complaint Adequately Pleads A Violation of Section 1594.

Section 1594(b) imposes liability on anyone who conspires with another to violate various sections of the TVPRA.  18 U.S.C. § 1594(b).  Despite Visa's argument to the contrary, the Complaint sufficiently alleges that Visa and the MindGeek Defendants had a "unity of purpose or a common design and understanding, or a meeting of the minds in an unlawful arrangement." Visa Mot. at 29 (citing *Transgo, Inc v. Ajac Transmission Parts Corp.*, 768 F.2d 1001, 1020 (9th Cir. 1985)). For example, plaintiffs alleged that Visa knew that its funding supported and facilitated MindGeek, would lead to the commercialization and monetization of CSAM and other non-consensual content depicting the Plaintiffs" (*see* Facts § B.5), and continued to partner with MindGeek despite numerous public disclosures that MindGeek was engaged in sex trafficking and dissemination of child pornography.  *See id.*

Messrs. Antoon and Tassillo's arguments that plaintiffs fail to plead each Individual Defendants' agreement to violate the sex trafficking laws and Mr. Bergmair's argument that plaintiffs fail to allege that he engaged in any prohibited conduct are belied by the detailed allegations of each individual's role in the enterprise (Facts §§ B.2-4) and the Complaints' alter ego allegations. *See infra* Argument, § VI.B.1.  These allegations, in which these defendants are alleged to be the head of a group engaged in these detailed activities, intimately involved in the oversight and execution of these activities, and working with the other participants is ample support at the pleading stage for the conspiracy claim.

### E.    Plaintiffs Do Not Seek To Extend The TVPRA's Reach Extraterritorially.

The MindGeek Defendants devote an entire section of their brief to arguing that the TVPRA (and the RICO statute) should not apply to certain plaintiffs' claims because it would be an extraterritorial application of domestic statutes.  This argument is a complete red-herring.  The extraterritoriality section of the TVPRA, Section 1596,

49

is not implicated where the predicate offense occurs domestically.  *See e.g.*, *Tanedo v. E. Baton Rouge Par. Sch. Bd.*, 2012 WL 5378742, at *6 (C.D. Cal. Aug. 27, 2012) ("[T]he focus and the touchstone of the territoriality inquiry of the TVPA is where the forced labor occurred and to where the victims were trafficked, and not from where the victims were trafficked or whether some of the means used to compel the labor occurred abroad.").

As alleged, the commercial sex act, specifically the posting, reposting, uploading to other MindGeek tubesites, and continued commercialization of the explicit videos occurred in the United States where MindGeek's servers are located and where the majority of this platform business is generated.  *See* ¶ 46 ("MG Freesites' servers containing its redundant library of pornographic content are located in Waltham, Massachusetts as well as elsewhere in the United States").  Therefore, an analysis of the extraterritoriality section of the TVPRA is unnecessary.  At a minimum, an analysis of where the injury occurred is inherently "a fact-intensive inquiry," *Humphrey v. GlaxoSmithKline PLC*, 905 F.3d 694, 701 (3d Cir. 2018), and should be decided on a more developed record, *see, e.g.*, *Tanedo*, 2012 WL 5378742, at *6-7 & n.10.

## II. FLEITES AND DOES 1-13 STATE CLAIMS FOR <u>VIOLATIONS OF CHILD SEXUAL EXPLOITATION LAWS</u>

The Child Sexual Exploitation laws provide a private right of action to recover damages for the possession, distribution, and receipt of child pornography.[15]  Fleites and Does 1-13, who were all minors at the time of the sex acts featured on MindGeek's tubesites, adequately allege violations of these statutes.

Defendants do not dispute that their tubesites are rife with child pornography. Nevertheless, they seek dismissal of plaintiffs' section 2252 and 2252A claims on the

---

[15] Section 2252 criminalizes possession, distribution, and receipt of child pornography, whereas Section 2252A also covers altered computer-generated sexually explicit images involving a minor.  Plaintiffs' allegations satisfy both statutes.

putative grounds that the complaint fails to plead defendants' knowledge that each of the minor plaintiffs were underage in the featured videos. (MG Mot. 47-48; Antoon Mot. at 21-22; Urman Mot. 40; Tassillo Mot. 19; Bergmair Mot. 33.)[16] This argument is belied by MindGeek's repeated public claim that moderators reviewed and approved every video prior to it being uploaded to its tubesites (¶¶ 196, 489(b), 496(a).) Moreover, numerous plaintiffs' videos had titles, tags, and comments that indicated they were underage, including by way of example only "13-Year Old Brunette Shows Off For the Camera" (¶ 262), "Young Stepsister Stripped" (¶ 285), "Prostitute school girl from Colombia agrees to f*** without a condom for $10.00 . . ." (¶ 302), "Thai Student" (¶ 310), "amateur . . .  teenager" (¶ 290), "naked teen" (¶ 295), and "not [ ] more than a teenager" (¶ 264).  In addition, the Complaint alleges that the minor Plaintiffs informed the MindGeek Defendants that videos and photographs on their tubesites depicted them underage, and in many instances the MindGeek Defendants either refused to take down the videos or failed to do so for extended periods of time.

---

[16] As an initial matter, this Court has previously held that this level of specificity is not required at the pleading stage where evidence of defendants' state of mind is uniquely within defendants' possession. *See Doe v. MindGeek*, 2021 WL 4167054, at *10. Rather, in *Doe v. MindGeek*, this Court held that the same allegations of MindGeek's pattern and practice of soliciting, curating, and disseminating CSAM alleged here were sufficient to infer knowledge of possession and distribution of child pornography at the pleading stage. *See id.* (allegations that MindGeek was "told repeatedly . . . about the prevalence of child pornography on their websites," "Defendants curate[d] content and develop[ed] platforms to help users share and distribute child pornography"; "that users of Defendants' platforms openly discuss trading child pornography and identify certain videos as child pornography in public comments"; and their "moderators knowingly reviewed, approved, and featured child pornography videos on their platforms" were sufficient to infer knowledge at the pleading stage); *cf* Facts, § A.2 (detailing public disclosures of prevalence of CSAM on MindGeek's tubesites and explaining the ways defendants curated content and developed platforms to disseminate nonconsensual content); ¶¶ 204, 244 (comments informing defendants that content was illegal); and ¶¶ 196, 496, 496(a) (alleging that defendants' moderators reviewed, approved, and featured child pornography videos on their platform).

51

(Facts, § D.)  Even in those instances where MindGeek did ultimately remove the videos, MindGeek has conceded publicly that they maintain the content in their libraries.  (*Id.* §§ A.2(c), D.)  In fact, MindGeek has maintained that it never deleted a single photograph or video posted to its tubesites even after being informed they were illegal and nonconsensual and received requests they be taken down.  (¶¶ 135, 219, 522, 532, 549.)  MindGeek, therefore, has illegally possessed plaintiffs' CSAM on its servers for years and continues to do so to this day. (¶¶ 250, 253, 310 (Doe 10).)

## III.  THE FEDERAL RICO CLAIMS ARE PROPERLY PLED.

The federal RICO statute makes it unlawful for "any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity" 18 U.S.C. § 1962(c) and for anyone to conspire to violate Section 1962(c), among other subsections, *see id.* § 1962(d). To plead a RICO violation, a plaintiff must allege defendant: (1) conducted, (2) an enterprise, (3) through a pattern, (4) of racketeering activity, (5) resulting in damages to business or property. *Just Film, Inc. v. Buono,* 847 F.3d 1108, 1116 (9th Cir. 2017) (*quoting Living Designs, Inc. v. E.I. DuPont de Nemours & Co.,* 431 F.3d 353, 361 (9th Cir. 2005)).  Congress mandated that RICO is to "be liberally construed to effectuate its remedial purposes." *Sedima, S.P.R.L. v. Imrex Co.,* 473 U.S. 479, 498 (1985) (internal quotations omitted); *see also Khosroabadi v. Mazgani Social Servs., Inc.,* 2017 WL 4712074, at * 7 (C.D. Cal. July 28, 2017) (Carney, J.).

The Complaint details defendants' coordinated efforts to capitalize and profit from child pornography, rape, assault, trafficking, nonconsensual content, and other wide-ranging criminal activities so that defendants and the enterprise members could make more than the enormous sums of money they would have otherwise made from a legitimate online pornography platform.  This is the quintessential conduct the RICO

1 | statute was designed to protect against.

2 |     Despite these detailed allegations, defendants argue that plaintiffs fail to

3 | adequately allege a RICO enterprise, a cognizable RICO injury, and a pattern of

4 | racketeering.  As set forth below, these arguments rely on cherry-picked facts and

5 | ignore others.  When the Complaint is viewed as a whole in the light most favorable to

6 | plaintiffs and all reasonable inferences are drawn in plaintiffs' favor – as required on

7 | this Motion, the allegations are plainly sufficient.

8 |    **A.**    **The Complaint Alleges A RICO Enterprise.**

9 |     The RICO statute defines an "enterprise" broadly to include "any individual,

10 | partnership, corporation, association, or other legal entity, and any union or group of

11 | individuals associated in fact although not a legal entity."  18 U.S.C. § 1961(4).  The

12 | Supreme Court has held the "very concept of an association in fact is expansive" and

13 | encompasses any "continuing unit that functions with a common purpose." *Boyle v.*

14 | *United States*, 556 U.S. 938, 945, 948 (2009).  The Ninth Circuit has similarly

15 | recognized that "[t]his expansive definition is 'not very demanding,'" *United States v.*

16 | *Christensen*, 828 F.3d 763, 780 (9th Cir. 2015) (quoting *Odom v. Microsoft Corp.*, 486

17 | F.3d 541, 548 (9th Cir. 2007)), and that "is to be 'liberally construed to effectuate its

18 | remedial purposes,'" *id*. (quoting *Boyle*, 556 U.S. at 944-45).

19 |     First, the MindGeek Defendants argue that the Complaint fails to plead a

20 | "common purpose" between enterprise members.  (MG Mot. at 35-38.)  As explained

21 | above, however, the Complaint plainly identifies the common purpose of the

22 | Enterprise, *see supra* Facts § B.1, and identifies how each of its members furthered that

23 | common purpose, *see supra* Facts §§ B.2 (Antoon, Urman, Tassillo, and Bro-Club),

24 | § B.3 (Bergmair and Bergmair Doe Defendants), § B.4 (the hundreds of MindGeek

25 | shell entities); § B.5 (Visa).  These allegations are more than sufficient.  *See Odom*,

26 | 486 F.3d at 552; *Bui v. Nguyen*, 712 F. App'x 606, 608-09 (9th Cir. 2017); *Bunnett &*

27 | *Co. v. Gearhart*, 2018 WL 1070298, at *3 (N.D. Cal. Feb. 27, 2018) (plaintiff's

28 |

allegations were sufficient to establish enterprise element where the complaint identified the common purpose, identified the enterprise's members and the roles, and alleged that they engaged in various criminal activities over a period of 18 months).[17]

Although the MindGeek Defendants argue that the Complaint impermissibly lumps the Enterprise together and does not adequately allege each defendants' individual role, this argument is belied by the specific allegations detailed above.  In any event, in this pre-discovery period, where the Complaint alleges that defendants have chosen to operate as a unit and information concerning each individual's participation is uniquely within defendants' control, courts in the Ninth Circuit have held group pleading to be permissible.  *See, e.g.*, *Khan*, 2013 WL 12132027, at *4 (sustaining RICO claims and explaining that the requirements of Rule 9(b) "may be relaxed with respect to matters within the opposing party's knowledge.  In such situations, plaintiffs cannot be expected to have personal knowledge of the relevant facts.'" (quoting *Nuebronner v. Milken*, 6 F.3d 666, 672 (9th Cir. 1993))); *see also supra* note 10 .[18]  Moreover, although Rule 9(b)'s particularity requirement applies to predicate acts of mail or wire fraud, it does not apply to the remainder of a RICO claim or to predicate acts that are not premised on fraud, such as the TVPRA and Section 2252 predicate acts here.  *See Natural-Immunogenics Corp. v. Newport Trial Grp.*,

---

[17] The argument that the Complaint simply alleges a contractual relationship between Visa and MindGeek must be rejected in light of these allegations.  *See Ketayi v. Health Enrollment Grp.*, 516 F. Supp. 3d 1092, 1135 (S.D. Cal. 2021).

[18] These same allegations also satisfy the conduct element, which requires only a showing that defendant played "some part in directing th[e] affairs" of the Enterprise. *JW Gaming Dev., LLC v. James*, 2020 WL 3640004, at *3 (N.D. Cal. July 6, 2020); *see Khan*, 2012 WL 12887395, at *7-8; *see also Bunnett & Co.*, 2018 WL 1070298, at *7 (denying motion to dismiss based on conduct element where allegations of complaint "suggest[ed] coordinated activity . . .").

CASE NO. 21-CV-04920-CJC-ADS
PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS

1   2020 WL 7263544, at *9 (C.D. Cal. Nov. 23, 2020).

2       The MindGeek Defendants' claim that the Complaint fails to allege an enterprise

3   distinct from the RICO person or persons it seeks to hold liable (*See* MG Mot. 35, 38-

4   39), is likewise without merit.  The requirement that the RICO person be distinct from

5   the enterprise is not a demanding pleading hurdle: "'the only important thing is that

6   [the enterprise] be either formally . . . or practically . . . separable from the individual'

7   RICO person."  *United States v. Mongol Nation*, 693 F. App'x 637, 638 (9th Cir. 2017)

8   (mem.) (quoting *Sever v. Alaska Pulp Corp.*, 978 F.2d 1259, 1534 (9th Cir. 1992)).

9   Where, as here, the RICO "person" is part of a larger "enterprise," distinctiveness is

10  satisfied.  *See id*.

11      As set forth above, the Complaint alleges that the MindGeek Enterprise consists

12  of not just the MindGeek Entities but also hundreds of shell companies set up by

13  defendant Antoon and his Bro Club, the other Individual Defendants, the Bro-Club's

14  capos, corrupt payment processors, including Visa, and secret shadow investors that

15  direct, control, and finance the Enterprise's activities.  *See* Facts § B.1.  However, even

16  assuming *arguendo*, the Enterprise was limited to the MindGeek Entities and its

17  officers and directors, defendants arguments would still fail because Ninth Circuit has

18  expressly "rejected the argument that 'there is no distinction between the officers,

19  agents and employees who operate [a] corporation and the corporation itself,'" *Mongol*

20  *Nation*, 693 F. App'x at 638 (quoting *Sever*, 978 F.2d at 1534), "because 'a corporate

21  officer can be a person distinct from the corporate enterprise,'" *id.* (quoting *Living*

22  *Designs*, 431 F.3d at 362).  *See also MH Pillars Ltd. v. Realini*, 2018 WL 1184847, at

23  *4 (N.D. Cal. Mar. 7, 2018) (explaining that the "argument that a RICO enterprise

24  cannot be formed by parent and subsidiary corporations is not in accordance with the

25  law of this Circuit.").  Indeed, even where individual defendants are alleged to be alter

26

27

28

CASE NO. 21-CV-04920-CJC-ADS
PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS

egos of corporate defendants, distinctiveness is satisfied. *See Bondit, LLC v. Hallows Movie, Inc.*, 2020 WL 7777992, at *4 (C.D. Cal. Apr. 1, 2020).[19]

## B. **The Complaint Alleges Cognizable RICO Injuries**[20]

Defendants' arguments concerning the failure to allege a cognizable RICO injury should also be rejected. The Ninth Circuit has held that cognizable RICO injuries encompass any "concrete" financial harm by reason of a RICO violation. *See In re Chrysler-Dodge-Jeep*, 295 F. Supp. 3d at 962. Concrete financial losses include out-of-pocket expenditures arising from the racketeering conduct. *See Just Film*, 847 F.3d at 1119. "An out-of-pocket loss is not required, however, for a financial loss to be tangible or concrete." *In re Volkswagen*, 2017 WL 4890594, at *5; *see Just Film*, 847 F.3d at 1119 (time away from work is a RICO injury); *Diaz v. Gates*, 420 F.3d 897, 898, 900 (9th Cir. 2005) (en banc).

---

[19] Urman's argument that the Complaint fails to allege an enterprise that is distinct from the racketeering activity (Urman Mot. 28-29), should also be rejected. As the Supreme Court has explained, "evidence used to prove [a] pattern of racketeering activity and evidence establishing an enterprise 'may in particular cases coalesce,'" *Boyle*, 556 U.S. at 947 (quoting *Turkette*, 452 U.S. at 583); *see also State Compensation Ins. Fund v. Khan*, 2012 WL 12887395, at *7 (C.D. Cal. Dec. 28, 2012) (Carney, J.) (rejecting as inconsistent with Ninth Circuit precedent the argument that plaintiff was required to plead that the enterprise had a purpose separate from the racketeering activity).

[20] Defendants' chart attached to the Sadun Declaration is both factually incorrect and misleading insofar as: (1) none of plaintiffs injuries are extraterritorial (*see* Argument, § I.E., *supra* and III.B., *infra*; (2) all plaintiffs allege emotional harm, including Doe 9 (¶¶ 490, 497, 507, 515, 523, 533, 597, 602, 609, 615, 620, 627, 632); (3) Defendants' conduct has caused all plaintiffs to suffer harm to their reputation (*id.*); (4) Defendants' conduct has damaged the commercial value of each and every plaintiffs' image, as Defendants received an improper financial benefit from plaintiffs generated through advertising revenue earned through videos and/or images of Plaintiffs (¶¶ 567, 579, 589, 592-96, 600, 605-06, 612-13, 617); and (5) plaintiffs do assert injuries to employment and employment prospects to Fleites (¶ 266), Doe 1 (¶ 275), Doe 2 (¶ 284), Doe 3 (¶ 287), Doe 11 (¶ 315), Doe 12 (¶ 319), Doe 22 (¶ 357), Doe 24 (¶ 363), and Does 4, 6, 18, 28, and 31 (as conceded by Defendants).

As an initial matter, the Complaint pleads out-of-pocket expenses incurred by several plaintiffs in direct response to defendants' TVPRA violations and the resulting proliferation of their images on MindGeek's tubesites.  *See, e.g.*, ¶¶ 390, 393 (Doe 31 hired DMCA Defender and a private investigator to remove the nonconsensual video, which Pornhub reuploaded multiple times); ¶¶ 341-43, 380-82 (Does 17 and 29 incurred attorneys' and copyright fees to remove the videos upon demand and continual reuploading of those videos).  Moreover, Doe 31 sustained significant adverse employment consequences (*see* ¶ 392), for which the financial losses are recoverable under the RICO statute.  *See Guerrero v. Gates*, 110 F. Supp. 2d 1287, 1293 (C.D. Cal. 2000).[21]

In addition to these increased costs and lost profits, the Complaint pleads that each plaintiff has suffered a concrete loss through the commercial misappropriation of their image and likeness.  (*See* ¶ 567.)  Misuse of intellectual property that results in concrete economic harm constitutes a sufficient RICO injury.  *See C&M Cafe v. Kinetic Farm, Inc.*, 2016 WL 6822071, at *8 (N.D. Cal. Nov. 18, 2016); *MedImpact Healthcare Sys., Inc. v. IQVIA, Inc.*, 2020 WL 5064253, at *25 (S.D. Cal. Aug. 27, 2020); *Georgian v. Zodiac Grp., Inc.*, 2011 WL 13214306, at *9-10 (S.D. Fla. Jan. 6, 2011). California law has long recognized an individual's cognizable property interest in the right of publicity, which prohibits the unauthorized use of image or likeness.[22] *See In re NCAA Student-Athlete Name & Likeness Licensing Litig.*, 724 F.3d 1268, 1280 (9th Cir. 2013) (The right of publicity "protects a form of intellectual property [in one's person] that society deems to have some social utility."); *Fraley v. Facebook, Inc.*, 830 F. Supp. 2d 785, 806 (N.D. Cal. 2011) (internal quotation marks and citations

---

[21] The MindGeek Entities' argument that the employment injuries "are personal injuries as a matter of the law of Oklahoma," MG Mot. at 43, should be rejected. *See Clark v. Stipe Law Firm, L.L.P.*, 320 F. Supp. 2d 1207, 1214 (W.D. Okla. 2004).

[22] Under RICO, whether a particular interest constitutes "property" is determined by state law.  *See Diaz*, 420 F.3d at 900.

omitted) (recognizing that right of publicity is a tool to "protect the economic value of one's name, voice, signature, photograph, or likeness."). This right is protected by both the common law and California Civil Code Section 3344, the latter of which provides that individuals, like plaintiffs, who have had their likeness commercially misappropriated, can recover "any profits from the unauthorized use." Cal. Civ. Code § 3344(a); *see also Solano v. Playgirl, Inc.*, 292 F.3d 1078, 1090 (9th Cir. 2002).[23] Where an individual's identity, image or likeness has commercial value, such as in the case of a video depicting an individual, "the injury may be largely, or even wholly, of an economic or material nature." *Fraley*, 830 F. Supp. 2d at 806 (internal quotation marks and citations omitted).

Here, the Complaint alleges that the Enterprise's misappropriation and misuse of plaintiffs' images caused damage to plaintiffs. (¶ 567.) The Complaint also alleges that "the Enterprise received an improper financial benefit in the form of advertising revenue sold based on views of pornographic videos containing plaintiffs' image, which were hosted on MindGeek's tubesites without Plaintiffs' consent." (*Id.*) Thus, the Complaint alleges both an injury to a property interest—commercial misappropriation of image and likeness—and concrete financial loss—the profits the Enterprise collected from this commercial misappropriation, which profits are expressly recoverable under Cal. Civ. Code § 3344(a) and thus under the federal RICO statute. *See Diaz*, 420 F.3d at 898, 900; *cf. Fraley*, 830 F. Supp. 2d at 810-12 (holding that plaintiffs adequately alleged both injury in fact and loss of money or property for purposes of California's Unfair Competition Law based on the defendant's unlawful

---

[23] The MindGeek Entity Defendants' reliance on *Amy v. Curtis*, 2020 WL 5365979, at *4-5 (N.D. Cal. Sep. 8, 2020), is misplaced. That case addressed the question of whether certain harms qualified as "personal injury" for purposes of 18 U.S.C. § 2255(a), which permits recovery for one "who suffers personal injury." *Amy* did not address the question of whether the plaintiffs suffered harm to their property, whether under RICO or any other statute.

misappropriation of their names and likenesses, from which the defendant was alleged to have profited.).[24]

Moreover, the foreign defendants who reside outside the United States are not precluded from recovering RICO damages, as the MindGeek Defendants incorrectly argue. Rather, the foreign plaintiffs' injuries qualify as domestic injuries under RICO because the commercial appropriation of their image and likeness and the profits generated by MindGeek were felt in the United States, where MindGeek maintains its servers and derives the majority of its profits, web impressions, customer conversions, and revenue. (¶¶ 46, 65-70.)[25]

---

[24] The MindGeek Defendants' claim that this injury is too speculative, *see* MG Mot. at 42-43, must be rejected at this juncture. The Complaint lays out how MindGeek profits even from the free content on its tubesites, *see* ¶¶ 83-85, 88-90, and alleges that the Enterprise profited from advertising revenue sold based on views of pornographic videos containing these Plaintiffs' images, *see* ¶ 567. The harm from the commercial misappropriation of Plaintiffs' images and likenesses is directly related to the commercial misappropriation itself. "It is inappropriate at [the pleading] stage to substitute speculation for the complaint's allegations of causation." *Mendoza v. Zirkle Fruit Co.*, 301 F.3d 1163, 1171 (9th Cir. 2002); *see also id.* (holding that the plaintiffs "must be allowed to make their case through presentation of evidence . . . at a later stage in the proceedings"); *see also Newcal Indus., Inc. v. Ikon Office Solution*, 513 F.3d 1038, 1055 (9th Cir. 2008) (concluding that proximate cause raises "factual questions which we cannot resolve on a Rule 12(b)(6) motion in this case").

The MindGeek Defendants' claim that Plaintiffs must allege specific prior attempts to monetize their property interest or a present intention of doing so, *see* MG Mot. at 42, is inconsistent with California commercial misappropriation law. *See Fraley*, 830 F. Supp. 2d at 806-07 (rejecting argument that plaintiff must plead some "preexisting commercial value and efforts to capitalize on such value in order to survive a motion to dismiss.").

[25] The Supreme Court was clear that the domestic-injury requirement "does not mean that foreign plaintiffs may not sue under RICO." *RJR Nabisco, Inc. v. European Community*, 579 U.S. 325, 353 n.12 (2016). The Third Circuit articulated a multi-factor inquiry in *Humphrey*, 905 F. 3d at 707, and explained that foreign plaintiffs' RICO injuries can be felt "on [a] defendant's United States-based website and,

## C.   **The Complaint Adequately Pleads Racketeering Activity.**

Finally, the Complaint chronicles the MindGeek Enterprise's pattern of racketeering activity,[26] including numerous acts of:  (a) sex trafficking; (b) sexual exploitation of children; (c) money laundering; (d) wire fraud; and (e) criminal copyright infringement.  (*See* ¶¶ 540-61.)[27]

As an initial matter, the tens of thousands of TVPRA violations committed by the Moving Defendants, *see supra* Argument § I, alone constitute a pattern of racketeering activity under RICO.  *See Socheat Chy v. Lam Sin Yam*, 2017 WL 10676596, at *9 (C.D. Cal. Nov. 7, 2017); *Nuñag-Tanedo v. E. Baton Rouge Par. Sch. Bd.*, 790 F. Supp. 2d 1134, 1148 (C.D. Cal. 2011); *see also Aragon v. Che Ku*, 277 F. Supp. 3d 1055, 1072 (D. Minn. 2017).  Where, as here, the pattern of racketeering is adequately alleged, the Court need not address defendants' challenges to other predicate acts.  *See, e.g.*, *MH Pillars Ltd.*, 2018 WL 1184847, at *6 (declining to address additional predicated acts once the racketeering activity prong had been met).

Nevertheless, the Complaint also alleges that the MindGeek Defendants committed numerous violations of 18 U.S.C. § 2252, as this Court already found in *Doe v. MindGeek*.  *See supra* Argument, § II.  Moreover, the Complaint also alleges numerous predicate acts of wire fraud in furtherance of the scheme to effectuate the Enterprise's criminal activities, including soliciting, uploading, transferring, and reuploading CSAM and other illegal content; processing payments to partners, agents,

---

therefore, in the United States."  *Id.* at 710; *Akishev v. Kapustin*, 2016 WL 7165714, at *7 (D.N.J. Dec. 8, 2016).

[26] The RICO statute defines a pattern of racketeering activity as requiring "at least two acts of racketeering activity" within a ten-year period of time.  *See* 18 U.S.C. § 1961(5).  A civil RICO plaintiff need not allege that she has been harmed by all of the predicate acts or even multiple predicate acts; instead, all that is required is that one of the predicate acts caused the plaintiff's injury.  *See Just Film*, 847 F.3d at 1117-18.

[27] The Complaint clearly establishes that these predicate acts meet the relatedness and continuity requirements and none of the defendants argues otherwise.

and other enterprise members; communicating with victims, advocates, and law enforcements about nonconsensual content, stonewalling efforts to have it removed, and silencing victims and advocates who tried to expose MindGeek's scheme (¶¶ 136, 138, 176, 198-204, 207-08, 212-15, 247, 249-53, 259, 236, 435-83, 551-57).[28]  In the face of these detailed allegations, the Moving Defendants' complaints about a lack of specificity are meritless.  *Perez*, 2019 WL 6362471, at \*3-4 (sustaining RICO claim where the complaint was "replete with examples of the Defendants employing the mails and wires to effectuate the scheme"); *Ulti-Mate Connectors, Inc. v. Am. Gen. Life Ins. Co.*, 2015 WL 12734007, at \*7-8 (C.D. Cal. Mar. 27, 2015) (same).  Finally, the Complaint also alleges numerous predicate acts of money laundering in violation of 18 U.S.C. § 1957[29] and criminal copyright infringement.[30]

### D.  **The Complaint Alleges A RICO Conspiracy.**

Finally, the Complaint also alleges a RICO conspiracy.  *See* ¶¶ 581-90.  As set forth above, the existence of the agreement between defendants and the intent and knowledge of the conspirators "can be readily and plausibly inferred" from the

---

[28] Importantly, the use of mails and wires need not itself be fraudulent.  *Perez v. DirecTV Grp. Holdings, LLC*, 2019 WL 6362471, at \*3 n.3 (C.D. Cal. July 23, 2019).  Rather, a plaintiff need only allege that the use of mails and wires was in furtherance of a scheme to deceive, which is easily inferred here.  *Id.*

[29] The Complaint chronicles the elaborate creation of a labyrinth shell companies that were used to bleed out hundreds of millions of dollars so that MindGeek effectively pays no taxes anywhere and reports net operating losses, while other members of the MindGeek Enterprise are paid substantial compensation.  *See* ¶¶ 140-48, 150-54, 161, 559.  The laundered proceeds were derived from unlawful activity.  ¶¶ 147-48, 150, 155-57, 161, 181, 561.  These allegations suffice.  *See United States v. Rogers*, 321 F.3d 1226, 1229 (9th Cir. 2003); *JW Gaming Dev., LLC v. James*, 2018 WL 4853222, at \*6-7 (N.D. Cal. Oct. 5, 2018).

[30] *See* ¶¶ 72, 133, 135, 215-216, 342-43, 539-40.  *See Kevin Barry Fine Art Assocs. v. Ken Gangbar Studio, Inc.*, 391 F. Supp. 3d 959, 973 (N.D. Cal. 2019) (holding that infringer's knowledge was "adequately alleged in the interstices of the complaint" and could be inferred from allegations in complaint).

61

Complaint's detailed allegations of interdependence and mutual efforts to further the common purpose of the Enterprise. *See* Facts § B; *see also Synopsys, Inc. v. Ubiquiti Networks, Inc.*, 2017 WL 3485881, at *17 (N.D. Cal. Aug. 15, 2017) (intent and agreement inferable from allegations); *see also Ketayi*, 516 F. Supp. 3d at 1138-39 (defendants' knowledge inferable from allegations of participation in scheme); *LD v. United Behavioral Health*, 508 F. Supp. 3d 583, 605 (N.D. Cal. 2020); *Perez*, 2019 WL 6362471, at *6; *Socheat Chy*, 2017 WL 10676596, at *10.[31]

## IV.  THE STATE AND COMMON LAW CLAIMS ARE PROPERLY PLED

Plaintiffs also assert several state and common-law causes of action (*see* Counts X-XIX, ¶¶ 591-644), which defendants fail to challenge in any meaningful way.  To the extent defendants addressed these claims at all they simply regurgitate their specificity and other flawed arguments disposed of above.[32]

As an initial matter, defendants claim, without analysis, that a law other than California should govern plaintiffs' claims, but defendants have woefully failed to meet their burden on this issue.  Where, as here, *see infra* Argument, § VI.B.1, a plaintiff alleges that the defendant "maintains a principal place of business in California," the "[d]efendant bears the burden 'to defeat the presumption that California law applies and to show a compelling reason justifying displacement of

---

[31] The arguments of the MindGeek Entities and Visa to the contrary simply overlook these allegations and the relevant case law.  A civil RICO plaintiff "'is not required to prove every detail of the agreement' when alleging conspiracy, particularly at the motion to dismiss stage."  *Ketayi*, 516 F. Supp. at 1138 (quoting *United States v. Collazo*, 984 F.3d 1308, 1319 (9th Cir. 2021)).

[32] Bergmair concedes that the Complaint states a claim for violation of the California statutes by the California Plaintiffs, *see* Bergmair Mot. 35 (challenging this claim with respect to the non-California plaintiffs), and does not challenge the other common law claims.  Moreover, given that the conduct complained of emanated, at least in part, from California, application of California statutes is appropriate irrespective of plaintiffs' residence.  *See Ward v. United Airlines, Inc.*, 889 F.3d 1068, 1073 (9th Cir. 2018); *People ex rel. DuFauchard v. U.S. Fin. Mgmt., Inc.*, 169 Cal. App. 4th 1502, 1518 (Cal. Ct. App. 2009).

California law.'" *Thomas v. Dun & Bradstreet Credibility Corp.*, 100 F. Supp. 3d 937, 946 (C.D. Cal. 2015) (quoting *Forcellati v. Hyland's, Inc.*, 876 F. Supp. 2d 1155, 1160 (C.D. Cal. 2012)).  A "[d]efendant 'can only meet [its] burden by engaging in an analytically rigorous discussion of each prong of California's "governmental interests" test based on the facts and circumstances of this case, and this [p]laintiff's allegations.'"  *Id.* at 947.  Far from meeting that burden, defendants have failed to conduct any choice of law analysis at all.  Thus, for the purposes of this Motion the court should apply California law and defer the question of applicable law to a later stage of the proceedings.  *See Thomas*, 100 F. Supp. 3d at 946-47.

Like the plaintiff in *Doe v. MindGeek*, plaintiffs have stated a claim for distribution of private sexually explicit material in violation of California Civil Code § 1708.85 (*see* Count XV). *Doe v. MindGeek*, 2021 WL 4167054, at *10.

Defendants' challenges to plaintiffs' civil conspiracy claims are predicated entirely on its challenges to the underlying claims.  *See* MG Mot. at 49.  But, as established herein, each of these claims are adequately alleged.  Moreover, there are ample facts to create an inference of an agreement between defendants, and each defendants' role in the conspiracy.  *See supra* Facts, § B; *see also Cork v. CC-Palo Alto, Inc.*, 534 F. Supp. 3d 1156, 1189-90 (N.D. Cal. 2021); *Spencer v. Mowat*, 46 Cal. App. 5th 1024, 1037 (Cal. Ct. App. 2020) ("Due to the secret nature of conspiracies, their existence is often inferentially and circumstantially derived . . . .").

Similarly, Visa's contention that plaintiffs' Unfair Competition Law claim should be dismissed because the Complaint does not allege that Visa participated in or exercised control over the sex trafficking venture (Visa Mot. at 34), is belied by the detailed allegations that Visa knowingly processed millions of sham credit card transactions, intentionally profited from a venture engaged in child pornography, rape, and other criminal activities, and intentionally lied and made misrepresentations about the nature of the content on MindGeek's tubesites so that it could continue to do so.

1  *See* Facts, § B.5  These allegations are more than sufficient at this stage of the case.

2  *See Novoa v. GEO Grp., Inc.*, 2018 WL 3343494, at *14 (C.D. Cal. June 21, 2018).

3      Although Tassillo argues that plaintiffs' failure to allege a concrete financial

4  injury is fatal to their UCL claim (Tassillo Mot. at 23), as set forth above, the

5  Complaint is rife with allegations of economic injuries, including the profits the

6  MindGeek Enterprise made by commercially misappropriating plaintiffs' images and

7  likenesses.  *See Fraley*, 830 F. Supp. 2d at 810-12.

8      Finally, the remaining arguments concerning the common law and statutory

9  claims, made primarily by Tassillo (Mot. at 20-23), Urman (Mot. at 41-44), and

10  Antoon (Mot. at 25), simply repeat defendants' refrain that the Complaint does not

11  contain any allegations of wrongful conduct by them.  These arguments are all

12  addressed above.  *See supra* Facts, §§ B.2-3; *see also See Kao v. Holiday*, 58 Cal. App.

13  5th 199, 202, 207 (Cal. Ct. App. 2020) (individual defendants were alter egos of

14  corporation and were therefore personally liable for plaintiff's damages).

15  ## V. CDA § 230 DOES NOT BAR PLAINTIFFS' CLAIMS

16      This Court has (twice) correctly held that Section 230 of the Communications

17  Decency Act ("CDA 230") does not protect MindGeek[33] from liability.  *See Doe v.*

18  *MindGeek*, 2021 WL 4167054; and *Doe v. MindGeek*, 21-cv-0038, Slip. Op. (Dec. 2,

19  2021) (the "*Doe v. MindGeek* Recon. Order").  As this Court explained in its recent

20  decision rejecting the very same arguments defendants advance here: "Congress has

21  not provided an all purpose get-out-of-jail free card for businesses that publish user

22  content on the internet[.]" *Doe v. MindGeek* Recon. Order at 17 (internal citation

23  omitted).  Rather, where, as here, defendants "have taken action to encourage unlawful

24  content and employ features to make a material contribution to such content," CDA

25

26

27  ---
[33] For the same reasons, CDA 230 does not immunize the Individual Defendants.  Visa is not an ICS and therefore CDA 230 is not applicable to it.

28

230 has no application.  *Id.*

### A.    The MindGeek Defendants Are Content Creators

While Section 230 provides a defense to claims brought against a provider or user of an interactive computer service (or ICS) that is simply publishing information provided by a third party, "the Communications Decency Act was not meant to create a lawless no-man's land on the Internet." *Doe v. MindGeek* Recon. Order at 17.  Thus, a defendant that is "responsible, 'in whole or in part, for the creation or development' of unlawful content on its platforms" is not entitled to CDA 230 protection.  *Doe v. MindGeek*, 2021 WL 4167054, at *3, *8; *see also Doe v. MindGeek* Recon. Order, at 9; *Fair Housing Council v. Roommates.com*, 521 F.3d 1157, 1168 (9th Cir. 2008) (*en banc*) (website did not have Section 230 immunity when it required users to disclose information that violated federal laws).[34]

Applying these standards, in *Doe v. MindGeek*, this Court held that MindGeek is a content creator and is not entitled to CDA 230 immunity.  *See Doe,* 2021 WL 4167054, at *9-10; *MindGeek* Recon. Order, at 13.  In reaching this conclusion, the Court reasoned that the MindGeek Defendants (1) "solicit, review, approve, and feature [illegal content] on their platforms" (*MindGeek Recon*. Order at 13); (2) "target unlawful content by . . .  categoriz[ing its] videos using coded language for child pornography to ensure that content is visible to the 'right fans,' and instruct[ing] users how to title their videos to target individuals interest in child pornography" (*id.*); (3) "'encourage' child pornography through [the use of] titles such as 'less than 18,' 'the best collection of young boys,' and 'underage.'" (*id.*); (4) "'upload' child porn videos to their sites'" (*id.* at 14); (5) fail to remove videos identified as nonconsensual, merely disabling the link but keeping the webpage with its title, description, tags, and comments, so that the video though disabled would continue to increase SEO (*id.* at 15

---

[34] The MindGeek Defendants bear the burden of establishing entitlement to CDA 230 immunity.  *Gonzalez v. Google LLC*, 2 F.4th 871, 889 (9th Cir. 2021).

CASE NO. 21-CV-04920-CJC-ADS

(noting MindGeek's practice to "remove child pornography from their platforms, [but] leave up links to [ ] illegal content [it was forced to disable] to continue to attract visitors,"); and (6) actively chose not to employ verification technology because it recognized it would "severely harm their business operations" (*id.*).

Here, the Complaint alleges that MindGeek (a) targets and promotes child pornography and other illegal content (Facts, §§A.2(b), (c)); (b)  directs users to it (*id.* (alleging that the MindGeek added tags, curated playlists; edited titles and tags, used coded language)); (c)  actively transfers child pornography and other illegal content to its affiliated sites (*id.* § A.2(c); (d)  maintains the webpages, titles, and comments for known nonconsensual content so that it could continue traffic and conversion (¶¶ 135, 209-11, 256, 258, 405, 325-27 (Doe 14), 373 (Doe 27), 386 (Doe 30), 389 (Doe 31)); (e)  modified the content, titles and tags of nonconsensual content to improve SEO (¶¶ 132, 134, 200-04); (f) stonewalled efforts to have CSAM and other illegal content removed from its websites (Facts, § D); (g) reuploaded content after it was forced to remove it from its tubesites *id.* §§ A.2(c), D); (h) shared revenue generated from trafficked content with sex traffickers (¶¶ 70, 85, 87-89, 202, 238, 258, 486(a), 494(a), 642(a)); (i) partnered with known sex traffickers and witnessed the trafficking first-hand when they visited a "football-field size warehouse in which women were crammed into adjoining studio stalls 'like livestock' to perform on camera" (¶¶ 182-83); (j) purchased trafficked content in bulk (Facts, § A.2(a)); (k) facilitated the reuploading of content even when MindGeek was forced to remove it by including the free download button and re-uploading some of that content themselves  (*id.* §§ A.2(c), D); (l) avoided even "pretextual restrictions" on the uploading of content because they knew it would reduce traffic and profits (¶ 187); and (m) provided users with VPN services to allow them to hide their unlawful conduct (¶ 494(n), 642(y)).

Taken together, these allegations go far beyond the neutral tools the Ninth Circuit has held are protected under CDA 230.  Accordingly, the Court's holdings in *Doe v.*

*MindGeek* apply with equal force here.

### B.    Plaintiffs' Sex Trafficking Claims Are Exempted From CDA 230 Immunity.

Defendants cannot claim immunity for plaintiffs' sex trafficking claims for the independent reason that FOSTA suspends CDA 230 protections for the violations of alleged here.  *See Doe v. MindGeek*, 2021 WL 4167054, at *4.

This Court previously determined that the FOSTA exemption applies where a complaint plausibly alleges that defendants had constructive knowledge of the alleged sex trafficking violations.  *Id.*; *MindGeek* Recon. Order, at 18 (rejecting actual knowledge standard).  Nevertheless, the Court also held based on the same allegations alleged here, that plaintiffs had satisfied the higher actual knowledge standard.  *See MindGeek* Recon. Order, at 21.  In so holding, the Court relied on, among other allegations, that the MindGeek Defendants publicly admitted that they "review and approve each and every video posted to their platforms, including those depicting Plaintiff, [ ] specifically evaluating whether the content contains illicit content, such as child pornography, [ ] and intentionally allow some evidence to be posted anyway" (*id.*; *see also e.g.*, ¶¶ 196, 451, 482), and refused to implement verification tools because of the financial harm it would cause, instead choosing to profit off of the nonconsensual content.  *Id.*; *See, e.g.*, ¶¶ 187-95.  For the same reasons, this Complaint amply pleads defendants' knowledge.

## VI.  THE COURT HAS JURISDICTION AND PLAINTIFFS HAVE STANDING

Faced with this Court's prior findings in *Doe v. MindGeek* and the detailed allegations of defendants' rackets, schemes, and wrongdoing, defendants resort to a number of procedural arguments in an effort to secure dismissal.  First, the MindGeek Entities argue that certain defendants are "not proper parties" to this case.  Second, the MindGeek Entities and the Individual Defendants argue that they are not subject to jurisdiction in this state.  Finally, Visa argues that plaintiffs lack Article III standing to

bring claims against it.  Each of these arguments are highly fact sensitive and should not be resolved on this motion.  Where, as here, plaintiffs have established a prima facie showing of jurisdiction and traceable injury, and defendants fail to rebut this showing, defendants' procedural challenges should be rejected.  At a minimum, plaintiffs are entitled to jurisdictional discovery.

A.    The Determination Of Proper Parties Requires Discovery.

The MindGeek Entities argue that four of the named defendants "are not proper parties to this lawsuit."  (MG Mot. at 7-8.)[35]  In support of this position, the MindGeek Entities rely solely on the Declaration of Andreou setting forth facts which purportedly contradict the facts alleged in the Complaint.  The reliance on such material is improper on a motion to dismiss and should not be considered by the Court absent discovery and cross-examination.  *See Stiefel v. Bechtel Corp.*, 497 F. Supp. 2d 1138, 1144 (S.D. Cal. 2007); *see also Arevalo v. Bank of Am. Corp.*, 850 F. Supp. 2d 1008, 1019 (N.D. Cal. 2011) (sustaining allegations against subsidiary where there was a factual dispute as to whether defendant or its subsidiary was the proper entity sued).[36]

In any event, the Andreou Declaration does not refute the Complaint's allegations that: MindGeek operates through a network of international sham entities

---

[35]    Wish respect to defendants' arguments that TrafficJunky Inc. and RK Holdings USA Inc. do not exist, Plaintiffs have alleged facts putting defendants on notice of the entities it intended to sue, which is all that is required at this stage of the proceeding. *See* ¶ 89, ¶ 49.  As to RK Holdings USA, Inc., since the filing of the complaint, Plaintiffs were informed of a clerical error, intended to name RK Holdings, LLC,  and will seek to amend to reflect the correct party.  With respect to TrafficJunky, plaintiffs are entitled to discovery to determine whether it is a legal entity and, if not, the identity of the legal entity operating under the tradename TrafficJunky.  The MindGeek Defendants are in the best position to know the correct name of the entity they own, operate, and control.

[36] While the Court may properly consider the affidavit in considering the portions of the MindGeek Defendants' motions based on personal jurisdiction, it would be improper to do so for arguments that plaintiffs failed to state a claim.  *See Zosma Ventures, Inc. v. Givi*, 2014 WL 12579805, at *1 (C.D. Cal. Oct. 28, 2014).

1  this structure was created solely to evade liability and make investigations into the

2  wrongdoing of each entity nearly impossible (*see, e.g.* ¶¶ 142-43, 161); new entities

3  were created and dissolved weekly (¶¶ 142, 145); and they each operated as agents and

4  alter-egos of each other (¶¶ 159-61, 66-67), and without regard to the corporate form

5  (¶¶ 59-61).  To the contrary, it bolsters, plaintiffs' allegations that there was no

6  legitimate purpose for this byzantine structure and that MindGeek entities were

7  operated as a single entity.  *See* Andreou Declaration, ¶¶ 21-22 (admitting that MG

8  Global employees moderate videos posted and reuploaded by MG Freesites)).  Thus,

9  even if the Declaration were properly considered on this Motion, it raises factual issues

10  that cannot be resolved without discovery.

11       B.    <u>The Court Has Personal Jurisdiction Over Each Defendant.</u>

12       Defendants' challenges to this Court's exercise of personal jurisdiction are

13  likewise unavailing.  On a motion to dismiss for lack of personal jurisdiction, absent

14  formal discovery and an evidentiary hearing, a plaintiff need make only a *prima facie*

15  showing that the court has jurisdiction over defendants.  *See Pebble Beach Co. v.*

16  *Caddy*, 453 F.3d 1151, 1154 (9th Cir. 2006).  In making this determination, the Court

17  must accept as true all allegations in the Complaint unless they are "directly

18  contradicted" by affidavit. *See Zosma Ventures*, 2014 WL 12579805, at *4; *DISH*

19  *Network L.L.C. v. Vicxon Corp.*, 923 F. Supp. 2d 1259, 1264 (S.D. Cal. 2013).

20  Moreover, the Court must also resolve all factual disputes in plaintiffs' favor.  *DISH*

21  *Network L.L.C.*, 923 F. Supp. 2d at 1262.

22       Federal courts have jurisdiction over a defendant where permissible under a

23  federal statute, or where no statute is applicable, to the extent permissible under the

24  state law of the forum.  Fed. R. Civ. P. 4(k)(1)(A).  California's long-arm statute, "is

25  coextensive with federal due process requirements . . . ."  *Mavrix Photo, Inc. v. Brand*

26  *Techs., Inc.*, 647 F.3d 1218, 1223 (9th Cir. 2011).  Thus, the only question the Court

27  must satisfy is whether the defendants "have certain minimum contacts with the forum

28

69

state such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Id.s*

As set forth herein, this Court may exercise general jurisdiction over each defendant.  Moreover, defendants are each also subject to personal jurisdiction in this state pursuant to the RICO statute and/or FRCP Rule 4(k)(2).

Significantly, MindGeek entities, including Cyprus-based MindGeek Freesites, and Luxembourg-based MindGeek S.á.r.l., have been sued at least seven times in California and an additional eight times in other jurisdictions in the United States, and have virtually never raised any personal jurisdiction challenges or secured dismissal on those grounds.  Clearly, the MindGeek Entities do not actually find litigating in this forum or the United States to be onerous or otherwise unreasonable.  Thus, the only logical inference is that the MindGeek Entities find the gravity of the allegations against them difficult to defend against, and so instead have chosen to fight them on procedural rather than substantive grounds.

Finally, in the event that the Court finds that the complaint fails to establish jurisdiction, plaintiffs are entitled to jurisdictional discovery.

1. The Agency And Alter Ego Relationship Between and Among the MindGeek Defendants Confer General Jurisdiction

This Court has personal jurisdiction over each of the MindGeek Entities and Individual Defendants based on the jurisdictional contacts of their agents/alter-egos MG USA and MG Global which are not contested on this motion and properly imputed to the remaining MindGeek Defendants.

To establish alter ego jurisdiction, the plaintiff must make out a prima facie case "(1) that there is such unity of interest and ownership that the separate personalities [of the entities] no longer exist and (2) that failure to disregard [their separate identities] would result in fraud or injustice." *Doe v. Unocal Corp.,* 248 F.3d 915, 926 (9th Cir. 2001) (quoting *Am. Telephone & Telegraph Co. v. Compagnie Bruxelles Lambert,* 94 F.3d 586, 591 (9th Cir.1996)); *ADO Fin., AG v. McDonnell Douglas Corp.*, 931 F.

70

Supp. 711, 715 (C.D. Cal. 1996) (the alter ego theory of jurisdiction has been similarly applied to exert jurisdiction over officers, directors, and managers of entities); *Flynt Distrib. Co. v. Harvey*, 734 F.2d 1389, 1393 (9th Cir. 1984) (same). "The essence of the alter ego doctrine is that justice be done." *Mesler v. Bragg Mgmt. Co.*, 39 Cal. 3d 290, 301 (1985)); *Firstmark Capital Corp. v. Hempel Financial Corp.*, 859 F.2d 92, 94 (9th Cir.1988) ("Under California law the kind of inequitable result that makes alter ego liability appropriate is an abuse of the corporate form . . .") In conducting the alter ego analysis, "the Court presumes [non-movant's] allegations of jurisdictional facts are true and decides all factual disputes in [non-movant's] favor." *ADO Fin., AG*, 931 F. Supp. at 718.

Courts routinely deny motions to dismiss for lack of personal jurisdiction where plaintiffs have sufficiently pled various factors of alter ego. *See, e.g.*, *Sihler v. Fulfillment Lab, Inc*, 2020 WL 7226436, at *7 (S.D. Cal. Dec. 8, 2020) (finding that the complaint alleged that the individual defendant was the alter ego of an entity that did not contest personal jurisdiction, and despite the defendant's conclusory denials in an affidavit, defendant did not deny the fundamental contention of involvement in the alleged wrongdoing); *Mieuli v. DeBartolo*, 2001 WL 777447, at *10 (N.D. Cal. Jan. 16, 2001); *Fed. Reserve Bank of San Fran. v. HK Sys.*, 1997 U.S. Dist. LEXIS 5573, *19 (N.D. Cal. 1997); *ADO Fin., AG*, 931 F. Supp. at 713.[37]

Applying these standards, the Complaint plainly alleges sufficient alter-ego allegations to impute jurisdictional contacts at this stage of the proceedings. Among other things, the Complaint alleges that the MindGeek entities operate as a single business entity (¶ 60), that the Individual Defendants, the Colbeck Capital Does and the Bergmair Does, maintained such pervasive control over MindGeek that the sham corporate form should be disregarded, that these defendants operated these entitles like

---

[37] The defendants' reliance on *AMA Multimedia, LLC v. Wanat*, is misplaced as it does not address alter ego relationships and jurisdictional discovery was conducted prior to the determination by the Court. 970 F.3d 1201 (9th Cir. 2020).

the mob with bosses and capos, and used fear and intimidation tactics against detractors (¶¶ 70, 93-94, 119-21), and created "an international network of ever-changing sham shell companies" through which they: (a) avoid taxes and mask criminality under the guise of legitimate entertainment[38] (¶¶ 83, 140-45); (b) pay for, populate the website with, and separately profit from content produced through human trafficking and slavery and pirated copyright materials; (c) permit known criminal organizations to steal customer information, commit credit card fraud, and blackmail customers; (d) defraud MindGeek advertisers, marketers, and other third-parties; (e) evade taxes and launder monies by "bleeding" value out of the organization to the Bro-Club and other Enterprise members via sham investments and expenses; and (f) pay for and execute blackmail, extortion, harassment, defamation, and hacking against those the Enterprise viewed as threats.  (¶¶ 139-61.)  Tellingly, the network was in constant metamorphosis. The MindGeek Enterprise created, dissolved, and then replaced sham shell companies on a monthly and sometimes daily basis, often with virtually the same names.  Plaintiffs allege that these sham shell companies had no *bona fide* business purpose for the network's sheer complexity and opaqueness or its constantly quantum like dissolution and creation of entities.  ¶ 142.

Moreover, as to the Individual Defendants, the Complaint details each of their roles in directing, managing and carrying out the operations of the Company, including controlling and dictating the illegal conduct at issue in this case. *See* Facts, §§ B.2-B.4.

None of the Individual Defendants submit a declaration refuting any of the allegations.  The MindGeek Entities collectively submit one barebones, five-page declaration that does nothing more than suggest that today each of the defendants is a

---

[38] The former CEO of the predecessor company of MindGeek, Fabian Thylman, was arrested on charges for exactly that: using the byzantine corporate structure to evade taxes. ¶¶ 112-13.  In an attempt to claim legitimacy, the predecessor company was purchased by Bergmair and the Bergmair Does.  Yet, the corporate structure not only continued, but MindGeek opened and closed hundreds of subsidiaries during Bergmair's tenure, further exacerbating the shell-company scam. ¶¶ 114-19.

1 separate entity.[39]  *See* Andreou Declaration.  Moreover, although the Andreou

2 Declaration purports to claim that each of the MindGeek Entities has independent

3 responsibilities and does not have overlap in management, despite being the parties

4 with exclusive knowledge of the facts, the Andreou Declaration fails to actually

5 identify any management to confirm there is no overlap, explain the *bona fide*

6 commercial purpose of each of the entities sued, or confront any of the allegations

7 regarding the sham shell-entity structure, including the creating and closing of entities

8 on a near-daily basis at certain points in time.  Further, the Andreou Declaration makes

9 the identical blanket conclusory allegation for each of the MindGeek Entities that they

10 are "adequately capitalized" and "responsible for their own contracts" without any

11 factual support, despite having exclusive access to this information.

12      Finally, the Andreou Declaration concedes that at least one California-based

13 MindGeek Entity, MG Global, provides services, including moderation, to other

14 MindGeek entities (without identifying which ones) and admits that employees of MG

15 Global have responsibilities for managing the content on MindGeek sites.  This alone

16 is fatal to any claims that MG Global is not a proper defendant, and directly supports

17 the Complaints' allegations that the MindGeek entities all served as alter egos and the

18 exercise of jurisdiction based on those relationships.

19      The MindGeek Entities complain that plaintiffs' allegations focus on the group

20 of MindGeek entities without "specific factual allegations showing what role each

21 MindGeek entity played."  (*See* MG Mot. 36-37.)  However, it is well-recognized that,

22 in this pre-discovery period, only the MindGeek entities, and not plaintiffs have

23

24 [39] It is of note that the entire Andreou Declaration is in the present tense.  The
Complaint's allegations go back over a number of years and address conduct that

25 occurred in the past.  Thus, the MindGeek Defendants fail to actually refute any of the
allegations of past conduct, which this Court must then accept as true.  *See Zosma*

26 *Ventures*, 2014 WL 12579805, at *5 n.6 ("Defendant's statements [in his Declaration],
made in the present tense, do not directly contradict Plaintiff's evidence of Defendant's

27 past activities in California.").

28

CASE NO. 21-CV-04920-CJC-ADS

PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS

1  information from which each entity's role can be determined.  *See supra* note 10.  This

2  information imbalance is compounded in this case by the creation of hundreds of sham

3  MindGeek entities with no legitimate purpose. Thus, under these circumstances,

4  discovery is warranted, not dismissal.[40]

5          2.  The Court Has Personal Jurisdiction Over The MindGeek
               Defendants Pursuant To Rule 4(k)(2) and the RICO Statute

6          Moreover, the exercise of personal jurisdiction over the MindGeek Defendants

7  is independently appropriate under either FRCP 4(k)(2) or RICO's nationwide

8  jurisdiction. FRCP 4(k)(2) confers jurisdiction over a foreign defendant who lacks

9  substantial contacts with any single state, but has sufficient contacts with the United

10 States as a whole to satisfy due process standards. *See In re Volkswagen*, 2017 WL

11 4890594, at *17.  Courts have adopted a burden-shifting mechanism so that if "'the

12 defendant contends that he cannot be sued in the forum state and refuses to identify any

13 other where suit is possible, then the federal court is entitled to use Rule 4(k)(2).'"

14 *Holland Am. Line Inc. v. Wartsila N. Am., Inc.*, 485 F.3d 450, 461 (9th Cir. 2007)

15 (quoting *ISI Int'l, Inc., v. Borden Ladner Gervais LLP*, 256 F.3d 548, 552 (7th Cir.

16 2001)).  Under 4(k)(2), plaintiffs need only make a *prima facie* showing that

17

18

19 _____
   [40] At a minimum, the alter ego relationship among the MindGeek Entities and
20 Individual Defendants confers specific jurisdiction over the MindGeek Defendants.
   The MindGeek Entities admit that certain entities in California have responsibilities for
21 moderating, uploading, and potentially reuploading content onto MindGeek tubesites.

22
        Moreover, even absent alter ego allegations, this Court may exercise specific
23 jurisdiction over the MindGeek Defendants because the MindGeek Entities have
   created numerous shell companies located in California for the purpose of effectuating
24 their fraudulent schemes and trafficking venture, have directed their activities towards
   California, derive substantial revenue from California-based users; selling targeted
25 advertising in California and to California-based users, including targeting California-
   based users for their subscription sites; partnered with sex traffickers based in
26 California; and uploaded or re-uploaded videos of California-based Plaintiffs without
27 their knowledge or consent.  *See* ¶¶ 64-70.
28
                                        74

defendants have minimum contacts with the United States.[41]  Likewise, section 18 U.S.C. § 1965(b), provides that a court may exercise personal jurisdiction over non-resident participants in an alleged RICO conspiracy, even if those parties would otherwise not be amenable to jurisdiction in that court, where defendant(s) has sufficient "national contacts, rather than its minimum contacts with the forum state," *See Mir v. Freines, Martin, Stein & Richland*, 2015 WL 4139435, at *12 (C.D. Cal. Jan. 12, 2015).

The Complaint alleges each defendants' minimum contacts with the United States sufficient to confer jurisdiction under either of these statutes, including the location of the servers which stored, transmitted, and monetized the illegal and nonconsensual content in this country and the purposeful direction of the MindGeek tubesites into the United States, which is one of its largest customer bases and thus responsible for a substantial portion of its profits.  *See* ¶¶ 64-70.[42]

### 3. The Court May Exercise Pendent Personal Jurisdiction.

Where, as here, the MindGeek Defendants have conceded for the purposes of this Motion that this Court has jurisdiction over claims brought by the California plaintiffs (see MG Mot. at 17-18), this Court may exercise pendent personal jurisdiction over the remaining claims brought by the non-California plaintiffs.  As the

---

[41] The MindGeek Defendants do not address Rule 4(k)(2) jurisdiction over the non-US Plaintiffs, instead relying on their incorrect argument that the non-US Plaintiffs seek extraterritorial application of the TVPRA and RICO.  *See* Argument, §§ I.E, III.B.

[42] The international individuals argue that Section 1965(b) does not confer jurisdiction over them here because they completed waivers of service and thus were not served in the United States.  Notably, defendants are all represented by United States counsel each of which requested a waiver of service in exchange for additional time to respond to the Complaint.  Defendants even agreed to waive all challenges to service of process.  Nevertheless, defendants now claim that their request to waive service is a bar to jurisdiction.  The Court should reject defendants' attempts at gamesmanship, particularly, here where the facts so strongly suggest wrongdoing, the Court should not allow defendants to continue evade liability through sham international entities.

Ninth Circuit explained, "[w]hen a defendant must appear in a forum to defend against one claim, it is often reasonable to compel that defendant to answer other claims in the same suit arising out of a common nucleus of operative facts." *Action Embroidery Corp. v. Atl. Embroidery, Inc*., 368 F.3d 1174, 1181 (9th Cir. 2004).  Under such circumstances, "judicial economy, avoidance of piecemeal litigation, and overall convenience of the parties is best served by adopting this doctrine." *Id*.; *see United States v. Botefuhr*, 309 F.3d 1263, 1272 (10th Cir. 2002). Because plaintiffs' claims all arise from the same nucleus of facts, *i.e.* MindGeek's pattern and practices of trafficking and criminal activities the exercise of pendent jurisdiction here is proper and would further the interests of efficiency.

### 4.   The Individual Defendants' Remaining Arguments Are Unavailing

Each of the Individual Defendants argue that it would not be reasonable or fair for them to be subject to jurisdiction in this state.  The allegations in the Complaint completely belie these arguments.  Plaintiffs allege that the MindGeek Enterprise, under the control of the Individual Defendants, created shell entities in California to further their fraudulent schemes and trafficking venture; purposely directed and tailored advertising to California-based users; derived substantial revenue from California-based users; and partnered with known-sex traffickers in California.  No Individual Defendant submits an affidavit at all, let alone one contradicting these allegations.  Thus, these allegations constitute a prima facie showing that the exercise of jurisdiction would comport with "fair play and substantial justice."  That the Individual Defendants purportedly did this from a foreign jurisdiction, as they claim, is of no moment, where they purposely injected themselves into the forum state's affairs.

### 5.   Jurisdictional Discovery Is Appropriate

In the event this Court determines that the allegations in the Complaint do not establish jurisdiction, plaintiffs are entitled to jurisdictional discovery.  As this Court has recognized "[r]equests for [jurisdictional] discovery should ordinarily be granted

1  'where pertinent facts bearing on the question of jurisdiction are controverted . . . or

2  where a more satisfactory showing of the facts is necessary.'" *Brophy v. Almanzar*, 359

3  F. Supp. 3d 917, 925 (C.D. Cal. 2018) (Carney, J.) (quoting *Wine Bottle Recycling v.*

4  *Niagara Sys. LLC*, 2013 WL 1120962 at *9 (N.D. Cal. Mar. 18, 2013)).  Moreover,

5  "denial of jurisdictional discovery constitutes an abuse of discretion when further

6  discovery 'might well demonstrate facts sufficient to constitute a basis for

7  jurisdiction.'" *Id.* (quoting *Harris Rutsky & Co. Ins. Servs., Inc. v. Bell & Clements*

8  *Ltd.*, 328 F.3d 1122, 1135 (9th Cir. 2003)).  Jurisdictional discovery is particularly

9  appropriate here, where the Complaint alleges that defendants operated through

10 hundreds of sham entities, and information concerning the activities and jurisdictional

11 contacts of each entity is uniquely within defendants' possession.[43]

12         C.    Plaintiffs Have Article III Standing.

13         Finally, Visa's procedural challenges to plaintiffs' standing fare no better.

14         As an initial matter, Visa's entire argument is premised on Visa's position that

15 the allegations in the Complaint regarding Visa's participation in and benefits from the

16 MindGeek Enterprise's sex trafficking venture and RICO enterprise are false.  These

17 factual determinations are not properly resolved at this stage of the proceeding; the law

18 is clear that courts must "presume success on the merits when evaluating standing."  *In*

19 *re Facebook, Inc., Consumer Privacy User Profile Litig.*, 402 F. Supp. 3d 767, 788

20 (N.D. Cal. 2019)); *see also Sierra Club v. EPA*, 699 F.3d 530, 533 (D.C. Cir. 2012).

21         Second, in enacting FOSTA, Congress implicitly conferred Article III standing

22 for all claims against those who participate in or benefit from a trafficking venture.

23 "Congress has the power to . . . articulate chains of causation that will give rise to a

24

25 [43] Moreover, plaintiffs allege that the MindGeek Enterprise, including the Individual

26 Defendants, operated on behalf of and at the behest of, the Colbeck Capital and
   Bergmair Does.  The identity of these Doe Defendants is exclusively within the

27 knowledge of some or all of the defendants.  Thus, at a minimum, plaintiffs are entitled

28 to jurisdictional discovery concerning the jurisdictional contacts of these defendants.

case or controversy where none existed before." *Massachusetts v. E.P.A.*, 549 U.S. 497, 516 (2007); *Robins v. Spokeo, Inc.*, 867 F. 3d 1108, 1112 (9th Cir. 2017). Congress must only "identify the injury it seeks to vindicate and relate the injury to the class of persons entitled to bring suit." *Massachusetts*, 549 U.S. at 516; *see Nat. Res. Def. Council v. U.S. E.P.A.*, 542 F.3d 1235, 1248 (9th Cir. 2008) (holding that in enacting the Clean Water Act, "Congress has expressed its view that developing [certain EPA regulations] reduces the risk of the pollution causing the members' injury," thus "support[ing] an inference that there is a causal connection between the lack of those regulations and adverse environmental effects" sufficient to satisfy Article III's traceability requirements); *see also Californians for Alternatives to Toxics v. Schneider Dock & Intermodal Facility, Inc.*, 374 F. Supp. 3d 897, 909–10 (N.D. Cal. 2019). By enacting FOSTA, Congress recognized that companies and individuals that knowingly benefit from a sex trafficking venture cause harm to sex trafficking victims. Congress extended sex trafficking liability beyond just the perpetrators themselves. *See* Sections 1591(a)(2), 1595.[44]

Finally, even without FOSTA, plaintiffs have standing because their injuries are "fairly traceable" to Visa. The requirement of traceability "is relatively modest at [the pleading] stage of the litigation." *Bennett v. Spear*, 520 U.S. 154, 171 (1997); *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 134 n.6 (2014) ("Proximate causation is not a requirement of Article III standing, which requires only that the plaintiff's injury be fairly traceable to the defendant's conduct.")[45] Article III's

---

[44] Visa's slippery-slope argument that future plaintiffs could sue Visa for purchase of "guns, prescription drugs, tobacco, soda, furs, and myriad other products or services" is a red herring. (Visa Mot. at 10-11.) It ignores that such claims would require Congress to confer standing through statute which it has not done so at this time.

[45] Nevertheless, Plaintiffs have alleged proximate cause in connection with the claims where it is required. *See* Argument, §§ I-IV, thus conferring statutory standing as well as Constitutional standing.

1  traceability requirement does not necessitate that plaintiffs "show to a scientific

2  certainty that defendant's [conduct] caused the precise harm suffered by the plaintiffs."

3  *Nat. Res. Def. Council v. Sw. Marine, Inc.*, 236 F.3d 985, 995 (9th Cir. 2000).

4         Indeed, "[t]he United States Supreme Court has stated that Article III standing

5  does not require that the defendant's actions be the last step in the chain of

6  causation." *Ning Xianhua v. Oath Holdings, Inc.*, 2021 WL 1700227, at *7 (N.D. Cal.

7  Apr. 29, 2021) (citing *Bennett*, 520 U.S. at 168–69). The chain of causation may have

8  "more than one link," provided the causal chain "is not hypothetical or tenuous."

9  *National Audubon Society v. Davis*, 307 F.3d 835, 849 (9th Cir. 2002). Thus, contrary

10  to Visa's allegations, Visa's conduct need not be the sole cause of plaintiffs' injuries,

11  nor the sole motivation for sex traffickers' decision to traffic plaintiffs on MindGeek's

12  websites; instead it must only be "a substantial factor motivating the third parties'

13  actions." *Mendia v. Garcia*, 768 F.3d 1009, 1013 (9th Cir. 2014) (quoting *Tozzi v.*

14  *U.S. Dep't of Health & Human Servs.*, 271 F.3d 301, 308 (D.C. Cir. 2001) (internal

15  quotation marks omitted).

16         Visa argues that there is no Article III standing because plaintiffs' injuries were

17  the results of "independent action of some third party." (Visa Mot. at 7.) But standing

18  exists when the injury is produced by determinative or coercive effect upon the action

19  of someone else. *Bennett*, 520 U.S. at 169; *see also Mendia*, 768 F.3d at 1011, 1013

20  (finding Article III standing where there was a "causal chain with multiple links" but

21  the actions of the third-party were not entirely independent).

22         As set forth herein, Visa was uniquely situated to stop the MindGeek

23  Enterprise's criminal activities. Nevertheless, even after it was informed of rampant

24  sex trafficking on MindGeek's websites, Visa continued to profit from its business

25  relationship with MindGeek. (¶¶ 9, 409-26, 501-08, 512, 537, 571, 635.) It did so,

26  despite the fact that its competitors publicly terminated their relationships with

27  defendants. More egregiously, Visa publicly misrepresented that the content on

28

MindGeek tubesites was consensual and did not depict CSAM.  (¶¶ 419, 427.) Visa's participation in defendants' sex trafficking venture and enterprise was a substantial factor in the harm caused to plaintiffs because had Visa withdrawn from the venture, MindGeek would likely have to have terminated its illegal practices.  Instead, Visa's processing of payments on MindGeek's platform had a determinative or coercive effect because it allowed defendants to continue to perpetuate their wrongdoing.[46]

## VII. PLAINTIFFS CAN PURSUE THEIR CLAIMS JOINTLY

Plaintiffs' claims are properly joined, where, as here, the claims all arise from the same pattern and practice of conduct by the Defendants—the MindGeek Defendants' systemic trafficking of plaintiffs and other women on its websites and Visa's knowing benefit therefrom—and share multiple common issues of fact and law. *Cappello Glob., LLC v. TEMSA Ulasim Arclari Sanayi Ve Ticaret A.S.*, 2020 WL 8994099, at *3 (C.D. Cal. Sept. 25, 2020) (citing Fed. R. Civ. P. 20(a)). (Permissive joinder is appropriate if "(1) a right to relief [is] asserted by . . . each plaintiff . . . relating to or arising out of the same transaction or occurrence or a series of transactions or occurrences; and (2) some question of law or fact common to all the

---

[46]    The cases relied upon by Visa are inapposite, as in those cases, "[m]ost, if not all, of the individual links in the chain[s] . . . depend[ed] on some allegation that [could not] be easily described as true or false." *Fla. Audubon Soc. v. Bentsen*, 94 F.3d 658, 670 (D.C. Cir. 1996); *see* Visa Mot. at 10.  Here, by contrast, all events in the causal chain between Visa's conduct and Plaintiffs' injuries have occurred and can be proven once the requisite information is made available to Plaintiffs in discovery.

In other cases relied upon by Visa, plaintiffs' injuries were caused by society as a whole, making it impossible for the court to reliably assess the connection between defendant's conduct and plaintiffs' injuries.  *See Native Vill. of Kivalina v. ExxonMobil Corp.*, 663 F. Supp. 2d 863 (N.D. Cal. 2009), *aff'd*, 696 F.3d 849 (9th Cir. 2012); *Kaing v. Pulte Homes, Inc.*, 2010 WL 625365 (N.D. Cal. Feb. 18, 2010), *aff'd sub nom. Kaing v. Pultegroup, Inc.*, 464 F. App'x 630 (9th Cir. 2011); Visa Mot. at 10. Here, Plaintiffs' injuries were caused by a discrete group of actors—the MindGeek Defendants, Plaintiffs' sex traffickers, and Visa—not by society as a whole, and the Court can therefore assess Visa's responsibility for Plaintiffs' injuries.

parties will arise in the action."). "Permissive joinder is to be liberally construed to promote the expeditious determination of disputes, and to prevent multiple lawsuits." *Cuprite Mine Partners LLC v. Anderson*, 809 F.3d 548, 552 (9th Cir. 2015). Pursuing these cases jointly will be vastly more efficient than thirty-four separate actions covering Defendants' exact same conduct.

A.   <u>Plaintiffs' Claims Arise from the Same Series of Transactions or Occurrences</u>

"Claims that have a 'very definite logical relationship' arise out of the same transaction or occurrence." *State Comp. Ins. Fund v. Drobot*, 2014 WL 12586244, at *4 (C.D. Cal. Jan. 28, 2014) (quoting *Bautista v. Los Angeles Cnty.*, 216 F.3d 837, 843 (9th Cir. 2000)).  In the Ninth Circuit, Rule 20 joinder "simply requires 'related activities' and 'similarity in the factual background of a claim.'" *Brighton Collectibles, Inc. v. RK Texas Leather Mfg.*, 2013 WL 2631333, at *3 (S.D. Cal. June 11, 2013) (internal citations omitted).

Because Rule 20(a) permits joinder for a "*series of transactions or occurrences,*" joinder of "different occurrences" in a single case is appropriate "where the claims involve enough related operative facts" or if defendant's improper conduct arose "out of a systemic pattern of events" that causes plaintiffs' injuries.  *MadKudu Inc. v. U.S. Citizenship & Immigr. Servs.*, 2020 WL 5628968, at *4 (N.D. Cal. Sept. 14, 2020) (emphasis added).  Thus, courts generally permit joinder where multiple plaintiffs' claims arise from the defendant's same conduct.  *Fraihat v. U.S. Immigr. & Customs Enf't*, 2020 WL 2759848, at *12 (C.D. Cal. Apr. 15, 2020).  Further, "courts are inclined to find that claims arise out of the same transaction or occurrence when the likelihood of overlapping proof and duplication in testimony indicates that separate trials would result in delay, inconvenience, and added expense to the parties and to the court." *Almont Ambulatory Surgery Ctr., LLC v. UnitedHealth Grp., Inc.*, 99 F. Supp. 3d 1110, 1187 (C.D. Cal. 2015) (quoting 7 Charles Alan Wright, Arthur R. Miller, *et*

81

*al., Federal Practice and Procedure* § 1653 (3d ed. rev. 2014)).

In *Fraihat*, the court permitted joinder of plaintiff-immigration detainees' against the United States Immigration and Customs Enforcement and various agencies where plaintiffs' claims "[arose] out of the same administrative practices," and the government's conduct was systemic. *Fraihat*, 2020 WL 2759848, at *12. In doing so, the court distinguished *Coughlin v. Rogers*, relied on heavily by defendants here (*see* Mot. to Sever at 2-4, 6), because in *Coughlin*, the plaintiffs did not allege that their injuries resulted from a systemic pattern of events. *Fraihat*, 2020 WL 2759848, at *12; *see also MadKudu*, 2020 WL 5628968, at *4 (distinguishing *Coughlin* and permitting joinder of claims by multiple companies where defendants engaged in a "pattern and practice" of wrongful conduct); *see also Ardolf*, 332 F.R.D. at 471-72, 480 (permitting joinder of six sex trafficking plaintiffs molested during different photo shoots because the claims were based on defendant's "*modus operandi*").

Applying these standards, joinder is appropriate here. As in *MadKudu*, *Fraihat*, and *Ardolf*, though the factual circumstances of plaintiffs' underlying sex acts vary, plaintiffs' claims all stem from a systemic pattern of misconduct—the MindGeek Defendants' creation of a massive sex trafficking enterprise to maximize SEO and its profits. The MindGeek Defendants' liability arises from their *modus operandi* of operating the Enterprise, including: encouraging and setting a road map for traffickers to upload child pornography and other non-consensual content (¶¶ 255, 494(l-m), 642(w-x)); the systemic reformatting and uploading of unlawful videos to its sites (¶¶ 8, 99, 132-34, 147-48,150, 177-81, 192-95, 200-04, 486 (a-b), 494(a-b, g), 642(a-b)); the pattern and practice of transferring illegal content to other MindGeek-owned tubesites, even after such content was purportedly removed; and the coordinated effort to conceal these criminal activities.[47]

---

[47] Defendants' reliance on *Blackman v. Teespring, Inc.*, 2019 WL 7832600 (N.D. Cal. July 12, 2019) (Mot. to Sever at 7) is misplaced, as a more recent Central District of

B.   Plaintiffs' Claims Share Numerous Common Issues of Law and Fact that Are Most Efficiently Addressed in One Litigation

"The common question requirement in Rule 20(a) 'does not require that every question of law or fact in the action be common among the parties; rather, the rule permits party joinder whenever there will be *at least one* common question of law or fact.'" *Fraihat*, 2020 WL 2759848, at *12 (emphasis added) (quoting Federal Practice and Procedure, *supra,* § 1653 (footnotes omitted)).

Plaintiffs here more than satisfy this requirement.  Contrary to defendants' claim that there are "no material" common questions of law or fact (Mot. to Sever at 8) (emphasis added), plaintiffs' claims will all jointly rely on, *inter alia*, the (i) MindGeek Defendants' conduct in operating the MindGeek Enterprise and trafficking venture, (ii) Defendants' knowledge that content depicting sex trafficking and child pornography, and non-consensual content was rampant on MindGeek's websites and that the MindGeek Defendants specifically designed their tubesites as such, (iii) MindGeek's pervasive company policies, such as the Company's provision of VPN services to hide traffickers' locations and the Company's policy allowing users to download content for free so that it could eventually be reuploaded, (iv) the Company's production of and partnership with producers of videos depicting sex trafficking and child pornography on its websites, (v) MindGeek's pervasive reformatting editing of videos, (vi) MindGeek's systematic re-uploading of content previously removed, and uploading of content on one of its tubesites to its other tubesites, (vii) MindGeek's misleading

California decision, *Paramount Pictures Corp. v. Omniverse One World Television, Inc.*, came to the opposite conclusion on very similar facts.  2019 WL 12381115, at *2-3 (C.D. Cal. Aug. 21, 2019).

Defendants' reliance on *Visendi v. Bank of Am., N.A.*, 733 F.3d 863 (9th Cir. 2013) is misplaced because this case does not involve *different* and unrelated financial institutions concerning over 100 different loan transactions, but instead concerns the conduct of the related Defendants that operated as a single enterprise, from which Visa directly benefitted.

83

claims that the content on its sites is legal and "user-uploaded" when in fact a large portion of the material on MindGeek tubesites is uploaded by MindGeek itself, and (viii) MindGeek's failure to implement any appropriate measures to monitor or prevent the uploading of illegal, nonconsensual content.  Proof of this conduct will rely on the same documentary and testimonial evidence provided by Defendants.  Moreover, as is already evident from the parties' motion to dismiss briefing, plaintiffs' claims are replete with common issues of law.  To the extent there are some differences in the law applicable to each Plaintiff, the Court and parties can adequately address the issue, as courts frequently apply different states' law, as needed.

Defendant's claim that certain factual differences between plaintiffs' claims mandates severance entirely misses the point.  These factual issues are not fatal to joinder, as the courts in *MadKudu*, *Fraihat*, and *Ardolf*, properly held, because the overall claims stem from defendants' *modus operandi* or their systemic patterns and practices of operating the MindGeek Enterprise, and there is sufficient overlap to make joinder the most efficient way to proceed, at least at this stage.

Severance of plaintiffs' claims and defendants' proposal to conduct discovery and trial in thirty-four separate litigations would surely "result in a waste of judicial resources and duplication of testimony" that the Federal Rules are designed to avoid.  *Ghotra by Ghotra v. Bandila Shipping, Inc.*, 113 F.3d 1050, 1057 (9th Cir. 1997).  As in *Ardolf*, "much of the discovery and depositions will be identical for [Plaintiffs]," as Defendants' testimony will be relevant to all thirty-four plaintiffs. 332 F.R.D. at 481. Contrary to Defendants' argument that the Court will be forced to heavily rely on out-of-state witnesses (Mot. to Sever at 13-14), the majority of witnesses will be MindGeek employees that work for a company at home in the District.  Further, Defendants' argument overlooks the fact that in civil RICO cases, provided there is good cause, the Court has the power "to compel the attendance of witnesses . . . in any . . . judicial district."  18 U.S.C. § 1965(c).  Additionally, joint trial of plaintiffs' claims

will not be unduly prejudicial to Defendants (*see* Mot. to Sever at 14), as courts avoid potential juror confusion through use of proper jury instructions and special verdict forms.  *Brighton Collectibles*, 2013 WL 2631333, at *6.

## CONCLUSION

For the foregoing reasons, Defendants' Motions to Dismiss and the Motion to Sever should be denied in their entirety.  To the extent the Court is inclined to grant Defendants' Motions to Dismiss in whole or in part, any dismissal should be without prejudice and with leave to amend.[48]

DATED:        December 10, 2021        Respectfully submitted,
                                       BROWN RUDNICK LLP

                                       By:    */s/ Michael J. Bowe*
                                              Michael J. Bowe (*pro hac vice*)
                                              Lauren Tabaksblat (*pro hac vice*)

---

[48] "The court should freely give leave [to amend a pleading] when justice so requires." Fed. R. Civ. P. 15(a); *see also Khan*, 2013 WL 12132027, at *2.