BENBROOK LAW GROUP, PC
BRADLEY A. BENBROOK (SBN 177786)
STEPHEN M. DUVERNAY (SBN 250957)
701 University Avenue, Suite 106
Sacramento, CA 95825
Telephone: (916) 447-4900
Facsimile: (916) 447-4904
brad@benbrooklawgroup.com
steve@benbrooklawgroup.com

INTERNATIONAL CENTER FOR LAW & ECONOMICS
GEOFFREY A. MANNE
KRISTIAN STOUT
BEN SPERRY
1104 NW 15th Avenue, Suite 300
Portland, OR 97209
gmanne@laweconcenter.org
kstout@laweconcenter.org
bsperry@laweconcenter.org

Attorneys for Proposed Amicus Curiae
International Center for Law & Economics

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

# SOUTHERN DIVISION

| | |
|---|---|
| SERENA FLEITES AND JANE DOE NOS. 1 through 33,<br><br>Plaintiffs,<br><br>v.<br><br>MINDGEEK S.A.R.L.; MG FREESITES, LTD; MINDGEEK USA INCORPORATED; MG PREMIUM LTD.; RK HOLDINGS USA INC.; MG GLOBAL ENTERTAINMENT INC.; TRAFFICJUNKY INC.; BERND BERGMAIR; FERAS ANTOON; DAVID TASSILLO; COREY URMAN; VISA, INC.; COLBECK CAPITAL DOES 1-10; BERGMAIR DOES 1-10,<br><br>Defendants. | Case No.:  2:21-CV-04920-CJC-ADS<br><br>**MOTION FOR LEAVE TO PARTICIPATE AS AMICUS CURIAE; [PROPOSED] BRIEF OF INTERNATIONAL CENTER FOR LAW & ECONOMICS AS AMICUS CURIAE IN SUPPORT OF DEFENDANT VISA, INC.'S MOTION TO DISMISS**<br><br>Hearing Date: February 14, 2022<br>Time: 1:30 p.m.<br>Courtroom: 9B<br>Judge: Hon. Cormac J. Carney<br><br>Action filed April 14, 2016 |

# TABLE OF CONTENTS

MOTION FOR LEAVE TO PARTICIPATE AS AMICUS CURIAE ......................1

[PROPOSED] AMICUS CURIAE BRIEF ..................................................3

I.      INTRODUCTION ...........................................................................3

II.     ARGUMENT ...................................................................................3

        A.      The Outer Boundaries of "Participation" ............................3

        B.      The Law & Economics of Collateral Liability ...................7

                1.      Collateral liability under the common law ..............10

                2.      Collateral liability under copyright law ..................12

        C.      The Operation of Payment Networks ..................................13

        D.      Visa is not the least-cost avoider in this case .....................15

III.    CONCLUSION ..............................................................................19

# TABLE OF AUTHORITIES

**Cases**

*Barber v. Change*,
   151 Cal. App. 4th 1456 (2007) ............................................................................... 11

*Baumer v. Pachl*,
   8 F.3d 1341 (9th Cir. 1993) ..................................................................................... 5

*Brady v. Dairy Fresh Prods. Co.*,
   974 F.2d 1149 (9th Cir. 1992) ................................................................................. 5

*Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*,
   511 U.S. 164 (1994) .................................................................................... 4, 6, 15

*Duronslet v. Cty. of Los Angeles*,
   No. 2:16-CV-08933-ODW (PLAx),
   2017 WL 5643144 (C.D. Cal. Jan. 23, 2017) ........................................................ 1

*Giraldo v. Cal. Dep't of Corrections and Rehabilitation*,
   168 Cal. App. 4th 231 (2008) ............................................................................... 12

*Gonzales v. Lloyds TSB Bank, PLC*,
   532 F. Supp. 2d 1200 (C.D. Cal. 2006) .................................................................. 4

*Hoptowit v. Ray*,
   682 F.2d 1237 (9th Cir. 1982) ................................................................................. 1

*In re Ins. Brokerage Antitrust Litig.*,
   No. CIV 04-5184 GEB, 2007 WL 1062980 (D.N.J. Apr. 5, 2007) ........................ 7

*K Mart Corp. v. Cartier, Inc.*,
   486 U.S. 281 (1988) ................................................................................................. 4

*Kalem Co. v. Harper Bros.*,
   222 U.S. 55 (1911) ................................................................................................. 13

*Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*,
   545 U.S. 913 (2005) ............................................................................................... 13

*Miller v. Yokohama Tire Corp.*,
   358 F.3d 616 (9th Cir. 2004) ................................................................................... 5

*Perfect 10 v. Visa Int'l*,
   494 F.3d 788 (9th Cir. 2007) ........................................................................... 16, 18

*Reves v. Ernst Young*,
   507 U.S. 170 (1993) ..................................................................................... 5, 6, 7, 18

*Rolo v. City Investing Co. Liquidating Tr.*,
   155 F.3d 644 (3d Cir. 1998) .................................................................................... 4

*Sandin v. Conner*,
   515 U.S. 472 (1995) ........................................................................................... 1

*Sony Corp. v. Universal City Studios, Inc.*,
   464 U.S. 417 (1984) ......................................................................................... 13

*Tarasoff v. Regents of Univ. of Cal.*,
   17 Cal.3d 425 (Cal. 1976) ............................................................................... 12

*Thompson v. Cty. of Alameda*,
   27 Cal.3d 741  (Cal. 1980) .............................................................................. 12

*Walter v. Drayson*,
   538 F.3d 1244 (9th Cir. 2008) ..................................................................... 6, 18

*WildEarth Guardians v. Haaland*,
   --- F. Supp. 3d ----, No. 2:19-CV-09473-ODW-KSX, 2021 WL 4263831,
   (C.D. Cal. Sept. 20, 2021) ................................................................................. 1

**Statutes**

18 U.S.C. § 1595(a) ............................................................................................. 6

18 U.S.C. § 1591(a)(2) ........................................................................................ 3

18 U.S.C. § 1962(c) ............................................................................... 3, 4, 5, 6

**Other Authorities**

Abraham & Kendrick, *There's No Such Thing as Affirmative Duty*,
   104 Iowa L. Rev. 1649 (2019) ....................................................................... 11

Coase, *The Problem of Social Cost*,
   3 J. L. & Econ. 1 (1960) ................................................................................... 9

David S. Evans,
   Platform Economics: Essays on Multi-Sided Businesses (2011) ................... 9

Demsetz, *When Does the Rule of Liability Matter?*,
   1 J. of Leg. Stud. 13 (1972) .............................................................................. 9

Fischel & Sykes, *Civil RICO after* Reves*: An Economic Commentary*,
   1993 Sup. Ct. Rev. 157 (1993) ......................................................................... 6

Guido Calabresi,
   The Cost of Accidents: A Legal and Economic Analysis  (1970) ............. 7, 9

Harper & Kime, *The Duty to Control the Conduct of Another*,
   43 Yale L.J. 886  (1934) ................................................................................. 11

Kraakman, *Gatekeepers: The Anatomy of a Third-Party Enforcement Strategy*,
2 J.L. ECON. & ORG. 53 (1986) ............................................................... 8, 9, 15

Lee, et al., *Credit Where It's Due: How Payment Cards Benefit Canadian
Merchants and Consumers, and How Regulation Can Harm Them*, Macdonald-
Laurier Institute Research Paper (Oct. 28, 2013), https://bit.ly/3qqiCgf ................. 1

Lichtman & Posner, *Holding Internet Service Providers Accountable*,
14 SUP. CT. ECON. REV. 221 (2006) .................................................................. 11

Mann & Belzley, *The Promise of Internet Intermediary Liability*,
47 WM. & MARY L. REV. 239 (2005) ................................................................. 10

Manne, et al., *Who Moderates the Moderators?: A Law and Economics Approach to
Holding Online Platforms Accountable Without Destroying the Internet*,
ICLE Working Paper (Nov. 9, 2021), https://bit.ly/3Fs2crU ................................. 1

Reiner Kraakman, *Third-Party Liability*, in 3 THE NEW PALGRAVE DICTIONARY OF
ECONOMICS AND THE LAW 583 (Peter Newman ed., 1998) ...................................... 3

Restatement (Second) of Torts § 314A (1965) ........................................................ 11

Visa Inc., Annual Report (Form 10-K) (Nov. 18, 2021) ............................................ 15

Zywicki, et al., *Unreasonable and Disproportionate: How the Durbin Amendment
Harms Poorer Americans and Small Businesses* (Apr. 25, 2017),
https://bit.ly/3GvxsHK ........................................................................... 1, 18

Zywicki, *The Economics of Payment Card Interchange Fees and the Limits of
Regulation*, ICLE Financial Regulatory Program White Paper Series (Jun. 2,
2010), https://bit.ly/3zWFZAT ........................................................ 1, 13, 14, 15

## MOTION FOR LEAVE TO PARTICIPATE AS AMICUS CURIAE[1]

The International Center for Law & Economics ("ICLE") moves for leave to file the attached amicus curiae brief supporting Defendant Visa, Inc.'s motion to dismiss for failure to state a claim.

A "district court has broad discretion to appoint amici curiae." *Hoptowit v. Ray*, 682 F.2d 1237, 1260 (9th Cir. 1982), overruled on other grounds by *Sandin v. Conner*, 515 U.S. 472 (1995). "There are no strict prerequisites that must be established prior to qualifying for amicus status; [a party] seeking to appear as amicus must merely make a showing that his participation is useful to or otherwise desirable to the court." *WildEarth Guardians v. Haaland*, --- F. Supp. 3d ----, No. 2:19-CV-09473-ODW-KSX, 2021 WL 4263831, at *10 (C.D. Cal. Sept. 20, 2021) (citation omitted). To that end, amicus participation is appropriate "when the amicus has unique information or perspective that can help the court beyond the help that the lawyers for the parties are able to provide," and this Court "has generally found it preferable to err on the side of permitting such briefs." *Id.* (citations omitted); *see Duronslet v. Cty. of Los Angeles*, No. 2:16-CV-08933-ODW (PLAx), 2017 WL 5643144, at *1 (C.D. Cal. Jan. 23, 2017).

ICLE's participation in this case meets these standards. ICLE develops and disseminates academic and scholarly output to build the intellectual foundation for rigorous, economically-grounded policy and sound legal governance. ICLE scholars have studied and written extensively on the law and economics of both payment networks and collateral liability.[2]

---

[1]    All parties have been notified of ICLE's motion and its intent to file the proposed brief. No party's counsel authored this brief in whole or in part, no person (including any party or any party's counsel) other than ICLE and its counsel contributed money to fund the preparation or submission of this brief.

[2]    *See, e.g.*, Zywicki, *The Economics of Payment Card Interchange Fees and the Limits of Regulation*, ICLE Financial Regulatory Program White Paper Series (Jun. 2, 2010), https://bit.ly/3zWFZAT; Lee, et al., *Credit Where It's Due: How Payment Cards Benefit Canadian Merchants and Consumers, and How Regulation Can Harm Them*, Macdonald-Laurier Institute Research Paper (Oct. 28, 2013), https://bit.ly/3qqiCgf; Zywicki, et al., *Unreasonable and Disproportionate: How the Durbin Amendment Harms Poorer Americans and Small Businesses* (Apr. 25, 2017),

1      ICLE believes that Plaintiffs' attempt to hold defendant Visa liable for the

2   alleged misconduct at issue in this case is inconsistent with the economically sound

3   enforcement of the applicable laws. As set forth in further detail in the proposed

4   amicus curiae brief, the law and economics of collateral liability generally, and as

5   applied to payment networks specifically, admonish that liability for Visa under the

6   circumstances of this case would create massive, unintended costs that would be

7   inadequately offset by any benefits obtained.

8      As the proposed brief explains, Visa sits outside the boundaries of liability

9   contemplated by statutes like RICO and TVPRA. At the very outer boundaries,

10   liability for indirect actors under these statutes is analogous to the sorts of collateral

11   liability sometimes found in other statutes and in common law tort. But the nature of

12   the relationship between Visa and the alleged direct actors in this case, dictated by

13   the mechanics of payment networks, does not support the traditional economic and

14   policy rationales for assigning collateral liability.

15      This proposed brief will thus elucidate the law and economics of collateral

16   liability and apply it to the circumstances of Visa's alleged participation in the

17   alleged enterprises at issue. As set forth below, the general principles of collateral

18   liability counsel strongly against holding Visa liable for the harms suffered by

19   Plaintiffs. To hold otherwise would be sure to generate a massive amount of social

20   cost that would outweigh the potential deterrent or compensatory gains sought.

21   Dated:  January 17, 2022              BENBROOK LAW GROUP, PC

22

23                                         By   /s Stephen M. Duvernay
                                              STEPHEN M. DUVERNAY
24                                            Attorneys for Proposed Amicus Curiae
                                              International Center for Law &
25                                            Economics

26

27   _____
     https://bit.ly/3GvxsHK; Manne, et al., *Who Moderates the Moderators?: A Law and*
28   *Economics Approach to Holding Online Platforms Accountable Without Destroying*
     *the Internet*, ICLE Working Paper (Nov. 9, 2021), https://bit.ly/3Fs2crU.

# [PROPOSED] AMICUS CURIAE BRIEF

## I. INTRODUCTION

Visa sits outside the boundaries of liability contemplated by statutes like RICO and TVPRA. At the very outer boundaries, liability for indirect actors under these statutes is analogous to the sorts of collateral liability sometimes found in other statutes and in common law tort.[3] But the nature of the relationship between Visa and the alleged direct actors in this case, dictated by the mechanics of payment networks, does not support the traditional economic and policy rationales for assigning collateral liability. This *amicus* brief elucidates the law and economics of collateral liability and applies it to the circumstances of Visa's alleged participation in the alleged enterprises at issue. As discussed further below, the general principles of collateral liability counsel strongly against holding Visa liable for the harms suffered by Plaintiffs. To hold otherwise would be sure to generate a massive amount of social cost that would outweigh the potential deterrent or compensatory gains sought.

## II. ARGUMENT

### A.    The Outer Boundaries of "Participation"

As alleged victims of sexual trafficking and related abuses, Plaintiffs seek to hold Defendant Visa liable under several different theories for the harms they suffered. Relevant to this brief are the asserted civil causes of action under the Trafficking Victims Protection Reauthorization Act ("TVPRA"), 18 U.S.C. § 1591(a)(2), and the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c). Both statutes contain language regarding "participation" and

---

[3]    This *amicus* brief uses the term "collateral liability" to encompass a range of theories of civil liability aimed at secondary actors not directly responsible for causing harm. Thus, the term contemplates causes of action like premises liability for third-party injury, distributor liability for defamation, civil aiding and abetting liability for fraud, contributory and inducement liability for copyright infringement, and various theories of vicarious liability under the doctrine of respondeat superior. *See generally* Reiner Kraakman, *Third-Party Liability*, in 3 THE NEW PALGRAVE DICTIONARY OF ECONOMICS AND THE LAW 583 (Peter Newman ed., 1998).

the definition of an "enterprise" or "venture" to limit application of the statute to parties who were sufficiently involved in the alleged wrongdoing to merit potential liability. The fundamental question with respect to Visa's Motion to Dismiss, then, is whether Visa should properly be considered a "participant" in the activities alleged under these statutes.

Visa's conduct plainly does not fit easily within the scope of "participation" in the sorts of harmful ventures contemplated by RICO and TVPRA. *See, e.g., Gonzales v. Lloyds TSB Bank, PLC*, 532 F. Supp. 2d 1200, 1210 (C.D. Cal. 2006) ("Defendant's provision of banking services is not enough on its own to constitute a violation of section 1962(c)."). Determining whether Visa's conduct should nevertheless be considered within the furthest reaches of the statutes' scope thus entails determining whether such an outcome would further the aims of the statutes without excessively impairing legal activity that was not intended to be deterred by them.[4]

For many years courts have wrestled with the outer boundaries of liability under RICO and similar statutes. For example, until the Supreme Court held such an inference impermissible in *Central Bank of Denver*,[5] courts sometimes inferred the existence of civil aiding and abetting liability under RICO to reach actors tangentially involved in racketeering enterprises. *See Rolo v. City Investing Co. Liquidating Tr.*, 155 F.3d 644, 657 (3d Cir. 1998) (applying *Central Bank of Denver*

---

[4]    Whether Plaintiffs' allegations against Visa properly state a civil claim under TVPRA or RICO is also a question of statutory interpretation. We do not directly address this question in this *amicus* brief, but note that "[p]olicy considerations can[] override [a court's] interpretation of the text and structure of the Act. . . to the extent that they may help to show that adherence to the text and structure would lead to a result 'so bizarre' that Congress could not have intended it." *Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 188 (1994) (citation omitted). *See also K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 325 (1988) (Scalia, J., concurring in part and dissenting in part) ("[I]t is a venerable principle that a law will not be interpreted to produce absurd results.").

[5]    511 U.S. at 182 (1994) (explaining that because "Congress has not enacted a general civil aiding and abetting statute," "there is no general presumption that the plaintiff may also sue aiders and abettors").

to preclude aiding and abetting liability under RICO "despite the existence of cogent policy arguments in support of extending civil liability to aiders and abettors of RICO violations," and despite "earlier cases that had recognized a private cause of action for aiding and abetting under RICO").

Other extensions of liability to collateral actors remain contested. *Compare, e.g., Miller v. Yokohama Tire Corp.*, 358 F.3d 616, 620 (9th Cir. 2004) (rejecting respondeat superior theory of liability under RICO in certain cases), *with Brady v. Dairy Fresh Prods. Co.*, 974 F.2d 1149, 1155 (9th Cir. 1992) (finding respondeat superior liability in other circumstances).

More directly relevant here, the provision of professional services to an enterprise can sometimes form the basis of liability under RICO, but the circumstances under which such collateral liability will be permitted have been significantly limited by the Supreme Court. "In order to 'participate, directly or indirectly, in the conduct of such enterprise's affairs,' one must have some part in directing those affairs." *Reves v. Ernst Young*, 507 U.S. 170, 179 (1993); *see id.* at 177–86 (adopting the "operation or management" test to determine whether outside professionals will be subject to RICO liability). The Ninth Circuit has followed suit, applying the "operation or management" test to, *inter alia*, legal professionals who provide their services to racketeering enterprises, even if they do so "knowingly." *See Baumer v. Pachl*, 8 F.3d 1341, 1344 (9th Cir. 1993) ("[Defendant's] role was limited to providing legal services to the [enterprise]. Whether [Defendant] rendered his services well or poorly, properly or improperly, is irrelevant to the *Reves* test.").

Notably, the plaintiff in *Baumer* alleged that the defendant professional's involvement in the alleged scheme was in the nature of aiding and abetting. *See id.* at 1345 & 1347 (noting that "[t]he complaint . . . alleges in pertinent part that [Defendant] 'knowingly aided and abetted [the conspiracy],'" and that "appellants relate without elaboration that 'Aiding and abetting the primary malefactors is sufficient to impose liability under . . . section 1962(c)"). Because *Baumer* was

decided before *Central Bank of Denver*, such a claim was not precluded. But cases after *Central Bank of Denver* make clear that plaintiffs cannot route around the Supreme Court's prohibition on civil aiding and abetting liability within RICO, TVPRA, or similar statutes by simply redefining the requisite level of participation to include collateral actors. As the Ninth Circuit has held, "[o]ne can be 'part' of an enterprise [under RICO] without having a role in its management and operation. [But s]imply performing services for the enterprise does not rise to the level of direction, whether one is 'inside' or 'outside.'" *Walter v. Drayson*, 538 F.3d 1244, 1249 (9th Cir. 2008).

Nor can "participate" be interpreted as a synonym for "aid and abet." As the Supreme Court acknowledged in *Reves*, "[t]hat would be a term of breadth indeed, for 'aid and abet' 'comprehends all assistance rendered by words, acts, encouragement, support, or presence.' But within the context of § 1962(c), 'participate' appears to have a narrower meaning." 507 U.S. at 178 (internal citation omitted). TVPRA's "participation in a venture" language, 18 U.S.C. § 1595(a), should impose a similar constraint, as some courts have already held. *See, e.g.*, *Ratha v. Phatthana Seafood Co.*, No. 16-CV-4271-JFW (ASx), 2017 WL 8293174, at *4 (C.D. Cal. Dec. 21, 2017) (applying the "operation or management" standard under RICO to TVPRA).

### Assigning Liability at the Outer Boundary of Participation Should Facilitate Greater Social Gains than Losses

Although much of this history of the limitations on collateral liability under such "participation" statutes turns on statutory interpretation, where boundary questions remain it will be policy choices, and not strictly textual interpretation, that determine the appropriate extent of collateral liability. *See* Fischel & Sykes, *Civil RICO after Reves: An Economic Commentary*, 1993 SUP. CT. REV. 157, 190 (1993) ("[T]he extension of RICO liability into the sphere of ordinary commercial litigation raises serious concerns about overdeterrence and excessive litigation. . . . Whether

*Reves* does in fact lessen the exposure of professionals, or represent a meaningful narrowing of RICO's scope, however, depends on how several issues left open by the decision are resolved in the future.").

The specific contours of the "participation" requirement under either RICO or TVPRA should further the aims of the statute without unduly burdening legal activity not intended to be captured by the statute. But application of such liability to legitimate, outside businesses collaterally involved in illegal schemes inherently presents serious risks of "overdeterrence due to error costs, litigation costs, and socially excessive damages." *Id.* at 183.

The statutes were not intended to capture every type of actor that could be tangentially connected to an illegal enterprise. Rather, at their core, both statutes are surely based on a fundamental cost-benefit analysis that assigns liability only where doing so will effectively deter wrongdoing, and will do so without imposing costs that could swamp the benefits of that deterrence. Indeed, the absence of sensible limitations on the scope of liability "would transform RICO into a legal monster the drafters never envisioned." *In re Ins. Brokerage Antitrust Litig.*, No. CIV 04-5184 GEB, 2007 WL 1062980, at *19 (D.N.J. Apr. 5, 2007) (citing and quoting *Reves*, 507 U.S. at 183, for the proposition that the "'liberal construction' clause is not without limits and 'not an invitation to apply RICO to new purposes that Congress never intended'")).

**B.    The Law & Economics of Collateral Liability**

An important goal of the law is to align individual incentives with social welfare such that harmful behavior is deterred and actors are encouraged to take optimal levels of precaution to prevent or mitigate injury. *See* GUIDO CALABRESI, THE COST OF ACCIDENTS: A LEGAL AND ECONOMIC ANALYSIS 26 (1970) ("I take it as axiomatic that the principal function of accident law is to reduce the sum of the costs of accidents and the costs of avoiding accidents.").

Sometimes this may entail the application of liability to collateral actors not directly responsible for harm. In this section, we briefly survey the law and economics of collateral liability and its proper role in optimizing an overall liability scheme.

In some circumstances it is indeed proper to hold third parties liable even though they are not primary actors directly implicated in wrongdoing. Most significantly, such liability may be appropriate when a collateral actor stands in a relationship to the wrongdoing (or wrongdoers or victims) such that the threat of liability can incentivize it to take action (or refrain from taking action) to prevent or mitigate the wrongdoing. That is to say, collateral liability may be appropriate when the third party has a significant enough degree of control over the primary actors such that its actions can cause them to reduce the risk of harm at reasonable cost.

Importantly, however, such liability is appropriate only when direct deterrence is insufficient and/or the third party can prevent harm at lower cost or more effectively than direct enforcement:

> Third-party enforcement of any sort serves as a possible answer when deterrence fails because 'too many' wrongdoers remain unresponsive to the range of practicable legal penalties…. Of course, [failures of] direct deterrence do not necessarily imply a need for supplemental enforcement measures. Alternative measures are justified only if they, in turn, can lower the total costs of direct enforcement and residual misconduct.

Kraakman, *Gatekeepers: The Anatomy of a Third-Party Enforcement Strategy*, 2 J.L. ECON. & ORG. 53, 56–57 (1986). Thus, not every collateral actor involved in a harmful transaction is a suitable target for third-party liability for a particular type of harm.

From an economic perspective, liability should be imposed upon the party or parties best positioned to deter the harms in question, such that the costs of enforcement do not exceed the social gains realized. The objective, then, is to locate the "least-cost avoider"—that is, the party to a conflict who can reduce the probability of harm at least overall cost, even if that party is not directly responsible

for the harm. *See* Demsetz, *When Does the Rule of Liability Matter?*, 1 J. OF LEG. STUD. 13, 28 (1972) ("A deeper analysis [of cases assigning liability] may reveal that that they generally make sense from an economic viewpoint of placing the liability on that party who can, at least cost, reduce the probability of a costly interaction happening."). While this may include collateral liability, "[t]he general problem remains one of selecting the mix of direct and collateral enforcement measures that minimizes the total costs of misconduct and enforcement." Kraakman, *Gatekeepers*, *supra*, 2 J.L. ECON. & ORG. at 61.

The relevant costs in this calculation are not only the administrative costs expended by the state in undertaking enforcement, but also—and often of much greater significance—those that may arise in the form of the lost *benefits* that society would enjoy in the absence of liability. *See* Coase, *The Problem of Social Cost*, 3 J. L. & ECON. 1, 27 (1960) ("[W]hat has to be decided is whether the gain from preventing the harm is greater than the loss which would be suffered elsewhere as a result of stopping the action which produces the harm."). Identifying the least-cost avoider thus entails "exclud[ing] from consideration as potential loss bearers all those activities that could reduce costs only by causing losses which are clearly much greater. . . than would result if one achieved the equivalent or greater reduction in accident costs by burdening other activities." CALABRESI, THE COST OF ACCIDENTS, *supra*, at 141.

The Internet is full of collateral actors that are indirectly involved in virtually every interaction between Internet users and content platforms. From backbone Internet service providers (ISPs), to content delivery networks (CDNs), to advertising and payment networks, each is a collateral actor, facilitating various elements of the complex interactions between users and content platforms and the advertisers, content creators, financial institutions, and other service providers that support them. *See generally* DAVID S. EVANS, PLATFORM ECONOMICS: ESSAYS ON MULTI-SIDED BUSINESSES (2011). Sometimes, the least-cost avoider online may

indeed be one of these collateral actors. When information costs are low enough, collateral actors may be able to monitor the conduct of end users. And pseudo-anonymity online may make remedies against end users less effective. In such an environment, it may make sense to apply some form of collateral liability. *See* Mann & Belzley, *The Promise of Internet Intermediary Liability*, 47 Wm. & Mary L. Rev. 239, 240 (2005) (identifying three reasons why collateral parties may be least-cost avoiders: "(1) increase[d]… likelihood that it will be easy to identify specific intermediaries for large classes of transactions, (2) a reduction in information costs, which makes it easier for intermediaries to monitor the conduct of end users, and (3) increased anonymity, which makes remedies against end users generally less effective.").

But there are costs to collateral liability, as well. Liability risk operates in the first instance to induce actors to take efficient precautions to avoid liability. Where this works upon a direct actor, it may induce the actor to avoid engaging in the specific, harmful activity—a consequence that, by definition, does not entail the loss of beneficial activity.

But collateral actors, by their nature, are often not in a position to effect so narrow a precaution. Because of limited information or limited control over the mechanisms that directly impose harm, avoidance of liability risk will often entail a much less refined course of action, such as a reduction in *all* services—necessarily including the provision of services to support beneficial activity—rather than just those specific to the activity that causes harm. Where these collateral costs in lost activity are sufficiently large, the threat of collateral liability is not worth the benefits it may confer.

### 1.    Collateral liability under the common law

The common law has long embraced the notion of collateral liability precisely for the purpose of aligning incentives where they can be most useful. *See, e.g.*, Lichtman & Posner, *Holding Internet Service Providers Accountable*, 14 Sup. Ct.

ECON. REV. 221, 223 (2006) ("[R]ules that hold one party liable for wrongs committed by another are the standard legal response in situations where . . . liability will be predictably ineffective if directly applied to a class of bad actors and yet there exists a class of related parties capable of either controlling those bad actors or mitigating the damage they cause."). But the common law elements of the causes of action that impose collateral liability invariably limit liability to circumstances in which collateral actors are well situated to monitor and control harms at low cost.

The law of negligence has evolved a number of theories of liability under which one party is charged with an "affirmative" duty of care with respect to the actions of a third party, even where that actor was not directly responsible for the harm. *See* Abraham & Kendrick, *There's No Such Thing as Affirmative Duty*, 104 IOWA L. REV. 1649, 1655 (2019) ("Although the general rule is that there is no liability for nonfeasance, a substantial number of exceptions have developed. These exceptions are characterized as 'affirmative duties.'"); *see also* Restatement (Second) of Torts § 314A (1965).

Thus, one common-law obligation of every business is to take reasonable steps to curb harm from the use of its goods and services. There are two bases for such a duty. If the business has created a situation or environment that puts people at risk, it has an obligation to mitigate the risk it has created. Secondly, if the business has entered into a relationship with someone, such as a potential customer it has invited onto its premises, it can have an affirmative obligation to mitigate the risk of harm to that person even if the business did not directly create the risk. *See, e.g.,* Harper & Kime, *The Duty to Control the Conduct of Another*, 43 YALE L.J. 886, 887 (1934).

These basic principles are applied to a wide variety of businesses at common law. Hotel owners, for instance, owe a reasonable duty of care to their paying guests when the owners are aware that a third party is victimizing or will victimize those guests. *See, e.g.*, *Barber v. Change*, 151 Cal. App. 4th 1456, 1466-67 (2007) ("A

landlord's general duty of maintenance includes the duty to take reasonable steps to secure the common areas against third party criminal acts—where these acts are foreseeable"). Such a duty arises from the hotel owners' control of its premises, and the recognition that it likely stands in a position both to identify potential perpetrators and to identify and protect the particular guests who may be at risk of harm.

The traditional duty to control another arose most commonly in cases of mental health professionals protecting the public from particularized threats from patients under their care. *See, e.g.*, *Tarasoff v. Regents of Univ. of Cal.*, 17 Cal.3d 425, 431 (Cal. 1976) (finding a duty of care for mental health professionals to protect specific third parties from particularized threats of harm from their patients). Importantly, however, that duty arose only where the third party had sufficient information to take action to protect "the known and specifically foreseeable and identifiable victim of the patient's threats." *Thompson v. Cty. of Alameda*, 27 Cal.3d 741, 752 (Cal. 1980). Courts have also imposed similar duties in other situations with special relationships. *See, e.g.*, *Giraldo v. Cal. Dep't of Corrections and Rehabilitation*, 168 Cal. App. 4th 231 (2008) (finding a special relationship between a jailer and prisoner, which gives rise to a duty of care to protect the prisoner).

Under all negligence theories, the duty of collateral actors is limited to "reasonably foreseeable" harms, and only in situations where it is proper to impose a duty of care arising from the actor's special access to particularized information regarding victims or perpetrators and/or its special ability to control potentially harmful conditions. This is how the common law struck the balance between accountability and over-deterring beneficial behavior.

## 2.    Collateral liability under copyright law

Federal law also sometimes applies liability in circumstances where collateral actors are best positioned to prevent harm. For instance, courts have interpreted the Copyright Act to include a cause of action for contributory infringement by third

parties. *See Kalem Co. v. Harper Bros.*, 222 U.S. 55 (1911). But where they have done so, courts have limited such liability to circumstances where the third party can control the activities of direct infringers. *See Sony Corp. v. Universal City Studios, Inc.*, 464 U.S. 417, 437 (1984) ("[T]he imposition of vicarious liability is manifestly just [only when] the 'contributory' infringer was in a position to *control* the use of copyrighted works by others.") (emphasis added).

Further, in determining whether indirect liability is appropriate, the Supreme Court has expressly considered the extent of collateral consequences from the imposition of indirect copyright liability, while declining to find liability where the costs would exceed the benefits. In *Sony,* for example, the Court declined to hold Sony contributorily liable for copyright infringement when VCR owners impermissibly recorded copyrighted programs because VCRs were primarily employed in "commercially significant noninfringing uses." 464 U.S. at 442. Deterring the creation and use of such devices by imposing liability would fail to "strike a balance between a copyright holder's legitimate demand for effective . . . protection of the statutory monopoly, and the rights of others freely to engage in substantially unrelated areas of commerce." *Id.* Subsequently, even when it found indirect liability to be appropriate, the Court noted that, in order to "leave[] breathing room for innovation and a vigorous commerce," liability was properly limited "to instances of more acute fault than the mere understanding that some of one's products will be misused." *Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 932–33 (2005).

## C.    The Operation of Payment Networks

In some contexts it may be appropriate to hold payment networks liable for certain third-party harms—but certainly not in every case. To differentiate these cases, it is important to understand some of the basic mechanics of payment networks. *See generally* Zywicki, *The Economics of Payment Card Interchange Fees and the Limits of Regulation*, *supra* note 1.

Payment networks operate as either "three-party systems" or "four-party systems." *Id.* at 27. In a three-party system, such as American Express or Discover, the card issuer deals directly with both the consumer and the merchant. The network issues the card, processes the payment, and operates the credit underwriting and processing function with respect to consumers. *Id.* In a four-party system such as the Visa or MasterCard networks, by contrast, consumers and merchants do not deal directly with the network. Instead, the relationship is intermediated through financial institutions—the "issuer," which issues the card and services the consumer's account, and the "acquirer," which settles the transaction on behalf of the merchant. *Id.* The role of the network is limited to serving as a bridge between the issuer and acquirer and providing the mechanisms and rules under which transactions between them take place. *Id.* at 31.

In four-party network transactions, such as are at issue in this case, merchants submit a request for payment to an acquirer (usually a bank). The acquirer then sends transaction data to the issuer (the entity that issued the card, also usually a bank), and the issuer transfers the appropriate funds to the acquirer. *Id.* Finally, the issuer charges the cardholder for the total amount spent at the merchant and either debits that amount from the cardholder's account (if the cardholder used a debit card) or receives payment plus interest sometime later (if the cardholder used a credit card). *Id*. at 29.

Critical for this case, it is important to understand that payment networks provide various services that facilitate the transfer of funds between acquirers and issuers, but they do not participate directly in transactions. "Strictly speaking, the credit card network isn't a direct player in the transaction, but the network ensures the smooth functioning of the system." *Id.* at 31. Consumers have a direct financial relationship with their issuing banks, and a direct transactional relationship with merchants. Despite conventional wisdom, however, consumers and merchants both have a tenuous relationship with payment networks. A consumer may be said to

hold, say, a Visa card, but, in reality, she holds a card issued by a particular bank

(the issuer) which, in turn, has contracted with Visa to provide transaction

processing services for that card. No payments flow directly from consumers or

merchants to payment networks. *Id.* at 29-31. As Visa's Annual Report describes it,

"Visa is not a financial institution. We do not issue cards, extend credit, or set rates

and fees for account holders of Visa products nor do we earn revenues from, or bear

credit risk with respect to, any of these activities." Visa Inc., Annual Report (Form

10-K) (Nov. 18, 2021).

**D.      Visa is not the least-cost avoider in this case**

Given the foregoing background on the law and economics of collateral

liability and the mechanics of payment networks, it would be improper to permit

Plaintiffs to maintain a RICO or TVPRA claim against Visa arising out of the

circumstances of this case.

Despite Plaintiffs' efforts to circumvent *Central Bank of Denver* by alleging

Visa's direct participation in the alleged enterprise, Visa's role is plainly that of an

outside, collateral service provider. As such, any ability Visa might have to deter

harm in this case would be limited to its ability to exert pressure on other collateral

actors (i.e., banks) to, in turn, exert pressure on the direct actors, aimed at curtailing

their harmful activity. But is Visa in a position to effectively police the illegal

conduct at issue in this case at reasonable cost? The answer is surely no.

"To serve as an ex ante enforcement strategy . . . collateral liability . . . must

prescribe a mechanism—an enforceable duty—that allows private parties to avert

misconduct when they detect it." Kraakman, *Gatekeepers*, *supra*, 2 J.L. ECON. &

ORG. at 57. Visa has only the most coarse and limited means of interposing itself

between MindGeek and its users in order to "avert misconduct," as well as

extremely limited access to the transaction-specific information on which it would

need to act in the first place. Moreover, whatever benefits might arise from inducing

Visa to undertake action to try to thwart such transactions, the costs would be enormous.

Here, by Plaintiffs' own admission, the only mechanism by which Visa could possibly police MindGeek's business would be to discontinue processing payments that flow to the company (more accurately—and more tenuously: to instruct any of MindGeek's acquirers that have contracted with Visa to provide payment network services to discontinue using Visa's network to transfer payments from MindGeek's users' issuers). *See* ECF 94, Omnibus Opp. to Defendants' Motions at 79–80.

But this standard can't be appropriate. In theory, *any* sufficiently large firm with a role in the commerce at issue could be deemed liable if all that is required is that its services "allow[]" the alleged principal actors to continue to do business. FedEx, for example, would be liable for continuing to deliver packages to MindGeek's address. The local waste management company would be liable for continuing to service the building in which MindGeek's offices are located. And every online search provider and Internet service provider would be liable for continuing to provide service to anyone searching for or viewing legal content on MindGeek's sites. The Ninth Circuit has already rejected such a broad-based view of collateral liability. *See Perfect 10 v. Visa Int'l*, 494 F.3d 788, 800 (9th Cir. 2007) (rejecting plaintiff's theory of liability that would extend to "a number of peripherally-involved third parties, such as computer display companies, storage device companies, and software companies . . . and even utility companies that provide electricity to the Internet").

What all these companies have in common is that none of them have a direct relationship with MindGeek, but they all "knowingly" provide services to MindGeek based on Plaintiffs' definition (which rests essentially on the availability of public information about allegedly illegal activity occurring on MindGeek's sites). What none of these companies has is access to particularized knowledge of any specific illegal transactions on MindGeek's websites or a role in the operation of the

company sufficient to enable it to intervene to control the alleged illegal activity occurring on those sites.

Likewise, Visa has no direct relationship with—including any ability to supervise or otherwise control—either MindGeek or its users. On an individual transaction level, Visa knows only that a transaction has been processed on its network, but has no insight into the precise nature of the transaction apart from how the merchant (MindGeek) categorizes it. Moreover, Visa has no technical capacity to monitor the individual behavior of users, including what material they upload or view on MindGeek's sites. Thus, the only form of control that Visa can exert in this context is of the most general sort: if made aware of illegal activity or other contractual violations to its terms of service, Visa can suspend processing activity.

But the cost of mandating this consequence by law would be enormous. While the types of content alleged to have harmed Plaintiffs are egregious and illegal, no one disputes that the vast majority of content on MindGeek's sites is legal. Inducing Visa to cut off all transactions would entail an immense interference with legitimate commerce. And without any ability to actually forestall illegal transactions themselves, this approach would no doubt fail in its intended aim, as MindGeek users intent on engaging in illegal transactions on the platform would find other payment mechanisms (like cryptocurrencies) to do so.

But the broader implications would be far more problematic. No criminal or civil justice system can prevent all illegal conduct, and MindGeek is far from the only Internet site where illegal content is allegedly exchanged. More significantly, however, because RICO and TVPRA apply to all forms of commerce, not just Internet pornography sites, the extension of liability under such laws to a general-purpose service provider like Visa would require it to raise the processing costs of—or curtail entirely—an enormous swath of perfectly valid, crucial transactions throughout the entire economy. The full consequence of holding Visa liable could easily affect general access to credit and banking in the economy, as the massively

increased cost of providing credit card network services would ultimately be paid by consumers in the form of higher costs of credit or foreclosure from access to payment cards entirely. *See, e.g.,* Zywicki, Manne, & Morris, *Unreasonable and Disproportionate: How the Durbin Amendment Harms Poorer Americans and Small Businesses*, *supra* note 1 (discussing how increased payment card network costs increase consumer banking costs, reduce access to payment cards, and impair financial inclusion).

Other courts have understood these costs and have hesitated to countenance such a broad conception of collateral liability. Indeed, under a similar set of facts in the copyright infringement context, the Ninth Circuit declined to find payment processors liable as indirect infringers simply for providing services used by sites where copyright infringement occurs. *See Perfect 10, Inc. v. Visa, Int'l*, *supra*, 494 F.3d 788. In particular, the court declined to find liability because there is "no direct connection to [the] infringement" committed by users of a site and a credit card company's provision of payment processing services. *Id.* 494 F.3d at 796; *see also id.* at 800 (noting that payment processors "merely provide a method of payment, not a 'site' or 'facility' of infringement").

As the Court in *Perfect 10* also suggested, it is insufficient to find an affirmative duty of care sufficient to support collateral liability that a service provider may have the power to *thwart* illegal conduct if it simply stopped its activities. To paraphrase the Ninth Circuit in that case: "[Even if Visa] could refuse to process payments to [MindGeek] and thereby undermine [its] commercial viability. . . , that Defendants have the power to undermine the commercial viability of [an enterprise] does not demonstrate that the Defendants materially [participate in] that [enterprise]." 494 F.3d at 800. *See also Walter v. Drayson*, 538 F.3d 1244, 1248 (9th Cir. 2008) ("It is not enough that [Defendant] failed to stop illegal activity, for *Reves* requires 'some degree of direction.'").

## III. CONCLUSION

Collateral liability is an important tool to ensure that a liability regime provides the proper incentives for optimal precautions and harm avoidance. But it is improper to extend liability to indirect actors who are not in a position to intervene to prevent harmful activity at reasonable cost or who do not have access to information sufficient to target harmful activity without excessively impairing beneficial activity, as well. TVPRA and RICO are broad statutes, but neither is properly interpreted to countenance the imposition of liability on tangential actors without the requisite degree of knowledge or control sufficient to support the imposition of collateral liability elsewhere in the law.

Visa's Motion to Dismiss should be granted.

Dated: January 17, 2022                    BENBROOK LAW GROUP, PC


                                           By   /s Stephen M. Duvernay
                                           STEPHEN M. DUVERNAY
                                           Attorneys for Proposed Amicus Curiae
                                           International Center for Law &
                                           Economics