# Exhibit A

Michael J. Bowe
(admitted *pro hac vice*)
mbowe@brownrudnick.com
Lauren Tabaksblat
(admitted *pro hac vice*)
ltabaksblat@brownrudnick.com
BROWN RUDNICK LLP
7 Times Square
New York, NY 10036
Telephone:    (212) 209-4800
Facsimile:    (212) 209-4801

David M. Stein (#198256)
dstein@brownrudnick.com
BROWN RUDNICK LLP
2211 Michelson Drive, 7th Floor
Irvine, California    92612
Telephone:  (949) 752-7100
Facsimile:   (949) 252-1514

*Attorneys for Plaintiff*

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SERENA FLEITES, | CASE NO. 2:21-cv-4920 |
| Plaintiff, | **[PROPOSED] AMENDED COMPLAINT** |
| v. | |
| MINDGEEK S.A.R.L. a foreign entity; MG FREESITES, LTD., a foreign entity; MINDGEEK USA INCORPORATED, a Delaware corporation; MG PREMIUM LTD, a foreign entity; MG GLOBAL ENTERTAINMENT INC., a Delaware corporation; 9219-1568 Quebec, Inc. (d/b/a MindGeek), a foreign entity; BERND BERGMAIR, a foreign individual; FERAS ANTOON, a foreign individual; DAVID TASSILLO, a foreign individual; COREY URMAN, a foreign individual; VISA INC., a Delaware corporation; COLBECK CAPITAL DOES 1-5; and BERGMAIR DOES 1-5 | 1. VIOLATIONS OF FEDERAL SEX TRAFFICKING LAWS [18 U.S.C. §§ 1591, 1594, 1595]<br>2. RECEIPT, TRANSPORT, AND DISTRIBUTION OF CHILD PORNOGRAPHY [18 U.S.C. §§ 2252, 2252A, 2255]<br>3. RACKETEERING [18 U.S.C. § 1962]<br>4. PUBLIC DISCLOSURE OF PRIVATE FACTS<br>5. INTRUSION INTO PRIVATE AFFAIRS<br>6. PLACING PLAINTIFF IN "FALSE LIGHT"<br>7. COMMON LAW MISAPPROPRIATION OF LIKENESS<br>8. STATUTORY MISAPPROPRIATION OF LIKENESS [California Civil Code § 3344]<br>9. DISTRIBUTION OF PRIVATE SEXUALLY |
| Defendants. | |

EXPLICIT MATERIALS
[California Civil Code §
1708.85]
10. NEGLIGENCE
11. UNFAIR COMPETITION
[California Business &
Professions Code §§ 17200,
17500]
12. CIVIL CONSPIRACY

**DEMAND FOR JURY TRIAL**

COMPLAINT

Plaintiff, Serena Fleites, through her undersigned counsel, for her complaint against MindGeek S.a.r.l.; MG Freesites, Ltd. d/b/a Pornhub ("Pornhub"); MindGeek USA Incorporated ("MindGeek USA"); MG Premium Ltd.; MG Global Entertainment Inc.; 9219-1568 Quebec, Inc. (d/b/a MindGeek) (collectively "MindGeek"); Bernd Bergmair; Feras Antoon; David Tassillo; Corey Urman; Bernd Bergmair Does 1-5; and Colbeck Capital Management LLC Does 1-5 (MindGeek together with Bergmair, Antoon, Tassillo, and Urman, Bergmair Does1-5, and Colbeck Capital Does 1-5, the "MindGeek Defendants"); and Visa Inc. ("Visa") (collectively, "defendants") for sex trafficking in violation of 18 U.S.C. §§ 1591 and 1595, for receipt, transport, and possession of child pornography in violation of 18 U.S.C. §§ 2252, 2252A, and 2255, racketeering in violation of 18 U.S.C. § 1962, and state statutory and common law violations, alleges as follows:

## INTRODUCTION

1.     Plaintiff Serena Fleites became a victim of child sexual abuse material ("CSAM") and trafficking at the age of 13 when CSAM depicting her was illegally accepted, uploaded, optimized to maximize website views, disseminated, and used to promote advertising by MindGeek.   This abuse continued over the course of years while she was a minor during which time MindGeek repeatedly accepted and exploited videos of the then-minor Plaintiff for monetary purposes.   The impact on Plaintiff's life was devastating, derailing a good, innocent young student's education, family, friend, and community relationships, and mental health.   While she has heroically survived, she had never fully recovered.   Her experience was not unique or surprising, but instead a regular part of the business model defendants created to get rich in the porn industry by operating without restrictions.

2.     MindGeek is the most dominant online pornography company in the world.   It is also one of the largest human trafficking ventures in the world.   And it is likely the largest non-regulatory repository of child pornography in North America

and well beyond.

3.     This is a case about rape, not pornography.    It is a case about the rape and sexual exploitation of children.    It is a case about the rape and sexual exploitation of men and women.    And it is a case about each of these defendants knowingly and intentionally electing to capitalize and profit from the horrendous exploitation and abuse of tens of thousands of other human beings so they could make more than the enormous sums of money they would have otherwise made anyway.

4.     MindGeek is a classic criminal enterprise run, according to those who know it best, "just like the Sopranos."    The "bosses" at the head of this criminal enterprise are MindGeek chief executive officer Feras Antoon and financier Berg Bergmair, representing a group of uber-wealthy owners of the company.    These uber-wealthy owners, the "over-bosses" of the enterprise, are unknown to the public and even to Antoon because they do not want to be publicly associated, or even risk being publicly associated, with the criminal enterprise they fund and from which they profit.    Indeed, until recently Bergmair had no identifiable public identity let alone identifiable connection to MindGeek.    Instead, he literally secreted himself from the world, hiding behind a false professional identity, an extensively scrubbed internet fingerprint, and extreme rules of secrecy.    And Antoon and other publicly known MindGeek executives misrepresented themselves as the true owners of MindGeek as part of the scheme to conceal the true ownership behind this criminal enterprise.

5.     Antoon and his Montreal-based MindGeek "crew," dubbed internally the "Bro-Club," likewise take extraordinary measures to keep their identities and activities unknown.    Like Bergmair, they assume fake identities when engaged in MindGeek's illegal and unethical activities, expending considerable resources to scrub as much of their online fingerprint as possible, and insist on extreme secrecy and security measures in MindGeek's business dealings even with respect to other

COMPLAINT

MindGeek employees.

6.    The reason for this extreme aversion to visibility and scrutiny is because the most powerful online pornography company in the world was built and sustained in material parts on child pornography, rape, and human trafficking.    In the arms race to be the number one result in the Google search engine for porn, the defendants knew it would be a huge advantage to have more content than anyone else.    In the science of search engine optimization ("SEO"), content is king and the unrestricted accumulation of content is a driving factor in determining which website leads in Google search results.

7.    At the direction of Bergmair and with the implementation of Antoon, Tassillo, and Urman, the defendants intentionally adopted, a business model in which they not only allowed users to populate their platform with virtually any type of pornographic content, they would carefully analyze those users and others who were drawn to such content to induce them to load more, watch more, live more on the MindGeek platform.    In the course of doing so, these defendants developed a detailed understanding of all the content on their platform, including nonconsensual content, and nonetheless elected to monetize that content.

8.    In addition, they used this detailed understanding of their content and users to generate advertising revenues by displaying ads purchased through their TrafficJunky platform on all displayed content, including ads directing users to premium pay products, services, and memberships that users could purchase through its in-house payment platform Probiller.    Such transactions on both platforms were overwhelmingly processed through credit card companies, which were aware of the inextricably intertwined use of CSAM and trafficked content in MindGeek's business model, but nevertheless imposed no limitations on transactions they would process.

9.    In doing so, the defendants succeeded in creating a bustling marketplace

1  for child pornography, rape videos, trafficked videos, and every other form of

2  nonconsensual content.   They intentionally elected to not employ any effective

3  monitoring of what was being uploaded, or process for removing content that was

4  exploitive and illegal.   To the contrary, in the rare instance where defendants were

5  forced to remove content from their platform, whistleblowers have confirmed that

6  they subsequently would reupload the content to their platform.

7       10.   Moreover, they actively engaged in pretextual gaslighting campaigns

8  touting non-existent technology, processes, and policies meant to exclude illegal

9  content, and repeatedly misrepresented that such content was not part of MindGeek's

10  business model or frequently on its sites.   They did this to mislead the market

11  generally that it was a legitimate, legal operation so as to induce the many users who

12  would not use the site had they known the truth, but also to satisfy credit card

13  companies like Visa who agreed to continue processing transactions only if

14  MindGeek made and maintained such claims, even though Visa knew from its own

15  due diligence and other external sources that no such effective technology, processes,

16  or policies were in effect.

17       11.   Not only did these defendants allow users to populate MindGeek's

18  platform with nonconsensual content, and restore the nonconsensual content of those

19  users when removed, they also acquired and populated the MindGeek platform with

20  their own nonconsensual content.   The MindGeek defendants frequently purchased

21  in bulk trafficked content from known trafficking areas such as Eastern Europe, Asia,

22  and South America.   In doing so, they used third-parties to upload that content in a

23  way that made it look like user uploaded content.   In executing this scheme,

24  MindGeek used its byzantine international corporate structure of hundreds of sham

25  shell corporations to mask the process and launder the payments.

26       12.   Put simply, a central element of the business plan that MindGeek used

27  to become the dominant online pornography company in the world was the

28

1  maximum use of nonconsensual content.    This meant much more than simply

2  permitting such content.    Rather it entailed (a) issuing guidelines, policies, and

3  interfaces that encouraged users to not only post such content but maximize its reach

4  via designating descriptive titles, tags, categories, and playlists; (b) providing their

5  own such elements to drive traffic to their sites so they could profit from advertising

6  revenues and product and service sales, including themselves uploading such content

7  to their own tubesites as a matter of course; (c) sharing revenues with those posting

8  the illegal material under certain circumstances; and (d) providing VPN, Tor site

9  access, and direct messaging services to permit users engaged in illegal conduct to

10  feels safe operating on the MindGeek sites.

11       13.    That business plan worked.    And the MindGeek defendants got rich.

12       14.    Also knowingly profiting along with them, were major American credit

13  card companies and banks, including in particular here, defendant Visa, who was

14  uniquely suited to stop this exploitation but chose instead to participate in the

15  profiteering.    Visa's participation was deliberate, informed, and based on a full

16  understanding of MindGeek's active and widespread incorporation of trafficked and

17  CSAM content in its business model.    Visa gained this understanding through the

18  extensive due diligence it and its agent banks conducted over the course of its

19  decade-long relationship with MindGeek, extensive discussions they had with

20  MindGeek during that period, and from direct reporting from victims, activists, the

21  press, and government and legislative bodies.    From all these sources, Visa was

22  fully aware that MindGeek's business model specifically solicited, promoted,

23  amplified, and otherwise exploited CSAM and other trafficked content to induce

24  users to visit its free and premium websites and generate revenues from those users

25  via advertising fees earned from the traffic itself, paid services and products

26  purchased by such visitors, and the sale of data harvested from them.

27       15.    Despite this full knowledge of these business practices, which Visa and

28

COMPLAINT

its agent banks discussed extensively with MindGeek, Visa explicitly agreed to continue participating in MindGeek's trafficking venture by processing the financial payments without which these illegal transactions would not take place.    Visa did so despite other prominent financial institutions, like PayPal, refusing to do so and publicly disassociating from MindGeek.    Visa did so to profit from those illegal transactions and all legal transactions.    MindGeek used illegal transactions to solicit, and because it made a policy decision not to police marketplace conduct of its merchants because doing so could limit its ability to do business.    Visa made this decision in discussions and negotiations with MindGeek and explicitly communicated to MindGeek its agreement to process these transactions despite the information it had from various sources based on window-dressing denials Visa knew were false.

16.    When it entered into this agreement, Visa was well aware from its own due diligence and that of its agent banks and from negotiations with MindGeek that it had the practical power to prevent these illegal transactions by conditioning its services on basic best practices that would ensure content was consensual and not CSAM.    Indeed, when public pressure spiked after a damning New York Times article about MindGeek, Visa and Mastercard promptly forced MindGeek to remove over 10 million unverified videos simply by suspending their services pending an "investigation."    Since then, MindGeek has stated publicly and has had innumerable industry proxies likewise publicly proclaim that if Visa refused to process payments MindGeek and the online porn industry would fail.    Despite acknowledging that their very quick "investigation" confirmed what the New York Times had reported, Visa has once again returned to processing the majority of MindGeek's transactions despite the failure of MindGeek to implement basic steps necessary to ensure content is consensual and not CSAM.

17.    Left devastated were the thousands of human beings who were

COMPLAINT

1  victimized not simply by their original abuser, but then again, and again, and again

2  by MindGeek and Visa's monetization of that exploitation.    Plaintiff in this case is

3  one such human being victimized first by her original abuser, and then repeatedly by

4  defendants in this case.

5  **PARTIES**

6        18.    Plaintiff Serena Fleites is an individual who is now at the age of

7  majority.    As alleged herein, Ms. Fleites is a victim of child sex trafficking.    At all

8  relevant times, Ms. Fleites was a resident of California.

9        19.    Defendant MindGeek S.a.r.l. is a foreign entity organized and existing

10  under the laws of Luxembourg.    MindGeek S.A.R.L. conducts business in the

11  United States, including in this District.    MindGeek S.a.r.l., formerly known as

12  Manwin directly and indirectly owns and operates over 100 pornographic websites,

13  production companies, and brands including Pornhub, RedTube, Tube8, YouPorn,

14  PornIQ, gaytube, Thumbzilla, Peeperz, PornMD, Xtube, Brazzers, Babes.com,

15  Reality Kings, Digital Playground, Twistys, Men.com, Mofos, MyDirtyHobby,

16  SexTube, and Webcams.    MindGeek S.a.r.l. also manages websites including

17  Wicked Pictures, lesbea.com, and Playboy.    MindGeek S.a.r.l. owns and/or controls

18  the majority of the pornography on the Internet, much of which it distributes for free,

19  to any person with a web connection, regardless of age.    Although incorporated in

20  Luxembourg, MindGeek S.a.r.l. operates out of Montreal, Canada, and has satellite

21  offices in, among other places, Los Angeles, San Diego, and San Francisco,

22  California.

23        20.    Defendant MG Freesites, Ltd. ("MG Freesites") (d/b/a Pornhub) is a

24  foreign company incorporated in the Republic of Cyprus with a principal place of

25  business at 195-197 Old Nicosia-Liamassol Road, Block 1 Dali Industrial Zone,

26  Cyprus, 2540.    MG Freesites conducts business in the United States, including in

27  this District.    MG Freesites is a wholly owned subsidiary of MindGeek S.a.r.l.

28

7
COMPLAINT

Through various intermediary entities MG Freesites, Ltd. owns, operates, and/or manages one or several of the pornographic websites owned by MindGeek, including Pornhub, and is controlled and operated by directors, officers, and employees working in MindGeek's offices in the United States and Canada.    MG Freesites' servers containing its redundant library of pornographic content, including the vast amount of CSAM uploaded to its sites since inception, are located in Waltham, Massachusetts as well as elsewhere in the United States and the world.

21.    Defendant MindGeek USA Incorporated ("MindGeek USA") is a corporation incorporated in the state of Delaware, with its principal place of business at 21800 Oxnard Street, Suite 150, Woodland Hills, California.    MindGeek USA is a wholly owned subsidiary of MindGeek S.a.r.l., either directly or through intermediary companies also under the control of MindGeek S.a.r.l. and is used to support the operations of Pornhub and MindGeek's other tubesites through support services, industry outreach and influencing, lobbying, and media relations in the State of California.

22.    Defendant MG Premium Ltd. ("MG Premium") is a foreign company incorporated in the Republic of Cyprus with a principal place of business at 195-197 Old Nicosia-Liamassol Road, Block 1 Dali Industrial Zone, Cyprus, 2540.    MG Premium conducts business throughout the United States, including within this District.    MG Premium is a wholly owned subsidiary of MindGeek S.a.r.l., either directly or through intermediary companies also under the control of MindGeek S.a.r.l.    MG Premium owns and operates certain MindGeek premium and pay sites that are supported by MindGeek's network of free tubesites and are used as a means of creating traffic to, and revenues for, these premium services.    Those premium sites are one of the more frequent subjects of advertisements placed on Pornhub and other MindGeek tubesite content, including its CSAM and otherwise trafficked content used to attract and more deeply engage users on those sites.

COMPLAINT

23.    Defendant MG Global Entertainment Inc. ("MG Global Entertainment") is a corporation incorporated in the state of Delaware, with its principal place of business at 21800 Oxnard Street, Suite 150, Woodland Hills, California.    MG Global Entertainment is a wholly owned subsidiary of MindGeek S.a.r.l., either directly or through intermediary companies also under the control of MindGeek S.a.r.l.    MG Global Entertainment is used to support the operations of Pornhub and other MindGeek tubesites through support services such as moderation, review, and approval of content, industry outreach and influencing, lobbying, and media relations in the State of California and throughout the United States.

24.    Defendant 9219-1568 Quebec, Inc. (d/b/a MindGeek) ("9219") is a company organized and existing under the laws of Canada with a principal place of business located in Montreal, though it conducts business throughout the United States, including within this District.    Defendant 9219 is a wholly-owned subsidiary through other intermediaries of MindGeek S.a.r.l. and directly employs defendants Antoon, Tassillo, and Urman as well as other employees who actually control and operate all of MindGeek S.a.r.l.'s purported subsidiaries and their employer's putative parent MindGeek S.a.r.l., which is along with all the MindGeek entities simply the alter ego of these defendants and the ownership defendants.

25.    Defendant Bernd Bergmair (also known as Bernard Bergemar and Bernard Bergemair) is a resident of Hong Kong, China and is the majority owner of MindGeek along with undisclosed investors on whose behalf he acts as a representative.    Bergmair, while not a formal executive of any MindGeek entity, actively wields ultimate control over the operations of all such entities, including being aware of, approving and directing the illegal activities alleged herein.

26.    Defendant Feras Antoon is a resident of Canada and is the co-owner and CEO of defendant 9219.    He has been held out as being co-owner and CEO of all MindGeek related entities.    In fact, Antoon, along with the other individual

1  defendants, does wield control over the operation of all MindGeek entities (including
2  his employer's purported parent) even though neither he nor they are executives or
3  directors of virtually any of those entities and they operate and hold all these entities
4  out to the public as one single entity irrespective of purported corporate formalities
5  which are entirely disregarded.

6      27.    Defendant David Tassillo is a resident of Canada and Owner and Chief
7  Operating Officer of defendant 9219.   Defendant Tassillo holds himself out publicly
8  as being COO and owner of all MindGeek related entities.   In fact, Tassillo, along
9  with the other individual defendants, does wield control over the operation of all
10  MindGeek entities (including his employer's purported parent) even though neither
11  he nor they are executives or directors of virtually any of those entities and they
12  operate and hold all these entities out to the public as one single entity irrespective of
13  purported corporate formalities which are entirely disregarded.

14      28.    Defendant Corey Urman is a resident of Canada and a Vice President of
15  defendant 9219, with responsibilities for Product Management, Video Sharing
16  Platform, and public and media relations for all MindGeek entities.   In fact, Urman,
17  along with the other individual defendants, does wield control over the operation of
18  all MindGeek entities (including his employer's purported parent MindGeek S.a.r.l.)
19  even though neither he nor they are directors or executives of virtually any of those
20  entities and they operate and hold all these entities out to the public as one single
21  entity irrespective of purported corporate formalities which are entirely disregarded.

22      29.    Defendant Bernd Bergmair ("Bergmair") Doe(s) 1-5, are secret
23  beneficial owners whom Bergmair represents and on whose behalf and his own
24  behalf he directs the business of the MindGeek enterprise and who, through him,
25  finance, direct, participate in, and otherwise facilitate the MindGeek enterprises'
26  illegal activities set forth herein.

27      30.    Defendant Colbeck Capital Management LLC ("Colbeck Capital")
28

1   Doe(s) 1-5, are beneficial owners in the MindGeek enterprise through Colbeck

2   Capital whose identities are presently unknown to Plaintiff, and who finance, direct,

3   participate in, and otherwise facilitate the MindGeek enterprises' illegal activities set

4   forth herein.

5       31.     Although the MindGeek business is ostensibly operated through

6   hundreds of subsidiaries and affiliates located in dozens of jurisdictions throughout

7   the world, in reality this entire structure is a sham and the alter ego of the individual

8   defendants and unknown beneficial owner defendants, all of whom actually exercise

9   direct control over the entire corporate organization despite not being directors or

10  executives of the vast majority of these entities.   This corporate structure was not

11  created and is not maintained for any legitimate business purpose or need of the

12  organization but instead to (a) make it impossible for any jurisdiction or plaintiff to

13  understand or track how the money flows through the organization; (b) make it

14  possible for the executives, beneficial owners, and their co-conspirators and

15  associates to siphon off revenues generated by the business before they reach the

16  ultimate parent; (c) mask the receipt of such funds by the owners, executives, and

17  associates; (d) allow the ultimate parent and the owners, executives, and associates to

18  evade taxes by generating false losses; and (e) impair the ability of those with claims

19  for illegal conduct to pursue legal remedies and render it impossible to recover any

20  judgment that might be secured through such remedies by leaving those business

21  woefully under-capitalized to satisfy any such judgments.

22      32.     In particular, the MindGeek organization operates as a single business

23  entity in which, among other things, (a) the complex and opaque international

24  corporate structure is in a constant state of flux with entities being retired, formed,

25  and replaced on a regular basis, often as quickly as within months and with virtually

26  identical names, resulting literally in hundreds of entities coming into and passing

27  out of existence like quantum particles over the course of years; (b) appointing

28

ministerial administrative employees as figurehead directors despite them having no knowledge about the entity and no involvement in its activities, which are instead directed by the individual defendants and beneficial owners even though they are neither directors or executives of such entities; (c) ubiquitously comingling funds and passing funds through multiple entities in transactions in which those entities have no connection to the transaction or other business reason to receive such payments and instead are used solely to mask the source and disposition of such funds and insulate it from legal and other authorities and civil liability; (d) issuing shares of one another to themselves and third parties haphazardly and without authority; (e) failing to maintain minutes, corporate records, and corporate formalities and confusing the records of the separate entities; (f) using the same business locations and employing the same employees; (g) failing to adequately capitalize the entities and siphoning off capital necessary to meet the entities obligations; (h) failing to maintain arm's length relationships among themselves; and (i) diverting assets without consideration from/to one another to the detriment of creditors, including Plaintiff.

33.    For example, the MindGeek Defendants have already admitted that MG Global Entertainment provides support to other MindGeek corporate entities and that multiple employees of MG Global Entertainment have responsibilities concerning the moderation of content on MindGeek's tubesites.    Moreover, even though Defendant 9219 and other MindGeek entities besides MG Freesites ostensibly do not operate Pornhub or MindGeek's other tubesites, 9219 employees actually conduct all operational functions including monitoring the website content, optimizing that content to maximize SEO, uploading content to its other tubesites, handling all financial and capital management, and handling all media and public relations and social media optimization.    Most recently, defendants deployed virtually all MindGeek employees to review all videos on the Pornhub tubesite putatively operated by MG Freesites after a viral New York Times expose resulted in credit

1  card companies suspending their relationships.

2      34.    Under these circumstances, recognizing the privilege of separate

3  existences between the MindGeek Defendants would promote injustice, unfairness,

4  and fraud.    Any separateness is to be disregarded.    As such, the MindGeek

5  Defendants are jointly and severally liable in this action as alter egos.

6      35.    In doing all things alleged herein, the MindGeek Defendants were

7  agents, servants, representatives, partners, joint venturers, affiliates, parents,

8  subsidiaries, and/or employees of each other in the acts and/or omissions herein

9  alleged.    The MindGeek Defendants were acting within the course and scope of

10  their authority as such agents, servants, representatives, partners, joint venturers,

11  affiliates, parents, subsidiaries, and/or employees and with the permission,

12  authorization, consent, and ratification of each other.

13      36.    Defendant Visa Inc. ("Visa") is a corporation incorporated in the state of

14  Delaware with a principal place of business at P.O. Box 8999, San Francisco,

15  California.    Visa recognized MindGeek as an authorized merchant and processed

16  payment to its websites including but not limited to Pornhub and continues to process

17  payments to some of MindGeek's websites.

18                         **JURISDICTION AND VENUE**

19      37.    This action arises under the Trafficking Victims Protection Act

20  ("TVPA"), 18 U.S.C. §§ 1589-1595, the Racketeer Influenced and Corrupt

21  Organizations Act ("RICO), 18 U.S.C. §§ 1961-1968, federal child pornography and

22  sexual exploitation laws, 18 U.S.C. §§ 2252A, 2255, and state statutes and common

23  laws.

24      38.    The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331

25  and has supplemental jurisdiction over pendent state-law claims under 28 U.S.C. §

26  1367.    This Court has personal jurisdiction over defendants pursuant to, inter alia,

27  18 U.S.C. § 1965 and 18 U.S.C. § 2255 because each defendant transacts business on

28

COMPLAINT

a systematic and continuous basis in the United States and this District, and/or has engaged in tortious misconduct here in violation of U.S. law, Rule 4(k)(2) of the Federal Rules of Civil Procedure which provides a federal forum for claims over the foreign defendants, and under the California long-arm statute, Cal. Civ. Proc. § 410.10, because each defendant, directly and through agents, transacts business within the state; committed tortious acts and omissions within the state; committed tortious injury in the state caused by an act or omission outside the state; regularly does business, engages in persistent course of conduct, and derives substantial revenue from services rendered in the state; owns, uses, and possesses real property within the state; or is registered to do business in and has consented to personal jurisdiction in this state.

39.    Among other things, defendants (i) directed their activities at United States citizens and California residents, (ii) derived benefit from United States citizens' and California residents' activities, (iii) created a substantial connection with the United States and the state of California, (iv) engaged in significant activities in the United States, including within California, (v) created continuing contractual obligations between MindGeek and United States entities and citizens, including California citizens, and (vi) caused foreseeable harm to Plaintiff in this country, state, and district.

40.    Defendants have offices throughout the United States, including in this State and in this District and conduct business directly related to the tubesites at issue in this case both in this District and throughout the United States.    Specifically, MindGeek USA and MindGeek Global Entertainment maintain their principal place of business at 21800 Oxnard Street, Suite 150, Woodland Hills, California 91367. Defendant Visa's principal place of business is located at P.O. Box 8999, San Francisco, California.

41.    Moreover, the MindGeek Defendants conduct business in this country

14

COMPLAINT

and state through a network of shell entities which are registered to do business in the United States and California, conduct business in this country and state, committed tortious acts in this country and state, and committed tortious acts outside the country and state that caused harm in the United States, California and this District.    These putative shell entities, agents, and alter egos, include, but are not limited to, California-based entities MG Billing U.S. Corp., MG DP Corp., MindGeek LLC, MG Holdings Ltd, and U.S. based entities MG Processing Corp., RK Holdings, LLC, MG Global Entertainment Inc., and MG Billings U.S., Defendants MindGeek S.a.r.l., MG Freesites, Ltd., and MindGeek USA.

42.    The illegal materials that the MindGeek Defendants and its agents and alter egos recruit, fund, produce, modify, disseminate, advertise, and monetize are created in the United States, including in among other locations this state, uploaded in this country and state, and stored on servers in the United States.    Indeed, the MindGeek Defendants transmit millions upon millions of videos and images to and from this State on an annual basis.

43.    Furthermore, MindGeek derives substantial profits from U.S-based operations, including from California-based users.    MindGeek's tubesites are some of the most trafficked websites on the internet, generating an enormous amount of revenue—over $460 million in 2018.    More recent estimates suggest that figure is low, as the online porn industry as a whole—which is dominated by MindGeek— may generate as much as $97 billion per year.    By comparison, Netflix generates approximately $11.7 billion in annual revenue.    In 2020, MindGeek's tubesites received an average of 3.17 trillion monthly web impressions, more than internet giants Amazon (2.58 trillion), Netflix (2.47 trillion), and Reddit (1.55 trillion), a significant percentage of which is comprised of U.S.-based users and generated from U.S.-based user uploads, including in California.    As of 2019, Los Angeles is the city with the fourth highest volume of Pornhub.com usage in the world.

44.    MindGeek profits from United States users, including California residents by, inter alia, (i) selling targeted advertising directed at United States based citizens and California residents on free pornographic videos hosted on MindGeek's tubesites, (ii) selling MindGeek's Pornhub Premium service to United States residents and California residents for $9.99 per month, (iii) directly selling United States citizens and California residents a license to view MindGeek's ModelHub content; and (iv) selling customer data to United States and California residents.

45.    Additionally, MindGeek partnered and shared advertising revenue with numerous sex traffickers who reside in the United States and California, uploaded and distributed sexually explicit videos of the U.S. and California-based Plaintiff without her knowledge or consent, and generated advertising revenue and other financial benefits from those uploads.

46.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to this action occurred in this District.    Further, MindGeek maintains an office in this judicial district and conducts substantial business within the district.

## FACTUAL BACKGROUND

**A.    MindGeek's Racketeering Enterprise: "It's Just Like the Sopranos."**

47.    Appropriately dubbed, "The Monsanto of Porn," MindGeek is a classic criminal enterprise carried out through wide-ranging criminal activities, including, but not limited to, human trafficking; child pornography; criminal copyright piracy; internet hacking, stalking, and doxing; blackmail and extortion; mail and wire fraud; embezzlement, bank and creditor fraud; tax evasion; and money laundering.    The company's top management and shadowy international financiers and their investors are the "bosses" of this Enterprise and, together with their "capos," run its rackets and schemes.

48.    The vehicles for these rackets and schemes are an internet pornography

platform led by the flagship website "Pornhub" and an international network of ever-changing sham shell companies.    Through these two elements, the Enterprise secures hundreds of millions of dollars in illicit monies each year, diverts them to the Enterprise members without paying any taxes, and masks the criminality under the guise of legitimate adult entertainment and an impenetrable corporate structure.

49.    The Enterprise viciously defends its concealed criminal activities from exposure.    When it senses a threat of exposure, the Enterprise responds like any lawless, rogue actor:    it lies, attacks, smears, bribes, blackmails, extorts, and otherwise intimidates any perceived threat by any means necessary.

50.    For example, MindGeek targeted long-time porn industry journalist Mike South because of revealing exposés he was publishing.    Initially, MindGeek used promised advertising revenue and lucrative partnership opportunities to bribe South.    When South rebuffed those offers, he began receiving threats.    Ultimately, he found a box outside his front door containing matches, a fire truck, and fire extinguisher, and the blunt message, "I'm sorry your house burnt down."    He has since carried a gun at all times.

51.    An anti-trafficking activist investigating MindGeek was subjected to such serious threats she told other activists doing the same, "I hope you have a saferoom."    The warning was prescient.    Those activists, and their extended families, were also targeted with threats of physical violence and death, vandalism, public smears, invasions of privacy, doxing, hacking, and other illegal and extortive behaviors designed to discredit, intimidate, and silence.

52.    Exploitation victims who dared to speak out or even demand relief from MindGeek were similarly targeted.    After one victim retained counsel, she began receiving threatening messages, received intimidating visits at home and work, and had her tires slashed.    She said she feared for her life.    She then disappeared. After weeks of unsuccessful attempts to reach her, a mysterious text was received by

her lawyer from an unidentified person who claimed to be her roommate and reported she had been in a car accident and was in a coma.    Although this person promised to provide further information, no further contact was received.    No such incident could be confirmed.    The victim's whereabouts and condition are still unknown.

53.    According to one MindGeek insider, the executive "bosses" oversaw a "very disturbing" misogynistic organization in which porn performers were referred to as "whores" and "product."    Repeated reports about sexual assault of performers on MindGeek productions or affiliated productions were not just ignored but joked about, and the victims who dared complain were blacklisted from further work and their content deplatformed or greatly diminished on MindGeek's pornographic sites. Reported rapes of female staff in Montreal were likewise not only ignored, but retaliated against.    Similarly, victims of rape, trafficking, or other nonconsensual exploitation on MindGeek's platform were ignored, shamed, and sometimes mocked when they asked MindGeek to remove videos of their abuse from its porn platform. Representative of MindGeek's ethos toward exploitation, an official MindGeek social media representative posted about sex tapes (which constitute a material amount of the exploitive material on MindGeek's platform), "don't do a sex tape if you are not ok with it being leaked."

54.    This was not a random aberration.    Rather, it reflected an ethos the "bosses" instilled from the top; a culture of not merely indifference but of embracing and celebrating nonconsensual, exploitive content.    There is perhaps no better embodiment of what is called internally "the Bro Culture" ethos than the public comments of MindGeek's long-time exclusive "Brand Ambassador," Asa Akira, endorsing and defending sex with 13 year-olds and exhibiting disdain for the laws protecting minors and for "snitches" who dare object to such abuse:

        This 13-year-old? . . . His attitude was amazing. But, you

1    know what? . . . if I were single and we were sitting in the

2    jacuzzi and he was like, "Hey, you know, like, I've never

3    f***ed a girl. (Asterisks added) Do you want to?" I think

4    I'd say yes.    No, that definitely... no one, no one would

5    consider that rape . . . except maybe his mom. . . . And

6    that's only if she's, like, a total bitch. . . . Yeah . . . and the

7    law. Whatever. [David Choe - Are we being delusional? Is

8    there anyone that has a problem with that?] No! Why

9    would I go [to jail]? Who's gonna tell? No snitching.

10   Snitches get snitches.... it would not ruin his life. It would

11   only improve it. . . . He . . . for the rest of his life, he could

12   tell this story. "I was such a cool kid that when I was 13, I

13   f***ed a porn star." (Asterisks added). [David Choe -

14   We're not talking about the law right now!] Jesus!    [David

15   Choe - Fu- f*** the law! (Asterisks added).What are you, a

16   f***ing, like do-gooder or something] (Asterisks added).

17   (AA) Snitch!    [(David Choe - What are you, the protector

18   of 13-year-olds or something?) (Critter – "I think

19   somebody has to")]    (AA) What nerd (laughs) . . . I think

20   there are 13- year-old girls out there that might be ready to

21   be f***ing, but not that many. (Asterisks added). Like, 15,

22   yeah. There's- . . . quite a few that are ready. . . .I would

23   not finger this 13-year-old's asshole [David Choe- If you're

24   a young boy and a- an older woman f***s you and she's fat

25   and ugly, then it's rape.] (Asterisks added). (AA) - It's

26   rape. (laughs).

27   55.    These public comments while stunning to most, were neither a surprise

28

19

COMPLAINT

nor a problem for MindGeek because it was a precise reflection of the lawless and exploitive culture and ethos instilled and demanded in the MindGeek Enterprise. Indeed, they selected Asa Akira as their sole "Brand Ambassador" precisely because she perfectly and loudly embodied this very lawless ethos in her own personal brand *long before* MindGeek asked her to embody them on its behalf.    By way of example only, before she was hired as MindGeek's Brand Ambassador Akira had made the following widely publicized comments celebrating rape, pedophilia, incest, and anti-Semitism: (a) "Is GHB the rape drug.    Asking for a friend" (9/8/2011); (b) "it's not really rape unless its anal rape, right? . . . "what the f*** is marital rape you can't rape the willing . . . Shoutout to my pedophiles" (9/27/2011) (asterisks added).; (c) "If loving Japanese rape porn is wrong, then I don't want to be right" (1/29/2011); (d) "Also, I'm pretty proud of myself for making it this far in life without having to register as a sex offender" (2/29/12); (e) "It only hurts if you resist" (1/23/13); (f) "Gay incest should be legal" (12/9/14); (g) "adulthood is knowing the difference between good rape and bad rape" (10/31/13); (h) "Why not f*** a jew for Hitler's birthday" (4/20/15) (asterisks added); and (i) "not one but TWO sightings of Hassidis Jews today." (11/28/09.)

56.    The embrace of nonconsensual content by the Enterprise is reflected in the numerous news reports of widespread and easily found child pornography and other exploitive content on the MindGeek Platform.    This includes the December 4, 2020 bombshell New York Times report entitled, "The Children of Porn Hub," the Dr. Oz segment on January 27, 2021 referred to as "The Victims of Pornhub," and the December 9, 2020 New York Times follow up article "An Uplifting Update, on the Terrible World of Pornhub."

57.    In 2021, the Canadian House of Commons opened up an inquiry into MindGeek's exploitation and monetization of child pornography, rape, trafficked, and other nonconsensual video and photographic content, and is reportedly

1  considering perjury charges for false testimony by "bosses" and defendants Antoon,

2  Tassillo, and Urman.

3      58.    On February 5, 2021, Antoon, Tassillo, and Urman appeared via video-

4  conferencing technology before the House, and each gave remarks in the proceeding,

5  which was televised.    Antoon falsely testified to the House, among other things, that

6  MindGeek is a "proud partner of" and "report[s] every instance of" to the National

7  Center for Missing and Exploited Children ("NCMEC") as required by law (which

8  was repudiated by subsequent testimony and report) when it becomes aware of it,

9  removes such content from its platform (not true), and employs technology and other

10  measures to ensure such content is never reuploaded to its platform or any other

11  platform (not true).

12     59.    Among other testimony, Tassillo testified that he could "guarantee you

13  that every piece of content, before it's actually made available on the website, goes

14  through several different filters," including several "different pieces of software"

15  followed by review by moderators.    Tassillo claimed that "the human moderators

16  will watch each one of the videos" and that "[w]e always instruct all of our agents to

17  err on the caution side.    Basically, if you have any doubt at all, just don't let it up"

18  to the tubesites.    He also testified that MindGeek reported "all cases to NCMEC."

19  As demonstrated below, this testimony from Tassillo is false.

20     **1.    MindGeek's Basic Revenue Model**

21     60.    On its face, the MindGeek business model looks like other internet

22  media business models like YouTube.    MindGeek owns a group of "tubesites" that

23  contain free, purportedly user populated, digital pornography.    Users are drawn to

24  the MindGeek tubesites by the ability to access free content, and to upload and

25  exchange free content.    MindGeek uses the traffic generated by that free content to

26  (a) advertise additional pornographic sites that offer paid content that are either

27  owned by MindGeek or by third-parties; (b) sell advertising for other products and

28

21

services it or third-parties offer; and (c) harvest user data for its own business marketing and development purposes and to sell to third parties.

61.     Within this model, MindGeek has various relationships with users/customers and third-party's offering products or services.   MindGeek has a relationship with those who use its tubesites for free to access and share content. These customers provide (a) content that helps populate the tubesites; (b) traffic and advertising "impressions" which generate income from third-party advertisers; (c) "paid" conversions in which a free tubesite user purchases content, services, or other products; and (d) data MindGeek can use to create and improve its content business as well as package or sell raw to third-parties looking to do the same.

62.     With respect to advertising, MindGeek's advertising platform "TrafficJunky" allows advertisers to buy ad space for products and online content and services and charges for that space as well as for 'impressions' (the number of users who have the ad displayed on a page they are viewing), "engagements" (the number of users who interact with the ad), and "conversions" (transactions that the user enters into for the product of service).   Advertising prices increase with increased traffic to the site and thus maximizing content so as to maximize traffic is a priority.   Moreover, ads are displayed and ad revenue generated on all content pages accessed by users.   Ad revenue earned through TrafficJunky accounts for over 50-60% of MindGeek's revenues.

63.     MindGeek also has a relationship with third-parties it allows to use its internet advertising platform to sell products and services.   MindGeek owned affiliates themselves sell products and services to tubesite users.   Third parties also can upload content and get paid a percentage of MindGeek's revenue for advertising "impressions" and paid customer "conversions" on traffic to, and interactions with, their content and ads accompanying it.   Third parties with their own pay websites, products, and services also pay to advertise on MindGeek's platform based on the

COMPLAINT

1    number of impressions those advertisements receive and conversions or purchases as

2    a result of those impressions, and they also may share in revenue with MindGeek

3    generated by impressions and conversions on their content.

4       64.    For example, on MindGeek's flagship tubesite Pornhub, any user could

5    upload content without a formal relationship with MindGeek.    MindGeek uses that

6    content to attract more users and generate income through TrafficJunky and

7    Probiller.

8       65.    Other users can also become so-called "verified" users and members of

9    MindGeek's "ModelHub" program and receive a share of the income associated with

10   traffic to their content.    This incentivizes users to post content and the additional

11   content further attracted still more users.    The ModelHub type arrangement allows

12   seemingly independent third-parties, including porn performers, to individually

13   generate revenue streams by posting content they produce, acquire, or repackage.

14      66.    Third parties might also be "content partners" who created content,

15   products, or services with their own distinct brand sold on and through MindGeek's

16   platform via that third party's tubesite "channel" and for which MindGeek and the

17   third party share revenue.

18      67.    Third parties with their own pay sites, products or services would also

19   secure customers from MindGeek by simply advertising on MindGeek's platform

20   through TrafficJunky sometimes simply paying an advertising fee, sometimes some

21   share of the revenue.    These third parties could be selling products and services

22   through MindGeek's Probiller platform or their own including products entirely

23   independent of porn, like ketchup and clothes or other adult-themed products and

24   services such as "dating" services or sex paraphernalia or purportedly enhancing

25   substances.    These third parties would purchase such advertising through ad

26   companies, like MindGeek owned affiliate TrafficJunky, which provides an interface

27   through which third parties can bid to purchase advertising space, filter and target its

28

advertising, and create the advertising they could sell premium products and services through MindGeek's Probiller.

68.     Third parties also purchase the vast amounts of data mined from the billions of user interactions with MindGeek's platform and the analytics MindGeek has performed on that data.    This data can be used to refine the third party's own webservices or to simply secure potential customer information and details for solicitations.

69.     Central to the economics of all these relationships is the traffic to the tubesites.    The more traffic, the more attractive the tubesites are to advertisers and content partners, the more ad impressions and customer conversions generating revenue, the more data to optimize and increase traffic, impressions, and conversions, and the more content to attract more user traffic.    This is a reinforcing dynamic.    As traffic increases, content and product and service optimization increases, which, in turn, increases traffic even more.

70.     The Gold Standard was to be at the top of the search results on search engines like Google.    To do this, MindGeek is deeply focused on SEO.    SEO is the science of optimizing a website's ability to garner top search rankings and depends on many factors but most prominently the amount of content and how effectively it is described.    Publicly, MindGeek does not even mention on its corporate website that it is involved in pornography.    Rather, it describes itself exclusively as a technology company skilled in SEO and related services.

**2.     The "Bro-Club"**

71.     According to whistleblowers with first-hand knowledge, the MindGeek Criminal Enterprise is run exactly like an organized crime family:    "It's just like the Sopranos," described one insider.    At the head of that crime family is Feras Antoon, the CEO of the company.    Feras Antoon and his select group of "made" men at MindGeek refer to themselves as the "Bro-Club."    Bro-Club membership comes

with the opportunity to make substantial monies participating in the Enterprise's criminal activities.    Indeed, as one person close to members of the Bro-Club explained, "[t]he only thing that mattered was how much money can you bring into the enterprise.    That was the only metric for your advancement.    Similar to what you see in Sopranos."

72.    The Bro-Club is comprised of members of Antoon's extended family from Canada, Lebanon, and Syria and a select few additional "made" members, including defendants Urman and Tassillo.    "All top executives were members of the Bro-Club, and most Syrian or Lebanese relations of Antoon," according to one whistleblower.    These "made" members earned their "bones" not through *bona fide* skills or credentials, but because they had demonstrated an eagerness to participate in its criminal activities, a paramount appetite for money, and a willingness to participate without objection, inquiry, or disclosure of illicit activities to advance in the organization.

73.    For example, Feras Antoon's brother Mark was one of his right-hand men, with responsibility for some of the Enterprise's most sensitive operations even though he had no *bona fide* credentials for doing so.    As one insider who worked with him explained, he "knows nothing about running a company but runs stuff like kickbacks and similar side arrangements with third-party and affiliates companies. That is why he is in the company.    This was discussed in meetings.    Every single individual would try to impress him because he was a key player."

74.    Similarly, Edy Kaba was made the head of the organization's European operations based out of Cyprus even though he had neither the credentials nor ability to understand, let alone manage, basic business functions.    As one whistleblower described, "anyone with the most basic background in business administration or finance knew more than him."    Nevertheless, he received the position along with substantial money, lavish perks, and a luxurious lifestyle in Cyprus to run

1   MindGeek's international operation because, according to a whistleblower, "he was

2   related to Antoon, was seen as loyal, willing to do illegal things, and remain silent

3   about them."

4       75.   Even the seemingly critical position of Chief Technology Officer of this

5   purportedly leading technology company was initially given to an Antoon relative,

6   Karin Mouaffi, without the resume to rate the job.   Experienced MindGeek

7   programmers and developers consistently complained and were extremely frustrated

8   with his inept leadership.   But his loyalty to the Enterprise was beyond question and

9   thus he was in charge of the technology central to so many of its criminal schemes.

10       76.   The Bro-Club "capos" also included some who had previously formed

11   successful tubesites or porn advertising companies that were sold to or otherwise

12   partnered with MindGeek.   Although teaming with MindGeek meant these

13   individuals needed to share their revenues, they joined the Enterprise nevertheless

14   "to cover your ass and be on safe ground" because, per an insider,

15            it provided protection from overseas folks who are bad

16            guys involved in bad stuff.   People were really scared

17            about their lives because the groups providing content for

18            their sites were real pimps.   If you are running your own

19            site and you know these pimps might do harm to you, you

20            join Tony Soprano's team.   Make less money but no one

21            will shoot you in the street.

22       77.   The "pimps" being referred to were the known traffickers in Eastern

23   Europe and Asia from whom the Enterprise and those who typically joined it bought

24   substantial pornography.

25       78.   This core group of "bosses" controlled all the elements of MindGeek's

26   business through which the Enterprise executed and masked its criminal schemes.

27   In particular, they controlled its finances, technology, content acquisition, formatting,

28

moderation, website operation and optimization, and the byzantine network of overseas international affiliates and partners through which the Bro-Club executed many of its schemes.    They did so through "capos" and "soldiers" looking to enter the Bro-Club.    These directors and vice-presidents were directly supporting the Enterprise's illegal activities that ran off the MindGeek platform.

79.    While doing so, they were groomed, tested, and weeded out depending on whether they embraced, avoided, or rejected questionable, unethical, and illegal activities.    That grooming and testing process began immediately even for low level employees who were exposed to "pretty f***ed up sh*t," (asterisks added) according to one former employee.    The goal of the grooming was obvious the former employee explained: "that's the thing, it is true that you do get very desensitized to certain things. . . . after like months or a year, it[']s true that you don't see bodies anymore, you don't even really care what's going on, how many people are involved, what is the woman doing."

80.    This desensitization was reinforced by supervision that made clear management did not care about appropriateness, legality, or ethics.    A former employee explained: "if someone finds something that shouldn't be there, would the manager raise it as an issue, and say 'hey, I just saw this and we should do something about it?' Absolutely not."

81.    This structure provided the Bro-Club with, in Feras Antoon's words, "plausible deniability"; revealed which employees should be promoted and separated; and chilled insiders with questions or objections.    As one whistleblower explained, "illegal or risky things were pushed down to low level people to ensure 'plausible deniability,'" and, if they did them, "it showed you are devoted so much you are willing to do illegal or unethical stuff with comfort and silence."    One former insider explained, "they referred to directors and managers as 'parachutes' if this goes wrong. . . .    They keep them in the dark, tell them to approve shady

27

COMPLAINT

1  things like ads and partnerships and credit card transactions but never in writing.

2  Then they would be able to say it was someone else's decision if it went wrong."

3      82.    There was extreme secrecy and security attached to the Bro-Club's

4  deliberations, decision, actions, and activities.    Due to fears of recording, phones

5  were excluded from important meetings of senior Bro-Club members, especially

6  when they met with the Enterprise's financiers, and displaying a phone in any

7  meeting was not done.    The executive offices from which the Bro-Club operated

8  were physically separated from regular employees and protected by strict security

9  measures, including cameras and security personnel to ensure not even MindGeek

10  personnel entered the floor.

11      83.    Particularly guarded were the finance offices.    Only certain personnel

12  were allowed to even enter these offices; others were permitted only when certain

13  other designated personnel were present; and doors were locked and shades drawn

14  when unoccupied for any amount of time.

15      84.    Moreover, employees were closely monitored, especially any who were

16  suspected of harboring doubts or objections to any MindGeek practices.    Employee

17  emails and Skype messages are routinely reviewed.    Company car GPS records

18  were tracked and drivers questioned after trips beyond certain limits or to certain

19  locations of concern.

20      85.    The Enterprise's paramount focus on secrecy was reflected in the Bro-

21  Club's obsession with suspected "snitches."    This ubiquitous Bro-Club term

22  included not only those who they suspected of speaking outside the MindGeek

23  organization, but also those who spoke up or objected internally.    The latter were

24  not just viewed as a risk of disclosure outside MindGeek, but also as a risk of

25  fomenting and encouraging objections to practices inside MindGeek.    As

26  individuals were considered for promotion, the Bro-Club always discussed, "whether

27  they could be trusted.    Whether they were a snitch," according to a whistleblower.

28

Even a suspicion by a single Bro-Club member that an individual was a "snitch" would not merely block their advancement, but ultimately result in them being pushed out of the company entirely.   Such individuals would either be frozen out and elect to leave, be set up to fail in stage assignments, or simply be told that there was a "consensus" that they should be let go without any explanation as to why or on whose word.

86.    For those who chose or were forced to leave MindGeek, their departure was often not the end of their experience.   It was a core understanding internally that if you threatened the Enterprise, "it would come after you," according to one whistleblower.   This included investigating the personal lives of former employees and their extended families.   Targeted individuals could expect to have their spouses, parents and siblings, neighbors, and community members, as well as their employers, co-workers, and business partners, receive anonymous post-cards, emails, in-person "visits," and social media message smearing.   These intimidation tactics would typically include revealing the individuals worked in porn or their sexual identity and hacking and distributing, or threatening to distribute, personal messages and photographs.

### 3.    The Financiers

87.    While the Bro-Club had daily operational control over MindGeek's business, they were not the exclusive "bosses."   Also in control were the actual owners of MindGeek.   The owners were comprised of a group of uber wealthy individuals, families, and groups represented by several former Goldman Sachs financiers.   These financiers offer "special situations" investments in which uber wealthy investors can receive oversized returns and evade taxes.   Oversized returns are available because the business being funded was or very likely was engaged in illegality and other legal risk that established, legitimate, and responsible Wall Street financial firms would not finance.   MindGeek was a poster child for such risk.

88.    From its birth, the Enterprise now known as MindGeek was awash in criminality.    That criminality manifested itself almost immediately in law enforcement investigations in Europe and the United States.    In the late 2000s, the United States was investigating MindGeek (then Mansef) for money laundering and arms dealing.    In 2009, the Secret Service seized $6.4 million from the company's bank accounts and those of its then nominal owners as a result.

89.    To get out from under that public scandal, the company was putatively sold to German Fabian Thylmann, who was funded by unknown investors from Eastern Europe.    This syndicate of money invested over $350 million in the form of secured debt to acquire the distressed company.    They did not do so directly, however, but through the boutique investment banking firm Colbeck Capital, run by two former Goldman Sachs investment bankers.    The loan was secured by all of MindGeek's assets, including its intellectual property and provided substantial control over management and the company's operations.    Despite it being a secured loan, the interest rate was a whopping 24%, reflecting the unwillingness of legitimate mainstream capital to invest in the company because of the innumerable red flags of illegality.

90.    Thylmann and his owner group appointed Antoon and the current leadership team and worked aggressively to grow the business and establish the Pornhub brand as mainstream.    Nevertheless, the company continued to be dogged by investigations into money laundering, tax evasion, human trafficking, and child pornography.    The byzantine, multi-national financial and corporate structure Grant Thornton, Thylmann, and the current management created largely delayed and frustrated the investigations as intended.    Nevertheless, in 2012, Thylmann, was arrested and extradited from Belgium to Germany on charges he had used that byzantine corporate structure to evade taxes.    But the other investigations continued, including into suspected child pornography.

30

COMPLAINT

91.    With Thylmann in jail, owners and the management scrambled to save the company, and sought again to ostensibly switch ownership.    The management team and financiers scrambled to seemingly "clean wash" the company, cover its tracks, and claim a new regime was taking over.    However, the existing loan's onerous terms, as well as the Bro-Club's syphoning off of all cash not used to pay the loan, left MindGeek no options for buying out Thylmann, paying off the loan, and executing a transition that would be publicly credible.

92.    Ultimately, the solution came in the form of shadowy financier Bernd Bergmair.    Like the principals of Colbeck Capital before him, Bergmair was a former Goldman Sachs investment banker who had left to provide niche financing for legally dubious ventures Goldman Sachs and similar Wall Street firms would not fund.    Representing one group of uber wealthy investors, he had purchased Pornhub competitor RedTube, in which he served as the titular CEO.

93.    Bergmair took extreme steps to conceal not just his identity, but his very existence.    He expended substantial sums scrubbing almost any references of himself from the internet and went by various alias, including Bernard Bergman. Indeed, when forced to put in an affidavit in a United States District Court litigation involving RedTube, he lied under oath that his name was Bernard Bergman.    He took such extraordinary measures because he and his investors were fully aware of the legally dubious nature of the business they owned and ran, and some of these investors were themselves the subject of international legal scrutiny or associated with those who were.    The investors were so uneasy being associated with this business, they were rabid about even their financier becoming known.

94.    At the time investors and management were trying to save MindGeek (then Manwin) in 2012-13, RedTube, unlike Manwin/MindGeek had substantial cash reserves that Manwin/MindGeek could use to buy out Thylmann, restructure the Colbeck Capital debt, and pay down liabilities necessary for an ostensible fresh start.

95.    Ultimately, a transaction was consummated in which Colbeck Capital's investor's debt as well as the interests of the investors backing Thylmann were restructured, RedTube and Manwin merged becoming MindGeek, and RedTube's cash and further capital from Bergmair's investors was invested in the form of similarly onerous secured debt and controlling stakes in critical subsidiaries.    The capital was used to partially buy-out Thylmann's investors and pay off certain critical third-party liabilities.    Some of those critical liabilities were to third-parties MindGeek's business needed to survive, others were to third-parties that MindGeek's executives believed needed to get paid for them personally to survive.

96.    Despite their centrality to the transaction, and control of the company going forward, the identities of Bergmair's investors, as well as Bergmair's real identity remained unknown even to Feras Antoon.    To the public, Antoon and other members of the Bro-Club were falsely reported, at Bergmair's direction, to be the owners of the business.    It was understood that the existence of other owners was never to be mentioned, and this deception succeeded.    For example, according to a December 2020 investigation by the Financial Times, Antoon and Tassillo were listed as the sole shareholders of MindGeek's ultimate corporate parent, aside from anonymous family trusts and shell companies.    However, during his testimony before the Canadian House of Commons in early February 2021, Antoon admitted that he and Tassillo are "minority shareholders of the company" and that Bergmair is "[t]he majority shareholder" of the business, "owning over 50% of the company." Even this testimony under oath was not truthful as Bergmair represents a group of investors who collectively hold the majority of the beneficial interests in the MindGeek entities.

97.    Although the Bro-Club led by Antoon remained in daily operational control of the restructured MindGeek, they now answered to Bergmair on behalf of the new owners.    Bergmair and his owner group conducted extensive due diligence

32

before proceeding with the transaction and were fully aware of the fraudulent international corporate structure through which MindGeek conducted its illicit business and on which it (and the new owners) depended.    The transaction was falsely portrayed as a "clean wash" of the company.    The "new" company was portrayed publicly and to European authorities as a technology company specializing in Search Engine Optimization and committed to the best practices and technology to ensure the business was free of illegal content and activities.    In fact, nothing had changed except for Thylmann's exit and the new partnership between the prior investors, the Bro-Club and Bergmair's owner group.

98.    Like the Colbeck Capital financing before it, the Bergmair financing contained usurious interest rates, draconian rights to all MindGeek assets upon a default, and the right to control and remove management.

99.    However, much more than Thylmann, Bergmair exercised daily direct oversight and control over the strategic operations of MindGeek, closely managing financial operations, business plans, and even the technology that was critical to the internet porn company's business.    Indeed, his technology involvement was so extensive, programmers and developers complained incessantly about what they considered his uninformed meddling.

100.    In exercising control for the Owner Group, Bergmair was in regular contact with and giving approvals to the Bro-Club on major MindGeek decisions. He received regular briefings on the financial performance of the Enterprise, was briefed on all activities designed to meet its financial commitments to the owners, and approved those initiatives material to that requirement.    Among those elements of the business model that Bergmair was fully aware of, endorsed, and directed was the unrestricted use of all content, including contraband content like CSAM and trafficked content.    Bergmair was and remained in direct communication and control of the decisions to fully and inextricably incorporate such content into the

33

COMPLAINT

1  business model by (a) soliciting such content; (b) instructing users on how to

2  effectively promote such content on the tubesites,; (c) separately optimizing the

3  impact of such content on MindGeek's Search Engine Optimization ("SEO"),

4  including by coupling it with playlists of similar content and suggested search terms

5  designed to induce even deeper engagement by users interested in such illegal

6  content; (d) placing advertisements with this illegal content to earn advertisement

7  revenues and premium content engagement; and (e) selling data harvested from such

8  traffic.

9      101.   As part of the false narrative orchestrated by Bergmair of a "clean

10 wash" of the organization, all European managers and directors were suddenly

11 terminated and replaced with Bro-Club members related to Feras Antoon.    Antoon's

12 relative Edy Kaba was placed in charge of all international operations despite his

13 lack of business or financial management credentials and experience.    Those

14 operations were consolidated in Cyprus because it was viewed as posing the least law

15 enforcement risk, and Kaba relocated to Cyprus from Montreal.

16      **4.    The Fake Pornhub Façade**

17      102.   After the rebranding, the Enterprise worked hard to depict MindGeek

18 not as a company in the business of online pornography, but as one of the world's

19 leading technology companies providing cutting edge SEO and online and marketing

20 data services.    Its corporate website mentions nothing about the world's largest

21 pornography site Pornhub, which was MindGeek's flagship tubesite, or its

22 surrounding constellation of other pornographic sites, partner sites, and businesses.

23      103.   And it worked even harder to portray its flagship tubesite, Pornhub, as

24 well as its other tubesites as "wholesome," legitimate, responsible, and mainstream.

25 MindGeek expended substantial resources and effort ensuring that its tubesites had

26 all the indicia of legitimate internet media websites, including a polished appearance,

27 comprehensive terms of service, policies, and customer service functions, and

28

multiple layers of interaction.    As part of this effort, MindGeek aggressively promoted itself in mainstream mediums with substantial advertising and marketing as well as a swarm of high profile publicity stunts promoting various social or other topical causes.    This effort included billboard ads in Times Square, ads on snowplows during blizzards, breast and testicular cancer campaigns, promotions for racial equality and voting rights, pop-up shops on Valentine's day, and environmental campaigns like Save the Oceans, Save the Pandas, and Save the Bees.

104.    It also attempted to publicly align itself with anti-exploitation entities despite embracing exploitation itself.    For example, in 2020 MindGeek began making donations to the European anti-child porn exploitation network called InHope.

105.    But these public images were a fraudulent front for a platform through which the Enterprise ran its rackets and schemes.    MindGeek was not in the business of providing SEO services to anything other than primarily the Enterprise's pornography platform and its partners and was exclusively devoted to running that business for the enrichment of its owners and Bro-Club members.    To do that, the Enterprise had to generate enough cash to pay the substantial "nut" of principal and enormous interest owed to the owners, while at the same time siphoning off the remaining cash and value in innumerable schemes executed through the company's impenetrable and ever shifting international network of sham shell companies.

106.    The public image of its actual pornography business was a fraud also. The highly polished webpages of Pornhub and its other tubesites were falsely portrayed to look like mainstream, legitimate tubesites, albeit about pornography, with extensive terms of service, complaint and customer service functions, and misleading promotional content to portray Pornhub as mainstream, harmless, and legitimate.    But all of this was window-dressing.

107.    The extensive terms of service were never enforced or intended to be

35

COMPLAINT

enforced.    To the contrary, those stated terms, policies, and restrictions were anathema to the actual business model MindGeek was pursuing.    According to those terms of service, content depicting racism, hate, incest, and children (even by adults) were all banned but nevertheless omnipresent on the platform.    Indeed, numerous versions of "underage," "teen," and "incest" were consistently among the most searched search terms and popular results in MindGeek's algorithmic video and search term tubesite suggestions.    Likewise, numerous versions of "drunk," "drugged," "passed out," and others indicating incapacitation were also among search terms sought most often by users and suggested by MindGeek.

108.    MindGeek was not only acutely aware of the popularity of these categories of search terms and the type of content they represented, its SEO aggressively solicited such content and instructed users to title, tag, and describe their content to include these very terms and upload this very type of content.

109.    In its explanation of "How to Succeed," on the MindGeek Defendants' Pornhub website, the MindGeek Defendants direct users to use up to 16 tags that describe the video and performers; select up to 8 relevant categories; when applicable, use niche specific categories to ensure content is visible to the "right" fans; write a creative title that describes the scene, and add a stage name to the title of the video.    These tactics are all designed to generate as much traffic as possible. The more sensational the video, the more likely it is to be streamed and generate revenues.    The MindGeek Defendants' categories demonstrate how they are specifically targeting viewers who are interested in child pornography, with categories like "teen," "school," "babysitter" and "old/young."    On the page explaining video categories, Defendants acknowledged that Teen is one of its most popular categories.

110.    This process was an explicit and overt solicitation of all forms of users and partners to provide such content because MindGeek's business plan was to

provide supply for any pornography for which there was a demand.   Likewise, there was no real complaint or customer service functions because actually enforcing the terms of service or accepting any restrictions on content was contrary to the actual business model MindGeek was implementing.

111.   Also false was the image of Pornhub and its associated free tubesites as comprised primarily of user uploaded content.   This was an important fraud for the Enterprise because it believed it provided legal protection under United States law, and it misdirected apparent responsibility for systemic illegality away from MindGeek.

112.   In fact, however, vast amounts of the content on these sites, although appearing to be uploaded by individuals independent of MindGeek were produced, acquired, and uploaded by MindGeek, sometimes directly and sometimes through affiliates and partners.   For example, MindGeek owns some of the entities it describes as Content Partners, including Brazzers, Babes.com, Digital Playground, Reality Kings, and Twistys.   This content was not merely acquired for MindGeek, but it was formatted by MindGeek, which edited the scenes and length, provided the titles and tags, and uploaded it to appear as if it was posted by individuals.

113.   Indeed, in his remarks at the WHD Global Cloud Festival, Thylmann admitted point blank that MindGeek was a creator of content and that that was the only way to make "really good money" in the online porn industry.

114.   In addition to MindGeek's own production and uploading of apparently user-generated content, a substantial amount of the content it placed on its sites was from bulk uploads of pirated copyrighted materials that MindGeek or third-parties it commissions pirated.   Indeed, whistleblowers reported personnel in MindGeek's Montreal headquarters "ripping" content from DVD's in a regular overnight operation and uploading that content to Pornhub and the other tubesites as independently uploaded content.   This was just one of the many schemes MindGeek

utilized to systemically pirate copyrighted materials and use them to support Pornhub and its other tubesites.

115.   Even content that was actually user-generated was edited and published by MindGeek formatters before upload.   These formatters based in Cyprus, Canada, and the United States would provide or modify titles, descriptions, and tags, and edit videos in order to maximize SEO, ad impressions, and customer conversions. MindGeek has repeatedly maintained publicly that every video on its sites went through this process.

116.   Additionally, MindGeek formatters create a graph or timeline and place it underneath videos to demonstrate the level or intensity of activity within a particular section of the video.   This helps the viewer identify and quickly advance to various levels of sexual activity within the video.   MindGeek harvests this data to optimize its ad placement and to otherwise monetize on the viewer's viewing habits.

117.   Along similar lines, MindGeek formatters create buttons for some videos that describe certain types of sexual activity occurring within the video, thereby allowing viewers to jump ahead to desired sections of the video depicting the activity identified in the button.   These efforts by MindGeek are yet another way to optimize profit sharing, ad placement, and otherwise capitalize on the data learned by capturing the viewer's preferences.

118.   Similarly, MindGeek formatters create thumbnails for the videos on its tubesites and store these thumbnails on a separate server.   This includes thumbnails created from CSAM videos.   As MindGeek explains to its content partners, thumbnails are a key component to attracting viewers to a video: "A well-chosen thumbnail will greatly impact the number of views by making videos more appealing for users to click on."

119.   With respect to advertising placement and content, MindGeek, through its TrafficJunky business, sells banner and sidebar advertisements, as well as

1    advertisements that appear before and after videos.    MindGeek placed these

2    advertisements on all pages viewed by users, including those featuring CSAM.

3        120.    MindGeek edits advertisements placed on its website and TrafficJunky

4    is the MindGeek department that handles advertising content.    The ads placed by

5    MindGeek frequently highlight terms such as "girls," "boys," "broken teens," and

6    "twink," which are terms that are known and encouraged for use by MindGeek.

7    These terms promote the creation, use, and viewing of CSAM.

8        121.    Indeed, MindGeek's TrafficJunky advertising platform allows

9    advertisers to build campaigns around keywords that clearly reflect illegal activity,

10   including "13yearoldteen"; "not18"; "14yrold"; and "15yrold."    For example, if an

11   advertiser selects the keyword "teens," the TrafficJunky platform shows that term

12   alongside several related terms, including "teenager"; "pigtail"; "clubseventeen";

13   "coed"; "pigtails"; "braces"; "teenyplayground"; and "teenylovers."

14       122.    MindGeek's TrafficJunky platform also tracks the amount of traffic

15   being driven by such keywords, showing advertisers the volume of traffic to be

16   expected with each search term and related search terms.

17       123.    The TrafficJunky platform also allows advertisers to target ads to people

18   searching for the word "rape" in languages other than English—such as Russian,

19   German, or Arabic—as well as the Japanese translation for "child rape."

20       124.    Thus, the MindGeek Defendants, through its TrafficJunky advertising

21   platform, are clearly intentionally targeting, promoting, and monetizing illegal

22   content for the advertising revenue.

23       125.    Another scheme was the reuploading of all materials that despite

24   MindGeek's best efforts had to be taken down because it had received a DMCA

25   copyright violation notice or a directive from authorities or a victim's lawyer to

26   remove child pornography or other illegal content.    Although MindGeek would

27   begrudgingly comply with such legal requirements, as set forth more fully below, it

28

39

COMPLAINT

would only disable the videos, not delete the webpage, title, tags, or comments. Nor would it delete the video, even of child pornography, from its server. MindGeek has repeatedly stated publicly that it kept every video ever uploaded on its servers even when they were disabled from its sites.   It did this for a simple reason: content was king in MindGeek's operations, and disabled content would be reuploaded to the system by MindGeek in a manner that appeared it had been uploaded by users and not MindGeek.

126.   Moreover, MindGeek pushed all content posted on any of its tubesites, regardless of initial sourcing, to its other tubesites, which it again falsely portrayed as posted by a user other than MindGeek.

127.   Finally, MindGeek's intensive search engine optimization function scrutinized all content, particularly content that its analysis indicated was trending or otherwise effective in driving traffic, gaining ad impressions, generating "conversions."   This process was applied to all content, regardless of category or subject being portrayed, and content that was effective would be modified and often duplicated to optimize its SEO further.   Moreover, where analytics indicated any content could be optimized better, it too would be modified to do so.

128.   Thus, regardless of initial sourcing, vast amounts of the content on all of MindGeek's tubesites was uploaded there by MindGeek, not users as it was engineered to appear; even content uploaded by users was reviewed, modified, and optimized by MindGeek; and all content regardless of where and by whom it was initially uploaded was then transferred by MindGeek on its other sites and sometimes third-party partner sites.   That is, all the individual content on MindGeek's tubesites, as well as the entire tubesite product itself, was a MindGeek production and product.   MindGeek's tubesites were user generated in a fictional sense only.

129.   It was this fraudulently portrayed internet platform and MindGeek's byzantine international network of sham shell companies through which the

Enterprise: (a) paid for, populated the website with, and separately profited from content produced through human trafficking and slavery and pirated copyright materials; (b) permitted known criminal organizations to steal customer credit card and personal identifying information, commit credit card fraud, and blackmail customers; (c) defrauded MindGeek advertisers, marketers, and other third-parties; (d) evaded taxes and laundered monies by "bleeding" value out of the organization to the Bro-Club and other Enterprise members via sham investments and expenses; and (e) paid for and executed blackmail, extortion, harassment, defamation, and hacking against those the Enterprise viewed as a threats.

130.   This fraudulent public portrayal of MindGeek's business model was also an essential element of MindGeek's agreement with Visa and its agent banks concerning their willingness to continue processing transactions, particularly for advertising via TrafficJunky and premium products and services through Probiller and the like.   Although Visa and its agent banks were fully aware of MindGeek's actual business model and the falsity of its public portrayals, maintaining these public pretexts and window dressing were a prerequisite to Visa's agreement to continue processing transactions as it provides cover and plausible deniability Visa felt it needed to safely take the position that it was not responsible for policing merchant conduct and continue doing business with MindGeek.

**B.    The Enterprise's Criminal Rackets and Schemes**

**1.    The Fraudulent Network of Sham Shell Companies**

131.   From its inception, MindGeek's corporate structure was created and maintained to facilitate and mask criminal conduct and insulate the company and Enterprise from criminal and civil culpability.   This structure consisted of hundreds of sham shell companies scattered throughout the world.   While a handful of these shell companies had *bona fide* relationships to MindGeek's business operations, the vast majority of them existed solely as vehicles through which to execute the

Enterprise's rackets and scams and evade taxes.    There was no *bona fide* business reason for this putative SEO company or its pornographic internet business to utilize this excessively complicated international network of sham shell companies.

132.    Consequently, despite generating hundreds of millions in revenue annually, MindGeek pays effectively no taxes anywhere.    Instead, by the time those revenues are funneled through the hundreds of international sham shell companies, the parent company records massive losses, not profits.    And because these sham shell companies are so numerous, and so dispersed across so many jurisdictions, no one jurisdiction can easily investigate the evasion or even be incentivized to do so. The same is true about the numerous other criminal schemes similarly effectuated through this network.

133.    Consistent with its illicit purpose, this network was in constant metamorphosis.    MindGeek created, dissolved, and then replaced sham shell companies on a monthly and sometimes daily basis, often with virtually the same names.    These sham shell companies had no *bona fide* business or substantive economic purpose, directors, officers, employees, or offices (let alone functional offices).    There was, likewise, no *bona fide* business purpose for the network sheer complexity and opaqueness or its constantly quantum like dissolution and creation of entities.    This shell game existed exclusively to implement and mask the Enterprise's criminal schemes, evade taxes, launder money, and insulate Enterprise members from culpability.

134.    As a whistleblower explained, "spreading the corporate structure out in hundreds of shells located in dozens of jurisdictions allowed spreading of transactions out such that they did not raise suspicion in any one country, and even if they did it was very difficult for that jurisdiction to investigate the suspicion when much of the information was in other jurisdictions."

135.    Often, the Bro-Club would appoint a single nominal director in these

sham shell entities from among low-level Enterprise members or MindGeek employees (such as executive assistants).   These purported "directors" knew nothing about the shell's purpose, existence, or operations; exercised no control over its bank accounts or "operations"; were paid handsomely for the no-show job and the substantial legal risk associated with it; were pure proxies and agents from the Bro-Club members who appointed and directed them; were frequently questioned by authorities without having any information to provide because they were figureheads controlled by the Bro-Club leaders; and were replaced regularly according to an appointed schedule so as to further impede the ability of authorities to investigate.

136.   As an insider explained,

> they created companies on a daily and monthly basis and
> used vendors to launder money and make payments.   Had
> a schedule for switching directors so none were there too
> long and would pay them premium to assume the risk of
> not knowing what was going on.   When investigations
> happen they delete everything from the system.   They
> used these affiliates to launder and mask transactions with
> entities that had bank red flags, were banned, were business
> partners under investigations. They get paid but they
> launder the payments.   Not through the corporate bank
> accounts.   I know that it happened.   I talked to the
> vendors and knew they got paid but could see it did not
> come out of the corporate accounts.

137.   These sham shell companies would be used in various ways not just to mask criminal involvement, but also to "bleed" and launder cash out of the organization to criminal partners and Enterprise members (especially the Bro-Club). These transactions, typically in the form of loans, investments, or vendor payments

to third-parties, would result in net operating losses to MindGeek.    Indeed, over the last 3-5 years, MindGeek has accumulated substantial net operating losses despite hundreds of millions of dollars in annual revenue.    Those "lost" monies, however, were transferred to third-parties in which Enterprise members had an interest or financial arrangement.

138.    An insider explained the process as follows:    An obscure affiliate in a low regulatory risk jurisdiction would transfer funds to middlemen/agents who commissioned and purchased cheap pornographic content from human traffickers. The MindGeek payments for this trafficked content would be "shadow payments" made from one of its obscure sham shell companies to a middleman without any invoice or paper trail.    Rather, a price would simply be agreed upon orally and a payment made to the agent middlemen.

139.    That trafficked content would be delivered to a different third-party for formatting and uploading.    The third-parties who received, formatted, and uploaded the content were a mix of Enterprise affiliates, MindGeek partner channels, and a network of entities who would be paid to generate thousands of phony user uploads. That third-party typically would receive compensation for its service either via "ghost payments" laundered through their existing revenues stream for MindGeek partners or directly through a different sham shell company.

140.    Thus, partner channels, many of whom ran their own network of shell companies, would be compensated for this work by higher monthly revenue share payments and one-time bonuses under their partner contracts to mask the payments. For non-MindGeek partners, payments would be laundered through MindGeek's obscure sham shell companies or its corrupt payment processors holding its credit card payments (such as was done frequently with MindGeek payments processor Wirecard before it collapsed as a massive fraud).    These banks and processors participated in the schemes because MindGeek would pay them exorbitant fees and,

COMPLAINT

for some, permitted them to use MindGeek's platform for their own credit card and identity theft schemes.

141.   Enterprise members would receive their cut of that consideration from the third-party via revenue sharing or some other financial kickback.   Regarding this scheme to acquire cheap trafficked content in bulk, one Enterprise member explained to an insider, "We can do this and we just pay more to launder the money."

142.   One whistleblower described the process of "bleeding" money out of the system to bogus "vendors" at inflated prices as follows:

> I remember one time we were talking about why the texts
> on PornHub were so awful. Like why was it written so
> poorly, and their translations from other countries were so
> bad.   I remember one person who worked there over 10
> years, he was like uh "yeah, they just like to keep doing
> them."   Like I guess they get fairly cheap translators, from
> the old times, like they always liked to have something to
> spend money on that was outside of the company. I mean,
> I'm not an expert, but no one spends money because they
> like to. So it's a weird thing. According to this coworker
> there is a well, there is money they need to spend. . . . it[']s
> not a secret that Mansef already had issues with money
> laundering. And it[']s not a secret that Fabian had issues
> with money laundering, I mean I am not surprised a lot of
> things never changed.

143.   Some of these schemes directly benefited MindGeek and its operational affiliates, and indirectly the Bro-Club and its financiers via payments on the outstanding loans and compensation to executives.   Many other schemes, however, benefited the Bro-Club, MindGeek's financiers and owners, and their co-conspirators

directly, and MindGeek merely provided the platform through which this was accomplished.    In these schemes, Enterprise members or their associates and partners would use their control over MindGeek to cause it to transact with shell companies they owned, or (more often) companies owned by others from whom the Enterprise members would be paid.    "This is where they make their money," a whistleblower said about members of the Bro-Club.

144.    In another scheme the Bro-Club would use its control over MindGeek to give favorable advertising placement to so-called affiliate channels or partners using the site as a feeder for their own paysites.    In exchange, Enterprise members would receive a cut of that third-party's profits as a kickback.    This defrauded others who had bid and paid more for priority placement on the site by diverting traffic from their sites to the ones paying the Bro-Club.    In other instances, the Bro-Club would simply place ads for these affiliates ahead of those of unrelated affiliates who had bid more for that placement.

145.    Feras Antoon and other Enterprise members also had their own third-party shells with which to transact with MindGeek, and which they would favor. For example, Antoon had a shell company through which he would sign exclusive deals with unknown porn performers and then use their control over MindGeek to promote those performers and increase the value of their content.

146.    The Bro-Club would also use control over MindGeek to permit known criminal organizations to use its sites to steal credit card information and personal identifying information and then receive a kickback or cut of the resulting illicit revenues.    As one whistleblower explained:

> Often when we talked to the company top management and they would say that they were making money in other ways.    Unlike a legitimate company, this company had no real capital management system. That permitted them to

1       use capital to fund other businesses, including those that

2       were not in porn.    This included groups in the Ukrainian

3       company accused by FBI of hacking.    Why did they allow

4       ads for bogus items like penis enlargement when you know

5       it is a fraud?    Because those groups paid much more than

6       market for those ads because it was really a way of

7       searching for personal identifying information and using

8       the data or selling the data to others.    It would be used for

9       blackmail.    It alerted them that the user had been on

10      Pornhub and then they would blackmail them by saying

11      they knew what they were watching. Of course, MindGeek

12      knows the purpose for this stuff.    You need to get

13      approval for advertising and they do research on the ads

14      and the companies.    They knew the companies were not

15      legitimate and the ads are fraudulent on their face.    These

16      and other side operations would have revenues sharing with

17      the people running MindGeek, but not through MG.

18      Executives would get paid to permit these the platform to

19      be used for purposes other than maximizing the value of

20      MindGeek.    In conversations with members it was

21      obvious the Bro-Club had other revenue streams around

22      Pornhub.    100% sure of that.    It was discussed.    I would

23      put my hand in fire on it.    Everyone gets a cut.

24          147.    Whistleblowers described one such scheme as follows:    Enterprise

25   members or those associated with them would create "partner" accounts on

26   MindGeek and use stolen credit cards to pay for memberships and content from those

27   partner accounts as well as manufacture false traffic, ad impressions, and

28

47

COMPLAINT

membership conversions.    Independent of these partner entities, MindGeek would also use its sham shell companies and third-party agents to pay enterprise members or associates to use fraudulent credit cards to generate advertising impressions and thereby secure advertising revenues from those fraudulent impressions.

148.    Even though the bulk of these charges would likely be charged back eventually, MindGeek would pay the "partners" their share of the fraudulent notional revenue generated from the purchases as well as the actual revenue advertisers would pay MindGeek from the fraudulent ad impressions generated.    Even though these transactions triggered numerous red flags with MindGeek's finance department, the Bro-Club and its capos would nevertheless direct finance to ignore the red flags and approve the transactions and payments.    Often, finance would be told to "not worry, we know those guys."

149.    As part of these schemes, various steps would be taken to circumvent banking laws and oversight.    For example, the Bro-Club implemented $1 trial memberships and associated entities would use stolen credit cards to buy such memberships.    The nominal transaction amount would not trip credit card company review and thus not be flagged as potentially fraudulent.    Although the Bro-Club understood the fraudulent trial memberships would never translate into an actual paying membership, it had MindGeek nevertheless pay fees to the "partners" for generating a membership.    As a result of these scams, MindGeek maintained a significant number of its large partner accounts that consistently broke even or lost money and which would have otherwise been terminated but for the fact they were part of the Enterprise.

150.    More egregiously, MindGeek devoted substantial time and resources to engineering its credit card transaction flow to avoid tripping credit card flags.    One such scheme was called "load balancing."    In "load balancing" MindGeek would work with the same payment processors it used to commit its various credit card

schemes to mingle suspect transactions with "clean" transactions.    This would cause the percentage of suspect transactions to remain below the percentage likely to trigger banking scrutiny, holds, and restrictions.

151.    There are various criteria banks use in this formula including the types of content and memberships being purchased.    As part of this scheme, MindGeek would enhance its ability to mask the fraudulent transactions by (a) paying its corrupt payment processors to fraudulently mix its payments with those of non-MindGeek entities; and (b) using credit cards MindGeek acquired (through, for example, pre-paid accounts) to generates its own clean transactions.

152.    MindGeek ran another scheme that it called "rebilling shift." MindGeek knew that it was fairly typical for subscribers to the subscription tubesites to pay for their first month subscription with prepaid credit cards instead of the subscribers' personal credit cards.    Typically, the prepaid credit cards did not have enough money stored on them to pay the cost for subsequent subscription months. Therefore, when MindGeek rebilled a card associated with such an account, the transaction would often fail because the card did not have sufficient funds. MindGeek accordingly would terminate the account's access privileges to the subscription tubesite.

153.    But MindGeek did not stop there.    Instead, in an effort to sweep any money that remained on such prepaid cards, MindGeek would charge the card an amount less than the cost for the next month's subscription.    If that transaction went through, MindGeek would keep that extra money as an "administration fee" or "service fee," even though the account no longer had access to the site.    If instead that second transaction failed like the first attempt did, MindGeek would attempt to charge the card again in an amount that was $1 less than the second attempted transaction.    MindGeek would continue these subsequent charge attempts in incrementally diminishing amounts until the amount of the attempted charge reached

$1.

154.    In conducting this "rebilling shift" scheme, MindGeek purposefully spread out its subsequent attempts to charge the card over a period of several days so as to avoid triggering any scrutiny from the credit card companies.

155.    This "rebilling shift" scheme, although involving only small amounts on a per-card basis, added up to substantial windfall to MindGeek in the aggregate, approaching $500,000 per year in some recent years.

156.    In sum, the Enterprise used MindGeek and its network of sham shell companies to perpetuate a long-running and elaborate pattern of illegal schemes through which the Enterprise members enriched themselves.    In addition, the Enterprise used this network of sham shell companies to mask their illicit activities, launder money, and evade taxes by making it difficult for any one jurisdiction to see suspicious transactions of magnitude and effectively investigate isolated transactions let alone the overall operation of the Enterprise's schemes.

157.    Finally, the Enterprise used the network of sham shell companies to defraud creditors and victims of their illicit activities by surreptitiously "bleeding" and laundering assets out of the entities and jurisdictions connected to the misconduct without any reasonable consideration and then out of the MindGeek corporate structure entirely so as to fraudulently transfer funds away from judgment creditors and other creditors and make it impossible or exceedingly burdensome and expensive for them to trace where those funds went.

## 2.    **The Enterprise's Human Trafficking Venture**

### i.    **The Pre-Online Porn Industry**

158.    Prior to the explosion of online pornography, there was a relatively effective federal and state statutory framework policing child pornography, other nonconsensual content, and copyright piracy in the porn industry.

159.    First, federal law mandates that "producers" of pornographic material

verify the age of all performers via government issued identification; maintain specified signed records of such verification for inspection; and mark all pornographic materials with disclosures certifying this verification had been completed and where the records could be inspected.   It was a federal felony to fail to meet these requirements.   The statute also makes it a federal crime "for any person" to "sell or transfer or offer for sale or transfer" any pornographic material that did not contain the required age verification disclosures.   This imposed a compliance obligation on those through whom producers sold pornography.

160.   Second, federal and state laws throughout the United States criminalize child pornography and impose near strict criminal liability for possessing or distributing such content.

161.   Third, federal and state laws also criminalized, among other things, sex trafficking as well as benefiting from a sex trafficking venture, such as the commercialization of pornography produced with trafficked individuals.   These anti-trafficking laws provided substantial criminal and civil sanctions for producing or monetizing nonconsensual pornography.

162.   Fourth, copyright laws likewise imposed substantial criminal and civil sanctions for the willful copyright piracy.

163.   Collectively, these various legal regimes effectively policed child pornography, nonconsensual content, and copyright infringement in the pre-online industry.

     **ii.**   **MindGeek Embraces Illegal Content To Dominate Online Porn**

164.   The explosion of online porn devastated the established porn industry and disabled the existing mechanism to police pornography.   MindGeek was central to this disruption and resulting lawlessness in porn.   From inception, MindGeek embraced under-age, nonconsensual, and pirated content in its business; solicited,

1  patronized, paid for, and placed such illegal content on its internet pornography
2  platform; and aggressively lied about and concealed these facts.

3    165.  MindGeek's motivation for its lawless business model was its singular
4  priority of SEO:    that is, its objective to be the top result in any internet search for
5  pornography and thereby maximize its website traffic, advertising impressions,
6  customer conversions, and data harvesting.    Indeed, MindGeek publicly portrayed
7  itself not as a porn company, but as a leading advertising, marketing, data, and SEO
8  company.

9    166.  Several factors dominate SEO, particularly relevant content volume,
10  effective content description, and website traffic.    Substantial content, effectively
11  described, is the most important SEO factor.    In addition, a website's search engine
12  prominence increases as more people visit it while searching for particular content.

13    167.  The birth of pornographic websites launched an arms race for maximum
14  content responsive to all likely search topics; detailed "long-tail" descriptions, titles,
15  and tags for that content; and maximum traffic and data capture.    As one
16  whistleblower explained,

17            what happen[ed] with Pornhub . . . is the fight they have on
18            Google results.    And that's where Pornhub lives or dies. . .
19            . the fight they've had with sites like Xvideos, or
20            XHamster, or XXX and XVideos . . . the fight they've had
21            with rankings is just crazy.    And that's the thing, . . . it[']s
22            about the long searches, it[']s about the long tail that are
23            the few searches but enough to matter.    And that's where
24            instead of you looking for one keyword, you're looking for
25            longer strings of words. And whoever is having more
26            content and more diverse content, wins.

27    168.  To "win," MindGeek intentionally elected to put no restrictions on the

28

content it would accept, offer, and commercialize.    Like a soft-drink company selling different beverage types and flavors to capture all existing consumer tastes, MindGeek sought to service demand for all pornographic tastes, including tastes for child pornography, rape, extreme violence, racism and hate, and other illegal acts like bestiality.    As one whistleblower explained, "there is a lot of f***ed up sh*t that is going on" (asterisks added) on MindGeek's tubesites, and "it is not an accident . . . ownership and management are clearly complicit . . . 100%" because "[i]t's just money" they care about.

169.    MindGeek did this knowing that an unrestricted embrace of pornographic content would necessarily include enormous amounts of child pornography, nonconsensual, and other illegal content on its sites.    It was impossible not to know this.    The pervasiveness of such content had necessitated the strict federal laws combating such content in the first place.    And it was widely reported, and certainly known by those in the pornography industry, that this problem had grown exponentially with the explosion of the internet.

170.    For example, NCMEC published a study in 2020 reporting that from 1998 to 2019 there was an "insatiable demand" for internet CSAM/child pornography, with millions of reported instances of such videos posted online, including 8.4 million in 2018, with a "trend toward more egregious sexual content in later years."    Equally well known was the explosion of human trafficking on the internet and in pornography particularly.

171.    MindGeek saw these rapidly growing problems not as something to protect against, but as an opportunity.    Under the direction and control of Bergmair, Antoon, Tassillo, Urman, and the beneficial owners they represented, MindGeek not only tolerated but fully embraced illegal content precisely because that content would significantly enhance its SEO, traffic, ad impressions, and customer conversions. This was no accident or phenomenon that simply happened without management and

ownership direction.    It happened because defendants decided to embrace these elements as inextricably intertwined elements of the business model from the moment they assumed collective control of the company, and directed the maximum integration and exploitation of such material going forward.    Its legality or consequences was irrelevant to these Defendants, as an insider explained:

> They focus on how much money I can make today. Right? So they take risk because today it's going to give you a dollar. If you have to change your practices next month, well we'll get there. But right now this is making more money.    Right, that's the type of mentality that makes you take those decisions. What's going to help me make more money. . . . 100% they are all about the money, not safety . . . . they just see numbers, let's be honest.

### iii.    MindGeek Implements Its Embrace Of Illegal Content

172.    Under Bergmair's direction and the operational implementation by Antoon, Tassillo, and Urman, MindGeek's embrace of illegal content in its business and SEO plans was complete.    It voraciously accepted, solicited, promoted, and normalized illegal content on its platform, and aggressively protected that exploitation by concealing it and attacking victims and others who put the use at risk.

### a.    MindGeek Purchased Trafficked Content In Bulk

173.    Substantial portions of the purported "user" content on MindGeek's tubesites was content produced by human traffickers that MindGeek itself commissioned or from whom it otherwise agreed to purchase.    It did this to increase its content and SEO exponentially more than it could have had it relied entirely on actual user uploaded content.    It also allowed it to secure particular content that its SEO analysis revealed was generating the greatest ad impressions and paying customer conversion. And it allowed it to do these things much more cheaply.

MindGeek used different variations to secure such content.    All of this was done with Bergmair's approval and direction and directed and executed by Antoon, Tassillo, and Urman.

174.    First, monies necessary to pay for the production, middlemen, and uploading of the content were transferred from obscure and always different foreign subsidiaries to agents/middlemen without any paper trail as to what the payments were for.    Those agents/middlemen would handle all interactions with producers in Eastern Europe and Asia who offered the best quality for the cheapest prices.    This was dramatically cheaper than what such productions would cost in the United States, and MindGeek and the Bro-Club directing this scheme understood it was because the content was the product of trafficking.    The finished content would then be transferred to the agent, who then transferred it for formatting to shell companies with whom the Bro-Club had financial interests or MindGeek partner channels who would do the formatting in exchange for favorable terms or monies disguised as partner channel payouts.    The Enterprise was fastidious about avoiding any contact in the process with certain jurisdictions like Germany or the United Kingdom, which were viewed as the most rigorous in enforcing laws against trafficking.

175.    Insiders familiar with this elaborate scheme left no doubt that the Bro-Club understood this was trafficked content:    "100% they knowingly paid real pimps. They would discuss how this cheap content was coming from old school pimps.    They found it exciting. They would explain, 'we don't need to pay studios in the US, low paid pimps come to us.'"

176.    Once formatted, the content would be uploaded by these entities and/or a network of agents who were paid to create user identities and upload content. Sometimes such content would be uploaded by MindGeek directly, either in Canada or Cyprus.    Once uploaded the content would be analyzed for its SEO effectiveness, ad impressions, and conversions, and the content as well as the formatting refined to

1  maximize SEO.    Then additional orders would be placed using the same process.

2    177.    One insider described the process this way:

3        MindGeek owns studios and works with studios.    These

4        studios produce high quality porn at high cost.    MindGeek

5        determined that high quality porn doesn't convert well on

6        tubesites.    Most people want to see the girl next door and

7        videos that seem more realistic.    To get this content they

8        run networks of advisors who run agencies that acquire

9        porn and cam videos from high trafficking areas like Czech

10       Republic and sell in bulk to MindGeek entities all over the

11       world or license companies that all actively feed the videos

12       into the tube sites as user uploads.    Actively feeding

13       content on the sites to make sure it does not touch North

14       America, Germany, or the United Kingdom.    It is was

15       clear to anyone in this industry that stuff out of eastern

16       Europe is from trafficking.    People within the company

17       knew there were real pimps running these agencies and

18       MindGeek knew it.    It was actively communicated among

19       management especially in Cyprus who were the ones

20       working to get stuff through it.    'We don't care,' was their

21       attitude. . . . MG affiliates will contract with a local agent.

22       Local agent interfaces with the production companies.

23       Agent gets it and sell it to MindGeek in bulk to their

24       affiliates.    No employee can talk of these studios.    Then

25       they create identities and upload it through Cyprus and

26       Canada.    They avoided UK and Germany.    The content

27       couldn't touch the UK or Germany offices because

28

1    enforcement and investigation risk was too much.    There

2    were other means of bulk uploading. If huge partners have

3    big studio that is part of MindGeek group.    You could

4    give it to them and they upload it and they get better

5    treatment and terms and share the revenue. MindGeek pays

6    for it but steer business through agents and pay huge

7    amounts to launder the money and uploading.    So you

8    can't see it went to MindGeek or that it uploaded it.

9    178.    In addition to the general awareness that content from these regions was

10    the product of extensive trafficking operations, MindGeek was aware the content was

11    trafficking because it met with the producers and visited some of their production

12    sites.    In one such visit, MindGeek executives witnessed a football-field size

13    warehouse in which women were crammed into adjoining studio stalls "like

14    livestock" to perform on camera.    Many of the women appeared young and were

15    engaged in scenes depicting underage girls.

16    179.    When asked by the producer where the women came from and lived, the

17    producer unapologetically explained that his company had agents that scoured

18    Eastern Europe for women who they recruited with promises of lucrative modelling

19    jobs that would allow them to go to college and otherwise have a better life.    When

20    those women agreed they were transported to dormitory style housing or apartments

21    and matched with a "boyfriend" who would groom them for porn.

22    180.    Women who were victimized by this trafficking network reported that

23    when they tried to leave, they were informed that their cam sessions had been

24    recorded and if they did not continue performing the trafficker would send copies to

25    their families and otherwise release them publicly and destroy their reputation and

26    future.

27    181.    Similarly, MindGeek allowed its platform to be used for prostitution,

28

which Bergmair, Antoon, Tassillo, and Urman were fully aware of and approved despite obvious red flags and knowledge on their part.    Like now defunct online marketplace BackPage (which was indicted along with its founders and seized by federal authorities), and Craigslist's now defunct "personal" pages, MindGeek knowingly permits its platform to be used to facilitate trafficked prostitution.    The website is awash in third party advertisements for "Craigslist," "Backpage, and other previously known sites where prostitution could be solicited from trafficked women. Ad impressions and customer conversion for these services all generate revenue for MindGeek, and in some instances revenue sharing for it and select Bro-Club members.

182.    The Enterprise and Bro-Club repeatedly deflected concerns raised internally by finance people who were alerted when they realized MindGeek was paying numerous ostensibly independent cam models through a single account. This was a trafficking red flag, but the Bro-Club and its capos informed finance to ignore the red flags and continue payments because "they knew the people behind the account and it was ok."

b.    **MindGeek's Unpoliced Platform**

183.    MindGeek's intentional use of illegal content was nowhere more apparent than the unrestricted ability to upload such content onto its tubesites. MindGeek's own Social Media Manager publicly explained that it would be a "disaster" to try to restrict users and uploaders to adults because "then no one would upload anything," it would "cost[] us money to verify," "devastate[] traffic," and "MindGeek loses money."    This MindGeek spokesperson further warned that even pretextual restrictions would be unacceptable to MindGeek because some percentage of minors would not be able to figure out how to circumvent them:    "you would get around them, a lot of people here would too but the large majority won't know how."

184.    Consistent with this ethos, despite knowing illegal content would be

uploaded without legitimate monitoring, MindGeek intentionally used an upload

process that would not filter out illegal content.    As one person familiar with the

Bro-Club explained, "they knew they were doing illegal stuff," but they refused to

take any steps to restrict content or traffic because it would restrict SEO and revenue:

> No doubt. I'm sure . . . Were we planning any efforts to
> stop that? Absolutely not. Because of views. Every time
> you put an extra layer of control on who watches, you lose
> content. And it[']s the same thing, in this case, if you put an
> extra layer of control on what content goes up, you lose
> content.    And content in this case is more pages, and more
> pages is more results, more results is more paid views.

185.   Thus, while non-pornographic tubesites with far less content uploaded

on a daily basis (and far less users seeking illegal conduct) employed tens of

thousands of "moderators" and sophisticated technology to ensure content was legal

and complied with the terms of service, MindGeek's uploading process ensured the

opposite outcome of successfully uploading illegal content.

186.   Located in Cyprus because of the availability of cheap labor in a

distressed economy, MindGeek's sham moderation function consisted over time of

as few as 6 but never more than about 30 untrained, minimum wage contractors for

all of MindGeek's tubesites and millions of videos uploaded daily.    These

employees were untrained, could be terminated at will, and worked in cramped

sweltering quarters that one eyewitness described as "inhuman."

187.   It was, of course, impossible for such a minute number of individuals to

actually watch and moderate the vast volume of daily videos uploaded.    As one

eyewitness explained, "the official number was around 700-800 Pornhub videos a

day but it was expected to do at least 900 Pornhub and depending on the day more

videos for other sites for each person…the more experienced moderators did around

1    1000 videos on Pornhub and around 150-200 videos on the other tubes."    Indeed,

2    there is a yearly bonus system in place for these reviewers that is based on the

3    number of videos *approved* for upload.

4        188.   Indeed, their real function was formatting, and internally were called

5    "content formatters," not "content moderators."    As formatters, their task was not to

6    moderate legality but format the videos for optimal SEO.    To do so, they would add

7    or edit the title, tags, and descriptions and sometimes edit the video.    They also

8    "scrubbed" words in the titles and tags that unequivocally indicated criminality.

9    While the red flags of criminality were removed, the video would nevertheless be

10   uploaded with optimized titles, tags, and descriptions that would still permit

11   MindGeek's search engine to suggest the video to users searching for that illegal

12   content.

13       189.   As an insider familiar with the process explained:

14               They basically went really fast with the content. It's not

15               like they are watching every Pornhub video.    They kind of

16               like would scroll through it, make sure that the titles didn't

17               have anything awful, and that's it. And it's mostly about

18               the titles you know? Because in the end if you can't find it

19               through a search, then no one who works against human

20               trafficking will. Right?

21       190.   Demonstrating the task was formatting not moderation, MindGeek set

22   unrealistic daily quotas of at a minimum 700-800 videos that bore no relationship to

23   the time it would take to actually screen that content.    The quotas were based on

24   how long it should take to format, not screen, the content.    Indeed, the quotas made

25   it impossible to actually screen videos for prohibited or illegal content.

26       191.   Moreover, formatting supervisors clearly communicated that actually

27   screening questionable or even obviously illegal content was not the formatters' task.

28

The goal was uploading content.    Thus, one insider explained that the woman with overall responsibility for formatting and ostensible "moderation" was a "sociopath" who would regularly "tell her team to just look the other way."    According to another insider, there was a motto drilled into formatters:    "Don't f**k with the f**ker." (Asterisks added).    As one whistleblower explained, a typical response to a formatter questioning legality of content would be:    "Imagine the trouble I will get in if we report this and take time and we don't meet quota and you will lose your job."

192.    When asked about the testimony of Feras Antoon and David Tassillo before the Canadian House of Commons in which Antoon and Tassillo testified under oath that every video was reviewed to ensure it was consensual, this whistleblower said bluntly, "it is a lie."

193.    Contrary to the perjury before the Canadian House of Commons, MindGeek insiders knew obvious nonconsensual content was uploaded and permitted to remain on Pornhub even though it was reviewed because including such content was part of the business model Bergmair, Antoon, Tassillo, and Urman implemented and aggressively developed.    An insider explained one such notorious example that was common knowledge internally:

> I remember there was one girl, it was huge, from when I was there.    But she always seemed, in the videos she never looked okay.    Like I remember she was always high. I mean something that, according to the minimum rules of decency, you would at least have a bit of the type of thinking you know, 'is it okay to have this type of content?    Is she really, you know in a state where she should be doing these videos?

194.    However, MindGeek did much more than permit illegal content to be

uploaded and remain on its site.    For example, MindGeek took all content uploaded without restrictions onto its Pornhub tubesite and transferred that content to its other tubesites as well.    This strategic operational element was implemented with the knowledge and approval of Bergmair, Antoon, Tassillo, and Urman.

195.    MindGeek also took all of the content from tubesites and partner channels it acquired like Redtube, YouPorn, Fake Taxi, etc., and transferred that in bulk to its library without review.    This strategic operational element also was implemented with the knowledge and approval of Bergmair, Antoon, Tassillo, and Urman.

196.    In addition, as part of its critical SEO process of supplying product for every taste and demand, MindGeek analyzed this illegal content, identified which examples performed better for their intended audience, and modified the formatting (titles, tags, and descriptions) of similar content to improve its performance and SEO generally.    This was done for all categories of content, including those depicting minors, rape victims, and other nonconsensual conduct.

197.    The focus of this analysis was exclusively identifying which content, descriptions, and tags were trending and producing ad impressions and subscriptions. Those that were trending were further refined and tested to amplify them even more, and the conclusions drawn from that were applied to similar content.    What was not a focus at all was whether the content was in fact consensual or adult.    Nowhere in this process or elsewhere, did MindGeek comply with § 2257's requirement that they secure proof of age where they were uploading material or its separate requirement that content being transferred by MindGeek contain the required certification of age certification from the producer.

198.    When MindGeek identified a title or tags that too explicitly flagged illegal content they would notify the user to change the title or change it themselves. But MindGeek would not disable the illegal video.    For example, a member of the

Pornhub model program, whose revenues were shared with MindGeek, had multiple videos of apparently underage women with titles indicating they were underage. One video of an apparently underage and incapacitate woman carried the viewers comments, "I thought she was dead until five minutes in" and "I don't think that girl is old enough to buy lottery tickets.   If you catch my drift."   The uploader originally titled the video, "delete your history after watching this" obviously flagging the video as child pornography.   But then he changed the title and when asked why by other users, he explained, "Pornhub support told to change all titles."

199.   This analysis was also part of MindGeek's suggested search and video algorithm by which it would solicit users to view similar content.   Thus, when a user, for example, searched for "teen sex," MindGeek would present the most popular video results associated with that term, and solicit searches with a host of other more detailed terms used by others for similar content, like "barely legal teen sex," "young teen sex," "middle school teen sex," etc.   Investigators, advocates, and journalists following MindGeek's suggestions easily found within a few clicks videos of obvious CSAM/child pornography or other forms of nonconsensual sex where terms associated with that type of abuse, like "drunk," drugged," "passed out," etc., were used.

200.   This was no accident.   It was a product of MindGeek's knowing, deliberate, and detailed understanding of the content on its site and effort to solicit people to watch that content and continue using the site, and was approved and directed by Bergmair and implemented by Antoon, Tassillo, and Urman.   As one insider explained, this knowledge and intent not only extended to, but emanated from, the Bro-Club running the platform:   "Well they know, they know everything that's going on . . . they are very involved. For sure. . . . would Feras know? Absolutely. Would David know? Absolutely," but, he further explained, "they don't care" and "don't' even check" because all they care about is SEO and revenues.

201.   That same insider explained MindGeek had the capabilities to easily search for illegal content, but never did:   "I've seen it, you can search any word, any video, you can look for the user, anything like any other database. . . . and the titles are there . . . so, why are they not searching for this and cleaning? . . . Because they want the content on their sites."

202.   The only time MindGeek would voluntarily remove content was when this detailed analysis revealed the content was harming its SEO.   For example, through its constant analysis, MindGeek determined that male homosexual content on its more popular tubesites was interfering with its impressions and conversions because when the suggested video and search algorithms suggests a gay video, a material percentage of users exited the website.   Accordingly, MindGeek affirmatively worked to reduce such content on the site by deleting it, transferring it to other sites, or segregating it.   No similar steps were taken when it became aware of illegal, nonconsensual content in its SEO work.

203.   The intentional exploitation of illegal content was further evidenced by MindGeek's treatment of videos flagged by authorities, victims, and users as illegal. Such requests were ignored, stonewalled, and stalled as much as possible to preserve the use of the content for as long as possible.   This was especially a priority when the content was performing well, and MindGeek's SEO analysts were trying to use that data to refine their algorithms to effectively solicit views of similar content from the same category of "consumers."

204.   Thus, when victims would notify MindGeek that videos of their abuse had been uploaded, they were typically ignored unless the victims persisted.   Then they would be stonewalled with denials or demands for information that they could not possess in many instances.   For example, in some instances, often victims were told that only the uploader could request a video be taken down; or they needed to provide the URL's for the videos; or that the videos did not exist or could not be

1    found when they did exist and could be found; or that they had been taken down

2    when they had not been.

3         205.   Moreover, when victims or authorities succeeded in getting MindGeek

4    to remove an illegal video, it would only disable the video but keep the webpage

5    with its title, description, tags, and comments so that the video though disabled

6    would still continue to increase SEO.   When a user searching for such content

7    landed on the disabled video's webpage, MindGeek's search and video suggestion

8    algorithms would solicit the user with similar videos to the one disabled.

9         206.   As one insider explained:

10          If you do it [a takedown request] through Pornh15-yearub,

11          then Pornhub eliminates the video but keeps the page. So

12          that page still has the titles and can still run from Google. . .

13          . Because what they want is ad impressions, because that's

14          what they charge for, for their clients. It's ad impressions,

15          ad impressions, ad impressions.

16        207.   Indeed, to this day, one can run internet searches for known

17   CSAM/child pornography or other nonconsensual content that was ordered taken

18   down by NCMEC or otherwise and the search will bring you to Pornhub even though

19   that video is not enable. MindGeek's algorithm will then direct you to similar non-

20   disabled content.

21        208.   Much worse, according to multiple insiders, MindGeek systematically

22   and surreptitiously would reupload all content that it had been forced to disable back

23   to the system and do so in a manner in which it appeared to have been reuploaded by

24   independent users and which circumvented MindGeek's purported systems for

25   identifying previously disabled videos. This is the reason why so many victims

26   reported that even when they successfully got videos disabled, the same videos

27   would be reuploaded again and again.

28

COMPLAINT

209.   One eyewitness to this process, explained that caches of disabled content "would be provided to employees on disks and they would be instructed to reupload those videos from non-MindGeek computers using specific email addresses that would allow the uploads to bypass MindGeek's purported 'fingerprinting' of removed videos. . . . They say they kept the stuff on the servers to cooperate with authorities but it was really so they could reupload."   All of these practices were known to and approved by Bergmair and implemented and directed by Antoon, Tassillo, and Urman. MindGeek has stated publicly and repeatedly that it retains on its servers all videos ever uploaded onto its tubesites.   This no doubt is necessary for its reuploading practice.   MindGeek, therefore, has throughout its existence illegally possessed CSAM/child pornography, and reuploaded that CSAM/child pornography innumerable times.   Indeed, MindGeek, with duplicative servers in the United States and Canada (among other locations) is likely the largest non-regulatory repository of CSAM/child pornography in North America.

210.   Moreover, insiders explained that MindGeek provided a download button for users, in part, to facilitate the propagation of content, including illegal nonconsensual content.   In effect, MindGeek knew and counted on users to download content, make new content and compilations, and then reupload it as new content or as a replacement for disabled content.   In addition, MindGeek provided private albums, a private, direct-message function, and file-sharing capabilities, all of which allowed users to exchange and trade any type of content without anyone else seeing it or MindGeek monitoring it.

211.   In this manner, MindGeek was facilitating criminal copyright infringement, and the transferring and distributing of CSAM/ child pornography or otherwise nonconsensual content as well as otherwise legitimate pornography in violation of 18 U.S. § 2257 and CSAM laws.

212.   Along similar lines, MindGeek also created its own VPN to make it

1  even more difficult for law enforcement to locate traffickers.    Similarly, Pornhub

2  has created a tor site to anonymize web traffic and prevent law enforcement from

3  tracking users' activities.    Pornhub also supports the use of cryptocurrency on its

4  site.

5        213.   Despite admitted possession of massive amounts of child pornography,

6  until 2020, MindGeek never voluntarily made a single legally required disclosure to

7  authorities in the United States or Canada about that material under either countries'

8  CSAM/child pornography laws.    MindGeek failed to do so even when its

9  possession has been publicly reported.    For example, in 2019, 58 videos of a 15-

10 year who was beaten and raped were posted on Pornhub.    These videos were

11 ultimately removed, but as per the testimony of NCMEC during Canada's

12 parliamentary investigation, MindGeek had never reported any instances of child

13 sexual abuse to NCMEC as required by federal law or reported to NCMEC's

14 counterpart under Canadian law until late 2020.    This was no accident, but rather

15 was done at the direction of Antoon, Tassillo, and Urman pursuant to the wishes of

16 Bergmair.

17        214.   Likewise, in 2020 two videos of child pornography – one involving a

18 toddler in diapers being abused and another of a pre-pubescent girl being anally

19 raped – were located on Pornhub.    After multiple reports MindGeek notified those

20 flagging it that the video had been disabled, fingerprinted, and reported to

21 NCMEC.    But according to NCMEC's own testimony, it was not reported to

22 NCMEC.    Two months later the same two videos were discovered back up on the

23 site, uploaded by two separate purposed user accounts.    Investigators submitted

24 takedown requests to Pornhub that were ignored.    It was not taken down until it was

25 reported to the FBI, the FBI notified NCMEC, and NCMEC issued a takedown order

26 to Pornhub.    One reupload remained up for almost two weeks after the initial

27 takedown requests and had over 20,000 views and an unknown number of

28

1  downloads. Even after it was removed MindGeek left the title, tags, views and url

2  live to continue driving traffic to the site using the child rape video.   Again this was

3  no outlier but a product of the clear policies and practices Bergmair, Antoon,

4  Tassillo, and Urman approved and aggressively implemented.

5      215.    Not only did MindGeek not report CSAM/child pornography it became

6  aware of on its tubesites, it actively discouraged victims and others from reporting it,

7  and lied to do so.   For example, MindGeek tried to convince a victim of

8  CSAM/child pornography not to report its presence on MindGeek's tubesites and

9  lied about MindGeek's practice of not removing such content unless forced to do so:

10  "You don't need to report the urls to an agency, just flag them it[']s very likely if

11  it[']s not removed it not illegal content. . . . We do have access to our entire upload

12  library, including deleted videos and can confirm this."



1
2

### iv.    MindGeek's Successful Exploitation of Nonconsensual Pornography

3      216.    MindGeek's plan to dominate the online porn industry with unrestricted

4  use of all content regardless of legality succeeded. It has attained near monopoly

5  status in the industry and is certainly dominant.

6      217.    As its business model of unrestricted content intended, the presence of

7  nonconsensual content was ubiquitous on MindGeek's internet platform.    Simple

8  Google searches even suggesting nonconsensual content would invariably return

9  Pornhub as the top search result.    Pornhub's suggested video and search algorithm

10  would then direct users to similar content.    With each click the search was refined

11  further and further.    In just a few clicks, in just a few minutes, users (and

12  investigators and journalists) could find seemingly unlimited pages and videos

13  depicting violent rapes, date and drugged rapes, child sexual assault or exploitation,

14  coerced or trafficked subjects, secret and stolen recordings, or any other form of

15  nonconsensual conduct.

16      218.    Titles, descriptions, tags and comments with these videos and suggested

17  by MindGeek were blunt, including:    "CP" (i.e., child porn), "teen", "young teen",

18  "barely legal", "super-young teen", "old/young", "young", "exploited teen", "crying

19  teen", "little", "xxxtra small," "drunk girl", "drugged girl", and "passed out."

20      219.    By way of example only, in just minutes of basic searches users,

21  advocates, investigators, and journalists, and certainly those working fulltime to

22  maximize MindGeek's SEO, would easily find troves of:

23          a.    homemade videos of adult males having sex with apparently or

24              obviously underage girls with titles such as, "Young Teen Gets

25              Pounded," "Old Man with young teen," "Young girl tricked,"

26              "Petite Thai Teen," "A Club Where You Can Play With Little Girls

27              And It's So Fun," "Bratty Little Girl," "Giant guys f***ing with no

28

mercy this little whore while she's crying" (asterisks added);

b. homemade movies of young boys being raped with titles and tags such as "Barely legal step-son well used after school in uniform," "Young hairless twink gets slapped," "Daddy f***s young teen boy virgin first time" (asterisks added), "Daddy came home frustrated and abused boy to crying";

c. drunk, drugged or otherwise incapacitated women, often clearly underage, being assaulted with titles and tags such as "Drunk," "Passed out teen," "Passed out sex," "Drunk and Passed Out Porn," "Passed out teen f***ed" (asterisks added), "Teen Totally Drunk Passed Out Sex Video Free," "Passed Out Naked Teens," "Tinder Girl Passed out at my House so I stuck it in her ass," "Mexican Teen She's to Drunk After Party Real Home Made!," "Drunk girl let's me dominate her," "Cute Amateur Teen Drunk And Stoned In Ecstasy With Her First BBC On Drugs," "F***ed sister hard in the ass while she was drunk and sleeping" (asterisks added), "Drunk girl gets handcuffed and abused," "Teen gets drunk and gangbanged";

d. non-professional secret recordings, often of obviously underage women, such as Asian high school students in a bathroom with hidden camera with the title, "Stolen Teen's secret peeing scenes";

e. stolen underage pornographic videos with titles and tags such as, "Amateur sextape stolen from teen girl[']s computer";

f. videos with extreme hate and racist themes such as "Black slave girl brutalized" with comments including "yes f*** that n*****" (asterisks added) "love seeing this little petite black whore tied up like she belongs taking it in her black ass," "Busty African Slave

70
COMPLAINT

Gets Pounded," "African Busty sluts get tortured by white master,"
"You should get your own black slave," " Black slave girl
pleasures white master and call herself 'N***** whore" (asterisks
added) and "Black slave Girls Made to Eat White Girl Asshole" or
anti-Semitic Nazi themed content (asterisks added).

220.   This content typically had compelling indicia (and often definitive
proof) that they were not consensual.   And while some amount of such content
could still be consensual despite this indicia, substantial percentages clearly were not
or likely were not, and another large percentage appeared to be nonconsensual with
no way of knowing.

221.   Despite monitoring and analyzing the content on its platform like NASA
monitors the space station, MindGeek did nothing to remove or even investigate this
patently abusive content or highly suspect content.   It failed to do so even when it
was flagged by user complaints and comments.

222.   For example, for seven years Pornhub contained a video of a completely
unconscious girl with underdeveloped breasts clearly being physically assaulted and
raped.   The title of the video was "dead pig half-opened eyes after being drugged."
That this title was literally true was painfully obvious from the video.   The rapist
repeatedly displayed the victim's dilated, red eyes and even touched her eyeball to
prove she was truly unconscious.   No moderator or search engine optimizer could
have missed the obvious rape depicted in this video.

223.   Another example involved one of MindGeek's most popular partner
channels (and a constant focus of its SEO efforts), "Exploited Teens Asia." A
representative video on this channel involved a young girl in a child's room
surrounded by toys and stuffed animals.   She was being aggressively penetrated by
an old man and she was crying out "karushi," which meant "stop."   Viewer
comments demonstrated the obviously nonconsensual nature of the video:

1          Do we really know sex trafficking when we see it!!
2          EXPLOITED TEENS ASIA she can't be older than 15 or
3          16. This is a real victim. In some moment she looks like
4          she wants to cry. You can see that she doesn't want this,
5          you can see that she wishes he'd leave her alon! I can't
6          believe 9k liked the image of an old perv humping a
7          helpless GIRL! Flag the f*** out of this and hopefully
8          pornhub will remove it. My heart breaks for her."
9          (Asterisks added).

10     224.   Others comments likewise realized this was a rape:   "She is crying
11 'kurushi' meaning painful and begging him to stop!" and "She looks underage af".

12     225.   The video had been up for 3 years and received over 4 million views,
13 certainly performance that MindGeek SEO would have closely analyzed and tried to
14 recreate, and the comments had been up as much as 7 months before activists called
15 out the video on twitter.    In response, MindGeek kept the title, description, and tags,
16 and swapped out the video.

17     226.   At the end of 2019, a video of an undeniably intoxicated and
18 incapacitated women being sexual assaulted was uploaded to Pornhub.    The video
19 was categorized as "homemade," titled as "Misadventures of a Drunk Girl," and
20 tagged in the category of "teen," "teenager, young drunk, funny."    The woman was
21 stripped naked, unable to walk or stand, crawled when she did move, and ultimately
22 was completely unconscious with her eyes rolled into the back of her head.

23
24
25
26
27
28

1
2
3
4
5
6
7
8
9
10
11
12
13



14    227.    Viewer comments such as, "so hot.    Love how drunk she is!",

15  confirmed her obvious incapacity as did, "I would take advantage of her all nite.

16  dude's smart for trying get her to drink more.    Bet he dumped loads in her stupid

17  c*nt.    I know I would."    (Asterisks added).

18
19
20
21
22
23
24
25
26



27    228.    Users who MindGeek directed to this video were then directed by
28

COMPLAINT

MindGeek's suggested search and video algorithm to equally clear cases of rape.    In one video, the drug needle used to render the victim unconscious was then inserted into the vagina of the victim and zoomed in on.    These videos were on the site for years and accompanied by numerous comments flagging them as obvious rape.

229.    Likewise, searches for "Pnp," "meth," "homeless," "crack whores," "meth whores," and other similar terms turned up countless videos of women who were plainly incapacitated or having a debilitating drug addiction being exploited by pimps and johns.

230.    Another video on Pornhub for over four years captured the rape of an Indian woman.    The video was not professionally produced.    There was no indicia of consent or performance.    Neither the uploader nor women were identified.    The woman was clearly in distress and desperately trying to hide her face.    Two years of user comments plainly flagged the video as rape:    "this is f***ing rape!!!!!!! bastards!!!!!!!!" (Asterisks added).    MindGeek was aware of the video, its obvious nonconsensual content, and the users' comments.    Rather than remove the video and page, Pornhub instead censored the word "rape" from the comments and left the video.

231.    For this video, MindGeek's suggested search and video algorithm directed viewers to similar rape videos, including a young teen woman in obvious distress, crying, and trying to cover her face while her rape was recorded.    The video is titled and tagged "amateur teen" and "hot Indian teen."

232.    Likewise, MindGeek's suggested search and video algorithm directed users searching "Asian" to a cache of sadistic abuse videos.    Among this cache were a category in which underage appearing Asian women were being suffocated in plastic bags attached to a vacuum packing machine.    The women were thrashing and screaming.    They were not performing.    The videos were amateur, poor quality, and had zero indicia of consent.

233.   In another such video, another apparently underage Asian women was dragged onto a dirty balcony and submerged in a plastic tub of ice water.   Her assailants violently grabbing her hair and used their boots to force her head under the water.   They restrained her and sprayed her face from a hose when she tried to breath.   There was no indication of consent, only assault:   the young woman shook, shivered, wept, gasped, and pleaded.   She was not performing.   When the men finally removed her from the tub, they continued to dose the collapsed, shivering woman with the hose before all urinating on her shaking body.

234.   Abuse videos were also common in MindGeek's partner channels.   For example, one of MindGeek's official ModelHub partner accounts called PornForce, from which MindGeek received a cut of all revenue, had videos of obvious victims being exploited.   For example, a video titled "Thai street teen" with the description "f***ed and facialized for $5" (asterisks added) showed a homeless and disabled Thai teen being penetrated and filmed "for $5."   In the comments a viewer asked, "is she deaf," and PornForce responded, "yes."

235.   Another ModelHub account was comprised of a man exploiting homeless teens in New Jersey in commercial sex acts.   The victims of this exploitation were anally assaulted while crying and pleading for the abuse to stop. MindGeek's suggested video and search algorithm would direct viewers of these videos to similar videos and suggested search terms of "abused teen," "crying teen," "exploited black teens," "homeless teen," and the like.

236.   In addition, MindGeek allowed its private premium accounts on Pornhub to be used as a secret marketplace to distribute illicit content, particularly CSAM/child pornography, for a fee, sometimes directly on the platform, sometimes through links to an external CSAM cache exchanged privately through the accounts. This trafficking included minors posting child pornography of themselves at the direction of predators and pimps.   The content, while private to other unsubscribed

1   users, was visible to MindGeek, part of its SEO analysis, and included in Google and

2   other search engine search result calculations and thus embraced and allowed to

3   remain.

4        237.   Victims of this exploitation who tried to seek assistance from MindGeek

5   consistently reported indifference to outright hostility, even in the most extreme

6   situations.   For example, one victim had the video of her rape uploaded to Pornhub

7   with her personal information where it remained for months despite her desperate

8   pleas until she hired a lawyer:

9            It was terrifying, there were people on Twitter-sharing

10           screenshots of them buying a train ticket saying they were

11           going to come and rape me. I thought about killing myself

12           it got so bad. Hundreds of thousands of people saw that

13           -video, which I didn't even know I still had. It was

14           devastating. What a horrible, humiliating thing to do to

15           someone. I moved in with a friend and put my flat on the

16           market because I thought I was going to get raped. I had to

17           change my whole life – leave my job, withdraw from

18           almost everybody I used to work with. I used to stay in my

19           room all weekend crying because I couldn't deal with it. He

20           ruined my life. I came off social media completely and the

21           only version of me that existed online was this persona that

22           he created.

23        238.   Remarkably, MindGeek's indifference was so callous it extended to

24   even public outreach from victims, such as this victim who made her report to a

25   MindGeek's Social Media Director on social media:

26           I was away on an international business trip when I met a

27           man at a hotel bar and went back to his room to have sex . .

28

1    . . Recently my friend sent me a Pornhub video and said it
2    looked like me.    I looked at it and it was me having sex in
3    the hotel room with thousands of views.    My face was
4    clearly visible in parts.    The video had an insulting title
5    calling me a slut.    The channel it was on featured a dozen
6    other videos of the same guy having sex with different
7    women in hotel rooms with the same amateur quality . . . . I
8    tried flagging the video with no results. I want the video
9    taken down and the guy punished, but I'm really not sure
10   what to do.

11   239.   Pornhub's only response to this report was to send the victim a link to

12   their site's takedown page.



27   240.   The same abuse occurred on Pornhub Gay.    A simple search for

28

"daddy and son" produced oceans of unprofessionally produced videos of very young looking boys with the titles saying "REAL Father Son" and other videos of distressed young hairless boys being penetrated by older men.   Other cases of CSAM/child pornography involved underage boys were videotaping themselves in sex acts, with video titles like "13 yr old boy" and "14yr old."

241.   Like many videos on Pornhub, these abuse videos frequently ran a Pornhub Live ad or other advertisement before playing the video and were surrounded by other ads for which Pornhub was paid.   Some of these videos had millions of views alone.   The "categories" collectively had many millions more, evidencing the significant contribution unrestricted access to nonconsensual content was to MindGeek's business model.

### 3.   MindGeek's Criminal Use of Nonconsensual Content is Revealed

242.   Even if the defendants otherwise had no knowledge of the illegal content MindGeek was monetizing on its platform, they could not have avoided the numerous alarming high-profile reports of egregious nonconsensual content on their platform.

243.   For example, after Taiwanese playboy Justin Lee was arrested by Taiwanese police for the date rape of dozens of women from 2009 through 2014, some minors, police reported that Lee had recorded those rapes and posted them on Pornhub.   MindGeek, in turn, transferred those videos to its other tubesites and to hundreds of users who downloaded those videos from those sites.   Obviously, none of the videos uploaded and none of the transfers complied with federal law on age and consent verification.   And MindGeek's purported "robust team" of "expertly trained" moderators and state of the art technology did not stop the videos depicting clearly incapacitated women being raped from being uploaded by Lee and transferred by MindGeek.

244.   Although Lee's arrest, conviction, and criminal conduct, including his uploading of the rape videos to Pornhub, were highly publicized worldwide, MindGeek kept those rape videos on its site for years thereafter. Even today, after the videos are no longer viewable on MindGeek's tubesites, MindGeek continues to benefit from those uploads and transfers as searches for such tapes on leading search engines will still direct searchers to Pornhub, where the tubesite's search engine will direct the users to similar content categories of content like "celebrity sex tapes."

245.   In February 2018, a Pornhub user repeatedly flagged child pornography being uploaded repeatedly to Pornhub's gay content categories.    One of those users told MindGeek, "[p]lease remove all pictures in the gay category starting with [XXXX] in the title.    They contain underage children.    Some of whom look 7 or 8 years old.    It[']s disgusting that this has slipped through, two nights in a row. Does this material get screened.    I'll be checking to see if the content has been removed."    Again, MindGeek permitted this illegal content to be repeatedly uploaded and transferred to its other tubesites despite its obviously illegal nature and despite being explicitly being flagged by users.

246.   From 2013 through at least part of 2020, MindGeek's tubesites contained hundreds of videos of child pornography created in video chat service Stickam chat rooms until those chat rooms were shut down in 2014 as part of one of the largest internet child pornography convictions in history, involving the sextortion of over 350 minors via the video chat service.    Despite the highly publicized investigation and conviction, for years, those child pornographic videos and compilations of those videos were ubiquitously uploaded by MindGeek users and transferred by MindGeek to its other tubesites and to users downloading the videos. They remain on its servers to this day.

247.   From 2013-2017, New York resident Nicole Addimando's husband physically abused and raped her, and subjected her to sodomy with objects, vaginal

COMPLAINT

torture with heated spoons, and being left for extended periods of time and in degrading and painful positions. These assaults were videotaped and posted to Pornhub.    Pornhub not only permitted those uploads, it transferred those videos to its other tubesites.    Even after Addimando's abuse and Pornhub uploads became highly publicized, videos of the assaults remained on MindGeek's tubesites and were uploaded, downloaded, and transferred by MindGeek numerous times.    Those videos remained on MindGeek's tubesites as late as 2019 and remain on its servers today.    To this day, a search engine inquiry of "Nicole Addimando Sex Tape" will result in the top two search results being to Pornhub with the result stating: "Nicole Addimando" and "Watch Nicole Addimando porn videos for free, here on Pornhub.com.    No other sex tube is more popular and features more Nicole Addimando scenes than Pornhub!"

248.    From 2014-2015, 49-year-old Dawn Giannini sexually abused a 14-year-old relative, recorded the abuse, and posted those recordings on Pornhub. MindGeek not only permitted the obviously underage assault and child pornography to be uploaded to Pornhub, it transferred those videos to its other tubesites.    The videos were viewed by the victim's friends at school, one of whom ultimately alerted the authorities leading to Giannini's arrest in 2018.    Those videos were still present on MindGeek sites as late as 2019 and remain on its servers today.    To this date, a search of "Giannini sex tape" on Yahoo produces a Pornhub search result listed third, for "Dawn Giannini Porn Videos" and the message "Watch Dawn Giannini porn videos for free, here on Pornhub.com. . . . No other sex tube is more popular and features more Dawn Giannini scenes than Pornhub!"

249.    In the fall of 2019, the Internet Watch Foundation, the United Kingdom's private internet watchdog for child pornography, reported to the Sunday Times that it had been notified of 118 instances of child pornography on Pornhub by the public over the prior 2.5 years, increasing each year.    Half of that child

pornography was Category A, the worst kind of abuse involving penetration and/or sadism.    MindGeek permitted the upload of this child pornography and transferred it to its other tubesites and never reported it the authorities as it was required to do in the United States and other jurisdictions where its servers are located.    That child pornography remains on MindGeek's servers to this day.

250.    The Sunday Times' own investigation in 2019 confirmed that Pornhub was "flooded" with illegal content that it failed to remove even after the paper had notified it of that illegal content:

> the world's most popular porn website [Pornhub] is flooded with illegal content . . . . Pornhub is awash with secretly filmed "creepshots" of schoolgirls and clips of men performing sex acts in front of teenagers on buses.    It has also hosted indecent images of children as young as three. . . . The website says it bans content showing under-18s and removes it swiftly. But some of the videos identified by this newspaper's investigation had 350,000 views and had been on the platform for more than three years. Three of the worst clips that were flagged to Pornhub still remained on the site 24 hours later. . . . The Sunday Times found dozens of examples of illegal material on the website within minutes. It followed research by the campaign group #NotYourPorn, which identified revenge porn videos and clips filmed by secret cameras. . . . One account, called "Candid teen asses," is devoted to posting covertly filmed "creepshots" showing UK girls in school uniform. Another features clips of a man performing sex acts among young concertgoers, rubbing up against them in a crowded music

venue. . . . While Pornhub has blocked users from
searching terms such as "underage" and "child porn,"
synonyms including "jailbait," "very young girl" and
"lolita" can still be used to find content. . . .

251.   In response, the MindGeek disinformation machine disseminated, via email, blatantly false denials from a fictious spokesman who does not exist, but who was, in fact, MindGeek VP Corey Urman.   As the Sunday Times reported, "Pornhub said it had a 'robust internal policy' for removing offending material, including 'expertly-trained human reviewers' and 'scanning content to determine whether it is consensual.'   Blake White, its vice president, said child sexual abuse made up a tiny proportion of content and the aim was to eradicate it.   'It is important to note that oftentimes videos described as 'hidden camera footage' or 'young teen' are in fact legal, consensual videos that are produced to cater to various user fantasies,' he said.   'They are in fact protected by various freedom of speech laws. Certain words are banned from being used in titles and tags, and we will be doing a thorough audit of our websites to update and expand this list.'"

252.   Even months after this reporting, on or about March 10, 2020, four videos of child pornography were uploaded to Pornhub depicting men abusing a toddler in diapers and a pre-pubescent child bound and being raped anally while crying for the abuser to stop.   At the time, Pornhub publicly admitted that these videos had been uploaded on its site, and misrepresented that they had been removed, "fingerprinted" so they could not be reuploaded, and reported to NCMEC.   Two months later, two of the videos were reuploaded to Pornhub by two separate Pornhub accounts to the website, had thousands of views, and were the subject of takedown requests to Pornhub.   Pornhub, however, refused to remove the videos for over ten days, during which time they were viewed tens of thousands of times, and only did so when the FBI became involved, reported it to NCMEC, and NCMEC instructed

COMPLAINT

Pornhub to disable the video.    Although Pornhub disabled the video, it left the video page, title, tags, and user on its site, did not cancel and remove the uploading accounts or review those accounts for the offending videos or other offending videos. Indeed, to this day, if one googles the title or user, Pornhub remains the number one search result.    Although the video is not available, Pornhub directed you to similar content identified by its algorithm.

253.    From 2009 through 2020, one of Pornhub's most popular Content Partners, GirlsDoPorn, and its founders produced pornographic content through trafficking women and minors.    In 2016, these allegations were made public when twenty-two women sued GirlsDoPorn for being trafficked, and in 2019, GirlsDoPorn, its founders, and others were indicted on federal trafficking charges. The website was shut down in early 2020, shortly after the indictment and the flight of its founder to New Zealand to avoid arrest, where he remains a fugitive.    Ruben Andre Garcia, one of the traffickers involved in the GirlsDoPorn trafficking operation, was sentenced to twenty years in prison on June 15, 2021.    This human trafficking ring was one of Pornhub's most popular partner channels, with nearly 800,000 subscribers and over six hundred million views, and was heavily promoted by MindGeek.

254.    The channel was so lucrative, and MindGeek so indifferent to monetizing nonconsensual content, that MindGeek kept the channel on its site and collected revenue from it even after learning of the initial civil lawsuit and did nothing to investigate the allegations.    Pornhub continued to host and monetize this trafficked content until the company and its founders were indicted and the website shutdown.    Nevertheless, even after the formal channel was disabled, trafficked GirlsDoPorn content was ubiquitous on MindGeek's tubesites and its internal search engine would regularly direct users to those videos.    As of October 2020, a simple search of "GDP" would result in over 300 videos and images of those victims.

255.   In late 2019, it was widely reported that a "verified" member of Pornhub's model program was actually a trafficked 15-year-old girl who had been missing for approximately a year.    MindGeek allowed the uploading of fifty-eight videos of this child being raped to its "verified" model channel and transferred those videos to its other tubesites.    MindGeek never reported this child pornography to NCMEC or CP3 as it was legally required to do according to NCMEC's testimony before the Canadian Parliament's Ethics Committee.

256.   Once again, MindGeek's response to these reports was to disavow any responsibility or knowledge, here claiming that the child had been "verified" as an adult with "valid ID": " @luxliv3s Hey Lix, she is a verified model with valid ID."



257.   This, however, was a lie.    MindGeek knew that it had never reliably verified the age of the 15 year old missing girl because the law requires all participants in filmed sex acts to be 18 years old. Rather, MindGeek wanted to continue to profit from advertising impressions from, and sales of the videos.

**4.    Plaintiff Is Exploited By MindGeek's Trafficking Venture**

258.   In 2014, eighth grader Serena Fleites learned that a nude, sexually explicit video her high school boyfriend had coerced her to make months earlier had been uploaded to Pornhub without her knowledge or consent.    She was just 13 years

84

old in the video, and was induced to do the video by a boyfriend who intended to post it to Pornhub and disseminate it thereby to the school community.    Her age was apparent from the image itself and from the title "13-Year Old Brunette Shows Off For The Camera."

259.    MindGeek personnel reviewed the video of Serena, as they repeatedly have claimed do for *every* video uploaded to Pornhub, and the title and were aware that this video constituted CSAM. Nevertheless, consistent with its overall business model and practices, MindGeek posted the video to its Pornhub site.    It also categorized, tagged, optimized for user preferences, and disseminated the images, tags and video depicting 13-year old Serena.    And it uploaded the optimized, tagged, categorized video to its other tubesites itself and incorporated it into it algorithmic playlists and suggested videos.

260.    The video immediately went viral on Pornhub.    By the time Serena discovered the video, it had more than 400,000 views, and had been widely disseminated throughout her school and neighborhood and it continued to generate views exponentially.    The video appeared alongside advertisements that MindGeek had placed and on which it earned revenues with every page visit, impression, engagement, and conversion.

261.    Too embarrassed to disclose the video to her mother, teacher, or principal, Serena reached out to Pornhub directly, impersonating her mother, informing Pornhub that the video was child pornography and demanding the video be removed:    "this is child pornography, my daughter is a minor and only 13 years old."    Approximately two weeks passed before Pornhub responded to Serena during which time it continued to generate views and MindGeek continued to earn advertising revenues.    When Pornhub did respond, it acknowledged the video contained CSAM and agreed to take it down.    Yet another one to two weeks went by before the video was removed from its site and then only after continued demands

1   from the minor victim.

2   262.   During the months before the video was removed, it was downloaded

3   countless times and reuploaded by different users and with different titles.   In the

4   months and years that followed, Serena regularly received messages on social media

5   from strangers attaching screenshots and active Pornhub links to her video.   One of

6   the uploads had 2.7 million views.   Others had hundreds of comments noting that

7   Serena could not be more than a teenager.   Each of the reuploaded videos was

8   reviewed and accepted by MindGeek, optimized, categorized, and tagged by

9   MindGeek, uploaded to other tubesites by MindGeek, downloaded to users by

10  MindGeek, and matched with advertising form which MindGeek earned revenues.

11  263.   Each time Serena learned the video had been reuploaded, she

12  recommenced the process to have the video removed.   Yet, Pornhub still took

13  weeks to take each video down, each time requiring Serena to provide photographic

14  proof that she was the child depicted in the video before removing it from its site.

15  264.   The dissemination was not limited to Pornhub.   The original Pornhub

16  video depicting 13-year-old Serena was downloaded and then reuploaded countless

17  additional times to other pornography sites and widely disseminated through email

18  and other forms of electronic communication.

19  265.   In response to the viral dissemination of the video, Serena was bullied

20  and harassed.   Classmates demanded that Serena send them sexually explicit videos

21  of herself and threatened to disclose the sexually explicit video to Serena's mother or

22  to her school if she did not comply.   The ongoing harassment sent Serena into a

23  downward spiral.   She began to regularly skip school which resulted in Serena

24  receiving a truancy notice.   Serena's mother, still unaware of Serena's sexually

25  explicit video on Pornhub, and frustrated with Serena's failure to regularly attend

26  school, suggested Serena move in with her sister.   Serena agreed.   Serena, no

27  longer able to face her classmates who incessantly harassed and bullied her,

28

1  unenrolled from high school, and commenced an online high school program.

2  266.  Approximately one year later, Serena moved back in with her mother.

3  She was depressed, hated her life, and in a failed suicide attempt, hung herself in the

4  bathroom.    She was found by her younger sister and her mother's boyfriend who

5  removed the power cord from her neck.    Serena received treatment by paramedics

6  and was admitted to a mental health facility in Bakersfield.

7  267.  The downward spiral precipitated by the viral dissemination of her nude

8  video continued for years.    Following her failed suicide attempt and hospitalization,

9  Serena avoided going back home and facing judgment from her family and

10  community.    In need of a place to stay, she reached out to a female friend who had

11  experienced similar mental health challenges.    Serena went to visit her friend, who

12  she discovered was using methamphetamine.    While staying at her friend's house,

13  Serena was introduced to heroin by an older male who she subsequently began to

14  date, became addicted, and struggled with addiction for the next three years.    To

15  fund their joint heroin habits, the older man manipulated Serena, who was still a

16  minor at the time, into creating sexually explicit videos of herself, which were then

17  sold on Craigslist and the Kik app.

18  268.  Serena subsequently learned that once sold, some of the videos were

19  uploaded to Pornhub without her knowledge or consent.    These videos were still on

20  Pornhub as recently as June 2020.    MindGeek personnel reviewed these videos of

21  Serena; were aware from that review and the video title and user tags that she was

22  under age; tagged, categorized, optimized the video, and incorporated it into its

23  algorithmic playlists and suggestions; uploaded the video to its other tubesites; and

24  associated the video with advertisements from which it earned revenues from

25  impressions, engagements, and conversions.    As a result, CSAM depicting Serena

26  was distributed broadly throughout the world on MindGeek's tubesites.

27  269.  The older man who manipulated Serena to make these sexually explicit

28

videos intended to monetize these videos at the time that they were made and he and those to whom he sold the videos regularly uploaded such videos to MindGeek's tubesites.

270.    Although Serena is now sober, the long-term effects of Pornhub's wrongdoing continue to this day.    The CSAM videos continue to be accessible on Pornhub as recently as last year.    Moreover, the original Pornhub videos of Serena continue to be disseminated through other platforms, including on MindGeek affiliated sites and other pornography sites.    Serena remains estranged from certain family members.    Throughout various stages of the past five years she was homeless and lived in her car.    She continues to suffer from depression and anxiety and has attempted suicide on multiple occasions over the years.

271.    The dissemination and proliferation of Serena's CSAM has interfered with her employment.    Moreover, to mitigate these challenges, Serena was forced to retain an investigatory firm to investigate whether any of her videos were still accessible on Pornhub or other pornographic sites and to facilitate takedown requests.

272.    Plaintiff was victimized on multiple occasions.    First, when she was first abused and exploited.    Second, when the videos of her abuse were uploaded to MindGeek's platform.    Third, when MindGeek, as a matter of course, transferred those videos to its other tubesites, to users downloading them, and to its platform again when it periodically reuploaded disabled content or non-disabled content that it had further optimized.    Fourth, when defendants did nothing to police and report such content to the authorities.

### 5.    Visa Profited from MindGeek's Trafficking Venture

273.    Uniquely situated to prevent MindGeek's trafficking venture were the financial institutions processing the transactions upon which that venture monetized the content.    At the top of that list were major American credit card companies Visa

and Mastercard.    Although it largely ignored calls from victims, advocates, and anti-trafficking advocacy groups to remove illegal and nonconsensual content, MindGeek was acutely concerned about its relationship with these financial institutions.    For example, a former MindGeek employee admitted that there is a "constant worry" at MindGeek "that payments companies like Visa could cut off service."    Along similar lines, another MindGeek employee publicly admitted when discussing the removal of animated depictions of child pornography from a MindGeek tubesite, "[o]ur problems with [the removed animated depictions] do not stem from personal feelings OR from the laws of the country we operate in. Changes are solely because of what type of content that major credit card companies are willing to work with."

274.    Indeed, the direct, immediate, and substantial impact these financial institutions could have had in preventing the victimization of women and men as well as children worldwide was made apparent in December 2020 when, in response to public outrage from a bombshell New York Times report exposing MindGeek's trafficking, Mastercard and Visa temporarily suspended business with MindGeek pending "investigations" into those allegations.    In response, MindGeek took down over 10 million unverified videos from its tubesites, constituting over 80% of its content, in an effort to restore such services.    Ultimately, Visa would restore services for MindGeek's paid premium sites and for advertising on all its sites.

275.    Despite its public declarations of shock at the New York Times expose, Visa had long been aware of the facts reported for over a decade and instead of insisting that MindGeek commercialize only legal consensual content, and comply with United States laws concerning the same, they explicitly agreed with MindGeek to continue processing payments on these illegal transactions so long as MindGeek maintained pretextual public claims that it had processes in place to prevent CSAM and trafficked content and that such content was not permitted or present on its sites.

And Visa would do this again even after the New York Times exposes, backtracking quickly on its initial very public "suspension" to quickly resume processing payments for premium services as well as the payment for advertising on all sites despite knowing that MindGeek still had not taken steps to ensure content was consensual and not CSAM.

276.    Indeed, at all times relevant to this complaint, major credit card companies and their member banks providing merchant services to MindGeek, particularly Visa, were aware of MindGeek's trafficking venture and explicitly agreed with MindGeek to process the financial transactions from which the defendants profited from the venture.    They did so despite numerous high-profile, publicly reported instances of obvious and indisputable trafficking, the termination of relationships with MindGeek by competitors and other business partners, facts in plain sight and known to them, and detailed reports presented to them from numerous anti-trafficking advocacy groups.

277.    These credit card companies and their member banks providing merchant services to MindGeek, particularly Visa, were aware of the trafficking and CSAM risk because it was common knowledge in the pornographic industry since no later than the 1980 and the subject of numerous public reports from government and advocacy agencies ever since, particularly since the emergence of online pornography industry.    They were likewise fully familiar with 18 U.S.C. § 2257 provisions designed to prevent CSAM/child pornography.

278.    More particularly, these financial institutions and their member banks, particularly Visa and its agent banks, were aware from their own due diligence and compliance functions that established instances of trafficking and CSAM/child pornography and red flags of such content were ubiquitous with respect of MindGeek.    Indeed, since its inception, all one needed to do was visit MindGeek's tubesites to observe tens of thousands of videos (with the help of MindGeek's

suggested search and video algorithm) depicting subjects who were obviously underage, under duress, incapacitated, being raped, or secretly exploited.    One would also easily observe tens of thousands more videos depicting the very same content where there was no way to determine whether the content was a consensual depiction of a nonconsensual event or nonconsensual.    As part of its due diligence and compliance functions, Visa and its agent banks did conduct such reviews in response to reports of illegal content and were well aware of the presence of such materials throughout their relationships with MindGeek.

279.    In addition, it was apparent from the most such superficial inquiry that MindGeek was taking no steps to police the presence of obviously nonconsensual content or determine if ambiguous content was consensual.    To the contrary, that simple investigation would have revealed that the titles, descriptions, and tags and MindGeek's algorithmic suggested video and search functions did not merely tolerate nonconsensual content but encouraged its upload and viewing.

280.    Furthermore, the most basic inquiry would have revealed that MindGeek made no effort to effectively employ technology to police illegal content, employed virtually no human moderation, employed no human moderation remotely approximating that of other websites with far less content, and had an incoherent random selection of superficial policies to prevent such content that were plainly not intended to do any such thing but were, as one insider said, "100% BS."

281.    Moreover, it was apparent to anyone, including the credit card companies and their merchant banking members, that MindGeek systemically ignored the requirements of 18 U.S.C. § 2257, which was enacted decades earlier because it was a known fact that absent basic age verification CSAM/child pornography would infest the pornography business.    Indeed, Pornhub's website explicitly directs uploaders in its ModelHub program: "For your free videos to earn ad revenue, the co-performer IDs are not required . . . ."

91

COMPLAINT

282.   The most basic observation also would have revealed that while major websites with video libraries and upload volumes as big as or smaller than MindGeek reported millions of CSAM/child pornography depictions to authorities, MindGeek reported virtually none.   This fact alone would have alerted anyone who cared that MindGeek was intentionally concealing and commercializing such content.

283.   Certainly, taken together, all of this would have informed even the densest inquisitor that MindGeek was intentionally engaged in commercializing nonconsensual trafficked content.   The credit card companies and their members providing merchant banking to MindGeek were not uniquely incapable of understanding all of this.   To the contrary, they were uniquely capable and in the best position to understand this.   And they did fully understand this based on their own due diligence and monitoring as well as reports from victims, news outlets, activists and advocates, government and legislative bodies, and from their discussions and negotiations about these issues with MindGeek itself.

284.   Most important, they were well aware and fully understood MindGeek's business model and its complete integration of trafficked and CSAM content and the inability to segregate that content from legitimate content.   They understood, particularly Visa and its agent banks, knew trafficked content and CSAM/child pornography was inextricably intertwined in MindGeek's SEO, promotion, solicitation, and funneling of website traffic to its paid porn services.   Nevertheless, Visa and its agent banks explicitly agreed with MindGeek to continue to process transactions without restrictions on all MindGeek sites provided MindGeek maintained pretextual window dressing claims that it had technology, processes, and policies in place to prevent such content that worked and denied claims otherwise. Visa did so because it elected to not assume any responsibility for illegal conduct in this industry lest it set a precedent that it needed to police illegal or objectionable content in other industries and thereby restrict its ability to do business and increase

COMPLAINT

1   its costs of compliance and monitoring.

2       285.    Indeed, as the campaign exposing Pornhub went viral in 2020, Visa

3   and other credit card companies, and their agent banks, began pressuring MindGeek

4   to clean up explicit references to trafficked content and CSAM/child pornography on

5   its sites by removing titles, descriptions, and tags that explicitly flagged such content.

6   However, Visa did not insist that the content itself be removed or that MindGeek put

7   in place systems to reasonably ensure it was not commercializing such content and/or

8   using it to benefit its business through SEO and the funneling of traffic to its

9   websites.

10      286.    Not all financial institutions chose to continue benefiting from

11  MindGeek's trafficking venture.    For example, in November 2019, Visa's

12  competitor PayPal terminated its relationship with MindGeek because it could no

13  longer ignore the overwhelming evidence of MindGeek's trafficking venture.    At

14  the time, PayPal publicly explained that "[PayPal] explicitly prohibits the use of [its]

15  services for the sale of materials that depict criminal behavior, or the sale of sexually

16  oriented content to minors."[1]    Despite this public disclosure, Visa continued to

17  partner with MindGeek because they were already aware of this information and had

18  agreed with Visa to continue doing business with them nonetheless provided

19  MindGeek maintain the false public cover that it was actively policing such content

20  and little to none was present on the site.

21      287.    Likewise, Visa continued to process payments for MindGeek partner

22  channels even after one of its most popular partner channels, GirlsDoPorn, was

23  indicted and then convicted for being a human trafficking venture.    When it did this,

24  Visa was aware that it had made millions of dollars in profits from GirlsDoPorn and

25  similar MindGeek partner channels and elected to continue to do so without any

26  _____

27  [1]   https://www.thetimes.co.uk/article/paypal-cuts-off-porn-site-that-ran-child-abuse-

28  videos-98j2bdnjt.

93

COMPLAINT

investigation or diligence.    It did so because it was already aware that MindGeek's business was infested with trafficked content like GirlsDoPorn, was aware that MindGeek systemically violated 18 U.S.C. § 2257 in neither requiring its partner channels to secure and certify age verification and consent and by transferring millions of videos a year in and through MindGeek's network of websites that did not comply with § 2257.

288.    Even worse, Visa continued to do business with MindGeek even after it was confronted directly with evidence of its complicity in MindGeek's trafficking venture.    For example, in 2020, Visa was included for the first time on the annual Dirty Dozen List issued by anti-trafficking advocates to highlight mainstream business that facilitate, participate in and profit from sexual abuse and exploitation. Visa was included on this list for processing payments for pornography websites, including those hosting content fetishizing minors, racism, sexual violence, and more.

289.    In response, Visa issued a public statement misrepresenting that:

> Visa only permits transactions on the Visa network for the
> purchase or sale of lawful products and services.    We
> categorically prohibit transactions involving child
> pornography and human trafficking. As a founding member
> of the Financial Coalition Against Child Sexual
> Exploitation, Visa works together with our coalition
> partners to identify potentially illegal merchants or illegal
> activities and bar them from the Visa network.

290.    This was a false statement echoing precisely the type of false public claims Visa insisted MindGeek maintain in order for it to continue doing business with it.    In trust, Visa was aware that it and its merchant banks servicing MindGeek permitted and profited from tens of thousands of transactions annually that benefited

from MindGeek's trafficking venture.    Specifically, in addition to transactions processed to pay for trafficked content and child pornography specifically, Visa and these banks, together with MindGeek, used their trafficking venture to promote, solicit, and facilitate the purchase of consensual porn.    And they did so despite its flagrant violation of § 2257.    Visa and its network banks were intimately familiar with MindGeek's business model and how it used illicit content to attract and funnel business, advertising, and paid memberships, all of which Visa elected to process and profit from nevertheless.

291.    Further evidencing Visa's commitment to doing business and benefiting from MindGeek's trafficking venture, in April 2020, during a conference call with Elizabeth Scofield, the Director of Global Brand Protection for Visa, anti-sex trafficking advocates detailed the ways in which MindGeek was enabling and profiting from the rape and trafficking of women and children.    At the conclusion of the call, Scofield requested written information that she could present to others at Visa, which was provided to her on April 30, 2020 in the form of a lengthy, detailed presentation detailing the ways in which Visa was participating in the exploitation of victims of sex trafficking through its partnership with MindGeek.    Visa never responded further, and elected instead to continue doing business with and benefiting from MindGeek's trafficking venture.

292.    Thereafter, Visa's participation and facilitation of MindGeek's illegal enterprise was reiterated by a letter sent by another non-profit organization dedicated to ending human trafficking and modern slavery on May 1, 2020.    The letter, which was addressed to Visa's Chief Executive Officer, Alfred F. Kelly, Jr., detailed MindGeek's documented complicity in the trafficking of women and children and concluded with a plea to Visa to terminate its partnership with MindGeek.

293.    MindGeek's illegal and criminal activities were further detailed in a second letter sent to Visa five days later on May 5, 2020.    Among other important

disclosures, the May 5, 2020 letter explained that it is impossible to "judge or verify consent in any videos on [Pornhub], let alone live webcam videos" which inherently makes it "a target for sex traffickers, child abusers, and others sharing predatory nonconsensual videos."[2]    This was not a novel alert.    The presence of trafficking in the webcam industry was notorious and well known to Visa.

294.    Nevertheless, Visa and its member banks processing payments from MindGeek elected to continue processing such transaction even when they carried with them obvious red flags such as involving accounts from known trafficking regions and where payments from large numbers of purportedly independent cam models were being deposited into single accounts of obvious traffickers.

295.    When Visa failed to take any action in response to the detailed presentation of facts and follow up correspondence, anti-trafficking public advocates launched an email campaign, targeting the executives of Visa.    Within two days of the May 8, 2020 campaign launch, hundreds of emails had been sent.    On May 15, 2020, a second campaign was started.    By May 22, 2020, thousands of emails had been sent to Visa executives calling for Visa to terminate its relationship with Pornhub.

296.    Yet Visa did not respond.    However, over two months later when the campaign against MindGeek again picked up steam due to a viral video released by advocates, Visa did conduct a CYA scramble to avoid being accused of ignoring the issue entirely.    On July 15, 2020, it sent a response letter.

297.    That response was stunning.    Instead, of seriously considering the evidence of illegality it was already well aware of, it offered mealy-mouthed platitudes about its vital role in commerce, its need to remain neutral, and the need for others to do something about a pure evil it was uniquely situated to immediately address:    "We believe that any truly effective solution must come from thoughtful

---

[2]    https://www.bbc.com/news/world-52543508

changes to laws and regulations by those elected to establish the laws of our country .

. . Maintaining a neutral stance under the law is vital for the free flow of commerce."

This public statement falsely implied that MindGeek's content was lawful and

legitimate under current laws and regulations, which Visa knew to be untrue.    In

effect, Visa was admitting, in plain English:    *we do not want to get involved in*

*policing illegal conduct when we are making money on the illegal conduct even if we*

*admit it is evil and we could easily stop it*" (emphasis added).    The ease with which

anyone, and certainly sophisticated financial institutions with rigorous due diligence

obligations, would have become aware of MindGeek's trafficking venture was made

obvious by the December 4, 2020 New York Times bombshell report by Pulitzer

Prize winner Nicholas Kristoff, "The Children of Porn Hub."

298.    Acknowledging that MindGeek's business involves much legitimate,

legal pornography, Kristoff also reported how his relatively modest investigative

efforts easily revealed that its business also was flooded with nonconsensual content

and seems designed so be so:

> Yet there's another side of the company:    Its site is
> infested with rape videos. It monetizes child rapes, revenge
> pornography, spy cam videos of women showering, racist
> and misogynist content, and footage of women being
> asphyxiated in plastic bags. A search for "girls under18"
> (no space) or "14yo" leads in each case to more than
> 100,000 videos. Most aren't of children being assaulted,
> but too many are.
>
> ****************************************
>
> A great majority of the 6.8 million new videos posted on

the site each year probably involve consenting adults, but many depict child abuse and nonconsensual violence. Because it's impossible to be sure whether a youth in a video is 14 or 18, neither Pornhub nor anyone else has a clear idea of how much content is illegal.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

I came across many videos on Pornhub that were recordings of assaults on unconscious women and girls. The rapists would open the eyelids of the victims and touch their eyeballs to show that they were nonresponsive.

Pornhub profited this fall from a video of a naked woman being tortured by a gang of men in China. It is monetizing video compilations with titles like "Screaming Teen," "Degraded Teen" and "Extreme Choking." Look at a choking video and it may suggest also searching for "She Can't Breathe."

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Facebook removed 12.4 million images related to child exploitation in a three-month period this year. Twitter closed 264,000 accounts in six months last year for engaging in sexual exploitation of children. By contrast, Pornhub notes that the Internet Watch Foundation, an England-based nonprofit that combats child sexual abuse

COMPLAINT

imagery, reported only 118 instances of child sexual abuse imagery on its site over almost three years, seemingly a negligible figure.

The Internet Watch Foundation couldn't explain why its figure for Pornhub is so low. Perhaps it's because people on Pornhub are inured to the material and unlikely to report it. But if you know what to look for, it's possible to find hundreds of apparent child sexual abuse videos on Pornhub in 30 minutes. Pornhub has recently offered playlists with names including "less than 18," "the best collection of young boys" and "under- - age."

*****************************************

So while it is now no longer possible to search on Pornhub in English using terms like "underage" or "rape," the company hasn't tried hard to eliminate such videos. A member called "13yoboyteen" is allowed to post videos. A search for "r*pe," turns up 1,901 videos. "Girl with braces" turns up 1,913 videos and suggests also trying "exxxtra small teens." A search for "13yo" generates 155,000 videos. To be clear, most aren't of 13-year-olds, but the fact that they're promoted with that language seems to reflect an effort to attract pedophiles.

Moreover, some videos seem at odds with the list of

banned content. "Runaway Girl Gets Ultimatum, Anal or the Streets" is the title of one Pornhub video. Another user posts videos documenting sex with teenage girls as they weep, protest and cry out in pain.

While Pornhub is becoming more careful about videos of potentially litigious Americans, it remains cavalier about overseas victims. One Indonesian video is titled "Junior High School Girl After Class" and shows what appears to be a young teenager having sex. A Chinese sex video, just taken down, was labeled: "Beautiful High School Girl Is Tricked by Classmates and Taken to the Top of a Building Where She Is Insulted and Raped."

In the last few days as I was completing this article, two new videos of prepubescent girls being assaulted were posted, along with a sex video of a 15-year-old girl who was suicidal after it went online. I don't see how good-faith moderators could approve any of these videos.

299. Almost immediately after this report was published, both Visa and Mastercard terminated substantial connections with MindGeek, claiming that after just a few days of "investigation" they had "discovered" that MindGeek's websites were permeated with illegal content.   In fact, these companies and their member banks providing merchant banking services to MindGeek were aware of these facts for over a decade but elected to continue doing business with them and make millions of dollars in profit from MindGeek's trafficking venture.

300. On December 10, 2020, Visa posted on Twitter: "[g]iven the allegations of illegal activity, Visa is suspending Pornhub's acceptance privileges pending the

1  completion of our ongoing investigation. We are instructing the financial institutions

2  who serve MindGeek to suspend processing of payments through the Visa network."

3        301.   Unlike Visa's response which merely acknowledged "allegations of

4  illegal activity," the CEO of Visa's biggest competitor, Mastercard, acknowledged

5  publicly that after just a few days of "investigation" it had determine MindGeek was

6  trafficking in illegal content:

7              We went back and we looked, and we found actually

8              instances where clearly the legal standard of what should

9              be allowed on Pornhub had been crossed. So, we went back

10             to Pornhub and said, 'Sorry, you've crossed the legal

11             standard.   Porn's not illegal. It is certain kinds of porn that

12             are illegal. So child porn is, and that's what we saw. That's

13             why we pulled out."

14       302.   Visa's investigation revealed the same thing, and more, yet it refused to

15  also publicly acknowledge this fact because it wanted to continue doing business

16  with, and profiting from, MindGeek's trafficking venture.

17       303.   And that is what it did.   Visa's ban on MindGeek's websites was short-

18  lived.   Although Visa continues its ban on MindGeek's websites that host user-

19  generated content, like Pornhub, in short order Visa reembraced MindGeek and

20  began processing payments again for MindGeek's paysites despite knowing that

21  these revenue streams are likewise permeated with trafficking like GirlsDoPorn, and

22  that MindGeek used its trafficking venture overall to attract, advertise, and funnel

23  visitors revenues to these paid sites.   Visa continues to process payments for such

24  content, including TrafficJunky and Probiller, which respectively are MindGeek's in-

25  house advertising and premium payment platforms that allow users to buy

26  advertising or premium products, services, and memberships and which account for

27  the vast amount of the revenue that MindGeek earns from its business model based

28

1    that inextricably incorporates and exploits trafficked and CSAM content.[3]

2    304.   In the case of Plaintiff, it is virtually certain that Visa was involved in

3    the processing of advertising revenues, including the conversions, and revenues from

4    premium services and products that MindGeek earned from the viral exploitation of

5    Plaintiff's underage videos.

6                    **6.    The Criminal Scheme to Conceal the Enterprise's**

7                    **Racketeering and Shame, Discredit, Intimidate, and Silence**

8                    **Victims.**

9    305.   MindGeek worked as hard to conceal and suppress the truth about its

10   business model as it did on SEO.   When such videos were publicly questioned in

11   social media discourse, it initially hid behind the false façade it had built of itself as a

12   mainstream legitimate company.   This played on the general public's

13   misunderstanding that because users were not operating on the dark web, but on

14   Pornhub, the content was consensual and legal.

15   306.   Indeed, Social Media Optimization ("SMO") was also an integral part of

16   its Enterprise.   As part of this SMO, MindGeek used its extensive control and

17   influence over all aspects of the new online porn industry that it dominated to mount

18   powerful public messaging campaigns when it felt necessary.   This network

19   included innumerable porn performers and producers who depended on MindGeek's

20   platform for their livings, putative public interest not-for-profits like the Free Speech

21   Coalition, which received substantial support from MindGeek and was called by

22   industry and MindGeek insiders its "lobbying arm," and porn industry publications,

23   like XBIZ, and bloggers, all of whom received substantial advertising and other

24   renumeration from MindGeek in exchange for acting as MindGeek mouthpieces.

25   307.   When it felt necessary, MindGeek would activate this extensive network

26   _____

27   [3]https://endsexualexploitation.org/wp-content/uploads/2021-Dirty-Dozen-

28   List_Notification-Letter_Visa_Final.pdf.

of seemingly independent voices to generate an "astroturf" campaign promote messaging MindGeek needed.   They did this through sophisticated SMO that included "ghost blogging," illegal undisclosed placed content and social media influencing and amplification, and extensive marketing, advertising, and aggressive media outreach.   Through all these tools, MindGeek worked tirelessly to manufacture a false public image that concealed its illicit practices and to silence those who posed a risk to that façade.

308.   In particular, this included MindGeek's extensive Pornhub Cares effort to create an image of its flagship Pornhub brand as mainstream, legitimate, and ethical.   As part of this effort, MindGeek promoted various social causes including billboard ads in Times Square, ads on snow plows during blizzards, breast and testicular cancer campaigns, voting campaigns, pop-up shops on Valentine's day, and environmental campaigns like Save the Oceans, Save the Pandas, and Save the Bees.

309.   It also attempted to publicly align itself with anti-exploitation entities. For example, in 2020 MindGeek began making donations to the European anti-child exploitation network called InHope causing the Canadian Centre for Child Protection – which is charged under Canadian law with combatting child pornography, has the leading technology to detect such abuse material, and knows MindGeek best of all – to withdraw from the network.   It did so because as the leading anti-child pornography organization in Canada it fully understood the hypocrisy of the affiliation and MindGeek's obvious effort to corrupt and compromise this organization dedicated to combatting organizations of which MindGeek was the poster child.

310.   But these hypocritical efforts to falsely portray itself as a responsible, ethical corporate actor palled in comparison to MindGeek's surreptitious efforts to use its influence network for unethical and illegal purposed.   For example, MindGeek funneled money from its foreign subsidiaries in Luxembourg and Cyprus

103

COMPLAINT

1   through its MindGeek USA subsidiary into California to lobby against California

2   laws governing the porn industry in violation of California law.    This illegal

3   lobbying and laundering of money to oppose these proposed laws resulted in fines

4   imposed by California Fair Political Practices Committee.

5       311.    Most troubling, MindGeek aggressively used its powerful messaging

6   network to insidiously attack, discredit, and intimidate former employees and

7   partners, whistleblowers, activists, and victims of its criminal schemes.    These

8   efforts were directly led by MindGeek vice president Corey Urman, who closely

9   controls and often personally participates in the public messaging.    Urman on behalf

10  of MindGeek leads these efforts and works closely with powerful public relations

11  and social media firms in North America and Europe, including most prominently

12  powerful New York public relations and social media firm 5wPR.

13      312.    Urman and 5wPR regularly purport to publicly speak on behalf of

14  MindGeek using false identities of non-existent people misrepresented as MindGeek

15  spokespeople.    These identities include Ian Andrews, Mike Williams, Chris

16  Jackson, Brett Hall, Dusty Gitalto, and Corey Price.    On occasion, reporters or

17  others have called a numbers for a purported MindGeek spokespeople only to learn

18  they were talking to a person of a different name who was employed by 5wPR.

19  These false identities were used because they know the statements they were making

20  were false and they did not want them attributed to themselves.

21      313.    MindGeek and 5wPR directly and through investigative firms and

22  "partners" in Eastern Europe do deep opposition research and investigation of their

23  "enemies" and their immediate and extended families.    This information is then

24  used to intimidate and blackmail them. MindGeek "enemies" also repeatedly

25  experience hacking of personal information and doxing.    Insiders uniformly report

26  that it is understood that anyone who crosses MindGeek or is seem as a threat to

27  expose their illegal practice will be subjected to this treatment.    Over the course of

28

the last 16 months, MindGeek, 5wPR, and their operatives have mounted an aggressive "astroturf" campaign against advocates and victims calling attention to its true business practices.

### 7.    MindGeek's Criminal Scheme is Publicly Revealed

314.   On February 9, 2020, activist Laila Mickelwait published an op-ed in the Washington Times about Pornhub to make the public aware that the site used nonconsensual content, did not have meaningful processes to exclude such content, and was profiting from such content:

> It took me under 10 minutes to create a user account and upload blank test content to the site, which went live instantly. I could have then gone on to become Pornhub-verified, and all I would need to do is send a photo of myself holding a paper with my username. That's it.
>
> One of the most-searched terms on Pornhub is "teen" pornography. The search will result in videos that are constantly being added faster than any individual could watch them. Many feature girls who look 13 years old at best — girls with braces, pigtails, flat chests, no makeup, extremely young faces, holding teddy bears and licking lollipops, all while being aggressively penetrated. A quick search for the word "teen" turns up titles such as "Young Girl Tricked," "Innocent Brace Faced Tiny Teen F---ed," "Tiny Petite Thai Teen," "Teen Little Girl First Time," on and on ad infinitum.
>
> Pornhub has no system in place to verify the girls (and I

1          say "girls" because they are not women) in the videos it

2          hosts are not trafficked children being raped on film in

3          order to line the pockets of its executives.

4

5          What all of this means is that at this very moment, there

6          could be hundreds, if not thousands, of videos of underage

7          sex trafficking victims on Pornhub. If there could be, I can

8          almost guarantee you there are. We already have evidence,

9          and it is just the tip of the iceberg.

10

11         It's time to shut down super-predator site Pornhub and hold

12         the executive megapimps behind it accountable.

13     315.    The article gained a significant amount of traction as it was shared by

14   advocates, advocacy groups allied with Mickelwait's work, and the public who were

15   hearing about the issue for the first time.

16     316.    Thereafter, Mickelwait launched a Change.org campaign to shut down

17   what the campaign branded as "Trafficking Hub" and titled "Shut Down Pornhub

18   and Hold Its Executives Accountable for Aiding Trafficking."    Mickelwait's

19   "Traffickinghub" Campaign went viral, with tens of thousands of individuals and

20   organizations quickly taking up the cause.    Among the groundswell of viral support

21   were hundreds of porn performers. For example, on February 16, 2020, Jenna

22   Jameson, called "the Queen of Porn" and "the most famous porn star of all time,"

23   said "Pornhub profits off of the rape and torture of women and children, Take a stand

24   against these monsters at MindGeek . . . Shut it DOWN."

25     317.    Also included in the viral support were parents who became aware that

26   their children were easily accessing the site, and even uploading content of

27   themselves, sometimes at the behest of predators.    Even a young minor boy joined

28

the effort on his own by becoming a "verified" user of Pornhub, obviously without showing any government issued identification or without anyone at Pornhub questioning the obviously underage boy applications to become "verified."

318.   After years of acting with impunity, Pornhub's initial response was muted.   Indeed, it did not even deny the Op-Ed's claims, instead only stressing that MindGeek was a technology company registered in Luxemburg for tax purposes. The Washington Times Op-Ed editor noted the response "speaks volumes" about the accuracy of the petition's claims.

319.   However, as the Traffickinghub Campaign went viral and others began coming forward, MindGeek's disinformation and intimidation machine sprang into action.   Rather than acknowledge and correct its now exposed misconduct, MindGeek instead unleashed an aggressive gaslighting campaign designed to smear, discredit, and intimidate advocates and victims who dared to begin speaking out.

320.   MindGeek's gaslighting disinformation campaign developed false messaging asserting that (a) it did not incorporate and monetize CSAM, rape, and other nonconsensual acts; (b) it did employ "robust" technological and human monitoring to prevent the uploading and use of nonconsensual content; and (c) its critics were lying and motivated not by the truth but by money that they could raise attacking MindGeek.   The goal of the disinformation campaign was to reinforce MindGeek's fraudulent depiction of its business model and products; discredit advocates and victims; and intimidate advocates and victims by doxing them and their families and exposing them to hateful online and in-person attacks and threats.

321.   This campaign began at home, with insiders reporting MindGeek management misrepresenting to employees that the public claims were "lies" that were being spread not because they were true but because those making the claims actually wanted to destroy the porn industry for "religious reasons."

322.   MindGeek and 5wPR also fully mobilized their extensive network of

COMPLAINT

1   social media agents, influencers, and amplifiers and fed that network opposition

2   research on, and disinformation about, advocates and victims.   For those victims

3   who spoke publicly under pseudonyms, extensive intelligence and covert

4   investigative work was done to identify and expose them.

5       323.   On or about February 25, 2020, Corey Urman, falsely posing under the

6   alias Blake White, misrepresented in an email to the media that MindGeek was and

7   continued to be committed to ensuring nonconsensual content was not part of its

8   product and that claims otherwise were "factually wrong" and "intentionally

9   misleading" lies:

10          Pornhub has a steadfast commitment to eradicating and

11          fighting any and all illegal content on the internet,

12          including nonconsensual content and child sexual abuse

13          material.   Any suggestion otherwise is categorically and

14          factually inaccurate. . . . Pornhub is actively working to put

15          in place state-of-the-art, comprehensive safeguards on its

16          platform to combat this material.   These actions include a

17          robust system for flagging, reviewing and removing all

18          illegal material, employing an extensive team of human

19          moderators dedicated to manually reviewing all uploads to

20          the site, and using a variety of digital fingerprinting

21          solutions.   We use automated detection technologies such

22          as YouTube's CSAI Match and Microsoft's PhotoDNA as

23          added layers of protection to keep unauthorized content off

24          the site.   We also use Vobile, a state-of-the-art

25          fingerprinting software that scans any new uploads for

26          potential matches to unauthorized materials to protect

27          against banned video being re-uploading.   We are actively

28

108

COMPLAINT

1    working on expanding our safety measures and adding new

2    features and products to the platform to this end, as they

3    become available.    Furthermore, Pornhub will continue to

4    work with law enforcement efforts and child protection

5    non-profits in the goal of eliminating any and all illegal

6    content across the internet.    The petition is not only

7    factually wrong and intentionally misleading, it was created

8    and is promoted by a radical rightwing fundamentalist

9    group in the United States – a group who's founders have

10    long vilified and attacked LGBTQ communities and

11    women's rights groups, aligned themselves with hate

12    groups, and espoused extremist and despicable language.

13   https://www.dailydot.com/irl/petition-pornhub-shut-down-sex-trafficking/

14        324.   These claims were gross misrepresentations.    There was no such

15   commitment to avoiding nonconsensual content; it was embraced.    MindGeek had

16   no effective way to moderate content either by technology or human moderation, and

17   was not even trying.    MindGeek did not work with law enforcement or report

18   suspected CSAM as required under federal law.    And Laila Mickelwait was not a

19   bigot, anti-LGBTQ or women's rights, or misleading, let alone, intentionally

20   misleading.

21        325.   Urman, posing once again as "Blake White," made similar

22   misrepresentations to the media in January 2020, when he told Insider.com and other

23   media outlets that "Here at Pornhub, we immediately remove any content that

24   violates our terms of use as soon as we are made aware of it."    As demonstrated in

25   this Complaint, including by Plaintiff's own efforts to remove the CSAM video of

26   her that was uploaded and repeatedly re-uploaded to Pornhub, Urman's statement

27   was patently false.

28

326.    Over the course of the next year, MindGeek's press relations and social media organization would aggressively disseminate this gross disinformation.    This campaign, led by Urman and 5wPR, included numerous MindGeek Pornhub models, including Maya Morena, Ginger Banks, Gwen Adora, and its Brand Ambassador Asa Akira, who were instructed via direct messages on Pornhub's website and provided with talking points to disseminate MindGeek's disinformation.    In return for participating in this disinformation campaign, these agents of MindGeek were rewarded with supplemental compensation and better promotion on the MindGeek platform.

327.    It also included "ghost bloggers" and other undisclosed operatives publishing scripts provided by MindGeek and 5wPR as "independent" work.    That placed content by MindGeek would then be amplified by its social media network, captive reporters, and 5wPR and other SMO efforts.    The false claims generated by this coordinated and aggressive gaslighting campaign of disinformation were repeated in hundreds of news stories and incalculable more social media posts and memes during 2020, smearing, shaming, and attempting to intimidate advocates, whistleblowers, and victims from speaking out.

328.    In addition, MindGeek and 5wPR worked surreptitiously to "vandalize" the Wikipedia page for advocates and to load onto those pages the disinformation they were aggressively disseminating.    Their efforts were so aggressive and obvious that Wikipedia put a disclaimer on the target's page.    Over the next year, MindGeek would continue to push this gaslighting disinformation campaign (a) misrepresenting that nonconsensual content was not present on MindGeek's tubesites; (b) misrepresenting that MindGeek disapproved of nonconsensual content on its tubesites; (c) misrepresenting that MindGeek had robust human and technological moderation to prevent such content from being uploaded; and (d) explicitly accusing Mickelwait of (i) lying in claiming otherwise in her op-ed, petition, and other public

1    comments about MindGeek, (ii) lying about her objectives and motivations, and (iii)

2    fraudulently using her claims to defraud people and enrich herself.    These

3    materially false claims were repeated ubiquitously for the next year by MindGeek,

4    particularly Urman and 5wPR, and the agents and operative in their press and social

5    media network.

6          329.    For example, as the viral opposition to MindGeek gained steam in

7    February and March 2020, MindGeek made various public statements intended to

8    gaslight the public, its users, its partners, and law enforcement.    By way of example

9    only, on March 5, 2020, MindGeek misleadingly tried to disassociate itself from its

10   own business, falsely reporting that it was merely "a technology company that

11   doesn't film or produce any adult content and is headquartered in Luxemburg, not

12   Montreal."    Two days later Urman and 5wPR had two separate statements issued

13   from MindGeek and Pornhub to make it appear they were separate businesses both,

14   denying their businesses were involved in illegal content and calling such

15   accusations "lies" and "grossly misrepresented."

16         330.    During this time, one of the early operatives commissioned by Urman

17   and 5wPR was a person operating on social media under the moniker EyeDeco.

18   From shortly after the viral online campaign against MindGeek began, EyeDeco and

19   5wPR commissioned EyeDeco as an operative in their "astroturf" gaslighting

20   campaign.    She would dox activists and victims, call them liars and grifters, and

21   attempt to harass and intimidate them with releases of personal information about

22   them and their extended families that Urman and 5wPR provided to her and

23   instructed her to disclose.

24         331.    EyeDeco's real identity is a female living in Montreal known to the

25   Plaintiff with the initials GS.    Among other things, investigation revealed that GS

26   uses the unique moniker "EyeDeco" in other mediums not readily available to the

27   public and has other connections to senior people involved in the MindGeek

28

Enterprise.    On March 1, 2020, she began disseminating MindGeek's gaslighting narrative misrepresenting that it only operated legally and with consensual content and that those publicly claiming otherwise were lying to enrich themselves.    She indicated that her audience would discover this if they "#FollowtheMoney."    For months she would continue to disseminate this false "#FollowtheMoney" meme.

332.    More ominously, GS began publicly doxing and releasing personal information about those who dared speak up against MindGeek and their extended families.    This personal information was researched and provided to GS by Urman and 5wPR.    As part of this intimidation campaign, in June 2020, GS doxed Mickelwait and her extended family with a release of an assortment of information. Among that information was properties that they owned, including that Mickelwait owned, which GS suggested was used as a brothel: "BTW . . . what kind of property rental businesses are generally known for renting on an hourly basis."

333.    Shortly thereafter, Mickelwait's extended family members discovered that their bank accounts, messaging apps, and iClouds had been hacked.    Those who committed this illegal intrusion then sent an intimate stolen picture of one of her family member's spouse in an effort to threaten and intimidate.    Other critics of MindGeek received similar treatment.    For example, senior executives at vocal critic National Center for Sexual Exploitation as well as their siblings had computers, cloud storage, emails, and social media accounts hacked.    Other victims and advocates who spoke out or expressed support and who Urman and 5wPR viewed as a threat were also threatened with or actually doxed.

334.    GS also directly targeted CSAM victims to discredit, sham, and intimidate.    One victim going by the name Sofia shared her story of being trafficked as a child on Pornhub in a blog she wrote.    In the blog she detailed the way in which from the age of nine to fifteen she was sex trafficked and how she found the videos of her child rape and exploitation on Pornhub over and over:

112

COMPLAINT

*"I am a survivor of child trafficking" a sentence iv'e put off saying for a very long time, I didn't consider myself a victim because I didnt know anything different. As a 9 year old I thought I was just helping mommy and daddy, as a child I had always been taught to not question my parents to be seen and not heard that as a girl I was nothing more than a inconvenience, that I needed to help my parents pay the bills because that's the least I could do.*

*My suffering did not end with those who had the power to use me, it continued but this time through a screen. Videos of my assaults and videos of me being forced to dance and strip began popping up on the popular tube site Pornhub, in some of them I was as young as 9 in others I was 15. I didn't know what to do I remember sitting in front of my phone and watching the view count go up. I used to spend hours reading the comments, people asking how much a night with me would cost.*

*I became so desensitized I stopped caring that videos continued to get uploaded, they would get deleted then a couple of days later they would get reuploaded or new ones would pop up. Some of the titles of the videos that continued to be uploaded to Pornhub were "Young girl begging to stop" "Screaming teen gets pounded" "barely legal getting choked" "Sexy brunette forced to strip" some of the videos were reuploaded 6 times.*

COMPLAINT

*I'm telling my story because I don't want anyone to go*
*through and feel the way I did, I thought if I spoke up*
*everyone would think I was a liar I don't* care *anymore to*
*anyone that's gone through something similar I'm with*
*you, I see you and I believe you. It is not our fault and*
*those who monetized and downloaded our trauma need to*
*be held accountable.*

*Pornhub needs to answer for their mistakes they need to be*
*shut down they've had countless opportunities to address*
*and fix their mistakes but they have continued to brush off*
*complaints and ignore victims, mistakes that have* ruined
*not only my life but countless others. It's time they take*
*responsibility for their actions and get their platform taken*
*from them.*[4]

335.   In response to this Medium post, GS publicly called out Medium:
"Suggest using #CrticialThought to understand how these #grifters have hijacked a
legitimate issue in order to further their own agenda," which as the "grifter"
reference clearly indicated was to enrich themselves.

336.   Sofia created a Twitter account with which to share the article and
continue advocating for herself and other victims while remaining anonymous.
Within moments of it being shared, GS attacked her as a liar and grifter. In doing so,
GS made an argument only someone very familiar with the details of Pornhub's
website would know, and which was fed to her by Urman and 5wPR.   She claimed

---

[4] https://medium.com/@A.Sofia/not-alone-945c743b6e42

that the screenshot Sofia had posted purportedly from her abuser showed an "edit" button that would only appear on the screen of the person uploading the video.

337.    Based on this claim, GS asserted that the abusive materials had been uploaded by "Sofia herself."    She called the young victim a "scammer" and tagged "#Scammer #LailaMickelwait" to indicate Sofia was a fake operated by others looking to use their campaign to enrich themselves.    Urman and 5wPR knew when they instructed GS to make these claims that they were false.

338.    GS went on to harass Sofia, saying, "I see you created your twitter account rather quickly – as in today. Your 'friend' #LailaMickelwait must have coached you on how to open a new account. What timely timing.    As to why you would #lie about this – no doubt Laila knows she does a lot of it re: #Pornhub."

339.    Sixteen-year-old Sofia, distraught over the attack said, "maybe it[']s because I don't want people knowing who I am no one coached me I made this decision myself."    GS taunted her "uh huh . . ." then suggested again that Sofia fabricated the whole account and was just a puppet of Mickelwait.    She went on, "Laila aka Sofia franchement all your #followers are sadly lacking in #CriticalThought."    GS use of the French word "franchement," which means "frankly," gave away her likely location in MindGeek's home of Montreal.

340.    GS then repeated her defamatory claim directly to Medium: "Before uploading stories, suggest vetting sources first see above regarding #edit button ONLY being available to #Uploaders Which in this case as per screenshot in your #Article #Story is Sofia herself. #LailaMickelwait #scammers."

341.    Distraught Sofia responded, "So now I am a liar because my assaulter sent me the screenshot himself. He used it to make me know he could profit of my body I am just a 16 year old why would I lie about this."

342.    It was then that Sofia uploaded the screenshot of the actual text message her abuser sent to her with the screenshot in the text. In Spanish it reads "See told

COMPLAINT

you I could do whatever I wanted with you" "cheap whore" "they don't even have to
wear a condom I am gonna tell Desire I found more clients for you."



343.    After Sofia uploaded the proof that she was not lying, GS ceased her
attacks.    She was the only one to have attacked Sofia with that claim until Urman
and 5wPR had the same assertion made to the New York Times in an effort to stop
its report "The Children of Pornhub."

344.    Urman and 5wPR also had GS attack plaintiff Serena Fleites, who was
featured in the New York Times story.    MindGeek fed GS opposition research on
Fleites derived from a "scrap" of the young woman's social media accounts after she
too went public with her abuse and exploitation by MindGeek.    GS used that social
media material to likewise attack Serena as a "#grifter": "Serena seems like she
knows and has known for quite some time exactly what she is doing aka #grifting."

345.    When the New York Times asked MindGeek about the GS's targeting
of Serena and Sofia, and the coincidence of both MindGeek and GS accusing Sofia
of uploading the video herself, GS's began taking down her social media and locked
her account.

346.    Before ending her campaign, GS worked to transition her efforts to

116

another operative being run by Urman and 5wPR under the false identity of Justine
Halley.    After GS was compromised, Halley took up her role as a "ghost" blogger
and social media operative in or about July 2020.    Posing as an independent writer,
Halley began publishing the Urman 5wPR narrative, including on medium.    That
narrative, like the one Urman and 5wPR fed GS, attempted to gaslight readers that
MindGeek tolerated no nonconsensual content and aggressively worked to exclude it
from its platform.    And she repeated the false narrative that those saying otherwise
were lying.

347.   Justine Halley was actually Sarah Valmont, a porn writer who had
attended graduate school in Montreal.    Valmont was unemployed during Pornhub's
gaslighting campaign and was hired by MindGeek to pose as an independent author
while actually writing as a MindGeek agent and publishing the narrative it was
paying here to publish.

348.   According to the narrative she was paid to publish, the viral campaign to
hold MindGeek accountable was "a calculated creation with an agenda that goes
beyond the push to shut down Pornhub" and really an effort to

> exploit[] the pain of real victims in [support of the
> advocate's] million dollar trafficking hub campaign . . . .
> Churning out increasingly sensationalist messages and
> outright falsehood to make it appear as though Pornhub is
> intentionally acting in bad faith, and is encouraging people
> to abuse their own platform terms of service by uploading
> illegal content. . . . Pornhub dos not allow illegal content
> period.    Pornhub has a robust system in place to moderate
> content using both cutting edge technology and human
> moderators.

349.   The fictitious Halley's claims were outright lies she was instructed to

1    disseminate by Urman and 5wPR.

2    350.    Thereafter, in August and September, Halley went even further at

3    Urman and 5wPR's direction.    She claimed falsely that Mickelwait was "doctoring

4    screenshots" that she was presenting publicly to prove her claims: "I have evidence

5    that Laila Mickelwait is doctoring screenshots she shares of Pornhub content and is

6    deliberately lying and misrepresenting the platform.    In some legal circles that kind

7    of things is called, 'libel'.    More to come." ((8/29/20)    *see also* "I hope Laila

8    gives whoever doctors her screenshots of PH a nice raise, along with plenty of

9    Kleenex." (9/1/20)).

10    351.    Urman and 5wPR instructed Halley to make this extraordinary claim

11    because the content readily available from MindGeek's own tubesites was the most

12    devastating evidence debunking their gaslighting narrative.    Unwilling to actually

13    remove such content from its platform, MindGeek was forced instead to claim it was

14    all fabricated when it was revealed.

15    352.    Halley combined these false claims with repeated claims that the entire

16    campaign was based on "evangelical bigots [who] are lying to well meaning people

17    about their real agenda and using the pain of victims to further that agenda." *See*

18    *supra* n.4.

19    353.    MindGeek's more overt network operatives also aggressively

20    prosecuted its gaslighting disinformation campaign with the same false narrative.

21    One of the most aggressive was its exclusive Brand Ambassador Asa Akira.    For

22    example, on July 2, 2020, Akira publicly gaslighted victims and advocates in

23    parroting MindGeek's lie that it did not monetize child pornography and trafficked

24    content and all nonconsensual content had always been "strictly prohibited":

25             Their claim that Pornhub is profiting off of child porn is

26             FALSE.    Illegal content is (and always has been) strictly

27             prohibited on Pornhub; that included any porn involving

28

1    anyone underage and any porn involving anyone who is

2    there without consent.

3    354.   On October 17, 2020, she called such claims "straight-up lies and

4    misinformation."

5    355.   Likewise, throughout 2020, Pornhub's social media director "Pornhub

6    Aria" gaslighted the public by misrepresenting that MindGeek strictly prohibited

7    illegal content, screened for it, had technology to detect it, and removed it

8    immediately.   For example, on April 10, 2020, Pornhub's Aria comprehensively

9    presented its gaslighting lie on social media, when she wrote on social media about

10   "misinformation circulating" on social media by advocates and victims who

11   "misrepresent [MindGeek's] policies and procedures":

12           First and foremost, illegal content is strictly prohibited on

13           Pornhub.   This has always been the case and will always

14           be the case and the safety of our users and models is our

15           number one priority.   Upon upload, every video and photo

16           uploaded to Pornhub is reviewed manually by a large and

17           extensive team of moderators looking for illegal content.

18           This sets us apart from other platforms like Twitter or You

19           Tube as well as other adult sites and allows us to act swiftly

20           and promptly for users who violate the terms of service.

21           In addition we use automatic detection technologies on

22           uploads such as YouTube's CSAI Match and Microsoft

23           Photo DNA as added layers of protection.   Finally, we

24           also review flags or content removal reports for illegal

25           content.   We have a dedicated community that works

26           actively to ensure that content adheres to our TOS and

27           rapidly flags any they find questionable for

28

119

COMPLAINT

review/removal.    Any content removal request we receive

on our content are priorities and expedited faster than any

other type of support request and acted upon within hours,

not days.    If we come across CSAM, the videos are

fingerprinted so they cannot be reuploaded, and the user is

banned.    We report the user and the uploads to the

National Center for Missing and Exploited Children

(NCMEC) who will work with global authorities. . . . All

illegal content, in addition to content that breaches our

terms of service, is immediately removed as it is detected.

356.    Every sentence of this MindGeek statement was a lie.

## CAUSES OF ACTION

### COUNT I

### (Violation of 18 U.S.C. §§ 1591(a)(1), 1595)

### Against the MindGeek Defendants)

357.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

358.    MindGeek, through its byzantine network of sham shell entities, agents, executives, and investors, is a sex trafficking venture within the meaning of 18 U.S.C. §§ 1591 and 1595.

359.    The MindGeek Defendants knowingly used the instrumentalities and channels of foreign commerce to facilitate violations of 18 U.S.C. §§ 1591 and 1595, occurring within the territorial jurisdiction of the United States.

360.    The MindGeek Defendants' conduct was in, or affected, interstate and/or foreign commerce.

361.    MindGeek recruited, enticed, harbored, transported, provided, obtained, advertised, maintained, patronized, and/or solicited Plaintiff and other minors, and

120

victims of rape, sexual abuse, sexual exploitation and nonconsensual sex that they knew, should have known, or recklessly disregarded had not attained the age of majority at the time of the commercial sex act and/or were caused to engage in commercial sex acts through combination of force, threats of force, fraud, or coercion by, among other things:

    (a)   recruiting, commissioning, paying for, buying, and aggressively soliciting content produced through human trafficking and slavery;

    (b)   producing CSAM and nonconsensual sexual content through MindGeek owned production companies;

    (c)   partnering with known traffickers, including known East Asia traffickers, and others through its ModelHub program;

    (d)   advertising additional pornographic sites that offer paid content that are either owned by MindGeek or by third parties;

    (e)   selling advertising for other projects and services it or third-parties offer, including through MindGeek affiliate, defendant Traffic Junky, and by placing advertisements alongside CSAM videos, including CSAM videos of Plaintiff;

    (f)   pushing and reuploading all effective content on any of its tubesites, including the CSAM videos of Plaintiff, regardless of its initial sourcing to its other tubesites which it falsely portrayed as posted by a user other than MindGeek;

    (g)   modifying effective content and duplicating to optimize search engine optimization, including to make content appear as if it was user made;

    (h)   creating playlists that target viewers interested in child pornography and other illegal content;

    (i)   featuring categories on their websites that target users interested in

COMPLAINT

1    child pornography and other sexual abuse, trafficking and

2    nonconsensual materials;

3    (j)    directing users to describe their videos using categories like "teen"

4         to drive traffic;

5    (k)    maintaining the webpage and thumbnails for disabled videos so that

6         the MindGeek Defendants can continue to generate traffic and

7         revenue from that illegal content;

8    (l)    maintaining a search and tagging system—which included tags

9         such as "passed out teen," and "sleeping pills"—to make it easier

10        for users to find and view videos of child and adult sex abuse, sex

11        trafficking, and other nonconsensual content;

12   (m)   providing guidance to its global network of sex traffickers on how

13        to upload videos of sex trafficking and evade criminal

14        liability while complying with MindGeek's purposefully

15        loose restrictions, including by maintaining public list of "banned

16        words"—*i.e.*, words to avoid in the title of videos;

17   (n)    providing its global network of sex traffickers VPN services

18        to allow them to cover up their unlawful conduct by obscuring the

19        sex traffickers' locations and identities;

20   (o)    allowing anyone to anonymously upload and download videos on

21        its tubesites, so that it would be extremely difficult for victims to

22        have their videos permanently removed, thus

23        increasing MindGeek's advertising revenue and profits;

24   (p)    facilitating the reuploading of removed videos to its site and

25        affiliated sites; and

26   (q)    allowing all videos to be downloaded which facilitated the reupload

27        by different users with different titles, including numerous

28

COMPLAINT

instances where the first CSAM video of Serena was reuploaded to Pornhub.

362.   Plaintiff is a victim of MindGeek's sex trafficking venture within the meaning 18 U.S.C. §§ 1591 and 1595.

363.   The CSAM and other nonconsensual content uploaded and distributed by MindGeek, as well as the uploading and distribution of that content, constitute commercial sex acts under the statute.

364.   MindGeek knew or recklessly disregarded the fact that (i) Plaintiff had not attained 18 years of age when caused to engage in the commercial sex acts; and/or (ii) means of force, threats of force, fraud, or coercion were used to cause Plaintiff to engage in a commercial sex act because, among other things:

    (a)  MindGeek had a reasonable opportunity to observe the victims featured on its website;

    (b)  MindGeek purported to have moderators review every video prior to uploading it to its website, and the CSAM nature of the first video of Serena that was uploaded to Pornhub was obvious from its title: "13-Year Old Brunette Shows Off For The Camera";

    (c)  MindGeek regularly reuploaded materials that had been removed from its site in response to directives from authorities or a victim's lawyer to remove child pornography or other illegal materials;

    (d)  Public comments on posts, video titles, and tags, including the title and public comments associated with the first video of Serena that was uploaded to Pornhub, revealed that the content depicted underage victims and victims of assault and sex trafficking;

    (e)  victim notification, third party reporting, direct correspondence from advocacy groups and governmental investigations;

    (f)  MindGeek failed to adopt appropriate age and consent verification

123

1    requirements, including for the videos depicting Plaintiff, who was

2    a minor in all of the videos depicting her.

3    365.   As a direct and proximate result of the MindGeek venture's

4 wrongdoing, Plaintiff has suffered substantial damages, including but not limited to,

5 physical, psychological, financial, and reputational harm as well as other economic

6 damages set forth herein, in an amount to be determined at trial.

7    366.   Moreover, by reason of MindGeek's violations of 18 U.S.C. §§ 1591

8 and 1595, Plaintiff is entitled to recover attorney's fees, costs, and punitive damages.

9               **COUNT II**

10       **(Violation of 18 U.S.C. §§ 1591(a)(2), 1595)**

11        **(Against the MindGeek Defendants)**

12    367.   Plaintiff incorporates by reference and realleges each and every

13 allegation set forth above, as though fully set forth herein.

14    368.   The MindGeek Defendants knowingly used the instrumentalities and

15 channels of foreign commerce to facilitate violations of 18 U.S.C. §§ 1591 and 1595,

16 occurring within the territorial jurisdiction of the United States.

17    369.   The MindGeek Defendants' conduct was in, or affected, interstate

18 and/or foreign commerce.

19    370.   The MindGeek Defendants knowingly benefit from a sex trafficking

20 venture by benefitting financially or receiving something of value from participation

21 in a venture that recruited, enticed, harbored, transported, provided, obtained,

22 advertised, maintained, patronized, and/or solicited Plaintiff and other minors and

23 victims of rape, sexual abuse, sexual exploitation, and nonconsensual sex that they

24 knew or recklessly disregarded had not attained the age of majority at the time of the

25 commercial sex act and/or were caused to engage in commercial sex acts through

26 combination of force, threats of force, fraud, or coercion.

27    371.   As set forth herein, the MindGeek Defendants participated in a venture

28

engaged in sex trafficking by inter alia:

    (a) recruiting, commissioning, paying for, buying, and aggressively soliciting content produced through human trafficking and slavery;

    (b) producing CSAM and nonconsensual sexual content through MindGeek owned production companies;

    (c) partnering with known traffickers, including known East Asia traffickers, and others through its ModelHub program;

    (d) advertising additional pornographic sites that offer paid content that are either owned by MindGeek or by third parties;

    (e) selling advertising for other projects and services it or third-parties offer, including through MindGeek affiliate, defendant Traffic Junky, and by placing advertisements alongside CSAM videos, including CSAM videos of Plaintiff;

    (f) pushing and reuploading all effective content on any of its tubesites, including the CSAM videos of Plaintiff, regardless of its initial sourcing to its other tubesites which it falsely portrayed as posted by a user other than MindGeek; and

    (g) modifying effective content and duplicating to optimize search engine optimization, including to make content appear as if it was user made;

    (h) creating playlists that target viewers interested in child pornography and other illegal content;

    (i) featuring categories on their websites that target users interested in child pornography and other sexual abuse, trafficking and nonconsensual materials;

    (j) directing users to describe their videos using categories like "teen" to drive traffic;

    (k) maintaining the webpage and thumbnails for disabled videos so that the

COMPLAINT

MindGeek Defendants can continue to generate traffic and revenue from that illegal content;

(l) maintaining a search and tagging system—which included tags such as "passed out teen," and "sleeping pills"—to make it easier for users to find and view videos of child and adult sex abuse, sex trafficking, and other nonconsensual content;

(m)   providing guidance to its global network of sex traffickers on how to upload videos of sex trafficking and evade criminal liability while complying with MindGeek's purposefully loose restrictions, including by maintaining public list of "banned words"—*i.e.*, words to avoid in the title of videos;

(n) providing its global network of sex traffickers VPN services to allow them to cover up their unlawful conduct by obscuring the sex traffickers' locations and identities;

(o) allowing anyone to anonymously upload and download videos on its tubesites, so that it would be extremely difficult for victims to have their videos permanently removed, thus increasing MindGeek's advertising revenue and profits;

(p) facilitating the reuploading of removed videos to its site and affiliated sites; and

(q) allowing all videos to be downloaded which facilitated the reupload by different users with different titles, including numerous instances where the first CSAM video of Serena was reuploaded to Pornhub.

372.   The MindGeek Defendants benefit financially from their participation in the venture.   Among other things, MindGeek benefits from premium subscriptions and advertisement revenues with almost three billion ad impressions each day, many of which are attributable to content posted of underaged and trafficked victims or

126

COMPLAINT

victims of fraud, force, or coercion, including CSAM videos of Plaintiff.    Moreover, the MindGeek Defendants used a network of sham shell companies to perpetuate a long-running and elaborate pattern of illegal schemes through which the members of the MindGeek venture enriched themselves.    By way of example only, MindGeek used this network of sham shell companies to mask their illicit activities, money laundering, and tax evasion by making it difficult for any one jurisdiction to see suspicious transactions of magnitude and effectively investigate isolated transactions let alone the overall operation of the Enterprise's schemes.    Finally, MindGeek used the network of sham shell companies to defraud creditors and victims of their illicit activities by surreptitiously "bleeding" and laundering assets out of jurisdictions in which MindGeek is likely to be sued and out of the MindGeek corporate structure entirely so as to make it more difficult or impossible for victims and other creditors to get obligations paid.

373.    The MindGeek Defendants knew, recklessly disregarded the fact that, or should have known that they benefited from participation in a sex trafficking venture, including through the posting and dissemination of videos and images on their websites depicting sex trafficking.    Among other things, the MindGeek Defendants have been repeatedly made aware of child pornography and other trafficked, nonconsensual, and illegal content on their websites by victim complaints, user comments, third party reporting, advocacy groups, and governmental investigations. Moreover, as set forth herein:

> (a)    MindGeek had a reasonable opportunity to observe the victims featured on its website;
>
> (b)    MindGeek purported to have moderators review every video prior to uploading it to its website, and the CSAM nature of the first video of Serena that was uploaded to Pornhub was obvious from its title: "13-Year Old Brunette Shows Off For The Camera";

(c)   MindGeek regularly reuploaded materials that had been removed from its site in response to a directive from authorities or a victim's lawyer to remove child pornography or other illegal materials;

(d)   comments on posts, titles, and tags, including the title and public comments associated with the first video of Serena that was uploaded to Pornhub, informed MindGeek that the content depicted underage victims and victims of assault and sex trafficking;

(e)   victim notification, third party reporting, direct correspondence from advocacy groups and governmental investigations; and

(f)   MindGeek failed to adopt appropriate age and consent verification requirements, including for the videos depicting Plaintiff, who was a minor in all of the videos depicting her.

374.   As a direct and proximate result of the MindGeek Defendants' violations of 18 U.S.C. §§ 1591 and 1595, Plaintiff has suffered substantial damages, including but not limited to, physical, psychological, financial, and reputational harm as well as adverse employment impacts, investigation expenses, and other costs associated with the prolific dissemination of her CSAM.

375.   Further, by profiting from these videos and images, the MindGeek Defendants have become unjustly enriched at the expense of Plaintiff in an amount to be determined at trial.

376.   Moreover, by reason of the MindGeek Defendants' violation of 18 U.S.C. §§ 1591 and 1595, Plaintiff is entitled to recover attorney's fees, costs, and punitive damages.

## COUNT III

### (Violation of 18 U.S.C. §§ 1591, 1595)

### (Against Visa)

377.   Plaintiff incorporates by reference and realleges each and every

128

COMPLAINT

1    allegation contained above, as though fully set forth herein.

2        378.    As set forth herein, MindGeek, through its byzantine network of sham

3    shell entities, agents, executives, and investors, is a sex trafficking venture within the

4    meaning of 18 U.S.C. §§ 1591 and 1595.

5        379.    Visa participated in the MindGeek sex trafficking venture by processing

6    premium subscriptions and payments for MindGeek partner channels.    It is virtually

7    certain that Visa processed payments that allowed viewers to access or download

8    videos of Plaintiff, among countless other trafficking victims.    Additionally, Visa

9    participated in the MindGeek sex trafficking venture by making at least two public

10   statements falsely suggesting that all of the content on MindGeek's tubesites was

11   lawful and legitimate under current laws, despite Visa's knowledge that that

12   suggestion was false.

13       380.    Visa knowingly used the instrumentalities and channels of foreign

14   commerce to facilitate violations of 18 U.S.C. §§ 1591 and 1595, occurring within

15   the territorial jurisdiction of the United States.

16       381.    Visa's conduct was in, or affected, interstate and/or foreign commerce.

17       382.    Visa knowingly benefits financially and/or receives something of value

18   from participation in the MindGeek sex trafficking venture with the MindGeek

19   Defendants including but not limited to millions of dollars in profits from credit card

20   transaction fees for premium subscriptions.

21       383.    Visa knew, recklessly disregarded, or should have known that it

22   benefitted from participation in a sex trafficking venture that trafficked Plaintiff,

23   among countless other victims, and engaged in acts that constitute violations of

24   section of 18 U.S.C. § 1591(a)(1).    As set forth herein, MindGeek's business model

25   of recruiting, enticing, harboring, transporting, providing, obtaining, advertising,

26   maintaining, patronizing, and/or soliciting CSAM and other sexual abuse and

27   trafficking content was known to, recklessly disregarded by, or reasonably should

28

129

COMPLAINT

have been known to Visa because, among other reasons:

    (a)  video titles, comments and tags, including the titles and comments associated with the first CSAM video of Serena that was uploaded to Pornhub, informed Visa that the content depicted underage victims and victims of assault and sex trafficking;

    (b)  the information was publicly available through third party reporting, including PayPal's public decision to withdraw based on the identification of CSAM and other illegal content, the New York Times expose article "The Children of Pornhub," and the Dr. Oz segment;

    (c)  direct correspondence from advocacy groups and e-mail writing campaign re same;

    (d)   governmental investigations, including by the Canadian House of Commons; and

    (e)  public searches on MindGeek's sites would reveal thousands of videos depicting subjects who were obviously underage, under duress, incapacitated, being raped or secretly exploited.

384.   As set forth herein, on November 14, 2019, Visa's competitor, PayPal, terminated its payment service to MindGeek entities on the basis of the existence of trafficked, underage images and other illegal content.   PayPal publicly explained the basis for its decision to terminate the relationship: "[PayPal] explicitly prohibits the use of [its] services for the sale of materials that depict criminal behaviour, or the sale of sexually oriented content to minors."

385.   Moreover, in May 2020 anti-trafficking advocacy groups sent Visa a series of letters detailing the prevalence of unlawful sex trafficking content on MindGeek's tubesites and demanding that Visa stop processing payments and immediately terminate its relationship with MindGeek.   Further, thousands of

1   members of these organizations emailed Visa echoing the letter and the requested
2   action.

3       386.   Yet Visa intentionally ignored, or at a minimum recklessly disregarded,
4   this information and continued to participate in and financially benefit from
5   MindGeek's sex trafficking venture.   Indeed, despite this information and Visa's
6   knowledge of it, Visa made at least two public statements falsely suggesting that all
7   of the content on MindGeek's tubesites was lawful and legitimate under current laws.
8   It was only thirteen months after PayPal publicly disclosed MindGeek's illegal
9   activities that Visa finally called for an investigation into MindGeek's practices and
10  purported to "suspend[] Pornhub's acceptance privileges pending the completion of
11  [Visa's] ongoing investigation."   Visa also purported to "instruct[] the financial
12  institutions who serve MindGeek to suspend processing of payments through the
13  Visa network."   And while Visa has continued its ban on MindGeek's websites that
14  distribute user-generated content, Visa has re-initiated its relationship with
15  MindGeek and began processing payments again for professionally produced
16  content.

17      387.   As a result of Visa's violations of 18 U.S.C. §§ 1591 and 1595, Plaintiff
18  has suffered substantial damages, including but not limited to, physical,
19  psychological, financial, and reputational harm as well as other damages.

20      388.   Further, by profiting from these videos and images, Visa has become
21  unjustly enriched at the expense of Plaintiff in an amount to be determined at trial.

22      389.   Moreover, by reason of Visa's violation of 18 U.S.C. §§ 1591 and 1595,
23  Plaintiff is entitled to recover attorney's fees, costs, and punitive damages.

24      **COUNT IV**

25      **(Violation of 18 U.S.C. §§ 1594(c), 1595)**

26      **(Against All Defendants)**

27      390.   Plaintiff incorporates by reference and realleges each and every
28

131

COMPLAINT

allegation contained above, as though fully set forth herein.

391.    Defendants conspired by agreement or understanding, to commit unlawful acts.    Each of the Defendants shared the same conspiratorial objective, which was to financially benefit from the monetization, recruitment, solicitation, funding, maintenance, advertisement, streaming, and distribution of CSAM and other nonconsensual content and illegal content.

392.    As set forth above and in Count VI, all of which are incorporated by reference as though fully set forth herein, Defendants committed overt acts in furtherance of the agreement or understanding by knowingly recruiting, producing, funding, maintaining, streaming, and distributing CSAM and other nonconsensual content and/or benefiting financially from such distribution.

393.    Defendants' participation in the furtherance of the sex trafficking venture and/or purpose was intentional and/or willful and, therefore, Defendants intentionally and/or willfully caused Plaintiff's commission of the sex acts.

394.    Visa knew that its funding supported and facilitated MindGeek would lead to the commercialization and monetization of CSAM and other nonconsensual content depicting the Plaintiff.    Visa also knew at the time it made the public statements referenced in this Complaint that, contrary to the false suggestion that those statements clearly created, MindGeek's tubesites were awash with unlawful and nonconsensual content, including CSAM.

395.    Defendants conspired with each other through affirmative acts that provided financial support to MindGeek to enable its exploitation of Plaintiff.

396.    At all relevant times, Defendants' conduct was willful and done with legal malice and knowledge that it was wrongful.

397.    Plaintiff has suffered substantial damages, including but not limited to, physical, psychological, financial, and reputational harm as well as other damages.

398.    Moreover, by reason of the Defendants' violation of 18 U.S.C. §§ 1594

and 1595, Plaintiff is entitled to recover attorney's fees, costs, and punitive damages.

## COUNT V

### (Violation of 18 U.S.C. §§ 2252, 2255)

### (Against The MindGeek Defendants)

399.  Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

400.  Serena Fleites is a victim of violations of 18 U.S.C. §§ 2252 and suffered personal injuries as a result of these violations.   Accordingly, Serena Fleites is entitled to bring a civil action under 18 U.S.C. § 2255.

401.  MindGeek knowingly transported visual depictions of minors engaging in sexually explicit conduct, as defined under 18 U.S.C. § 2256(2)(A), including, but not limited to, photographs and videos of Serena Fleites, who was a minor at the time the photographs and videos were taken, via its websites which affected interstate or foreign commerce in violation of 18 U.S.C. § 2252(a)(1).

402.  MindGeek knowingly received and distributed visual depictions of minors engaging in sexually explicit conduct, as defined under 18 U.S.C. § 2256(2)(A), including, but not limited to, photographs and videos of Serena Fleites, who was a minor at the time the photographs and videos were taken, via their websites which affected interstate or foreign commerce.

403.  MindGeek knowingly sold or possessed with intent to sell visual depictions of minors engaging in sexually explicit conduct, as defined under 18 U.S.C. § 2256(2)(A), including, but not limited to, photographs and videos of Serena Fleites, who was a minor at the time the photographs and videos were taken, via its websites which affected interstate or foreign commerce in violation of 18 U.S.C. § 2252(a)(3).

404.  MindGeek knowingly possessed visual depictions of minors engaging in sexually explicit conduct, as defined under 18 U.S.C. § 2256(2)(A), including, but

133

COMPLAINT

not limited to, photographs and videos of Serena Fleites, who was a minor at the time the photographs and videos were taken, via its websites which affected interstate or foreign commerce in violation of 18 U.S.C. § 2252(a)(4).   Moreover, even when MindGeek was forced to take down illegal content in response to legal requests, rather than delete the materials it was not legally allowed to possess or redistribute, it claimed to have stored all the data on its servers and periodically would reupload that content or push it to affiliate sites so that it could continue to generate traffic and corresponding revenue.

405.   In addition, the MindGeek Defendants duplicated and distributed new child pornography depicting Plaintiff by creating and hosting new "thumbnail" images from existing videos of Plaintiff.

406.   MindGeek's knowledge of the CSAM nature of the videos depicting Plaintiff can readily be inferred from the title of the video—"13-Year Old Brunette Shows Off For The Camera"—as well as the hundreds of public comments associated with that video indicating that Plaintiff was clearly a minor.   Moreover, even after Plaintiff told Pornhub directly that the video was child pornography, it still took almost one month before the MindGeek Defendants removed the video, during which time the video was viewed and downloaded by multiple users, facilitating future uploads of the video.   Additionally, each time Plaintiff discovered that the video had been reuploaded to Pornhub, she again informed Pornhub that the video was child pornography and, each time, Pornhub still waited weeks to remove the video. Serena Fleites has suffered substantial physical, psychological, financial, and reputational harm as well as other damages as the result of MindGeek's violation of 18 U.S.C. § 2252.

407.   Defendants' conduct was malicious, oppressive, or in reckless disregard of Serena Fleites' rights, and Serena Fleites is entitled to injunctive relief, compensatory, and punitive damages, and the costs of maintaining this action. 18

U.S.C. § 2252A(f).

## COUNT VI

### (Violation of 18 U.S.C. §§ 2252A, 2255)

### (Against The MindGeek Defendants)

408.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

409.   Serena Fleites is a victim of violations of 18 U.S.C. § 2252A and suffered personal injuries as a result of these violations.   Accordingly, Serena Fleites is entitled to bring a civil action under 18 U.S.C. § 2255.

410.   MindGeek knowingly transported child pornography, as defined under 18 U.S.C. § 2256(8), including, but not limited to, photographs and videos of Serena Fleites, who was a minor at the time the photographs and videos were taken, via their websites which affected interstate or foreign commerce in violation of 18 U.S.C. § 2252A(a)(1).

411.   MindGeek knowingly received or distributed child pornography, as defined under 18 U.S.C. § 2256(8), including, but not limited to, photographs and videos of Serena Fleites, who was a minor at the time the photographs and videos were taken, via their websites which affected interstate or foreign commerce in violation of 18 U.S.C. § 2252A(a)(2).

412.   MindGeek knowingly reproduced child pornography, as defined under 18 U.S.C. § 2256(8), including, but not limited to, photographs and videos of Serena Fleites, who was a minor at the time the photographs and videos were taken, via their websites which affected interstate or foreign commerce in violation of 18 U.S.C. § 2252A(a)(3)(A).

413.   MindGeek knowingly advertised, promoted, presented, distributed, or solicited visual depictions of actual minors engaging in sexually explicit conduct, as defined under 18 U.S.C. § 2256(2)(A), including, but not limited to, photographs and

videos of Serena Fleites, who was a minor at the time the photographs and videos were taken, via their websites which affected interstate or foreign commerce in violation of 18 U.S.C. § 2252A(a)(3)(B).

414.   MindGeek knowingly sold or possessed with intent to sell child pornography, as defined under 18 U.S.C. § 2256(8), including, but not limited to, photographs and videos of Serena Fleites, who was a minor at the time the photographs and videos were taken, via their websites which affected interstate or foreign commerce in violation of 18 U.S.C. § 2252A(a)(4).

415.   MindGeek knowingly possessed child pornography, as defined under 18 U.S.C. § 2256(8), including, but not limited to, photographs and videos of Serena Fleites, who was a minor at the time the photographs and videos were taken, via their websites which affected interstate or foreign commerce in violation of 18 U.S.C. § 2252A(a)(5).  Moreover, even when MindGeek was forced to take down illegal content in response to legal requests, rather than delete the materials it was not legally allowed to possess or redistribute, it claimed to have stored all the data on its servers and periodically would reupload that content or push it to affiliate sites so that it could continue to generate traffic and corresponding revenue.

416.   In addition, the MindGeek Defendants duplicated and distributed new child pornography depicting Plaintiff by creating and hosting new "thumbnail" images from existing videos of Plaintiff.

417.   MindGeek's knowledge of the CSAM nature of the videos depicting Plaintiff can readily be inferred from the title of the video—"13-Year Old Brunette Shows Off For The Camera"—as well as the hundreds of public comments associated with that video indicating that Plaintiff was clearly a minor.   Moreover, even after Plaintiff told Pornhub directly that the video was child pornography, it still took almost one month before the MindGeek Defendants removed the video, during which time the video was viewed and downloaded by multiple users, facilitating

future uploads of the video.    Additionally, each time Plaintiff discovered that the video had been reuploaded to Pornhub, she again informed Pornhub that the video was child pornography and, each time, Pornhub still waited weeks to remove the video.

418.    Serena Fleites has suffered substantial physical, psychological, financial, and reputational harm as well as other damages as a result of MindGeek's violations of 18 U.S.C. §§ 2252A.

419.    MindGeek's conduct was malicious, oppressive, or in reckless disregard of Serena Fleites' rights, and Serena Fleites is entitled to injunctive relief, compensatory and punitive damages, and the costs of maintaining this action. 18 U.S.C. § 2252A(f).

## COUNT VII
### (Violation of 18 U.S.C. § 1962(c))
### (Against All Defendants)

420.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

421.    At all relevant times, each Defendant is a person within the meaning of 18 U.S.C. § 1961(3).

422.    Since at least 2007 through the present (the "Scheme Period"), Defendants and enterprise members were associated in fact and comprised an "enterprise" within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c) willfully and with actual knowledge of the illegality of their actions and those of the Enterprise. The MindGeek Enterprise is engaged in, and its activities affect, interstate and foreign commerce.

423.    The MindGeek Enterprise consisted of the numerous MindGeek Entity Defendants as well as the network of sham shell entities throughout the world, the vast majority of which existed solely as vehicles through which to execute the

Enterprise's rackets and scams and evade taxes; the MindGeek executives, including defendants Feras Antoon, Corey Urman, David Tassillo, and other members of the Bro-Club that directed and controlled the network of sham shell companies; MindGeek's financiers, including defendant Bergmair; the MindGeek Defendants' "capos" and "soldiers" including those who previously ran tubesites or porn advertising companies that MindGeek used and relied on to solicit and secure trafficked and nonconsensual content; and a network of corrupt credit card companies, including defendant Visa, that engineered and facilitated credit card and financial transactions to siphon off illicit profits and avoid credit card red flags.

424.   The common purpose of the MindGeek Enterprise was to maximize profits for Enterprise members by maximizing the use of trafficked and nonconsensual content, including CSAM, and to do so while deceiving the public into believing that the content was lawful and consensual.

425.   The Enterprise has an existence beyond that which is merely necessary to commit predicate acts and, among other things, oversaw and coordinated the commission of numerous predicate acts on an ongoing basis in furtherance of the scheme to enrich itself, which resulted in direct harm to Plaintiff.

426.   During the Scheme Period, each Defendant agreed to and did conduct and participate in the affairs of the Enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1) and (5), and 1962(c).   To maximize MindGeek's SEO and profits, Enterprise members furthered the Enterprise's common purpose by, among other things, (a) recruiting, enticing, harboring, transporting, providing, obtaining, advertising, maintaining, patronizing, and/or soliciting persons, including Plaintiff, that it knew or should have known had not attained the age of majority at the time of the commercial sex act and/or were caused to engage in commercial sex acts through force, threats of force, fraud or coercion, or any combination thereof; (b) paying for, populating MindGeek's

tubesites with, and separately profiting from content produced through human trafficking and slavery and pirated copyright materials; (c) knowingly possessing and distributing child pornography; (d) using the mails and wires in furtherance of a scheme to deceive the public that MindGeek was a technology company and engaged in legitimate business; and (e) engaging in money laundering, criminal copyright piracy, internet hacking, bank and creditor fraud, and tax evasion, (f) permitting known criminal organizations to steal customer credit card and personal identifying information, commit credit card fraud, and blackmail customers; (g) defrauding MindGeek advertisers, marketers, and other third-parties; (h) evading taxes and laundering monies by "bleeding" value out of the organization to the Bro-Club and other Enterprise members via sham investments and expenses; and (i) paying for and executing blackmail, extortion, harassment, defamation, and hacking against those the Enterprise viewed as a threats.    This scheme was intended to, and did in fact, result in substantial profits for the members of the Enterprise and caused direct harm to countless victims, including Plaintiff.

427.    Each of the Enterprise members furthered the Enterprise's common purpose in myriad ways.    For example, the MindGeek Defendants furthered the Enterprise's common purpose by, *inter alia*, purchasing trafficked and other nonconsensual content from third-party traffickers and uploading that content to MindGeek tubesites and sharing revenue with numerous other sex traffickers; and modifying the titles and tags of user-uploaded content that bore clear indicia of illegality to scrub obvious red flags but to optimize titles, tags, and descriptions so that the videos could be more easily found and suggested to users searching for that type of illegal conduct.

428.    Defendants Antoon, Urman, Tassillo, and other Bro-Club members furthered the Enterprise's common purpose by, *inter alia*, directing the scheme to purchase trafficked and nonconsensual content in bulk; directing MindGeek finance

139

COMPLAINT

personnel to disregard clear trafficking red flags, such as where numerous ostensibly independent cam models were being paid through a single account; orchestrating the complex shell game to facilitate and mask criminal conduct, insulate the Enterprise members from civil and criminal liability, and to launder illicit profits to Enterprise members and evade taxes; and by providing false testimony to the Canadian House of Commons concerning the nature of the content on MindGeek's tubesites and MindGeek's safeguards to screen out and remove nonconsenual and trafficked content.

429.    Defendant Urman also furthered the Enterprise's common purpose by making numerous other false public statements concerning the nature of the content on MindGeek's tubesites and MindGeek's safeguards to screen out nonconsensual and trafficked content; and by closely controlling and sometimes personally participating in public false messaging and smearing and doxing campaigns against those who have made public allegations concerning the nonconsensual content on MindGeek's tubesites.

430.    Defendant Bergmair furthered the Enterprise's common purpose by, *inter alia*, orchestrating the façade of a "clean wash" of MindGeek and portraying it publicly to European authorities as a company committed to best practices and technology to ensure the business was free of illegal content and activities.    At the time of this misleading messaging, Bergmair had full awareness, after conducting extensive due diligence, of the fraudulent international corporate structure through which MindGeek conducted its illicit business.

431.    The Bergmair Doe Defendants furthered the Enterprise's common purpose by providing the critical financing used to facilitate the MindGeek Enterprise's illicit activities.    These shadowy international financiers are the ultimate puppet masters of the Enterprise, and were fully aware of the legally dubious nature of the business they owned and ran and of the fraudulent international

1 | corporate structure through which MindGeek conducted its illicit business.

2 |     432.   Visa furthered the common purpose of the Enterprise by, *inter alia*,

3 | engineering and facilitating credit card and financial transactions to siphon off illicit

4 | profits and avoid credit card red flags, such as accounts from known trafficking

5 | regions and where payments from large numbers of purportedly independent cam

6 | models were being deposited into a single account, in spite of its knowledge about

7 | the nature of the content on MindGeek's tubesites.

8 |     433.   Visa also furthered the common purpose of the Enterprise by making at

9 | least two misrepresentations to the public.   First, Visa—knowing that Pornhub and

10 | MindGeek's other tubesites were awash with unlawful and nonconsensual content,

11 | including CSAM—made a public statement misrepresenting that it categorically

12 | prohibited transactions involving child pornography and human trafficking, that it

13 | only permitted transactions for the purchase and sale of lawful products and services,

14 | and that it works with its coalition partners to identify potentially illegal merchants or

15 | illegal activities and bar them from the Visa network.   Second, after being

16 | confronted with yet additional information concerning the illegal content on

17 | MindGeek's tubesites, Visa responded with a letter suggesting that changes to laws

18 | were necessary and that Visa was simply maintaining a neutral stance under the

19 | law—thereby falsely implying once again that MindGeek's content was lawful and

20 | legitimate under current laws, which Visa knew was not true.

21 |     434.   The other corrupt payment processors of the MindGeek Enterprise

22 | furthered the common purpose of the Enterprise by assisting with the Enterprise's

23 | money laundering activities and masking fraudulent transactions from banking

24 | scrutiny, in exchange for payment of exorbitant fees.

25 |     435.   The Enterprise's racketeering conduct and acts in furtherance of the

26 | scheme and the Enterprise's common purpose included, but were not limited to, the

27 | predicate RICO acts of: (a) sex trafficking in violation of 18 U.S.C. § 1591; (b)

28 |

sexual exploitation of children in violation of 18 U.S.C. § 2252; (c) money laundering of illicit proceeds in violation of 18 U.S.C. § 1957; (d) use of mails and wires in a scheme to defraud the public in violation of 18 U.S.C. §§ 1341 and 1343, as set forth in 18 U.S.C. § 1961(1)(B); and (e) criminal infringement of a copyright in violation of 18 U.S.C. § 2319.

(i)    **Sex Trafficking, including of Plaintiff, in violation of the Trafficking Victims Protection Act**

436.    As set forth herein, the Enterprise recruited, funded, solicited, produced, advertised, edited, distributed, and monetized sex trafficking and other illegal materials. Moreover, these materials were then formatted by enterprise member shell companies that MindGeek had financial interests in, promoted on Pornhub and pushed to MindGeek's affiliated sites.

437.    Defendants knew and intended the violations of Section 1591(a).    By way of example only, MindGeek executives travelled to a warehouse where they witnessed many young women crammed into adjoining studio halls "like livestock" to perform on camera.    MindGeek paid sex traffickers because it was cheaper than producing consensual pornography. One Enterprise member rationalized, "we don't need to pay studios in the US, low paid pimps come to us."    The full scope of the Enterprise's violations of Sections 1591 are set forth in Counts I through III which are fully incorporated here.

438.    Moreover, as set forth herein, in furtherance of this scheme, the Enterprise intentionally disregarded adequate age and consent verification controls. To the contrary, the Enterprise intentionally solicited CSAM and sex trafficked materials and other illegal content, directed sex traffickers on how to post their content to maximize the traffic and avoid removal of their videos from MindGeek's tubesites, monitored and modified effective content, and reuploaded content both to Pornhub and to MindGeek's affiliate sites.    While MindGeek publicly claims to

142
COMPLAINT

moderate and review every video before it was posted, it in fact employs only a handful of untrained contractors who serve as formatters, not moderators, and whose true roles are to optimize search engines, traffic, and clicks so that the Enterprise can maximize revenues.

439.   In furtherance of this objective, the Enterprise intentionally developed a system of permissible code words for video and photograph titles to create a lucrative marketplace for videos of sexual assaults of both minors and adults, including the CSAM videos of Plaintiff.    The Enterprise intentionally used an upload process that would not filter illegal content.    The Enterprise permitted and promoted videos and photographs depicting the sex abuse and sex trafficking of children on its tubesites by, among other things, directing the Enterprise's global network of sex traffickers to title their videos using codewords in the video titles, such as "young teen," "abused teen," "super-young teen," "barely legal," and "exploited teen."

440.   The Enterprise also promoted and advertised videos depicting sexual assault by, among other things, suggesting that the Enterprise's global network of sex traffickers use titles such as "Screaming teen gets pounded," "barely legal getting choked," or "F***ed Sleeping Schoolgirl after a Drunk Party." (Asterisks added). While MindGeek alleges to filter videos with titles containing "rape" or "underage," videos with "r**e" or "unde***e" in the title were permitted.    Similarly, MindGeek personnel permitted the upload of the CSAM video of Plaintiff with a title that clearly indicated that Plaintiff was thirteen years old in the video.

441.   The foregoing activities constitute violations of 18 U.S.C. § 1591 and § 1595 which makes it illegal to recruit, entice, harbor, transport, provide, obtain, advertise, maintain, patronize and/or solicit persons, including Plaintiff, that it knew or should have known had not attained the age of majority at the time of the commercial sex act and / or were caused to engage in commercial sex acts through force, threats of force, fraud or coercion, or any combination thereof and violated 18

U.S.C. § 1591 and § 1595 or benefit from a venture engaged in any of the foregoing activities.

442.   MindGeek and its global network of sex traffickers and financial partners profited from the vast criminal sex trafficking enterprise and its violations of Sections 1591 and 1595 through, among other means, advertising revenue and premium subscription fees, and credit card processing fees.

(ii)   **Sexual Exploitation of Children, including Plaintiff, in violation of 18 U.S.C. § 2252**

443.   In furtherance of the Enterprise's sex trafficking scheme, MindGeek and its global network of sex traffickers knowingly committed innumerable violations of 18 U.S.C. § 2252 by knowingly possessing and distributing visual depictions involving the use of a minor engaging in sexually explicit conduct, including the CSAM videos of Plaintiff. The Enterprise's use of coded language and its inadequate age and consent verification policy facilitated the solicitation of sexually explicit conduct of minors.

444.   MindGeek has publicly stated that it never permanently deleted child pornography videos that were removed from its tubesites. Instead, MindGeek unlawfully retained these videos on its servers so that it could later reupload the videos onto its tubesites to drive search term optimization, traffic, and increase revenues.   Moreover, even when MindGeek was made aware of illegal content on its sites, it merely disabled the content and did not remove or delete it so that it could continue to generate traffic and revenue from that illegal material.   Thus, it continued to remain in possession of the illegal content.   It also was regularly reuploaded these illegal materials to Pornhub and other MindGeek affiliated sites.

445.   Enterprise members, including MindGeek, knowingly transported, received, distributed, sold, and possessed with the intention to sell visual depictions of minors engaging in sexually explicit conduct, as defined under 18 U.S.C. §§

2256(2)(A), including but not limited to, photographs and videos of Serena Fleites, who was a minor at the time the photographs and videos were taken, via its websites which affected interstate or foreign commerce in violation of 18 U.S.C. § 2252(a). MindGeek solicited such content from the Enterprise's network of sex traffickers and distributed the content for profit on its tubesites.

(iii)    **Use of mails and wires in furtherance of a scheme to defraud MindGeek's customers.**

446.    It was the purpose of the Enterprise to deceive the public, government, and its users that MindGeek was the world's leading technology companies providing cutting edge SEO and online and marketing data services.    The Enterprise expended substantial resources and effort ensuring that its tubesites had all the indicia of legitimate internet media websites, including a polished appearance, comprehensive terms of service, policies, and customer service functions, and multiple layers of interaction.    But these public images were a fraudulent front for a platform through which the Enterprise ran its rackets and schemes.

447.    In furtherance of its fraudulent scheme, MindGeek used the mails and wires to, by way of example only, (a) pay and communicate with its network of sex traffickers in Eastern Europe and Asia, (b) upload and reupload videos that it knew contained CSAM, sex trafficking materials, sexual assault and exploitation materials and other illegal content, (c) push this content to all of its partner sites, (d) use the elaborate network of sham shell companies to mask payments to sex traffickers in Eastern Europe and Asia to purchase trafficked content, and (e) issue numerous public misrepresentations in furtherance of this scheme, including, *inter alia*, false testimony before the Canadian House of Commons by Antoon and Tassillo; false statements made by Urman in an email to the Sunday Times; additional false statements made by Urman in another email to the media; and Visa's public statements falsely suggesting, despite Visa's knowledge to the contrary, that

MindGeek's content was lawful and legitimate under current laws.

448. As set forth herein, the Enterprise members knew solicited, recruited, produced, funded, distributed, monetized, and reuploaded images of minors, rape, sexual assault, trafficking, and other illegal content, including of Plaintiff.    In an unknown number of wire transactions and communications, each of which consists of an independent predicate act of wire fraud.

449. MindGeek paid sex traffickers in Eastern Europe and Asia to produce illegal content as part of the Enterprise's fraudulent scheme.

450. Further, when a sex trafficking victim, despite MindGeek's best efforts, was actually successful in removing a video from MindGeek's tubesites, the Enterprise chose to keep the video in its archives, so that the Enterprise could reupload the video at some later point.    An eyewitness explained that previously removed content "would be provided to employees on disk and they would be instructed to reupload those videos from non-MindGeek computers using specific email addresses that would allow the uploads to bypass MindGeek's purported 'fingerprinting' of removed videos."    Each and every time that an Enterprise member reuploaded a video that it knew contained CSAM or images of sex trafficking constitutes an independent predicate act of wire fraud, as the Enterprise reuploaded these videos to further its fraudulent scheme.

451. Additionally, MindGeek made an unknown number of misrepresentations in email communications to victims of sex trafficking who sought to remove videos from MindGeek's tubesites.    MindGeek purposely stalled these victims to make it extremely difficult to remove these videos and keep them online as long as possible and to continue to defraud the victims and the public that it was a legitimate business.    The total number of such communications, which each constitute an independent act of wire fraud, is not yet known, members of the Enterprise engaged in the following email communications as set forth in Table A.

COMPLAINT

## TABLE A

| ADDITIONAL MAIL AND WIRE COMMUNICATIONS | | | | |
|---|---|---|---|---|
| **Author** | **Recipient** | **Date** | **Content** | **Method** |
| Pornhub Support | Former Jane Doe No. 21 in this case | 1/5/2016 | [PORNHUBHELP #EXP-485-90140]: Removing a amateur video | Email |
| Pornhub Support ("Tanya") | Former Jane Doe No. 31 in this case | 3/2/2018 – 3/6/2018 | 3/6/2018 Email from "Tanya" refusing to provide information requested by Former Jane Doe No. 31 requesting "information to determine who consented to this video being uploaded on your site."   The email from "Tanya" instead directed Former Jane Doe No. 31: "For any inquiries about the personal information of Pornhub community members, please have authorities contact us directly at support@pornhub.com." | Emails and Chats with Pornhub Support |
| Pornhub Support ("Brett Hall") | Former Jane Doe No. 31 in this case | 3/5/2018 – 3/8/2018 | 3/6/2018 Email in which "Brett Hall" asks Former Jane Doe No. 31 in this action: "Are you the female in the video? How do you know this is you"<br><br>Emails from 3/7/2018 and 3/8/2018 in which "Brett Hall" informs Former Jane Doe No. 31 that her video was "only removed from Pornhub" | Emails and Chats with Pornhub Support |

147
COMPLAINT

| | | | in response to Former Jane Doe No. 31's request for "what other sites feed into and out of Pornhub so that I know which sites to look at to see if it is loaded on their site as well" | |
|---|---|---|---|---|
| Pornhub Support ("Tanya") | Former Jane Doe No. 2 in this case | 12/14/2018 – 7/4/2019 | 12/14/2018 Email in which "Tanya" tells Former Jane Doe No. 2 the following with respect to her request that Pornhub take down the CSAM video of her: "Please provide us with the link to the videos and/or pictures in order for us to remove them."<br><br>7/2/2019 Email in which "Tanya" tells former Jane Doe No. 2 with respect to her CSAM video on Pornhub: "In order to locate and remove the content, we require more information.   The quickest way is with the link to the video." | Email and Chats with Pornhub Support |
| Pornhub Support ("Brett Hall") | Former Jane Doe No. 2 in this case | 1/9/2019 – 9/8/2019 | 8/5/2019 Email in which "Brett Hall" tells Former Jane Doe No. 2 with respect to repeated uploads of her CSAM video to Pornhub: "It's a violation of our terms of service to upload content | Email and Chats with Pornhub Support |

COMPLAINT

| | | | | |
|---|---|---|---|---|
| | | | without consent and permission of all parties. To prevent further uploads of this video to our website, please consider fingerprinting it with Vobile, a third party provider of a database against which every content uploaded to Pornhub is scanned." | |
| Pornhub Content Partner Team ("Jonny") | Former Jane Doe No. 28 in this case | 4/4/2019 | Pornhub] Re: CONTENT REMOVAL [Reference # 691760] | Email |
| Pornhub Support ("Tanya") | Former Jane Doe No. 33 in this case | 4/29/2019-4/30/2019 | 4/29/2019 Email From "Tanya" instructing Former Jane Doe No. 33 to "[p]lease provide us with the link to the videos and/or pictures in order for us to remove them" even after Former Jane Doe No. 33 had already told Pornhub Support "I'm not sure if [sic] the URL." | Emails |
| Pornhub Copyright ("Jenn") | Former Jane Doe No. 28 in this case | 8/9/2019 | [Pornhub] Re: Revenge Porn [Reference # 918779] | Emails |
| Pornhub Support ("Frankie") | Former Jane Doe No. 29 in this case | 4/9/2020 – 4/16/2020 | 4/9/2020 Email from "Frankie" falsely informing Former Jane Doe No. 29: "The videos have been removed." Former Jane Doe No. 29 responded two days later: "The videos have not been removed, I can | Emails and Chats with Pornhub Support |

COMPLAINT

| | | | click on each link and still see them!!" 4/14/2020 Email from "Frankie" informing Former Jane Doe No. 29 that "[w]e have reinstated the videos" because "[t]he Model has provided the necessary 2257 documentation and your IDs." | |
|---|---|---|---|---|
| Pornhub Support | Former Jane Doe No. 3 in this case | 5/29/2020 | 5/29/2020 Email from Pornhub Support indicating that "[w]e are currently experiencing a delay in responses due to an increase in volume." | Email |
| Pornhub Support ("Tanya") | Former Jane Doe No. 3 in this case | 5/27/2020 | 5/27/2020 Email from "Tanya" to Former Jane Doe No. 3 providing, in pertinent part: "[T]he video will be removed. We have taken it upon ourselves to fingerprint the content with Vobile on your behalf.   This should effectively block future uploads of the video.   Please note that we offer no guarantee . . . Furthermore we recommend that you educate yourself on [Vobile's] services and the limitations of digital fingerprinting technology." | Email |

150
COMPLAINT

| | | | | |
|---|---|---|---|---|
| Pornhub Support ("Joan") | Former Jane Doe No. 3 in this case | 6/3/2020 | 6/3/2020 Email in which "Joan" states, in pertinent part, "one of our most important responsibilities is not only keeping our platform free of illegal material, but helping to protect against the dissemination of online child sexual abuse material.   We do not tolerate any behaviour or content that features, let alone exploits children online. . . . We have a strict zero-tolerance policy toward such content and our enforcement of that policy includes, amongst other things, the use of several advanced industry technological tools such as PhotoDNA (to help protect against the upload of photos that constitute and/or feature known child sexual abuse material), CSAI Match (to help protect against the upload of videos that constitute and/or feature known child sexual abuse material), and MediaWise by Vobile (a fingerprinting technology that allows user generated content sharing platforms, like | Email |

151

COMPLAINT

| | | | Pornhub, to mark identified violative content to help protect against future uploads of that same content on their respective platforms).    We also report all identified apparent child pornography to the NCMEC (the National Centre for Missing and Exploited Children).” . | |
| Pornhub Support (“Marie-Frederique” and “Janie”) | Former Jane Doe No. 29 in this case | 12/5/2020 – 12/6/2020 | 12/5/2020 Email from “Marie-Frederique” to Former Jane Doe No. 29 explaining the following with respect to Former Jane Doe No. 29’s takedown request: “[W]e need some more information for you. Can you please clarify the reason for the removal?”  12/6/2020 Email from “Janie” to Former Jane Doe No. 29 stating, in pertinent part: “Please be aware that we consider it a serious violation of our terms of service to upload content without the consent and permission of all parties featured in the content in question.    We take seriously our commitment to protecting the safety of | Chats with Pornhub Support |

COMPLAINT

| | | | our users and integrity of our platform." The email also explained that, although the videos had ostensibly been fingerprinted with Vobile and that "[t]his should effectively block future uploads of the content," Pornhub "offer[red] no guarantee . . . We strongly recommend that you take some time to fully learn about Vobile's services and the limitations of digital fingerprinting technology." | |

452. Further, MindGeek worked hard to conceal and suppress the truth about its business model was an Enterprise based on racketeering and a criminal scheme to shame, discredit, intimidate, and silence victims, including through public statements on Twitter, Instagram, and other electronic platforms that use the wires.

453. Defendants engaged in the above-referenced conduct with the intent to deceive the public into believing that the content was lawful and consensual.

454. This false façade played on the general public's misunderstanding that because users were not operating on the dark web, but on Pornhub, the content was consensual and legal. Upon information and belief, members of the public relied upon Defendants' fraud to access content that was CSAM or trafficked content, including the videos of Plaintiff and content that required payment to access, as well as to purchase products or service that were advertised alongside that nonconsensual or illegal content.

(iv) **Money Laundering**

455. In furtherance of the Enterprise's sex trafficking scheme and campaign

153

COMPLAINT

to defraud, the Enterprise knowingly engaged in monetary transactions involving illicit proceeds in excess of $10,000 derived from its sex trafficking of Plaintiff.

456.    As detailed herein, the Enterprise created a labyrinth of shell companies with no purpose, existence, or operations on a daily and monthly basis, not only to mask the Enterprise's criminal conduct, but to launder money to other Enterprise members.    As set forth herein, the Enterprise deposited, withdrew, transferred, or exchanged funds in or affecting interstate or foreign commerce to a financial institution.    MindGeek used its byzantine, multi-national financial and corporate structure to evade taxes and execute scams.    Despite generating hundreds of millions of dollars of revenue annually, MindGeek effectively pays no taxes anywhere.    No one jurisdiction can effectively investigate this tax evasion because the sham shell companies are too numerous and are too dispersed across so many jurisdictions.        MindGeek used its network of sham entities to launder money and pay other Enterprise members, resulting in net operating losses for MindGeek but substantial compensation for other Enterprise members.

457.    In thousands of transactions, MindGeek shared and distributed the Enterprise's profits among its global network of sex traffickers.    By way of example only, to simulate "user" uploaded content, MindGeek paid third parties, including Enterprise affiliates, MindGeek partner channels, and a network of other entities, to receive, format, and upload sex trafficking content to MindGeek's tubesites.    These transactions were structured so that the entities that made direct payments to sex traffickers and other business partners under investigation were shell entities far removed from the main MindGeek corporate entities with no invoice or paper trail

458.    MindGeek and its network of sex traffickers knew that these funds were derived from the Enterprise's racketeering activity, including sex trafficking, sexually exploitation of children, and mail and wire fraud.

1                                    *       *       *

2       459.   Each of the predicate acts referred to in the preceding paragraphs was

3   carried out for the purpose of executing the Enterprise's fraudulent scheme and

4   furthering the Enterprise's common purpose, and as set forth herein, defendants and

5   enterprise members engaged in such acts with the specific intent of furthering that

6   scheme willfully and with knowledge of its falsity. Each Defendant performed or

7   participated in the performance of at least two of the predicate acts.

8       460.   The conduct and actions set forth herein were related to each other by

9   virtue of: (a) common participants; (b) a common victim or victims; (c) the common

10  purpose and common result.

11      461.   Defendants' activities were interrelated, not isolated, and involved a

12  calculated series of repeated violations of the law in order to conceal and promote

13  fraudulent activity. The Enterprise has existed with the current members and others

14  as yet unknown since at least 2007, and the conduct and activities have continued as

15  of the date of this Complaint.

16      462.   Each of the Defendants conducted the Enterprise by playing at least

17  some part in directing the Enterprise's affairs by engaging in the conduct set forth

18  herein, including, *inter alia*, the conduct undertaken by each Defendant to further the

19  common purpose.

20      463.   Defendants' direct and indirect participation in the Enterprise's affairs

21  through the pattern of racketeering and activity described herein constitutes a

22  violation of 18 U.S.C. § 1962(c).As a direct and proximate cause of defendants'

23  violations of 18 U.S.C. § 1962(c), Plaintiff has sustained damage to her business and

24  property, including injury by reason of the predicate acts constituting the pattern of

25  racketeering activity set forth above that was not only foreseeable but intended and

26  an objective of the predicate activity.

27      464.   Plaintiff's damages include, but are not limited, to costs incurred to

28

remove nonconsensual, sexually explicit videos and photographs from MindGeek's websites, including attorney's fees, consulting fees, and other lost income; deprivation of employment opportunities; and loss of her image.    The Enterprise's misappropriation and misuse of Plaintiff's images damaged the commercial value of Plaintiff's image.    Further, the Enterprise received an improper financial benefit in the form of advertising revenue sold based on views of pornographic videos containing Plaintiff's image, which were hosted on and reuploaded to MindGeek's tubesites without Plaintiff's consent.

465.   As a result of the violations of 18 U.S.C. § 1962(c), Plaintiff's has suffered damages in an amount to be proven at trial.    Plaintiff is entitled to recover from Defendants the amount in which she has been damaged, to be trebled in accordance with 18 U.S.C. § 1964(c), together with interest, costs, and attorneys' fees incurred by reason of the Enterprise's violations of 18 U.S.C. § 1962(c), and disgorgement of Defendants' illicit proceeds. Plaintiff is also entitled to an injunction against future misuse of her image.

## COUNT VIII

## (Violation of 18 U.S.C. § 1962(d))

## (Against All Defendants)

466.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

467.   As set forth herein, during the Scheme Period, each Defendant willfully, knowingly, and unlawfully conspired to, and did further the efforts of the Enterprise to, perpetrate the scheme against Plaintiff and others through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).

468.   In furtherance of the conspiracy, and to effectuate its objectives, each Defendant and Enterprise member agreed that the following predicate acts, among others, would be committed by one or more of the members to the conspiracy: (a)

sex trafficking in violation of 18 U.S.C. § 1591; (b) sexual exploitation of children in violation of 18 U.S.C. § 2252; (c) money laundering of illicit proceeds in violation of 18 U.S.C. §1957; and (d) the use of mail and wires in connection with a scheme to defraud users that MindGeek is a legitimate business and that it distributes and monetizes only legal, consensual, and verified content, when in fact MindGeek recruits, solicits, produces, maintains, distributes, and monetizes sex trafficking in violation of 18 U.S.C. §§ 1341 and 1343, as set forth in 18 U.S.C. § 1961(1)(B).

469.   Specifically, the following predicate acts were performed at the direction of, and/or were foreseeable to, Defendants for the purpose of executing the scheme to (a) solicit, entice, and recruit users to upload to MindGeek's tubesites videos and photographs of sexually explicit conduct, including of children and adults engaging in nonconsensual sex acts and nonconsensual posting of sex acts, (b) knowingly benefit from thousands of such videos and photographs posted to MindGeek's tubesites, (c) knowingly possess and distribute child pornography, and (d) deceive users that MindGeek is a legitimate business.

470.   It was specifically intended and foreseen by Defendants that the Enterprise would engage in and conduct activities which affected interstate commerce.   Each Defendant was aware of the various racketeering schemes, assented to the efforts of the Enterprise to carry out these acts, and acted in furtherance of the conspiracy.

471.   The pattern of racketeering consisted of multiple acts of racketeering by each Defendant.   The activities of Defendants were interrelated, not isolated, and were perpetrated for the same or similar purposes by the same persons.   These activities extended for several years up to the commencement of this action. Defendants' conduct constitutes a conspiracy to violate 18 U.S.C. § 1962(c), in violation of 18 U.S.C. § 1962(d).

472.   Plaintiff has been injured in her business and property as a direct and

proximate cause of Defendants' conspiracy to violate 18 U.S.C. § 1962(c), and the overt acts taken in furtherance of that conspiracy.

473.   Plaintiff has been injured in her business and property as a direct and proximate cause of Defendants' violations of 18 U.S.C. § 1962(d), including injury by reason of the predicate acts constituting the pattern of racketeering activity set forth above.

474.   Plaintiff's damages include, but are not limited, to costs incurred to remove nonconsensual, sexually explicit videos and photographs from MindGeek's websites, including interference with her employment; loss of her image; and costs associated with retaining an investigatory firm to investigate whether any of her videos were still accessible on Pornhub or other pornographic sites and to facilitate takedown requests.   The Enterprise's misappropriation and misuse of Plaintiff's image damaged the commercial value of Plaintiff's image.   Further, the Enterprise received an improper financial benefit in the form of advertising revenue sold based on views of pornographic videos containing Plaintiff's image, which were hosted on MindGeek's tubesites without Plaintiff's consent.

475.   As a result of violations of 18 U.S.C. § 1962(d), Plaintiff has suffered substantial damages in an amount to be proven at trial.   Plaintiff is entitled to recover from Defendants the amount in which she has been damaged, to be trebled in accordance with 18 U.S.C. § 1964(c), together with interest, costs, and attorneys' fees incurred by reason of the Enterprise's violations of 18 U.S.C. § 1962(d), and disgorgement of Defendants' illicit proceeds.

## COUNT IX

### (Public Disclosure of Private Facts)

### (Against The MindGeek Defendants)

476.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

477.   By maintaining, streaming, distributing, reuploading, and monetizing videos and images of sexually explicit conduct, including nonconsensual sexual acts and child pornography, of Plaintiff on its websites, including but not limited to Pornhub, MindGeek publicly disclosed private facts about Plaintiff.

478.   Before this disclosure, the videos and images of nonconsensual sexual acts and child pornography of Plaintiff were private and not known to the public.

479.   The videos and images of sexually explicit conduct, including nonconsensual sexual acts and child pornography, of Plaintiff made known to the public are highly offensive and objectionable to a reasonable person.

480.   MindGeek disclosed the videos and images of sexually explicit conduct, including nonconsensual sexual acts and child pornography, of Plaintiff with knowledge that they are highly offensive or with reckless disregard of whether they are highly offensive.

481.   The videos and images of sexually explicit conduct, including nonconsensual sexual acts and child pornography, of Plaintiff are not of legitimate public concern.

482.   Plaintiff has suffered substantial physical, psychological, financial, and reputational harm, as well as other damages, as the result of MindGeek's public disclosure of the videos and images of sexually explicit conduct, including nonconsensual sexual acts and child pornography, of Plaintiff.

483.   MindGeek's conduct was malicious and/or the MindGeek Defendants acted with the intent to vex, injure, or annoy, or with a conscious disregard of the Plaintiff's rights, and Plaintiff is entitled to injunctive relief, and compensatory and punitive damages.

COMPLAINT

## COUNT X

### (Intrusion Into Private Affairs)

### (Against The MindGeek Defendants)

484.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

485.    By maintaining, streaming, distributing, reuploading, and monetizing videos and images of nonconsensual sexual acts and child pornography of Plaintiff on its websites, including but not limited to Pornhub, MindGeek intentionally intruded upon the solitude or seclusion, private affairs or concerns of Plaintiff.

486.    The intrusion was substantial, and of a kind that would be highly offensive to an ordinarily reasonable person.

487.    Plaintiff has suffered substantial physical, psychological, financial, and reputational harm, as well as other damages, as the result of MindGeek's intrusion into Plaintiff's private affairs.

488.    Because MindGeek has engaged in conduct of an oppressive, fraudulent, and malicious nature, Plaintiff is entitled to punitive damages.

## COUNT XI

### (Placing Plaintiff In False Light)

### (Against The MindGeek Defendants)

489.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

490.    By maintaining, streaming, distributing, reuploading, and monetizing videos and images of nonconsensual sexual acts and child pornography of Plaintiff on its websites, including Pornhub, MindGeek made a public disclosure of a fact about Plaintiff.

491.    The fact disclosed was false and portrayed Plaintiff in a false light.   Namely, Plaintiff was placed before the public in a false light because

viewers and at least some users of the websites, including but not limited to Pornhub, may have, and likely did, believe that Plaintiff voluntarily appeared in the videos and images, willingly engaged in pornography, and made money as "actors" off of the posting of the videos and images.

492.    The false light in which Plaintiff was placed would be highly offensive to a reasonable person.

493.    MindGeek had knowledge of or acted in reckless disregard of the falsity of the publicized fact and the false light in which Plaintiff would be placed.

494.    As a result of MindGeek's wrongdoing, Plaintiff has suffered substantial physical, psychological, financial, and reputational harm, as well as other damages.

495.    Because MindGeek has engaged in conduct of an oppressive, fraudulent, and malicious nature, Plaintiff is entitled to punitive damages.

## COUNT XII

### (Common Law Misappropriation Of Name And Likeness)

### (Against The MindGeek Defendants)

496.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

497.    By maintaining, streaming, distributing, reuploading, and monetizing videos and images of nonconsensual sexual acts and child pornography of Plaintiff on their websites, including but not limited to Pornhub, MindGeek appropriated Plaintiff's identity, image, likeness, and pictures.

498.    The appropriation of Plaintiff's identity, image, likeness, and pictures was for MindGeek's own purposes or benefit, commercially or otherwise. MindGeek financially benefitted from these videos and images.

499.    Plaintiff did not consent to this appropriation.

500.    Plaintiff has suffered substantial physical, psychological, financial, and reputational harm, as well as other damages, as the result

COMPLAINT

of MindGeek's appropriation of Plaintiff's identity, image, likeness, and pictures.

501.   Plaintiff is entitled to, among other remedies, compensatory and punitive damages, restitution of all amounts to which Defendants have been unjustly enriched as a result of the misappropriation, disgorgement of Defendants' profits from the misappropriation, and injunctive relief.

## COUNT XIII

## (Misappropriation Of Name And Likeness In Violation of Cal. Civil Code 3344)

## (Against The MindGeek Defendants)

502.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

503.   By maintaining, streaming, distributing, reuploading, and monetizing videos and images of nonconsensual sexual acts and child pornography of Plaintiff on its websites, including by not limited to Pornhub, MindGeek knowingly appropriated Plaintiff's identity, image, likeness, and pictures.

504.   The appropriation of Plaintiff's identity, image, likeness, and pictures was for MindGeek's own purposes or benefit, commercially or otherwise. MindGeek financially benefitted from these videos.

505.   Plaintiff did not consent to this appropriation.

506.   Plaintiff has suffered substantial physical, psychological, financial, and reputational harm, as well as other damages, as the result of MindGeek's appropriation of the Plaintiff's identity, image, likeness, and pictures.

507.   Plaintiff is entitled to, among other remedies, compensatory and punitive damages, restitution of all amounts to which Defendants have been unjustly enriched as a result of the misappropriation, disgorgement of Defendants' profits from the misappropriation, and injunctive relief.

1
**COUNT XIV**

2
**(Distribution Of Private Sexually Explicit Materials in Violation of California**

3
**Civil Code § 1708.85)**

4
**(Against The MindGeek Defendants)**

5
508.   Plaintiff incorporates by reference and realleges each and

6
every allegation contained above, as though fully set forth herein.

7
509.   By maintaining, streaming, distributing, reuploading, and monetizing

8
videos and images of sexually explicit conduct, including nonconsensual sexual acts

9
and child pornography, of Plaintiff on its websites, including but not limited to

10
Pornhub, MindGeek intentionally distributed videos and images of Plaintiff.

11
510.   The distributed material exposed an intimate body part of Plaintiff

12
and/or shows Plaintiff engaged in sexually explicit conduct, including exposure of an

13
intimate body part, or an act of intercourse or oral copulation.

14
511.   Plaintiff did not consent to MindGeek's online and widespread

15
distribution of the videos and images depicting her.

16
512.   Plaintiff had a reasonable expectation that the material would remain

17
private.

18
513.   MindGeek knew that the Plaintiff had a reasonable expectation that the

19
material, which constituted CSAM, would remain private.

20
514.   Plaintiff has suffered substantial physical, psychological, financial, and

21
reputational harm, as well as other damages, as a result of MindGeek's intentional

22
distribution of the Plaintiff's videos and images.

23
**COUNT XV**

24
**(Negligence)**

25
**( Against The MindGeek Defendants)**

26
515.   Plaintiff incorporates by reference and realleges each and every

27
allegation contained above, as though fully set forth herein.

28

163

516.    MindGeek had a duty to use ordinary care and to prevent injury to Plaintiff.

517.    By maintaining, streaming, distributing, reuploading, and monetizing videos and images of nonconsensual sexual acts and child pornography of Plaintiff on its websites, failing to take down videos and images upon request but merely disabling the link, and by reuploading illegal content, among other wrongdoing detailed herein, MindGeek breached the duty of care to Plaintiff.

518.    MindGeek's breach of its duty of care caused harm to Plaintiff.

519.    Plaintiff has suffered substantial physical, psychological, financial, and reputational harm, as well as other damages, as the result of MindGeek's breach of the duty of ordinary care.

## COUNT XVI

### (Violation Of Cal. Bus. & Prof. Code §§ 17200 and 17500)

### (Against All Defendants)

6.    Plaintiff incorporates by reference and realleges each and every allegation set forth above as if fully set forth herein.

520.    Defendants have engaged in unlawful, unfair, and fraudulent business acts and practices by participating in a venture engaged in trafficking that intentionally produced, recruited, funded, disseminated, and monetized the dissemination of CSAM materials, sex abuse, trafficking content, and other nonconsensual content on its site.

521.    Defendants fraudulently deceived its users that they were monetizing, distributing, and advertising legitimate, legal content, when in fact defendants' websites were riddled with videos of rape, child pornography, sex trafficking, and other nonconsensual content, including videos of Plaintiff.    Defendants knowingly had inadequate age and consent verification systems in place that enabled users to upload child pornography to Defendants' websites.    This conduct constitutes an

unlawful, unfair, and fraudulent business act and practice.

522.   Defendants profited by selling advertising space to display advertisements alongside Plaintiff's videos, images, and likenesses without her consent.

523.   Defendants profited by featuring Plaintiff's videos, images, and likenesses without her consent to drive user traffic to their websites.

524.   This conduct constitutes an unlawful, unfair, and fraudulent business act and practice.

525.   Plaintiff has a financial interest in the use of her own videos, images, and likeness.

526.   As a result of Defendants' use of Plaintiff's videos, images, and likeness without Plaintiff's consent, Plaintiff has lost money to which she is rightfully entitled.

527.   As a result of Defendants' use of Plaintiff's videos, images, and likenesses without Plaintiff's consent, Plaintiff has suffered financial harm in the form of costs for therapy as well as substantial time away from her work and substantial expense hiring a company to assist her with her efforts investigate the continued dissemination of her videos on Pornhub and facilitate the take downs of her CSAM from MindGeek's tubesites.

528.   Plaintiff seeks restitution of all amounts to which Defendants have been unjustly enriched as a result of their unlawful, unfair, and/or fraudulent acts, and disgorgement of all profits Defendants have made through the unlawful, unfair, and/or fraudulent acts.

529.   Plaintiff is entitled to preliminary and permanent injunctive relief restraining the Defendants from committing further unfair trade practices and mandating the full disclosure of Defendants' personal and financial interests in causing Plaintiff's harm.

COMPLAINT

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# COUNT XVII

## (Civil Conspiracy)

## (Against All Defendants)

530.   Plaintiff incorporates by reference and realleges each and every allegation set forth above as if fully set forth herein.

531.   As set forth herein, Defendants conspired and acted in concert to commit unlawful acts.    Each of the Defendants shared the same conspiratorial objective, which was to maintain, stream, reupload, monetize, and distribute CSAM and other nonconsensual content and/or to benefit financially from such distribution so as to maximize profits and to do so while deceiving the public to believe that all content on MindGeek's tubesites was lawful and consensual.

532.   Defendants' conspiratorial scheme was carried out by the commission of the wrongful and overt acts set forth above, including, but not limited to:

(a)   recruiting, commissioning, paying for, soliciting content produced through human trafficking and slavery;

(b)   producing CSAM and nonconsensual sexual content through MindGeek owned production companies;

(c)   partnering with known traffickers;

(d)   advertising MindGeek tubesites prior to playing videos containing CSAM or otherwise illegal and trafficked content, including, upon information and belief, the CSAM videos of Plaintiff;

(e)   generating substantial advertisement revenue based on CSAM and otherwise illegal and trafficked content, including, upon information and belief, the CSAM videos of Plaintiff;

(f)   pushing all content posted on any of its tubesites, including the CSAM videos of Plaintiff, regardless of its initial sourcing to its other tubesites which it falsely portrayed as posted by a user other

COMPLAINT

1          than MindGeek;

2     (g)  modifying effective content and duplicating to optimize search

3          engine optimization ("SEO"), including to make content appear as

4          if it was user made;

5     (h)  creating playlists that target viewers interested in child

6          pornography and other illegal content;

7     (i)   featuring categories on their websites that target users interested in

8          child pornography and other sexual abuse, trafficking and

9          nonconsensual materials;

10    (j)   directing users to describe their videos using categories like "teen"

11         to drive traffic;

12    (k)  maintaining the webpage and thumbnails for disabled videos so that

13         the MindGeek Defendants can continue to generate traffic and

14         revenue from that illegal content;

15    (l)  maintaining a search and tagging system—which include tags such

16         as "passed out teen," and "sleeping pills"—to make it easier for

17         users to find and view videos of child and adult sex abuse, sex

18         trafficking, and other nonconsensual content;

19    (m) providing guidance to its global network of sex traffickers on how

20         to upload videos of sex trafficking and evade criminal

21         liability while complying with MindGeek's purposefully

22         loose restrictions, including by maintaining public list of "banned

23         words"—*i.e.*, words to avoid in the title of videos;

24    (n)  providing its global network of sex traffickers VPN services

25         to allow them to cover up their unlawful conduct by obscuring the

26         sex traffickers' locations and identities;

27    (o)  allowing anyone to anonymously upload and download videos on

28

167

COMPLAINT

1    its tubesites, so that it would be extremely difficult for victims to

2    have their videos permanently removed, thus

3    increasing MindGeek's advertising revenue and profits;

4    (p)    allowing removed videos to reuploaded to its site; and

5    (q)    allowing all videos to be downloaded which facilitated the reupload

6    by different users with different titles.

7    533.    At all relevant times, Defendants' conduct was willful and done with

8    legal malice and knowledge that it was wrongful.

9    534.    As a direct, proximate result of the operation and execution of the

10    conspiracy, Plaintiff has been injured and suffered damages in an amount to be

11    proven at trial.

12    **<u>PRAYER FOR RELIEF</u>**

13    WHEREFORE, Plaintiff demands judgment in her favor and against the

14    Defendants, jointly and severally:

15    A.    Awarding Plaintiff compensatory damages in an amount to be

16    determined at trial;

17    B.    Awarding Plaintiff restitution for all monies defendants earned

18    marketing, selling, and exploiting Plaintiff's videos, pictures, likeness, and images;

19    C.    Awarding Plaintiff punitive damages;

20    D.    Awarding Plaintiff her attorney fees and costs and expenses for

21    litigating this case;

22    E.    Awarding Plaintiff treble damages;

23    F.    Awarding Plaintiff pre-judgment and post-judgment interest;

24    G.    Awarding Plaintiff injunctive relief;

25    H.    Granting such other and further relief as this Court deems just and

26    equitable.

27    **<u>DEMAND FOR JURY TRIAL</u>**

28

COMPLAINT

1    Plaintiff demands a jury trial for all triable issues of fact.

2

3  DATED:    March 21, 2022          Respectfully submitted,

4                                    BROWN RUDNICK LLP

5

6

7                                    By:  */s/ Michael J. Bowe*

8                                         Michael J. Bowe
                                          (admitted *pro hac vice*)
9

10                                        *Attorneys for Plaintiff*

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COMPLAINT