# EXHIBIT 1

**C A N A D A**

**PROVINCE OF QUÉBEC**
**DISTRICT OF MONTRÉAL**

**NO : 500-06-001115-209**

**(Class Action)**
**SUPERIOR COURT**

**JANE DOE**

Applicant

c.

**9219-1568 QUÉBEC INC.**

and

**MINDGEEK S.A.R.L.**

and

**MG FREESITES LTD**

and

[…]

<u>**MINDGEEK USA INCORPORATED**, a legal person having a place of business at 21800, Oxnard Street, Suite 150, Woodland Hills, California, 91367, United States</u>

<u>and</u>

<u>**MG BILLING LTD**, a private limited liability company incorporated under the laws of Ireland, having a place of business at 77, Sir John Rogerson's Quay, suite 1192, Dublin 2, Dublin, Ireland</u>

<u>and</u>

<u>**FERAS ANTOON**, an individual residing at 3700, rue Pierre-Daviault, Saint-Laurent, Québec, H4R 3K4</u>

<u>and</u>

**DAVID TASSILLO**, an individual residing at 342, rue des Anemones, Laval, Québec, H7X 0C1

and

**COREY URMAN**, an individual having his place of work at 7777, Décarie Boulevard, office 300, Montréal, Québec, H4P 2H2

and

**9279-2738 QUÉBEC INC.**, legal person having its head office at 7777, Décarie Boulevard, office 600, Montréal, Québec, H4P 2H2

and

**SOCIÉTÉ DE GESTION FDCO INC.**, legal person having its head office at 7777, Décarie Boulevard, office 600, Montréal, Québec, H4P 2H2

and

**9288-1259 QUÉBEC INC.**, legal person having its head office at 7777, Décarie Boulevard, office 600, Montréal, Québec, H4P 2H2

and

**9288-1275 QUÉBEC INC.**, legal person having its head office at 7777, Décarie Boulevard, office 600, Montréal, Québec, H4P 2H2

Defendants

---

# **AMENDED** APPLICATION FOR AUTHORIZATION TO INSTITUTE A CLASS ACTION AND TO OBTAIN THE STATUS OF REPRESENTATIVE
### (Sections 571 *C.C.P.* and following)

---

**[…] TO THE HONOURABLE JUSTICE DONALD BISSON, S.C.J., DESIGNATED TO HEAR ALL PROCEEDINGS IN THE PRESENT ACTION, THE APPLICANT STATES AS FOLLOWS:**

## I. GENERAL PRESENTATION

### A) THE CLASS ACTION

1.  Applicant wishes to institute a class action on behalf of the natural persons forming part of the class hereinafter described, namely:

    > Since 2007, all natural persons whose intimate videos or photos, (including child sexual abuse material, images of sexual assault and non-consensual intimate images) were posted without their consent on a website owned or operated by the defendants, directly or indirectly;

    > or, subsidiarily:

    > Since 2007, all natural persons in Canada whose intimate videos or photos, (including child sexual abuse material, images of sexual assault and non-consensual intimate images) were posted without their consent on a website owned or operated by the defendants, directly or indirectly;

    > (hereinafter referred to as the "**Class**")

    or any other Class to be determined by the Court;

2.  This action arises from the publication by the defendants, on several websites that one or more of them own or host, of intimate videos or photos <u>that</u> were posted without the consent of the subjects (the "**non-consensual content**").  This includes, but is not limited to, the illegal dissemination by the defendants, directly or indirectly, of content for streaming and download that depicts child sexual abuse material, the sexual assault of non-consenting adults, and intimate images ("**non-consensual intimate images**") of adults who have not consented to the public dissemination of such content;

3.  As a consequence of the foregoing, the Applicant, and the Class members, who featured in the non-consensual content published on the defendants' websites, suffered, and continue to suffer damages for which they are entitled to receive compensation;

### B) THE DEFENDANTS

4.  The defendant 9219-1568 Québec Inc. (which carries on business as MindGeek) is a Montréal-based company with between 750 and 999 employees, as appears from the État

des renseignements d'une personne morale au registre des entreprises which will be produced as **Exhibit P-1**, with a portfolio of pornographic websites;

5. The defendant MindGeek s.a.r.l., <u>formerly known as Manwin,</u> is a legal person having a place of business at 32 Boulevard Royal, 2449 Luxembourg, Luxembourg, which owns, operates and/or manages one or several of the websites;

6. The defendant, MG Freesites Ltd, <u>(d/b/a Pornhub)</u> is a private limited liability company incorporated under the laws of the Republic of Cyprus having a place of business at 195-197 Old Nicosia-Limassol Road, Block 1 Dali Industrial Zone, Cyprus 2540. MG Freesites Ltd. owns, operates and/or manages one or several of the websites;

7. […];

8. […];

8.1. <u>The defendant MindGeek USA Incorporated is a legal person incorporated under the laws of Delaware, having a place of business at 21800, Oxnard Street, Suite 150, Woodland Hills, California, 91367, United States. MindGeek USA Incorporated owns and operates a series of database hosting adult-only content;</u>

8.2. <u>The defendant MG Billing Ltd. is a private limited liability company incorporated under the laws of Ireland, having a place of business at 77, Sir John Rogerson's Quay, Suite 1192, Dublin 2, Dublin, Ireland. MG Billing Ltd. is the entity receiving subscription fees from premium members on the PornHub websites;</u>

8.3. <u>The non-consensual videos hosted on these PornHub sites generated significant subscription fees and profits for the defendants, both collectively and individually;</u>

8.4. <u>In 2018, the defendant MG Billing Ltd. had revenues of $220.9 million, as appears from an article from The Journal titled "Grant Thornton has resigned as auditors to firms owned by operator of Pornhub" dated February 10, 2021, which will be produced as **Exhibit P-2**;</u>

8.5. <u>The defendant Feras Antoon is a natural person who resides in Quebec and is the chief executive officer (CEO) of 9219-1568 Québec Inc., among other things;</u>

8.6. <u>The defendant David Tassillo is a natural person who resides in Quebec and is the chief operating officer (COO) of 9219-1568 Québec Inc., among other things;</u>

8.7. <u>The defendant Corey Urman is a natural person who resides in Quebec and is the vice-president of product management, video-sharing platforms for 9219-1568 Québec Inc.;</u>

8.8. <u>The defendants Feras Antoon, David Tassillo, and Corey Urman together are referred to as "**MindGeek Principals**";</u>

8.9. <u>The defendant 9279-2738 Québec Inc. is a holding company incorporated in Québec and the majority owner of 9219-1568 Québec Inc., as appears from the État des</u>

renseignements d'une personne morale au registre des entreprises, which will be produced as **Exhibit P-3**;

8.10. The defendant Société de gestion FDCO Inc., previously known as MindGeek Holding Inc., is a holding company incorporated in Québec, as appears from the État des renseignements d'une personne morale au registre des entreprises, which will be produced as **Exhibit P-4**;

8.11. Société de gestion FDCO Inc. is the majority owner of MindGeek s.a.r.l. as appears from the Formulaire de réquisition filed on November 25, 2013 on the Registre de Commerce et des Sociétés du Luxembourg, which will be produced as **Exhibit P-5**;

8.12. The defendant 9288-1259 Québec Inc. is a holding company incorporated in Québec, and the majority owner of Société de gestion FDCO Inc. Its majority owner is Feras Antoon, as appears from the État des renseignements d'une personne morale au registre des entreprises, which will be produced as **Exhibit P-6**;

8.13. The defendant 9288-1275 Québec Inc. is a holding company incorporated in Québec and the second owner of Société de gestion FDCO Inc. Its majority owner is David Tassillo, as appears from the État des renseignements d'une personne morale au registre des entreprises, which will be produced as **Exhibit P-7**;

8.14. Together, the defendants Feras Antoon, David Tassillo, and Bernd Bergmair own more than 90 percent of MindGeek, as appears from the Globe and Mail article "MindGeek owner stymies multiple bids by investors to buy firm" dated October 4, 2021, which will be produced as **Exhibit P-8**;

9. The defendants together will be referred to as "**MindGeek**";

10. MindGeek has incorporated […] hundreds of subsidiaries and related companies around the world over time, the details of which are unknown to the Class at this time. The structure of MindGeek has changed numerous times throughout the years. However, MindGeek, including the MindGeek Principals, operate[…] as a single business enterprise, commingling its funds and other assets to shelter and avoid liabilities and to hide the identity of its owners, treating each other's assets as their own, issuing shares haphazardly and without authority, holding themselves out as being personally liable for the debts of each other, failing to maintain proper minutes and corporate records, using the same business locations and employing the same employees, failing to adequately capitalize the entities, failing to maintain arm's length relationships among themselves, and diverting assets without consideration to the detriment of and are **thus** jointly and severally liable in this action as alter egos of the other;

10.1. The purpose of these subsidiaries is to seek, to facilitate and to mask illegal conduct and to consequently insulate MindGeek, and the MindGeek Principals, from liabilities;

10.2. For instance, as of 2018, the defendant MindGeek s.a.r.l. has more than 50 subsidiaries which it controls in vast majority, including the defendants 9219-1568 Québec Inc., MG

Freesites Ltd, MindGeek USA Incorporated, MG Billing Ltd. and 9279-2738 Québec Inc., and all their financial statement are consolidated under it, as appears from the Consolidated Financial Statements for the financial year that ended December 31, 2018, which will be produced as **Exhibit P-9**;

10.3.   MindGeek deliberately uses a complex corporate structure which is an amalgam of at least 48 subsidiaries in Luxembourg, Cyprus, Ireland, the U.S., Canada and Romania, among other countries, as appears from the Globe and Mail article "Lifting the veil of secrecy on MindGeek's online pornography empire", dated February 4, 2021, which will be produced as **Exhibit P-10**;

10.4.   Other analyses of MindGeek's complex corporate structure refer to a myriad of multiple companies in countries such as the British Virgin Islands, Canada, Curaçao, Cyprus, Germany, Ireland, Luxembourg, Mauritius, the Netherlands, the U.K and the United States, managing 172 companies in 11 countries, as appears from the online article "Offensive OSINT s01e05-OSINT & Corporate espionage. Tentacles of Mindgeek part 1." on the website "offensiveosint.io", dated May 20, 2020, which will be produced as **Exhibit P-11**;

11.   The most popular of MindGeek's websites is called PornHub, but it also owns multiple other similar websites, such as RedTube, YouPorn, Tube8, PornMD, Thumbzilla, Xtube (which shut down in September 2021), and others (collectively with PornHub, the "**offending websites**");

12.   As part of its business, MindGeek actively solicits, promotes, and facilitates the payment for dissemination on its offending websites of explicit sexual images and videos, from which it generates significant profits;

13.   Although the offending websites offer premium subscription plans, they offer free content for non-members (the majority of visitors), and profit from advertising, co-promotions, and other business arrangements;

14.   PornHub, for example, is one of the most-visited websites in the world, attracting 3.5 billion visits a month and recording almost three billion ad impressions per day, as appears from The New York Times article "The Children of Pornhub" dated December 4, 2020 which will be produced as **Exhibit P-[…]12**;

15.   PornHub has been visited 42 billion times in 2019, as appears from […] Le Journal de Montréal article "MindGeek: agir là où ça fait mal!" dated December 22, 2020 which will be produced as **Exhibit P-[…]13**;

16.   The offending websites […] enable visitors to upload pornographic photos and videos from the general public, including non-consensual content;

17.   Until December 2020, anyone could upload pornographic content to PornHub, which content was then available for streaming or download to save for viewing on a personal computer in perpetuity;

17.1.   The content hosted on the offending websites are stored on servers located throughout the world, including in Los Angeles, New York, and Montréal, with backups in Amsterdam, as appears from a video interview with the previous owner of MindGeek Fabian Thylmann during the 2017 edition of the event WHD.global (also known as Cloudfest), which will be produced as **Exhibit P-14**;

18.   Despite knowing that there […] was a high risk […] that non-consensual content would be uploaded, MindGeek took no steps to ensure that only consensual images and videos would be allowed on the offending websites it owned or operated, directly or indirectly. Instead, MindGeek monetized the non-consensual images and videos for profit;

## C)   THE NON-CONSENSUAL CONTENT

19.   A 2019 investigation by the United Kingdom's Sunday Times discovered dozens of illegal videos of child sexual abuse on PornHub within minutes, some of which depicted children as young as three years old, with some of this content having been posted on the platform several years earlier, as appears from the article "Unilever and Heinz pay for ads on Pornhub, the world's biggest porn site" dated November 3, 2019, which will be produced as **Exhibit P-[…]15**;

20.   MindGeek also hosts content for streaming and downloading, which depict intimate representations, including sexual acts, featuring persons who never consented to such publication;

21.   MindGeek knows […] that the offending websites host non-consensual content for streaming and download including, but not limited to, the sexual abuse of children and intimate depiction of adults, who have not consented to the public dissemination of the content;

21.1.   On October 29, 2019, it was reported in an online Jezebel's article "Hidden Camera Clips Popped Up on Pornhub – and the Problem Won't Go Away", which will be produced as **Exhibit P-16**, that five videos of women showering and changing in a locker room at South Carolina's Limestone College in the United States, without their knowledge or consent, were hosted on PornHub, and despite alerts from parents, MindGeek only took down the videos once the police became involved;

21.2.   Following these events, a civil lawsuit was launched by nine plaintiffs in South Carolina on March 4, 2020, against multiple defendants, including MindGeek. The lawsuit alleges that MindGeek did not take any steps to remove the offending content even though it knew that the content was non-consensual as a result of the take down notices that it received, profiting from the non-consensual content, as described in the Complaint, which will be produced as **Exhibit P-17**;

21.3.   On January 24, 2020, it was reported in the Insider's article "The US Navy wants to know who secretly uploaded videos of sailors to Porn Hub" that dozens of service members of the US Navy were secretly filmed while showering and the videos were uploaded to PornHub, which will be produced as **Exhibit P-18**;

21.4.   In this article, Corey Urman stated that "*Here at Pornhub, we immediately remove any content that violates our terms of use as soon as we are made aware of it.*", which is false;

22.   […] Other examples described in public news articles include:

a)   PornHub hosted a video of a 14-year[…]-old girl being raped, as appears from the BBC News article "I was raped at 14, and the video ended up on a porn site" dated February 10, 2020 which will be produced as **Exhibit P-[…]19**;

b)   The mother of a missing 15-year[…]-old girl discovered many videos of her daughter's rape and sexual abuse on PornHub, as appears from The New York Times article P-[…]10 and the article from the Sun Sentinel titled "58 porno videos of 15-year-old girl led to Davie man's arrest" dated October 23, 2019 which will be produced **Exhibit P-20**;

c)   PornHub hosted the video of a 14-year[…]-old Indigenous girl's sexual assault and torture for months, despite requests for the video's removal;

23.   These examples are described in an open letter to Justin Trudeau, Prime Minister of Canada, dated March 9, 2020, from a group of Canadian Members of Parliament […] and Senators, […] which stated in part as follows:

> " *Dear Prime Minister,*
>
> […]
>
> *Pornhub, owned by Montréal-based MindGeek, is the largest website in the world producing, making available and distributing sexually explicit content, with 42 billion visits and 6.8 million videos uploaded per year. It has come to our attention that some of this content contains the real exploitation of women and minors. In several cases, Pornhub has either refused to remove such videos, or has failed to remove them in a reasonable timeframe.*
>
> *An investigation late last year by the Sunday Times UK found "dozens" of illegal videos of child sexual exploitation on Pornhub within "minutes". Some of the illegal content had been on the platform for more than three years. Following this investigation, PayPal cut off its services to Pornhub in November 2019.*
>
> *Over the last few months, the media has highlighted additional examples of content featuring victims of child sexual exploitation, sex trafficking, and sexual assault being published on Pornhub including:*
>
> *• A 15-year-old girl who had been trafficked and missing for a year was found after 58 videos of her rape and sexual abuse were discovered online, many on Pornhub.*

• *Twenty-two females were lured into filming sex acts and the videos subsequently uploaded to Pornhub. The perpetrators have been charged with sex trafficking.*

• *A 14-year-old indigenous girl's sexual assault and torture were filmed and uploaded to Pornhub which hosted her videos for months despite repeated requests to remove the videos.*

• *A 14-year-old girl was filmed being raped by a 49-year old woman and videos of her rape were uploaded to Pornhub.*

• *A victim of domestic violence was sexually assaulted, and the videos of her abuse uploaded to Pornhub.*

*Each time these videos are viewed-and many have hundreds of thousands of views-the victims are revictimized. This is deeply harmful to those exploited in these videos.*

*The ability for Pornhub, and other online companies, to publish this content, and in some cases to profit off crimes committed against children, victims of sex trafficking and sexual assault, is fundamentally contrary to any efforts to increase gender equality in Canada and protect women and youth from sexual exploitation.*

*In addition, these videos are available online because Pornhub verifies the email address of the account creator and does not require verification of the age or consent of each person featured in subsequent videos that are uploaded.*

*The Government of Canada has a responsibility to ensure that people who appear in sexually explicit content that is uploaded and published online by companies operating in Canada are not children, nor victims of human trafficking or sexual assault. Further, the Government of Canada has a responsibility to investigate those who produce, make available, distribute and sell sexually explicit content featuring victims of child sexual exploitation, sex trafficking, and sexual assault.*

*We, the undersigned Senators and Members of Parliament, call upon the Government of Canada to:*

*[...]*

*2. Ensure that MindGeek's activities are in compliance with Canadian law including, Bill C-22, an Act respecting the mandatory reporting of Internet child pornography by persons who provide an Internet service, which came into force on December 8, 2011, and Bill C-13, the Protecting Canadians from Online Crime Act, which came into force on March 10, 2015; and*

*3. Take whatever other steps are necessary at the federal level to ensure that companies that sell, produce, make available or publish sexually explicit content be required to verify the age and consent of each individual represented in such material.*

*We are committed to working with your government to protect women and youth, particularly those who are victims of child sexual exploitation, sex trafficking, and sexual assault from further exploitation online and addressing this issue in a timely manner.*

*Thank you for your immediate attention to this matter.*

*Sincerely,*

*Senator Julie Miville-Dechéne*
*Independent Senator for Quebec*

*Senator Kim Pate*
*Independent Senator for Ontario*

*John McKay, MP*
*Scarborough-Guildwood*

*Stuator Frances Lankin*
*Independent Senator – Ontario*

*Rosemarie Falk, MP*
*Battlefords- Lloydminster*

*Dr. Colin Carrie, MP*
*Oshawa*

*Arnold Viersen, MP*
*Peace River – Westlock*

*Cathay Wagantall, MP*
*Yorkton – Melville*

*Tom Kmiec, MP*
*Calgary Shepard"*

23.1. <u>PornHub also hosted the video of a 16-year-old girl which was viewed 2,447 times since its upload by a verified account on February 27, 2018, as appears from the ABC News article "Tuscaloosa man charged for producing porn with a minor, uploading it to Pornhub" dated September 16, 2020, which will be produced as **Exhibit P-21**</u>;

24.   On December 15, 2020, a lawsuit was launched in California alleging, among other things,
that:

a)   MindGeek knew or should have known that one of its commercial partners since
2011, GirlsDoPorn, regularly used fraud and coercion to get women to appear in
videos;

b)   For over a decade, GirlsDoPorn sex-trafficked hundreds of high school and college-
aged women using fraud, coercion, and intimidation to get the young women to film
pornographic videos under the false pretense that the videos would remain private,
<u>never published on</u> […] the Internet, and never to be seen in North America, when
in reality, GirlsDoPorn intended to publish the videos online, including on MindGeek
sites;

c)   MindGeek continued to participate in GirlsDoPorn's sex trafficking by marketing,
selling, and exploiting victim's videos, years after MindGeek learned GirlsDoPorn
used fraud, intimidation, and coercion as part of its customary business practices;

d)   MindGeek did not remove videos when requested to do so by the women who
appeared in them, despite […] <u>receiving further facts to prove coercion of the
women;</u>

e)   MindGeek did not end its partnership with GirlsDoPorn until that company's
operators were charged by U.S. authorities in November 2019. One of
GirlsDoPorn's operators, Ruben Andre Garcia, pleaded guilty to two counts of sex
trafficking by force, fraud, and coercion;

as appears from the Complaint which will be produced as **Exhibit P-[…]22**;

24.1.  <u>On or about October 15, 2021, MindGeek reached a settlement with the fifty plaintiffs in
the California civil lawsuit regarding GirlsDoPorn, Exhibit P-21, as appears from the Vice
article "Girls Do Porn' Victims Reach Settlement With Pornhub" dated October 16, 2021,
which will be produced as **Exhibit P-23**. The terms of the settlement are confidential;</u>

25.   MindGeek waited until December 2020, to block unverified users from uploading new
content on PornHub and to suspend millions of videos uploaded by non-verified users
across its platforms, including PornHub, as appears from the The Globe and Mail article
"MindGeek suspends millions of videos uploaded by non-verified users across its
platforms, including Pornhub" dated December 14, 2020 which will be produced as
**Exhibit P-[…]24**;

26.   MindGeek should have taken these and other <u>steps (many of which involve</u> minimal <u>and,
and easily implementable processes)</u> […] <u>far</u> earlier, in 2007, to ensure that non-
consensual content was not posted on its <u>offending</u> websites;

27.   Instead, it generated significant revenue and profit from non-consensual intimate images
and videos hosted on its <u>offending</u> websites;

27.1. <u>On December 11, 2020, the Standing Committee on Access to Information, Privacy and Ethics of the House of Commons ("**ETHI**") adopted a motion to study the "Protection of privacy and reputation on platforms such as Pornhub";</u>

27.2. <u>On December 23, 2020, the website Cuestione reported that REDIM, the Network for the Rights of Children in Mexico, has denounced the presence of child sexual abuse material ("**CSAM**") to MindGeek on the offending websites for many years, but never received any response, as appears from the original article in Spanish *"Pornhub recibió denuncias desde México sobre pronografía infantile en su sitio y las ignoró"* and an automated English translation generated by the website, which will be jointly produced as **Exhibit P-25;**</u>

27.3. <u>On February 2, 2021, the ETHI held its first meeting on the "Protection of privacy and reputation on platforms such as Pornhub" and heard the testimony of Serena Fleites and her lawyer, Michael Bowe. Ms. Fleites is a 19-year-old woman whose intimate videos, while she was 13 years old, were posted on PornHub and were repeatedly reposted on Pornhub even after they were initially removed;</u>

27.4. <u>In her testimony, Serena Fleites explained that despite the videos stating her age and multiple comments pointing that she was a minor, the videos persisted being hosted on the offending websites. Ms Fleites also explained that PornHub did not deal with her takedown requests in good faith, thus prolonging her torment, because PornHub earned significant profits by hosting the videos:</u>

> *<u>**Ms. Serena Fleites:** Basically, when the videos were first uploaded online and I didn't want to tell my mom about them—and I pretended to be my mom—they would say, like, "Oh, well, it's not actually you in the video, so to provide proof that's your daughter and that she's underage, you're going to have to provide...." like, pictures of me next to some sort of identification. They would ask for all these different things. Even after I sent one picture next to whatever identification they asked for, they would ask for another picture next to a different sort of identification, and so on and so forth. They were just dragging out the process for so long even though it was very obvious it was a child in the video. Even if, say, it wasn't me in the video, they could still tell that was a child in the video, yet they were still dragging out this process. They didn't want to take the video down because it had, at that point, millions of views. It was bringing them ad revenue and clicks to their site. It would be at the top of Google for the searches."</u>*

<u>as appears from the transcript of the first meeting, which will be produced as **Exhibit P-26**;</u>

27.5. <u>Michael Bowe provided testimony describing further details of child pornography hosted on the offending websites:</u>

> *<u>"To drive home how real it is, let me give you just a few examples of other victims we've talked to and verified.</u>*

*A girl was raped at 15, and a video was posted on Pornhub and distributed through a community. Pornhub refused to remove the video for three weeks, then said it had been removed when in fact it wasn't removed for another two months, with several hundred thousand additional views, downloads and distribution in that community.*

*A child younger than 10 was sold into trafficking and was the subject of child pornography for almost 10 years. Those videos were distributed on various MindGeek platforms where they could remain at least until later last year.*

*A 15-year-old was secretly filmed via computer hack and then extorted to do other videos. Those videos were posted on Pornhub with her personal information, distributed widely, including to her community and to her family, and subjected her to long-term abuse and stalking. When she raised the issue at Pornhub, it refused to search for the videos or take any other proactive steps to prevent their distribution. The trauma led her to consider suicide.*

*A woman was raped on videotape and it was distributed on Pornhub, including through her community.*

*A 17-year-old was secretly recorded by an underage boyfriend, and it was posted to Pornhub and distributed throughout her school community and to her family, subjecting her to harassment and extortion.*

*A woman was drugged and raped after meeting someone on a date. The rape was videotaped and posted on Pornhub. We believe it was sold on Pornhub by the person who posted it.*

*A 14-year-old was secretly recorded by her boyfriend, who posted the video to Pornhub and distributed it, again, through her school and community.*

*Child pornography posted on Pornhub of an individual had hundreds of thousands of views and an unknown number of downloads. When confronted, Pornhub failed to report it to the authorities. That's something I'll talk about in a second.*

*A 16-year-old was coerced into a sexual act that was videotaped and posted on Pornhub without her knowledge or consent.*

*A 16-year-old girl was trafficked by two American men who filmed the sexual acts as part of the trafficking. In fact, that was what she was offered for. Those acts were posted to Pornhub. This individual is aware of other women in that trafficking ring who were sold for the same purpose.*

*An underage girl was trafficked for years by a business colleague of her father's. Videos were monetized on Pornhub. She reported the incident, but the videos were not taken down for an extended period of time.*

> *An underage girl attempted suicide multiple times and turned to drugs after videos were posted on Pornhub."*

as appears from his testimony before the ETHI on February 2, 2021, Exhibit P-26;

27.6.  The second meeting of the ETHI on the "Protection of privacy and reputation on platforms such as Pornhub" was held on February 5, 2021, and included the testimony of MindGeek Principals, as appears from the transcript of the second meeting, which will be produced as **Exhibit P-27**;

27.7.  On February 12, 2021, a class action lawsuit was filed in Alabama on behalf of all victims who had videos and images of their childhood sex trafficking sold and/or distributed on websites owned, operated, managed, and controlled by MindGeek. The two plaintiffs are women who were childhood victims of sexual abuse to generate child pornography, as appears from the Complaint which will be produced as **Exhibit P-28**;

27.8.  On February 19, 2021, the ETHI held its third meeting on the "Protection of privacy and reputation on platforms such as Pornhub" and heard the testimony of three victims, and the sex trafficking expert Laila Mickelwait, as appears from the transcript of the third meeting, which will be produced as **Exhibit P-29**;

27.9.  Victoria Galy, a woman from Tennessee, testified that PornHub hosted more than 60 non-consensual videos and images of her while she was drugged or intoxicated. MindGeek refused or omitted on multiple occasions to remove the content, asserting that the videos were legitimately consensual videos because they had been claimed by a verified model account on PornHub. However, the model's claims were false and fraudulent. As of December 2020, the videos were only suspended, not removed :

> *"August of 2020, when my memories began to return, I began contacting Pornhub again regarding these videos. Upon visiting their website, I found that there had been many more videos made over that two- to three-year period. I reported many videos, including the ones claimed by Vicky Lust. There were approximately 60 to 65 videos. These were made by my ex, Brandon. Some of the videos were removed, but the ones that were claimed by Vicky Lust were not. I was told that they were claimed by a verified model and that they would not remove them. I sent them numerous emails explaining that the videos were of me and my ex, Brandon, but they refused to listen. I sent them photos of my birthmark, pointed out that I said Brandon's name in at least one of the videos, and even submitted photos of my various body parts to prove that it was me. They still refused to remove them.*

> *[…]*

> *In addition to the clear PowerPoint presentation that was provided to them, the comments that were posted and deleted on the Vicky Lust videos evidenced their non-consensual nature. It was not until after December 2020, when I*

> *filed a civil lawsuit against them pro se, I emailed them a copy and the article came out in The New York Times titled "The Children of Pornhub", that they have now, at least temporarily, suspended these videos. They are of course all over the Internet now, having been downloaded by who knows how many users, and on a plethora of other websites. I will never be able to remove these videos. There were over eight million views just on Pornhub alone. To think of the amount of money that Pornhub has made off my trauma, date rape and sexual exploitation makes me sick to my stomach."*

as appears from her testimony before the ETHI on February 19, 2021, Exhibit P-29;

27.10. Witness #1, a 24-year-old Canadian woman who testified before the ETHI under anonymity, had videos of her assault, while she was unconscious, hosted on PornHub. MindGeek profited from her videos by linking them on other offending websites to create traffic :

> *"To give an idea of the scope of the spread, as of early January 2021—after the December purge, and after the RCMP had removed a bunch for me—googling the name of my Pornhub video still returned over 1,900 results. One cause of the spread is, of course, users downloading it and reuploading it. There are definitely some of these floating around, but the most significant way my video was spread was through links. MindGeek did this by putting links to my Pornhub video on their other sites as a cheap way of adding content to those sites. Many of the other third party sites also use this method, so they too linked to my video on Pornhub. Of the 1,900 search results, Pornhub is the source for all of them.";*

as appears from her testimony before the ETHI on February 19, 2021, Exhibit P-29;

27.11. Thus, although MindGeek purports to have addressed the problems of non-consensual videos on the PornHub website as of December 2020 by allegedly removing all non-verified videos, the experience of Witness #1 as described above demonstrates that these steps are inadequate and not in good faith and that MindGeek continues to derive significant profits from non-consensual videos that it purports to have removed from the offending websites;

27.12. Witness #2, a 19-year-old woman, testified before the ETHI under anonymity that pornographic videos depicting her while she was 15 years old, were posted on PornHub. MindGeek only removed some of the videos which were subsequently uploaded again. She was required to persistently police the site to report the uploading of videos that had been removed, thus perpetuating her trauma :

> *"Pornhub would remove my videos once I found them, but I believe that's only because I provided a police reference code and because I mentioned suicide. I think they knew all too well that another death at their hands wouldn't look too good. Every time they took it down, they also allowed more and more videos of me to be reuploaded. The videos would get hundreds of thousands*

*of views and contained my personal information, including my address and my family's social media.*

*[…]*

*Pornhub always told me that I needed a link to get the videos removed. It was difficult because I couldn't always find the videos that were being sent to me. When I started questioning Pornhub on why they allowed anyone to just upload anything, they just told me that I needed to upload my videos to their third party site. I told them that not only was it illegal for me to do this, but it was illegal for them to ask me to do this because it's child porn and I'm not even allowed to have the content of myself. I told them there was nothing I could do, I felt suicidal and I was even considering getting legal advice if it didn't stop. They ignored me, and I never contacted them again.*

*They say they tried to tell me there was nothing they could do without a link, but that was a flat-out lie, given the fact that as soon as they were sent cease and desist letters, all footage of me was removed from their site straight away.*

*[…]*

*Yes, definitely. I had to constantly try to find these videos and images myself. They had no help for me whatsoever*
*[Technical difficulty—Editor]."*

as appears from her testimony before the ETHI on February 19, 2021, Exhibit P-29;

27.13. Indeed, even if copies of non-consensual videos were eventually removed by MindGeek, the videos were easily re-uploaded because MindGeek allowed visitors to download videos to store them on their personal computers, thus shielding them from being removed, and leading to the potential for the videos to be uploaded in perpetuity to the Internet;

27.14. During her testimony before the ETHI, the sex trafficking expert Laila Mickelwait described numerous examples of CSAM posted on PornHub, as described below:

*"There was, for example—one of many examples—a video of a girl. The title of the video was "School girl is Fucked in Forest". The tags in the video said "CP" and "Not 18". The uploader was "UASex", which would stand for underage sex, for anybody who would be looking at that. In the comments, they actually indicated that the girl was in the ninth grade, that commenters knew who she was and that she was underage. Not only did Pornhub moderators or reviewers look at that video, look at the tags, look at the title, look at the uploader and then approve it, but they featured it. They advertised that video on the site, on the home page, to get more views and more clicks. That is the advertising of child sexual abuse material. I have numerous examples of that.*

*There is one other instance that was particularly egregious, which I was aware of this year, in 2020, of a very obviously prepubescent, underage girl being anally raped and tortured. She was screaming in the video. It was horrific. This video was uploaded three different times by three different users over a period of weeks. It was reported. The report was documented. It was not taken down. A number of days later, it was reported again. It was documented. It was reported. It was not taken down.*

*Finally, I facilitated the transfer of the link of this video to the FBI. The FBI then sent it to the National Center for Missing & Exploited Children, and finally they confirmed the video was underage and they made a demand to Pornhub to take it down. Pornhub finally took it down after weeks and tens of thousands of views with a download button so that a hundred million people a day had the opportunity to commit the federal crime of downloading that child sexual abuse material. Then, they left the title, the tags, the views and the link available still to be indexed on Google to continue to drive traffic to their site using that child's sexual abuse."*

as appears from her testimony before the ETHI on February 19, 2021, Exhibit P-29;

27.15. On February 22, 2021, the ETHI held its fourth meeting on the "Protection of privacy and reputation on platforms such as Pornhub" and heard testimony from representatives of the Canadian Center for Child Protection (C3P), the National Center for Missing & Exploited Children of the United Sates (NCMEC) and the Royal Canadian Mounted Police (RCMP), as appears from the transcript of the fourth meeting, which will be produced as **Exhibit P-30**;

27.16. During this meeting, the President and CEO of NCMEC testified that several victims contacted them for help to remove videos after MindGeek had been nonresponsive to their requests :

*"Over the past year NCMEC has been contacted by several survivors asking for our help in removing sexually abusive content of themselves as children that was on Pornhub. Several of these survivors told us they had contacted Pornhub asking them to remove the content, but the content still remained up on the Pornhub website. In several of these instances NCMEC was able to contact Pornhub directly, which then resulted in the content being removed from the website."*

as appears from his testimony before the ETHI on February 22, 2021, Exhibit P-30;

27.17. The Executive Director of the C3P also testified that a computer software tool described as Project Arachnid identified CSAM on MindGeek's offending websites, but MindGeek persisted in delaying the removal of the offending material:

> *"MindGeek testified that moderators manually review all content that is uploaded to their services. This is very difficult to take seriously. We know that CSAM has been published on their website in the past. We have some examples to share.*
>
> *The following image was detected by Arachnid. This image is a still frame taken from a CSAM video of an identified sexual abuse survivor. The child was pubescent, between the ages of 11 and 13, at the time of the recording. The image shows an adult male sexually assaulting the child by inserting his penis in her mouth. He is holding the child's hair and head with one hand and his penis with the other hand. Only his midsection is visible in the image, whereas the child's face is completely visible. A removal request was generated by Project Arachnid. It took at least four days for that image to come down." [...]*

as appears from his testimony before the ETHI on February 22, 2021, Exhibit P-30;

27.18. On March 9, 2021, Rose Kalemba, the woman appearing in the BBC article, Exhibit P-19, submitted a written testimony to the ETHI recounting her story and the refusal of MindGeek to remove the video of her rape and assault, while she was 14 years old, for more than half a year, as appears from her brief submission to the ETHI, which will be produced as **Exhibit P-31**;

27.19. On April 3, 2021 a CTV News article described the story of a Canadian woman who found a video of her assault while she was unconscious on PornHub, as appears from the article "'I will always be someone's porn': One woman's struggle to remove all traces of her videotaped sexual assault" dated April 3, 2021, which will be produced as **Exhibit P-32**;

27.20. Despite finally removing the video from PornHub, still images of the videos remained on search engines, which MindGeek did little to resolve, allowed it to attract visitors to its offending websites;

27.21. In April 2021, an article from La Presse highlighted the story of a woman from Sherbrooke who tried to have intimate images of herself removed from PornHub after her ex-boyfriend uploaded them without her consent. Even with the help of the police, it took many requests to MindGeek to have the content removed, as appears from the article "J'ai voulu mourir" dated April 26, 2021, which will be produced as **Exhibit P-33**;

27.22. On June 17, 2021, a lawsuit was launched in the Central District of California by Serena Fleites and 33 other victims alleging, among other things, sexual trafficking, receipt, transport, and possession of child pornography, and racketeering by MindGeek and other defendants. The plaintiffs are all persons whose non-consensual videos or images were hosted on the offending websites, as appears from the Complaint which will be produced as **Exhibit P-34**;

27.23.  On June 17, 2021, the ETHI presented their report "Ensuring the Protection of Privacy and Reputation on Platforms such as Pornhub" to the House of Commons, which will be produced as **Exhibit P-35**;

27.24.  In its report, the ETHI concludes that the "*onus to protect individuals […] from violations of their privacy and reputation online should lie with the platform hosting that content*". It also noted MindGeek's lack of rigor in applying its moderation measures;

27.25.  On July 19, 2021, an article from the Independent reported the story of a Chinese woman who discovered a video of herself on PornHub filmed without her consent while she was underage, as appears from the article "*Chinese woman who found her video on Pornhub creates app to help victims*" dated July 19, 2021, which will be produced as **Exhibit P-36**;

28.     Despite all of the above, non-consensual content remains on the offending websites;

## D.    CAUSES OF ACTION

28.1.   Most of MindGeek's activities relating to the offending websites took place, and still take place, in Montréal;

28.2.   Before the ETHI on February 5, 2021, Feras Antoon testified that the vast majority of MindGeek's employees are working in Montréal, where services are provided for the offending websites owned by the European entities :

> "***Mr. Feras Antoon****: Yes, I can walk you through it.*
>
> *MindGeek is headquartered in Luxembourg. MindGeek Europe comprises four offices: Luxembourg, the U.K., Cyprus and Romania. We have 800 people in Europe. MindGeek Europe owns all the IP, trademarks and copyrights of all our products and platforms. Pornhub, for example, is owned by MindGeek Europe.*
>
> *The Canadian subsidiary has 1,000 employees based in Montreal. The Canadian entity is a service entity that supplies services to all the European entities, for example Pornhub. The services provided on the platform are from Montreal. Those services include management, customer care and engineering. The Montreal office, which has 1,000 employees, has around 400 engineers."*

as appears from his testimony before the ETHI, Exhibit P-27;

28.3.   The MindGeek principals, who are the key representatives who are responsible for the direction and operation of MindGeek, reside in Quebec.

28.4.   MindGeek operates a complex web of shell and sham companies, as described above, but its offices in Montréal are legitimate offices with hundreds of employees and potential witnesses, as appears from an article from La Presse titled "Porno et Impôts" dated October 10, 2016, which will be produced as **Exhibit P-37**;

28.5.   Therefore, the harm suffered by the members stems from MindGeek's actions or omissions that occurred in the province of Québec;

29.   The availability of non-consensual content, including but not limited to, photos and videos of sexual abuse and sexual assault, including those of minors, on the offending websites is a direct and foreseeable result of those sites' failure to elicit the consent of persons in the photos and videos and to comply with the applicable legal obligations;

30.   Until […] recently, MindGeek had no policies or procedures or seriously inadequate ones that were not enforced, to, among other things, investigate:

- prospective content partners' business practices or reputation;

- prospective content users practices or reputation;

- on each video or image before they were published, steps to ensure they were obtained with consent;

- on allegations of offenses committed by its content partners or users;

31.   MindGeek did not employ enough properly trained content moderators to review the footage on […] the offending websites for acts of sex trafficking, rape or underage persons;

32.   The non-consensual content would not have been accessible to the public but for MindGeek's breaches of its duties owed to the Class members to securely and responsibly ensure that images and videos are posted with consent;

32.1.   MindGeek has never implemented, and still does not have in place, an appropriate system to verify and confim the consent and age of the people involved in the content hosted on the offending websites;

32.2.   Before December 2020, anyone could upload, anonymously, content on the offending websites. MindGeek only asked the uploader to click a button or series of buttons to « confirm » consent and the age of persons involved in the content, as appears from the transcript of the ETHI on February 5, 2021, Exhibit P-27;

32.3.   These procedures were laughable as easily circumvented;

32.4.   MindGeek did not take any further or independent steps to verify or confirm, in any way, the age or consent of the people depicted in the content;

32.5.   Since December 2020, MindGeek alleges that only verified members can upload videos. However, there are numerous flaws in the new alleged verification system, including that only the age of the verified member is confirmed with a valid ID, and not the age of the people depicted in the uploaded content, as appears from the transcript of the ETHI on February 5, 2021, Exhibit P-27;

32.6.   Even then, no independent efforts to confirm consent are taken by MindGeek;

32.7.   MindGeek Principals declared and guaranteed several times before the ETHI that each and every video and image uploaded to the offending websites are thoroughly reviewed beforehand by a team of human moderators, as appears from the transcript of the ETHI on February 5, 2021, Exhibit P-27;

32.8.   Some of the alleged moderation activities took place in Montreal, at MindGeek's headquarters;

32.9.   However, this testimony is false;

32.10.  MindGeek's alleged team of moderators was inadequately staffed for the volume of content posted to the offending websites, as appears from the transcript of the ETHI on February 5, 2021, Exhibit P-27, and the testimony of the sex trafficking expert Laila Mickelwait before the ETHI on February 19, 2021, Exhibit P-29;

32.11.  Further, MindGeek's alleged team of moderators was instructed to review videos in bad faith, as appears from an article in the Daily Mail titled "'Our job was to find weird excuses not to remove them': PornHub moderators, who watched 1,200 videos A DAY, reveal lenient guidelines at the site being sued for $80m for 'profiting from sex trafficking'" dated December 17, 2020, a former moderator working in Montreal revealed moderators had to meet content quotas to be reviewed each day and that they needed to find excuses to let suspicious content through, which will be produced as **Exhibit P-38**;

32.12.  Further evidence of the lax moderation practices in relation to content uploaded on PornHub is described in the news show W5, broadcasted on April 3, 2021, on CTV, which will be produced as **Exhibit P-39**;

32.13.  An article from the Globe and Mail described further bad faith moderation efforts by MindGeek, based on information provided by former employees of MindGeek:

> *"MindGeek will not say how many moderators it employs, however. There is a group of employees in Montréal, known as content formatters, who prepare material to go online and also screen user-uploaded videos for inappropriate material. Formatters were told a team in Cyprus first flagged videos that did not meet MindGeek's terms of service such as material depicting children. But if the content is not professionally produced, determining the ages of those in unser-uploaded videos and whether it's even consensual is ultimately impossible according to former content formatters interviewed by the Globe, whose tenures spanned from 2012 to 2020.*
>
> *On a typical day, a formatter could review between 100 and 200 videos. They don't watch videos from start to finish, but instead click through at various points. The amount of videos employees were expected to review could be overwhelming, and one said formatters had around two minutes with each one. Any extra time spent assessing whether something violated the company's guidelines created a risk of falling behind.*

> *If they encountered videos that were clearly illegal, the content was quickly removed, formatters said. But difficulties arose if a video fell into a grey area, such as if it looked homemade or when trying to assess if someone is intoxicated, which would violate the terms of service. In cases where a content formatter was uncertain, a senior employee would make the decision.*
>
> *Two former employees said that more often than not, manages favoured approving the videos, rather than removing them. Sometimes managers would spot a tattoo, and use that as evidence that a person was of legal age and presumably consenting.*
>
> *Occasionally, employees flagged content so egregious they recommended contacting the police. But two former formatters said they were discouraged by managers from doing do. One was told not to bother, since uploaders are typically anonymous and unlikely to be identifiable."*

as appears from the Globe and Mail's article "Lifting the veil of secrecy on MindGeek's online porn empire" dated February 4, 2021, as appears from article, **Exhibit P-10**;

32.14.  On March 25, 2021, Charles Angus, a member of the parliament, read a letter sent to the ETHI by a former manager of PornHub before the House of Commons. The letter stressed the fact that MindGeek discouraged its employees from reporting CSAM to authorities :

> *"This former manager also mentioned that he was:*
>
> *...discouraged from contacting Interpol when I stumbled on child content by my superiors. I was not allowed to report this kind of content when it crossed my desk."*

as appears from an except of the transcript of this session, which will be produced as **Exhibit P-40**;

32.15.  Moreover, MindGeek Principals described inadequate procedures in place for moderating content, by failing to require moderators to scrutinize a video's audio content:

> *"**David Tassillo** : Once it passes the software queue.... If anything fails at the software level, it automatically doesn't make it up to the site. Once that piece has gone through, we move over to the human moderation section. The human moderators will watch each one of the videos, and if they deem that the video passes, it will be –*
>
> ***Shannon Stubbs**: Do they watch it with sound on?*
>
> ***David Tassillo**: Sometimes they do, sometimes they don't—*
>
> ***Shannon Stubbs**: Every single video....*

> **David Tassilo**: *The agents are—*
>
> **Shannon Stubbs**: *To me, sound would be extremely important to decipher consent."*

as appears from David Tassilo's testimony before the ETHI on February 5, 2021, Exhibit P-27;

32.16. Indeed, rather than searching in good faith for non-consensual videos, a far more significant role of the alleged moderators (sometimes called content formatters) was to find ways to generate more traffic on the offending websites by taking steps to modify, optimize, and manipulate content uploaded by users, and thus ensuring greater profit for MindGeek and its shareholders, as appears from the complaint, Exhibit P-34;

32.17. For instance, the alleged moderators or content formatters would take steps to edit the title, tags, and descriptions of the videos and images to make them more appealing and thus ensuring that greater numbers of people would watch the content. They would also "scrub" any title, tags, and description that reveal the illegal nature of the content before uploading it to the offending websites, with blatant disregard for the fact that the content was in fact illegal, as appears from the complaint, Exhibit P-34;

32.18. MindGeek also instructed its employees to upload mass amounts of pirated copyrighted materials to the offending websites, as appears from the complaint, Exhibit P-34;

32.19. Instead of doing everything in their power to ensure that non-consensual content is not hosted on the offending websites, MindGeek profits from this content by way of advertisement, the sale of user data, premium memberships, etc., as appears from the National Center on Sexual Exploitation (NCOSE) brief submitted to the ETHI on February 19, 2021, which will be produced as **Exhibit P-41 :**

> *"While Pornhub contains user-provided content, it also has a formal Content Partner Program which includes Brazzers, Fake Taxi, and Kink.com, and once included GirlsDoPorn, whose leaders are currently being prosecuted for sex trafficking. Pornhub owns some of the entities it describes as Content Partners, including Brazzers, Babes.com, Reality Kings, and Twistys. Pornhub also has a webcam program called Modelhub, where people create pornography of themselves and receive a percentage of the website's earnings. Pornhub profits in several ways: advertising, including through TrafficJunky, which MindGeek owns, selling user data, revenue from videos sales and premium memberships, and revenue from Modelhub tips.*
>
> *Because Pornhub has monetized pornographic content through advertisements and premium subscriptions, it is facilitating and profiting from commercial sex acts. Any content involving minors is per se sex trafficking. Non-consensually produced pornographic content is also legally a form of sex trafficking. This includes all filmed rape, as well as any content involving force, fraud, abuse of power or vulnerability, or any other*

*coercion—whether from an external trafficker or through MindGeek-owned studios, Modelhub program, or Content Partner.*
*[...]*

*Pornhub waited more than two years after the civil lawsuit was filed – until GirlsDoPorn owners were indicted – to remove the sex trafficking channel, and people could still access the videos as late as December 2020. In the meantime, MindGeek continued to profit from the views the abuse videos continued to garner. That is, MindGeek deliberately facilitated and monetized pornographic content produced through slavery in the form of sex trafficking."*

32.20. MindGeek is not diligent in removing non-consensual content. It ignores or delays responding to victims' takedown requests, causing them undue harm;

32.21. In instances where MindGeek does act on takedown requests concerning non-consensual content, it only disables the content in question. The page, the title, the tags and the descriptions are still displayed on the offending websites and remain accessible to the visitors to generate traffic and profits for MindGeek, as appears from article, Exhibit P-32;

32.22. The removed non-consensual content is not deleted. It is kept on servers and sometimes reuploaded by MindGeek on the offending websites to make it look like the content was uploaded by users;

32.23. MindGeek also allowed users to reupload non-consensual content that was removed through the flag system or the Content Removal Request Form;

32.24. MindGeek Principals are personally liable for the class members damages as administrators of MindGeek;

32.25. MindGeek Principals knowingly oversee and manage MindGeek with a view to maximize revenues and profits, with knowledge or wilful blindness as to compliance with the law or ensuring that non-consensual content is absent or eradicated from the offending websites;

32.26. MindGeek Principals discussed and knew that non-consensual content was uploaded to the offending websites, but they failed to take actions or implement procedures to stop it, as appears from a text message exchange between a MindGeek employee and the sex trafficking expert Laila Mickelwait in March 2020, which will be produced as **Exhibit P-42**;

32.27. To the contrary, MindGeek Principals took active steps through the MindGeek corporate network to generate, acquire and diffuse non-consensual content, and profit from it, and to take active steps to shield profits and assets from victims;

32.28. MindGeek Principals knew that the offending websites were rife with non-consensual content and that non-consensual content was routinely uploaded, but they knowingly and wilfully failed to take the necessary measures to curtail this content because it would negatively impact revenues and MindGeek's search engine rankings as the largest pornographic website in the world;

32.29. MindGeek Principals ensured that content posted on the offending websites be continuously scrutinized to ensure MindGeek's high impressions in search engines to drive traffic to the offending sites to generate revenues. At the same time, they knew that this scrutiny did not extend to ensure that non-consensual content was removed;

32.30. MindGeek Principals ensured that reports of non-consensual content were assigned to low-level employees to ensure plausible deniability and to cast blame on others, knowing that these employees routinely allowed non-consensual content to remain on the offending websites;

32.31. The sole purpose of MindGeek Principals was to drive maximum traffic to the offending websites to generate revenues and to persist with the monetization of non-consensual conduct for MindGeek's benefit and the benefit of MindGeek Principals, with complete disregard for compliance with the law;

32.32. MindGeek Principals testified and admitted before the ETHI that as executives, they had a responsibility in ensuring that the content uploaded on the offending websites was consensual, as appears from the transcript of the ETHI on February 5, 2021, Exhibit P-27;

32.33. However, they did not fulfill this responsibility and completely disregarded the rights to privacy of the victims to maximize profits;

32.34. Before the ETHI, MindGeek Principals also testified that they report every instance of CSAM on the offending websites to the NCMEC, as appears from the transcript of the ETHI on February 5, 2021, Exhibit P-27;

32.35. However, contrary to the testimony of the MindGeek Principals, the NCMEC confirmed that it only started to received reports from MindGeek in 2020, as appears from the transcript of the ETHI on February 22, 2021, Exhibit P-30, and from the NCMEC brief submitted to the ETHI the same day, which will be produced as **Exhibit P-43**;

32.36. Moreover, since 2015, the website cybertip.ca, Canada's tipline to report the online sexual exploitation of children, received more than 2,600 reports of CSAM or sexual exploitation regarding MindGeek's offending websites, as appears from the C3P brief submitted to the ETHI on February 18, 2021, which will be produced as **Exhibit P-44**;

32.37. The representative from C3P also testified before the ETHI that in the last 3 years, they identified and confirmed 193 instances of CSAM on MindGeek's offending websites :

> *"At this point, we would like to share what we have seen on MindGeek's platforms. Arachnid has detected and confirmed instances of what we believe to be CSAM on their platform at least 193 times in the past three years. These sightings include 66 images of prepubescent CSAM involving very young children; 74 images of indicative CSAM, meaning that the child in the image appears pubescent and roughly between the ages of 11 to 14; and 53 images of post-pubescent CSAM, meaning that sexual maturation of the child may be*

*complete and we have confirmation that the child in the image is under the age of 18.*
*[…]*

*We do not believe the above numbers are representative of the scope and scale of this problem. These numbers are limited to obvious CSAM of very young children and of identified teenagers. There is likely CSAM involving many other teens that we would not know about, because many victims and survivors are trying to deal with the removal issue on their own. We know this."*

as appear from his testimony before the ETHI on February 22, 2021, Exhibit P-30;

32.38. Despite the existence of numerous examples of CSAM on MindGeek's offending websites since at least 2015, representatives of the RCMP testified that they only started receiving reports of CSAM from MindGeek, through NCMEC, in June 2020, as appears from their testimonies to the ETHI on February 22, 2021, Exhibit P-30;

32.39. Indeed, the RCMP never received any direct report of sexual exploitation of minors from MindGeek in the last 10 years, as appears from La Presse article "Dénonciation d'exploitation sexuelle juvenile Pornhub au-dessus des Lois" dated March 10, 2021, which will be produced as **Exhibit P-45**;

32.40. MindGeek claimed in the past that it did not need to report cases of CSAM to the RCMP for alleged jurisdictional reasons, as appears from the article, Exhibit P-45;

33.    It is a fundamental human right […] to have control over the dissemination of intimate images and videos of oneself. The right to privacy is internationally recognized in multiple instruments, including article 12 of the *Universal Declaration of Human Rights*, article 17 of the *International Covenant on Civil and Political Rights*, article 16 of the *Convention on the Rights of the Child,* article 8 of the *European Convention on Human Right*s, and article 11 of *the American Convention on Human Rights*;

34.    Every province in Canada has similar legislation and rules of law that protects any individual's right to inviolability, dignity and to the protection of his or her privacy, among others;

35.    In Québec, articles 3, 10, 35, 36, 37 and 1457 of the *Québec Civil Code,* articles 1, 4 and 5 of the *Charter of human rights and freedom* and the *Act respecting the protection of personal information in the private sector,* CQLR c. P-39.1 protect the individual's rights to inviolability, to the safeguard of […] one's dignity, honor and reputation and to respect […] one's private life;

36.    In several common law provinces, legislation has been enacted establishing a statutory cause of action for violation of privacy, which apply to individuals residing in those jurisdictions:

-    British Columbia: *Privacy Act*, RSBC 1996, c. 373;

-   Manitoba: *Privacy Act*, CCSM c. P125;

-   Saskatchewan: *Privacy Act*, RSS 1978, c. P-24;

-   Newfoundland: *Privacy Act*, RSNL 1990, c. P-22;

37.   Several provinces have also enacted legislation respecting civil remedies for the non-consensual distribution of intimate images, which apply to individuals residing in those jurisdictions:

-   Manitoba: *Intimate* Image Protection *Act*, CCSM, c. 187;

-   Alberta: *Protecting Victims of Non-Consensual Distribution of Intimate Images Act*, RSA 2017, c. P-26.9;

-   Saskatchewan: *The* Privacy Amendment *Act*, 2018,  SS 2018, c. 28;

-   Nova Scotia: *Intimate* Images *and* Cyber-protection *Act*, SNS 2017, c. 7;

-   Newfoundland: *Intimate Images Protection Act*, RSNL 2018, c. I-22;

38.   The court may take judicial notice of the law of other provinces or territories of Canada and of that of a foreign state or require that proof be made of it;

39.   In addition, the *Criminal Code*, R.C.S., 1985, c. C-46 and *An Act respecting the mandatory reporting of Internet child pornography by persons who provide an Internet service,* S.C. 2011, c. 4 apply to this case;

40.   Among other things, it is an offence contrary to s. 162.1 of the *Criminal Code* to knowingly publish, distribute, transmit, sell or advertises an intimate image of a person knowing that the person did not give their consent, or being reckless as to whether or not that person gave their consent;

41.   By its actions and omissions, and in the duties owed to the Class members, MindGeek has breached and violated Class members' rights and is responsible for the damages suffered, such breaches including;

a)   failing to verify the consent and age of the persons depicted on the offending websites;

b)   failing to prohibit non-verified users to post content before December 2020;

c)   failing to have effective policies and procedures to avoid the dissemination of non-consensual content on its offending website;

d)   failing to have an effective takedown system in place by, among other things, failing to remove the non-consensual content from all websites and failing to remove the information associated with such content, once informed;

e)    failing to effectively and completely takedown images and videos posted on related websites or licensed for use on third party websites;

f)    failing to take steps to prevent non-consensual content from being re-posted on a particular website and/or from being posted on any of the other websites owned, operated and/or managed by MindGeek or licensed for use on third party websites;

g)    failing to advise Class members of the existence and availability of technology to prevent non-consensual content from being re-posted on a particular website and/or from being posted on any of the other websites owned, operated and/or managed by MindGeek;

41.1.    <u>While MindGeek violates the privacy and reputation of the Class members, the MindGeek Principals, MindGeek's representatives and shareholders use a complex web of shell and sham corporations and even aliases to protect their financial interests and profits derived from non-consensual conduct of Class Members;</u>

41.2.    <u>For instance, the defendant Corey Urman uses the pseudonym Corey Price in his public statements. An other unamed employee uses the fake name Ian Andrews :</u>

> *<u>"Mr. Arnold Viersen: Who is Mr. Corey Price?</u>*
>
> *<u>Mr. David Tassillo: Mr. Corey Price is an alias used by my colleague, Corey Urman. He uses it, basically, because he doesn't like—</u>*
>
> *<u>Mr. Arnold Viersen: Mr. Urman's on the call here.</u>*
>
> *<u>Can you confirm this, Mr. Urman?</u>*
>
> *<u>Mr. Corey Urman: Yes, it's an alias I've used in public-facing statements.</u>*
>
> *<u>Mr. Arnold Viersen: Why would you use an alias?</u>*
>
> *<u>Mr. Corey Urman: It's just a matter of safety. Some of our employees at the company have used aliases or pseudonyms from time to time because of safety. We've seen a lot of threats and doxing on 4chan and other message boards. David and Feras, who have been using their real names, have actually seen quite a lot of attacks and threats against them and their families.</u>*
>
> *<u>Mr. Arnold Viersen: Is Ian Andrews another one of your aliases?</u>*
>
> *<u>Mr. Corey Urman: Ian Andrews is a pseudonym for someone who works in our media communications team. It's not me. That is someone who works on our team."</u>*

<u>as appears from his testimony before the ETHI on February 5, 2021, Exhibit P-27;</u>

41.3. <u>The laws and provisions on privacy, inviolability, dignity, honor, and reputation are rules of public order and principles of basic human rights applicable to every person;</u>

41.4. <u>By using MindGeek to violate these rules of public order and principles of human rights, the defendants Feras Antoon, David Tassillo, and Bernd Bergmair are also personnally liable for damages to the class as owner/shareholders of MindGeek and cannot invoke the corporate veil to limit their liability;</u>

## E.     DAMAGES

42.     The circumstances give rise to serious and far-reaching consequences on the Class members' personal lives, the full extent of which has yet to be determined;

43.     On behalf of herself and the Class members, the Applicant claims <u>pecuniary and non-pecuniary</u> damages and compensation, with respect to:

   a. <u>Breach of the *Universal Declaration of Human Rights*, article 17 of the *International Covenant on Civil and Political Rights*, article 16 of the *Convention on the Rights of the Child,* article 8 of the *European Convention on Human Right*s, and article 11 of *the American Convention on Human Rights*;</u>

   a. [...] <u>Breach of the Charter of Human Rights and Freedoms, CQLR c C-1, art. 1, 4 and 5;</u>

   b. Breach of the *Privacy Act*, RSBC 1996, c. 373, s. 1(1); breach of the *Privacy Act*, CCSM c. P125, s. 2(1); breach of the *Privacy Act*, RSS 1978, c. P-24, s. 2; breach of the *Privacy Act*, RSNL 1990, c. P-22, s. 3; and breach of the *Civil Code of Quebec* SQ 1991, c. 64 art. 3, 10, 35-37;

   c. Breach of the *Intimate Image Protection Act*, CCSM, c. 187, s. 11(1); breach of the *Protecting Victims of Non-Consensual Distribution of Intimate Images Act*, RSA 2017, c. P-26.9, s. 3; breach of the *Privacy Amendment Act*, 2018, SS 2018, c. 28, s. 7.3(1); breach of the *Intimate Images and Cyber-protection Act*, SNS 2017, c. 7, s. 2; and breach of the *Intimate Images Protection Act*, RSNL 2018, c. I-22, s. 4(1);

   d. <u>Breach and l</u>oss of privacy including, but not limited to, the publication of embarrassing or private facts, without consent, publicly placing a person in a false light, and intrusion upon seclusion;

   e. Breach of copyright and appropriation of likeness;

   f. Defamation and damage to reputation;

   g. Negligence [...];

   h. Inducing breach of confidence; <u>and</u>

i.      Unjust enrichment; […]

j.      […];

44.   On behalf of herself and the Class members, the Applicant also claims aggravated, punitive, and exemplary damages, the particulars of which will be provided prior to trial;

## II.   FACTS GIVING RISE TO THE APPLICANT'S CLAIM […]

45.   The facts on which the Applicant's personal claim against MindGeek is based, are as follows;

46.   The Applicant is an adult female residing in Ontario;

47.   As a child, the Applicant was a victim of sexual abuse, some of which was recorded and subsequently published online, […] including on the offending websites;

48.   The Applicant is aware of a video depicting her abuse as a child that was disseminated on PornHub's website. The video depicts the abuse of the Applicant when she was approximately 12 years old;

49.   Indeed, between September and October 2019, she received a private message on her Twitter account from a man she knew, which said something to the effect that she was appearing on a link, which was also contained in the […] message;

50.   The Applicant did not see this message until January of 2020;

51.   Once she saw the message, the Applicant clicked on the link which took her to the video hosted on Pornhub;

52.   While the videos behind a pay screen are not accessible to non-paying users, the link allows anyone who clicks on it to see the video title, a still image from the video and the comments underneath;

53.   On the basis of the image, the Applicant was able to identify herself, and also identify the particular incident of abuse it depicted;

53.1.   The comments under the video mentioned that it had been posted before;

53.2.   The comments under the video also provided links to other videos of the Applicant and when she clicked on those links, she could each time be able to view a still image from the video and the comments underneath;

53.3.   In all these still images, she was between 12-14 years old;

54.   Following the events described here above, the Applicant filled out a […]Content Removal Request Form to request removal of the video provided on the Defendants' website under the contact support section;

54.1.   <u>The Form asked her to provide her name, email address and to choose a subject from a drop-down list of issues;</u>

54.2.   <u>Under the drop-down list, the Applicant selected "content removal request" and, under the comment section, she provided the original URL link sent to her, and stated that more videos of her were linked in the comments under that video, which she also wanted removed;</u>

55.   All the Applicant received was an automated response, 4-5 business days later and the Defendants have never followed up in any manner with the Applicant afterwards;

## III.   <u>FACTS GIVING RISE TO AN INDIVIDUAL ACTION BY EACH CLASS MEMBER</u>

56.   The facts giving rise to the personal claim of each Class member against MindGeek are as follows:

a)   Each Class member has, […] at the relevant time, appeared in non-consensual content disseminated by MindGeek, on one or more <u>offending</u> websites it owns or hosts, directly or indirectly, for streaming and download;

b)   Each Class member's rights to inviolability, to the safeguard of dignity, hon<u>or</u> and reputation and to respect for one's private life were violated by MindGeek;

c)   MindGeek owed duties to the Class members to protect their rights to inviolability, to the safeguard of one's dignity, hon<u>or</u> and reputation and to respect for one's private life;

d)   <u>MindGeek and the MindGeek Principals who directed the actions of MindGeek</u> breached its duties to the Class members<u>, and took active steps to cause harm to the Class members, all in the in the province of Québec</u>;

e)   All the damages suffered by the Class members are a direct and proximate result of MindGeek's conduct and […] <u>the</u> breaches of <u>its</u> duties;

f)   In consequence of the foregoing, the Applicant and Class members are justified in claiming the payment of all damages and losses they suffered and continue to suffer due to MindGeek's conduct;

g)   Each Class member was the victim of an unlawful an<u>d</u> intentional interference with his fundamental rights, thus giving rise to punitive damages;

## IV.   <u>COMPOSITION OF THE CLASS</u>

57.   The composition of the Class makes it difficult or impracticable to apply the rules for mandates to take part in judicial proceedings on behalf of others or for consolidation of

proceedings, with respect to provision 575 (3) of the *Code of civil procedure*, for the following reasons:

a)      It is expected that there are numerous Class members;

b)      The names and addresses of people who can be part of the Class are unknown to the Applicant;

c)      The facts alleged in the foregoing paragraphs make it difficult, if not impossible, to contact each Class member to obtain a warrant or to proceed by way of joinder;

57.1.   Since the filing of the application for authorization on December 29, 2020 and until October 29, 2021 :

- Ninety four (94), Class members contacted the undersigned lawyers, or Sotos LLP in Ontario. These members are from Québec, the rest of Canada and elsewhere in the world;

- Eleven (11) Class members from Québec had contacted La Sortie, an organization based in Montréal and designed to help and support victims of sex trafficking, as appears from a letter dated October 19, 2021 from Ronald Lepage, director of La Sortie, which will be produced as **Exhibit P-46**;

- Five (5) class members testified, orally or in writing, before the ETHI;

57.2.   As mentioned in paragraphs 32.36 and 32.37 of the present application, more than 2,600 reports of CSAM and other non-consensual content were made to cybertip.ca since 2015 and C3P confirmed 193 instances of CSAM regarding MindGeek's offending websites, which could represent a considerable number of class members;

57.3.   The three United States claims mentioned in this application identify 76 other class members, residing in different countries around the world;

57.4.   Other potential class members were also identified in the different articles produced in the section here above;

57.5.   The number of class members around the world is far larger than the Class members identified to date. However, it is impossible for the undersigned lawyers to estimate the number of Class members;

58.     The class action is the only procedural vehicle that will enable all victims of MindGeek to access justice and get compensation for the harm suffered;

59.     It would be impossible, as well as disproportionate, to require each individual member of the Class to institute an individual action, whereas a class action allows an economy of

resources by having one judge hear all of the evidence and render a decision binding upon the defendants and all Class members;

## V.    QUESTIONS

60.    The identical, similar, or related questions of law or fact between each member of the Class and MindGeek which the Applicant wishes to have decided by the class action are:

a)    Do the offending websites facilitate the dissemination of non-consensual content?

b)    Did the defendants breach any of its duties to the Class members?

c)    Did the defendants violate the Class members' rights to inviolability, to the safeguard of their dignity, honor and reputation and to respect for their private life?

d)    Did the defendants fail to abide by the rules of conduct incumbent upon it, according to the circumstances, usage, or law, so as not to cause injury to the Class members, thereby causing injuries to the Class members as a result of its fault?

e)    Are the defendants liable to pay any damages or compensation to the Class members?

f)    If so, what kind of damages are commonly suffered by the Class members?

g)    May the Court determine a minimum quantum of damage that the Class members suffered in common and/or set parameters for the damages suffered by the Class members, based on the gravity of the defendants' conduct and the consequence thereof?

h)    Did the defendants unlawfully and intentionally interfere with the fundamental rights of the Class members?

i)    If so, what is an appropriate amount of punitive damages to which the defendants should be condemned in order to sanction and deter the conduct in question?

j)    Is it appropriate for punitive damages to be recovered collectively?

61.    The questions of law or of fact which are particular to each of the members of the Class are:

a)    Did each Class member appear in non-consensual content published by the defendants, on one or more offending websites it owns or hosts, for streaming and download, that depicts the sexual abuse of children, the sexual assault of non-consenting adults, and/or non-consensual intimate images of adults who have not consented to the public dissemination of such content?

b)    What is the quantum of the pecuniary and non-pecuniary damages suffered by each of the Class members?

## VI.   NATURE OF THE ACTION

62.   The action that the Applicant wishes to institute for the benefit of the Class members is a class action in civil liability for compensatory and punitive damages against the defendants;

## VII.   CONCLUSIONS SOUGHT

63.   The conclusions sought by the Applicant against the defendants are as follows :

GRANT the Class Action;

CONDEMN the defendants to pay pecuniary and non-pecuniary damages temporarily evaluated at $500 million, to be enhanced, plus interest at the legal rate as of the date of the *Application for Authorization to Institute a Class Action and to Obtain the Status of Representative*, as well as the additional indemnity provided by the law in virtue of article 1619 C.c.Q.;

CONDEMN the defendants to pay punitive damages temporarily evaluated at $100 million, to be enhanced, plus interest at the legal rate as of the date of the *Application for Authorization to Institute a Class Action and to Obtain the Status of Representative*, as well as the additional indemnity provided by the law in virtue of article 1619 C.c.Q.;

DECLARE :

a)   That all Class members are entitled to be compensated for all of their pecuniary damages resulting from the faults of the defendants, including, but without limitation, their loss of income, their loss of earning capacity and their expenses and relevant disbursements;

b)   That all Class members are entitled to be compensated for their non-pecuniary damages resulting from the faults of the defendants, in accordance with parameters to be set by the Court during the trial pertaining to the collective questions;

ORDER collective recovery of the punitive damages claimed herein, and the liquidation of the Class members claims pursuant to articles 595 to 598 C.C.P.;

CONDEMN the defendants to pay the costs incurred for any investigation necessary to establish its liability in this case, including the extrajudicial fees of the lawyers and out-of-court disbursements;

CONDEMN the **defendants** to pay to Class members the costs of distributing the funds to Class members;

CONDEMN the defendants to any further relief as may be just and proper;

THE WHOLE with the legal costs, including the coast of all exhibits, reports, expertise, and publication of notices;

## A)    The Applicant requests the status of representative of the Class

64.    Applicant, who seeks to obtain the status of representative, is able to adequately represent the Class members, for the following reasons:

a)    That person [...] is a Class member, as she appeared in non-consensual content disseminated by MindGeek, on website(s) it owned or operated, directly or indirectly;

b)    That person has the capacity and interest to fairly and adequately protect and represents the interest of the members;

c)    That person acts in good faith and has instituted this action for the sole goal of having her rights, as well as the rights of other Class members recognized and protected so that they may be compensated for the damages that they have suffered as a consequence of MindGeek's conduct;

d)    That person understands the nature of the action;

e)    That person is available to dedicate the necessary time for an action and to collaborate with Class members; and

f)    That person does not have any conflict of interests with the other Class members on the issues common to the Class members;

## B)    The Applicant suggests that this class action be exercised before the Superior Court of justice in the district of Montreal

65.    The Applicant suggests that the class action should be brought before the Superior Court of the district of Montréal because MindGeek has its principal place of business in the judicial district of Montréal;

66.     The Applicant adds that the Superior Court of Québec, district of Montréal, has competence over the proposed international or national Class;

67.     The present motion is well-founded in fact and in law.


**FOR THESE REASONS, MAY IT PLEASE THE COURT:**

**GRANT** the present *Application for Authorization to Institute a Class Action and to Obtain the Status of Representative*;

**AUTHORIZE** the institution of a Class Action

**ASCRIBE** the Applicant the status of representative of the persons included in the Class herein described as:

> Since 2007, all natural persons whose intimate videos or photos, (including child sexual abuse material, images of sexual assault and non-consensual intimate images) were posted without their consent on a website owned or operated by the defendants, directly or indirectly;

> or, subsidiarily:

> Since 2007, all natural persons in Canada whose intimate videos or photos, (including child sexual abuse material, images of sexual assault and non-consensual intimate images) were posted without their consent on a website owned or operated by the defendants, directly or indirectly;


**IDENTIFY** the principal questions of fact and law to be dealt collectively as the following:

a)      Do the offending websites facilitate the dissemination of non-consensual content?

b)      Did the defendants breach any of its duties to the Class members?

c)      Did the defendants violate the Class members' rights to inviolability, to the safeguard of their dignity, honor, and reputation and to respect for their private life?

d)      Did the defendants fail to abide by the rules of conduct incumbent upon them, according to the circumstances, usage, or law, so as not to cause injury to the Class members, thereby causing injuries to the Class members as a result of their fault?

e)      Are the defendants liable to pay any damages or compensation to the Class members?

f)      If so, what kind of damages are commonly suffered by the Class members?

g)      May the Court determine a minimum quantum of damage that the Class members suffered in common and/or set parameters for the damages suffered by the Class members, based on the gravity of the defendants' conduct and the consequence thereof?

h)      Did the defendants unlawfully and intentionally interfere with the fundamental rights of the Class members?

i)      If so, what is an appropriate amount of punitive damages to which the defendants should be condemned in order to sanction and deter the conduct in question?

j)      Is it appropriate for punitive damages to be recovered collectively?

**IDENTIFY** the conclusions sought by the class action to be instituted as being the following:

GRANT the Class Action;

CONDEMN the defendants to pay pecuniary and non-pecuniary damages temporarily evaluated at $500 million, to be enhanced, plus interest at the legal rate as of the date of the *Application for Authorization to Institute a Class Action and to Obtain the Status of Representative*, as well as the additional indemnity provided by the law in virtue of article 1619 C.c.Q.;

CONDEMN the defendants to pay punitive damages temporarily evaluated at $100 million, to be enhanced, plus interest at the legal rate as of the date of the *Application for Authorization to Institute a Class Action and to Obtain the Status of Representative*, as well as the additional indemnity provided by the law in virtue of article 1619 C.c.Q.;

DECLARE :

a)      That all Class members are entitled to be compensated for all of their pecuniary damages resulting from the faults of the defendants, including, but without limitation, their loss of income, their loss of earning capacity and their expenses and relevant disbursements;

b)      That all Class members are entitled to be compensated for their non-pecuniary damages resulting from the faults of the defendants, in accordance with parameters to be set by the Court during the trial pertaining to the collective questions;

ORDER collective recovery of the punitive damages claimed herein, and the liquidation of the Class members claims pursuant to articles 595 to 598 C.C.P.;

CONDEMN the defendants to pay the costs incurred for any investigation necessary to establish its liability in this case, including the extrajudicial fees of the lawyers and out-of-court disbursements;

CONDEMN the defendants to pay to Class members the costs of distributing the funds to Class members;

CONDEMN the defendants to any further relief as may be just and proper;

THE WHOLE with the legal costs, including the coast of all exhibits, reports, expertise, and publication of notices;

DECLARE that all Class members that have not requested their exclusion from the Class in the prescribed delay will be bound by any judgement to be rendered on the Class action to be instituted;

FIX the delay of exclusion at 60 days from the date of the publication of the notice to Class members;

ORDER the publication of a notice to Class members pursuant to section 591 C.C.P.;

PERMIT the use of pseudonyms for the identification of the Applicant and of the Class members in the proceedings, exhibits, and/or all other documents filed into the Court record, in order to protect their identities;

THE WHOLE with costs, including the costs of all publications of notices and expert reports.

Québec, November 29, 2021

*Siskinds, Desmeules*

**SISKINDS DESMEULES AVOCATS**
(Me Caroline Perrault)
(Me Karim Diallo)
caroline.perrault@siskinds.com
karim.diallo@siskinds.com
Lawyers of the Applicant

43, rue de Buade, bureau 320
Québec (Québec) G1R 4A2
Téléphone : 418-694-2009
Télécopieur : 418-694-0281
Notification : notification@siskinds.com



**TODOC**
NOTIFICATION & SIGNIFICATION
ÉLECTRONIQUE

BORDEREAU

DE NOTIFICATION

Référence interne : ND:67-256

## INFORMATION SUR LE DOSSIER

**Jane Doe c. 9219-1568 Québec inc. & als.**                    500-06-0001115-209

SUPERIOR COURT

DISTRICT OF MONTREAL

## EXPÉDITEUR

**Carole Ouellet, adjointe juridique pour Me Caroline Perrault et Me Karim Diallo**

Siskinds, Desmeules, Avocats

43 rue de Buade, bureau 320, Québec, Québec, G1R 4A2

418-694-2009

carole.ouellet@siskinds.com

## DESTINATAIRE

**Me Patrick Ouellet**

Woods

2000, McGill College, bureau 1700, Montréal, Québec, H3A 3H3

514-982-2551

notification@woods.qc.ca

## DÉTAILS DE LA NOTIFICATION

**Date d'envoi de la notification :** **29 novembre 2021**
Heure :                            10:30 HNE
État de l'envoi :                   Notifié
Nature du(des) document(s) :        AMENDED Application for authorization to institute a class action and to obtain the status of representative - AMENDED List of exhibits

## DOCUMENT(S) NOTIFIÉ(S)

| Nom | Clé de validation |
| --- | --- |
| Amended_application_for_authorization.pdf | 1a727a14a76655ad2f93b164ced4ce7b |
| Amended_Exhibits_list.pdf | 4b056f59be5bffd74364e6e2c9c5d528 |

## CONCLUSION

Todoc certifie que le destinataire a été notifié par courriel et que les documents transmis ont été mis à sa disposition.



**TODOC**
NOTIFICATION & SIGNIFICATION
ÉLECTRONIQUE

BORDEREAU

DE NOTIFICATION

Référence interne : ND:67-256

**INFORMATION SUR LE DOSSIER**

**Jane Doe c. 9219-1568 Québec inc. & als.**                                        500-06-0001115-209

SUPERIOR COURT

DISTRICT OF MONTREAL

---

**EXPÉDITEUR**                                              **DESTINATAIRE**

**Carole Ouellet, adjointe juridique pour Me Caroline Perrault et Me**    **Me Patrick Ouellet**
**Karim Diallo**                                            Woods
Siskinds, Desmeules, Avocats                                2000, McGill College, bureau 1700, Montréal, Québec, H3A 3H3
43 rue de Buade, bureau 320, Québec, Québec, G1R 4A2        514-982-2551
418-694-2009                                                pouellet@woods.qc.ca
carole.ouellet@siskinds.com

---

**DÉTAILS DE LA NOTIFICATION**

**Date d'envoi de la notification :**  **29 novembre 2021**
Heure :                                10:30 HNE
État de l'envoi :                      Notifié
Nature du(des) document(s) :           AMENDED Application for authorization to institute a class action and to obtain the status of representative - AMENDED
                                       List of exhibits

---

**DOCUMENT(S) NOTIFIÉ(S)**

Nom                                                         Clé de validation

Amended_application_for_authorization.pdf                  1a727a14a76655ad2f93b164ced4ce7b

Amended_Exhibits_list.pdf                                  4b056f59be5bffd74364e6e2c9c5d528

---

**CONCLUSION**

Todoc certifie que le destinataire a été notifié par courriel et que les documents transmis ont été mis à sa disposition.



**BORDEREAU**

**DE NOTIFICATION**

Référence interne : ND:67-256

### INFORMATION SUR LE DOSSIER

**Jane Doe c. 9219-1568 Québec inc. & als.**

SUPERIOR COURT

DISTRICT OF MONTRÉAL

500-06-0001115-209

---

### EXPÉDITEUR

**Carole Ouellet, adjointe juridique pour Me Caroline Perrault et Me Karim Diallo**

Siskinds, Desmeules, Avocats

43 rue de Buade, bureau 320, Québec, Québec, G1R 4A2

418-694-2009

carole.ouellet@siskinds.com

### DESTINATAIRE

**Me Fanny Albrecht**

LCM Attorneys inc.

600, de Maisonneuve West, suite 2700, Montréal, Québec, H3A 3J2

514-375-6228

falbrecht@lcm.ca

---

### DÉTAILS DE LA NOTIFICATION

**Date d'envoi de la notification : 29 novembre 2021**
Heure : 10:30 HNE
État de l'envoi : Notifié
Nature du(des) document(s) : AMENDED Application for authorization to institute a class action and to obtain the status of representative - AMENDED List of exhibits

---

### DOCUMENT(S) NOTIFIÉ(S)

| Nom | Clé de validation |
|-----|-------------------|
| Amended_application_for_authorization.pdf | 1a727a14a76655ad2f93b164ced4ce7b |
| Amended_Exhibits_list.pdf | 4b056f59be5bffd74364e6e2c9c5d528 |

---

### CONCLUSION

Todoc certifie que le destinataire a été notifié par courriel et que les documents transmis ont été mis à sa disposition.



BORDEREAU

DE NOTIFICATION

Référence interne : ND:67-256

**INFORMATION SUR LE DOSSIER**

**Jane Doe c. 9219-1568 Québec inc. & als.**                                                                 500-06-0001115-209

SUPERIOR COURT

DISTRICT OF MONTREAL

**EXPÉDITEUR**

**Carole Ouellet, adjointe juridique pour Me Caroline Perrault et Me Karim Diallo**

Siskinds, Desmeules, Avocats

43 rue de Buade, bureau 320, Québec, Québec, G1R 4A2

418-694-2009

carole.ouellet@siskinds.com

**DESTINATAIRE**

**Me Sébastien C. Caron**

LCM Attorneys inc.

600, de Maisonneuve West, suite 2700, Montréal, Québec, H3A 3J2

514-375-2680

scaron@lcm.ca

**DÉTAILS DE LA NOTIFICATION**

**Date d'envoi de la notification :**   **29 novembre 2021**

Heure :                                              10:30 HNE

État de l'envoi :                              Notifié

Nature du(des) document(s) :        AMENDED Application for authorization to institute a class action and to obtain the status of representative - AMENDED List of exhibits

**DOCUMENT(S) NOTIFIÉ(S)**

| Nom | Clé de validation |
| --- | --- |
| Amended_application_for_authorization.pdf | 1a727a14a76655ad2f93b164ced4ce7b |
| Amended_Exhibits_list.pdf | 4b056f59be5bffd74364e6e2c9c5d528 |

**CONCLUSION**

Todoc certifie que le destinataire a été notifié par courriel et que les documents transmis ont été mis à sa disposition.

**C A N A D A**
**PROVINCE OF QUÉBEC**
**DISTRICT OF MONTRÉAL**

(Class Action)
**SUPERIOR COURT**
**NO : 500-06-001115-209**

**JANE DOE**

Applicant

c.

**9219-1568 QUÉBEC INC.** and ALS.

Defendants

**AMENDED APPLICATION FOR**
**AUTHORIZATION TO INSTITUTE A CLASS**
**ACTION AND TO OBTAIN THE STATUS OF**
**REPRESENTATIVE**
(Sections 571 C.C.P. and following)

**BB-6852**                    **N/D : 67-256**

Me Caroline Perrault
Me Karim Diallo

**SISKINDS DESMEULES** | Avocats s.e.n.c.r.l.

43, rue de Buade, bureau 320, Québec (Québec)  G1R  4A2

**TÉLÉPHONE**      418-694-2009 (Sans frais 1-877-735-3842)
**TÉLÉCOPIEUR**   418-694-0281
**NOTIFICATION**  notification@siskinds.com

SISKINDS.com/qc